**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

JOHN BONE, et al.,          )
                                )
          Plaintiffs,    )
                                )
          v.              )          1:18cv994
                                )
UNIVERSITY OF NORTH CAROLINA  )
HEALTH CARE SYSTEM, et al.,    )
                                )
          Defendants.    )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion to Dismiss [pursuant to Federal Rule of Civil Procedure] 12(b)(1) and 12(b)(6)" (Docket Entry 20 (parenthesis omitted)) filed by Defendant University of North Carolina Health Care System ("Defendant UNCHCS") ("UNCHCS Dismissal Motion") and the "Motion to Dismiss Amended Complaint" (Docket Entry 28) filed by Defendant Nash Hospitals, Inc. ("Defendant NHI") ("NHI Dismissal Motion").[1] For the reasons that follow, the Court should deny the UNCHCS Dismissal Motion and should grant in part and should deny in part the NHI Dismissal Motion.

## I.  BACKGROUND

Plaintiffs have brought this action pursuant to Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, 12181-12189, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), and Section 1557 of the

---

[1] Plaintiffs also filed a Motion for Leave to File a Surreply (Docket Entry 40), which will be granted.

Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116, contending that Defendants "deny[] blind individuals an equal opportunity to access their health care information."  (Docket Entry 18, ¶ 1.)[2]

According to the Amended Complaint, Plaintiff John Bone ("Plaintiff Bone") is "blind and uses Braille to make and receive written communications."  (Id., ¶ 7.)  Similarly, the Amended Complaint alleges that Plaintiff Timothy Miles ("Plaintiff Miles") is "blind and cannot read standard print.  He relies on large print or electronic documents that he can enlarge to make and receive written communications."  (Id., ¶ 8.)  The Amended Complaint identifies Plaintiff National Federation of the Blind ("NFB") as a non-profit corporation that "promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, health care, employment, family and community life, transportation, and recreation."  (Id., ¶ 9; see also id. ("The vast majority of [Plaintiff NFB's] approximately 50,000 members [including Plaintiff Bone and Plaintiff Miles] are blind persons who are recognized as a protected class under federal laws.").)  Finally, the Amended Complaint describes Plaintiff Disability Rights of North Carolina

_____

[2] The Amended Complaint uses the term "blind" "in the broadest sense to include all persons who, under federal civil rights laws, suffer from a vision-related disability that requires alternative methods to access print."  (Docket Entry 18, ¶ 4.)

("DRNC") as a non-profit corporation "authorized to pursue administrative, legal, and other appropriate remedies to protect and advocate for the legal rights of individuals with disabilities and to redress incidents of discrimination in the state." (Id., ¶ 11; see also id., ¶ 12 ("[Plaintiff DRNC] represents the interests of its blind constituents in North Carolina who require medical documents in alternative formats.").)

In turn, the Amended Complaint alleges that Defendant UNCHCS "is an integrated health care system owned by the state of North Carolina[,] established by state law, N.C.G.S. § 116-37. [Defendant UNCHCS] currently consists of UNC Hospitals and its provider network . . . and eleven affiliate hospitals and hospital systems across the state, including [Defendant NHI]," with its "principal place of business [] in Chapel Hill, North Carolina." (Id., ¶ 13.) The Amended Complaint further identifies Defendant NHI as a "non-profit hospital affiliate" of Defendant UNCHCS, which "employs and contracts with numerous providers for the delivery of medical services in its facilities," with a "principal place of business [] in Rocky Mount, North Carolina." (Id., ¶ 14.) According to the Amended Complaint, both Defendants UNCHCS and NHI receive "federal financial assistance from the Department of Health and Human Services." (Id., ¶ 60.)

The Amended Complaint asserts that "Titles II and III of the ADA, Section 504, and Section 1557 require [Defendants] to communicate in an equally effective manner with all blind individuals, and to ensure that their contractors . . . do the

-3-

same." (<u>Id.</u>, ¶ 2.) Moreover, the Amended Complaint maintains that Defendants and their contractors violate these laws by "depriv[ing] blind individuals of full and equal access to their medical services, programs, and activities. They provide critical communications, such as health care notices, visit summaries, follow-up instructions, forms, questionnaires, invoices, and other types of documents, only in standard print, a format inaccessible to blind individuals." (<u>Id.</u>, ¶ 3.) In particular, the Amended Complaint states that:

> ineffective communication with blind . . . patients . . . compromises their ability to review, and, if necessary, respond to communications on a timely basis, and forces them to rely on and divulge private medical and financial information to sighted third parties for assistance. This disrupts blind patients' access to their health care, prevents them from understanding and following medical instructions, and results in unfair financial penalties for not being able to access and pay medical bills on time, all leading to significant financial and personal hardship.

(<u>Id.</u>)

To support its claims, the Amended Complaint sets forth the following facts relevant to the Dismissal Motions:

**A. Plaintiff Bone**

> [Plaintiff] Bone [is] a resident of Rocky Mount, North Carolina, [and] relies on [Defendant NHI] for his emergency medical needs.

> [He] visited Nash General Hospital to receive emergency medical services in December 2016, and again in or about June and July 2017. During [Plaintiff] Bone's 2016 visit [and 2017 hospitalization], he received services from [Defendant NHI] directly and from its contractors . . . . Upon information and belief, all of these entities are either components of [Defendant UNCHCS] and/or [Defendant NHI].

-4-

During these two hospital visits, [Plaintiff] Bone informed hospital and provider staff that he was blind and needed to receive medical bills in Braille. The staff did not ask [Plaintiff] Bone to take any additional steps to obtain medical bills in Braille.

Neither the hospital nor its contractors initially sent bills to [Plaintiff] Bone in Braille. Instead, [Plaintiff] Bone received all of the bills related to his hospital visits in print.

[Plaintiff] Bone could not read the print bills and did not know how much money he owed or who to pay for his two emergency medical visits.

The hospital and its contractors continued sending [Plaintiff] Bone second and final bill notices in print; he accrued late fees; and [Defendant NHI] and at least three of its contractors referred him to collection agencies. The creditors pursued payment from [Plaintiff] Bone and threatened him.

Only after [Plaintiff Bone's counsel] wrote to [Defendant NHI] did it agree to provide Braille invoices for previously sent bills. None of [Defendant NHI]'s contractors, however, have provided Braille invoices. Thus, [Plaintiff] Bone still does not know how much money he owes for his two emergency medical visits. Furthermore, [Defendant UNCHCS, Defendant NHI], and their contractors have all failed to address whether [Plaintiff] Bone could expect to receive Braille documents going forward without attorney involvement. They have not provided any assurances that the hospital system would ensure timely provision of alternative formats on a systemic basis.

(Id., ¶¶ 15-21 (internal paragraph numbers omitted).)

**B. Plaintiff Miles**

[Plaintiff] Miles resides in Chapel Hill, North Carolina and is a regular patient of several different medical practices operating out of [Defendant] UNC[HCS[, which] [h]e visits . . . at least once every six months and often more frequently. For example, between June and August 2018, [Plaintiff] Miles visited three different UNC practices. . . .

During visits to [Defendant] UNC[HCS] providers, [Plaintiff] Miles receives standard print versions of documents and often asks the staff for large print

versions of the documents instead. These include notices he is asked to sign, forms, visit summaries, and follow-up instructions. [Defendant] UNC[HCS] providers consistently refuse to provide [Plaintiff] Miles with these documents in large print. Some providers have offered to read documents aloud to [Plaintiff] Miles, but this is not effective for [Plaintiff] Miles, who, particularly in the case of visit summaries and follow-up instructions, wants to have a document to take home with him to review after his visits. He does not want to be forced to memorize all of the information contained in these documents. With respect to notices, these documents are often long and provider staff typically paraphrase and attempt to summarize the contents, rather than read the entire notice verbatim. Such summarizing does not provide [Plaintiff] Miles with all of the same information contained in the standard print notices.

[Plaintiff] Miles also receives all of his invoices from [Defendant] UNC[HCS] providers in standard print. These invoices typically come from [Defendant] UNC[HCS]'s billing department directly and [Plaintiff Miles] has called [Defendant] UNC[HCS] to request large print copies. For example, in December 2017, [Plaintiff] Miles called the billing department to ask for an end of year summary of all of his bills in large print. The billing department responded by telling [Plaintiff] Miles that it would 'look into it.' He never heard back from the billing department about this request or received large print documents as a result. On other occasions, the billing department has told [Plaintiff] Miles that its medical billing system does not allow for large print billing statements. Only following a letter from [Plaintiff] Miles's counsel regarding [Defendant] UNC[HCS]'s failure to provide accessible formats, did [Defendant] UNC[HCS] mail [Plaintiff] Miles large print documents related to some recent visits with [Defendant] UNC[HCS] providers.

[Defendant] UNC[HCS] has failed to ensure that [Plaintiff] Miles receives large print documents in a timely manner, independent of attorney involvement. For example, after [Defendant] UNC[HCS] mailed [Plaintiff] Miles these select large print documents, [Plaintiff] Miles visited two different [Defendant] UNC[HCS] practices on or about October 10, 2018, and October 19, 2018. During each visit, [Plaintiff] Miles requested large print documents, but was told by staff that they could not provide them. During one of his visits, [Plaintiff] Miles could not access the provider's instructions that he received in standard print at the

end of his visit. Although staff attempted to read the instructions out loud to him, he was not feeling well at the time and believed he was unlikely to be able to remember all of the instructions. [Plaintiff] Miles wants to be able to access his health care information independently, without having to disclose personal medical information to third parties. He could do so if [Defendant] UNC[HCS] and its contractors provided him with large print documents.

(Id., ¶¶ 23-26 (internal paragraph numbers omitted).)

Based on its allegations, the Amended Complaint requests that the Court: (1) issue a declaratory judgment; (2) order injunctive relief; (3) award compensatory damages and attorneys fees; and (4) grant other "just and proper" relief. (Id. at 22-23.) Defendants have moved to dismiss. (Docket Entries 20 and 28; see also Docket Entry 24 (Substituted Memorandum by Defendant UNCHCS); Docket Entry 29 (Memorandum by Defendant NHI).) Plaintiffs have responded (Docket Entries 26 and 32), and Defendants have replied (Docket Entries 27 and 33).[3]

## II. DISCUSSION

### A. Motion to Dismiss Standards

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("Rules"), Defendant UNCHCS moves to dismiss for lack of subject matter jurisdiction, specifically due to Plaintiffs' lack of standing, and for failure to state a claim in

---

[3] Plaintiffs also filed a motion for leave to file a surreply asserting that, "[i]n the interest of fairness, Plaintiffs should be allowed to contest the extensive, new evidence raised in [Defendant NHI's] reply brief." (Docket Entry 40 at 2.) Plaintiffs attached their proposed Surreply along with supporting documents (Docket Entries 40-1, 40-2, 40-3). Defendant NHI responded (Docket Entry 41) and Plaintiffs replied (Docket Entry 42).

that (1) Defendant UNCHCS "does not 'control' [Defendant NHI]," (2) Defendant UNCHCS did not violate any "clearly established right of Plaintiffs under Title II of the ADA, Section 504 . . . or Section 1557," (3) Title II of the ADA, Section 504, and Section 1557 do not require Defendant UNCHCS to "fundamentally alter the nature of its services programs or make additional modification sought by Plaintiff[s],"[4] (4) Plaintiffs have not alleged discrimination because of disability, (5) Plaintiffs suffer no current injury, (6) Plaintiffs fail to state a claim for prospective relief, and (7) Plaintiffs NFB and DRNC "fail to state a claim for nonparty individuals." (Docket Entry 24 at 2-3.)

Similarly, Defendant NHI moves to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction due to lack of standing and mootness, by asserting that (i) it has "provided the requested accommodation," (ii) it "has taken systemic measures to ensure effective communication with [Plaintiff] Bone and other blind patients in the future," and (iii) "there is no evidence of harm to [Plaintiff] Bone." (Docket Entry 29 at 9.) Defendant NHI also moves to dismiss this matter pursuant to Rule 12(b)(6) for failure to state a claim under Section 1557 because "Braille communication is not required under [Section 1557]." (Id.)

---

[4] Although Defendant UNCHCS mentions this argument initially in its substituted memorandum (see Docket Entry 24 at 2), it fails to develop the argument (see id. at 8-21; see also Docket Entry 27 at 1-15).

## 1. Rule 12(b)(1) Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may contest the Court's subject matter jurisdiction, including by challenging a plaintiff's standing. See, e.g., White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005). "When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). However, the United States Court of Appeals for the Fourth Circuit has explained that, "when a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on *Rule 12(b)(6)* and assume the truthfulness of the facts alleged." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009) (italics in original).

"On the other hand, when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." Id.; see also White Tail Park, 413 F.3d at 459 (explaining that the "district court may consider evidence outside the pleadings without converting the proceeding to one for summary judgment" (internal quotation marks omitted)). Nonetheless, the Fourth Circuit has stated that, "when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should

resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous." <u>Kerns</u>, 585 F.3d at 193.

### 2. Rule 12(b)(6) Standard

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. <u>Id.</u> At the same time, the complaint need not contain detailed factual recitations, as long as it provides the defendant "fair notice of what the claim is and the grounds upon which it rests." <u>Twombly</u>, 550 U.S. at 555 (internal quotation marks and alteration omitted).

In reviewing a motion to dismiss, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." <u>Coleman v. Maryland Ct. of App.</u>, 626 F.3d 187, 189 (4th Cir. 2010), <u>aff'd sub nom.</u>, <u>Coleman v. Ct. of App. of Md.</u>, 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court

to draw on its judicial experience and common sense.'" <u>Francis v.</u> <u>Giacomelli</u>, 588 F.3d 186, 193 (4th Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." <u>E.I. du Pont</u>, 637 F.3d at 448. The Court likewise may consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." <u>Philips v. Pitt Cty. Mem'l Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009). Generally, a "court cannot go beyond these documents" without "convert[ing] the motion into one for summary judgment," an action from which courts should refrain "where the parties have not had an opportunity for reasonable discovery." <u>E.I. du Pont</u>, 637 F.3d at 448. Notably, a Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992).

## B. Standing

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975). "This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." <u>Id.</u> "In both dimensions it is founded in concern about the proper -- and properly limited -- role of the courts in a democratic

society." Id. With respect to the constitutional limitations, the standing analysis addresses justiciability, i.e., "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art[icle] III." Id.

To meet that requirement, Plaintiffs must sufficiently allege that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, __ U.S. __, __, 136 S. Ct. 1540, 1547 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). "When a complaint is evaluated at the pleading stage, however, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim.'" Hutton v. National Bd. of Exam'rs in Optometry, Inc., 892 F.3d 613, 620 (4th Cir. 2018) (quoting Lujan, 504 U.S. at 561). "Accordingly, [the Court] accept[s] as true the allegations for which there is sufficient factual matter to render them plausible on their face." Id. (alteration and internal quotation marks omitted).

"The standing requirement must be satisfied by individual and organizational plaintiffs alike." White Tail, 413 F.3d at 458. The Supreme Court has recognized that "an association may have standing in its own right to seek judicial relief from injury to

itself and to vindicate whatever rights and immunities the association itself may enjoy." <u>Warth</u>, 422 U.S. at 511. "Additionally, an organizational plaintiff may establish associational standing to bring an action in federal court on behalf of its members when: (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." <u>White Tail Park</u>, 413 F.3d at 458 (internal quotation marks omitted).

### 1. Defendant UNCHCS

#### i. Plaintiff Bone

In its dismissal motion, Defendant UNCHCS asserts that Plaintiff Bone lacks standing for his claims against it, because he "does not have an injury in fact that is fairly traceable to [Defendant] UNCHCS or [that] is likely to be redressed by a favorable judicial decision." (Docket Entry 24 at 10.)[5] Specifically, Defendant UNCHCS contends that (i) "Plaintiff Bone does not claim that [Defendant] UNCHCS has denied him billing documents in Braille" (<u>id.</u>), (ii) Plaintiff Bone "has not alleged that [Defendant] UNCHCS has contractual relationships with [Defendant NHI]'s contractors" (<u>id.</u> at 9), (iii) Defendant UNCHCS

---

[5] Defendant UNCHCS also makes references to the ripeness doctrine in its arguments regarding both Plaintiffs Bone and Miles. (<u>See</u> Docket Entry 24 at 10, 13.) "Analyzing ripeness is similar to determining whether a party has standing," <u>Miller v. Brown</u>, 462 F.3d 312, 319 (4th Cir. 2006), but Defendant UNCHCS fails to develop any ripeness argument (<u>see</u> Docket Entry 24 at 8-13).

"was not managing billing services on behalf of [Defendant NHI] in 2016 and 2017" (id. at 10), and (iv) "Plaintiff Bone's assertion that he has been denied assurances [by Defendant UNCHCS and Defendant NHI] that he will receive his billing in Braille in the future is speculative at best" (id.).

Beginning with Defendant UNCHCS's attack on the adequacy of Plaintiffs' allegations regarding Braille billing documents, the Amended Complaint states the following:

> . . . . In failing to provide blind patients like [Plaintiff] Bone . . . with accessible formats such as Braille . . . [Defendant] UNC[HCS] has refused to provide the auxiliary aids and services necessary to communicate with blind patients in an equally effective and timely manner that protects their privacy and independence.
>
> Examples of [Defendant] UNC[HCS]'s, . . . inaccessible communications include . . . billing information . . . .

(Docket Entry 18, ¶¶ 34-35 (internal paragraph numbers omitted); accord id., ¶¶ 66-67, 82-83.) Further, as to Defendant UNCHCS's relationship with Defendant NHI's contractors, the Amended Complaint alleges:

> [Plaintiff] Bone visited [Defendant NHI] in December 2016, and again in or about June and July 2017. During [Plaintiff] Bone's 2016 visit, he received services from [Defendant NHI] directly and from its contractors . . . . [and, d]uring [Plaintiff] Bone's 2017 hospitalization, he received services again from [Defendant] NHI directly and from its contractors . . . . Upon information and belief, all of these entities are either components or contractors of [Defendant] UNC[HCS] and/or [Defendant NHI].

(Id., ¶ 16.) At the pleading stage, Plaintiffs thus have sufficiently linked the failure to provide Plaintiff Bone with

Braille billing documents to Defendant UNCHCS, through its relationship with Defendant NHI and Defendant NHI's contractors.

Next, Defendant UNCHCS argues that Plaintiff Bone lacks an injury "fairly traceable" to it, because it did "not manag[e] billing services on behalf of [Defendant NHI] in 2016 and 2017." (Docket Entry 24 at 10.) However, Defendant UNCHCS has submitted evidence which appears to contradict that position. According to the declaration of Chris Ellington, President of Network Hospitals for Defendant UNCHCS, ("Ellington Declaration"), Defendant UNCHCS entered into a Management Services Agreement ("MSA") with Defendant NHI on April 1, 2014. (Docket Entry 20-1, ¶ 3; see also Docket Entry 20-2 at 1.) The MSA states, under "Section 2. Management Services": Defendant UNCHCS "will render the [m]anagement [s]ervices set forth below . . . (d) [m]anagement and administration of . . . NHI's . . . business office functions, including, but not limited to, billing and collection activities, accounting and bookkeeping functions, and accounts payable and purchasing activities . . . ." (Docket Entry 20-2 at 2-3 (emphasis added).) Moreover, Plaintiffs have identified Defendant NHI as an "affiliate hospital" of Defendant UNCHCS. (See Docket Entry 18, ¶ 13; see also Docket Entry 26 at 10 (asserting that "[Defendant] UNC[HCS] and [Defendant NHI] promote [Defendant NHI] as a joint venture between them, called 'Nash UNC Health Care'").) Under these circumstances, this Court need not resolve this traceability issue on a motion to dismiss. See Leskovisek v. Illinois Dep't of Transp., 305 F. Supp. 3d 925, 935 (C.D. Il. 2018) (refusing to

determine at dismissal stage whether the defendant, alleging lack of control, could face liability for failing to accommodate the plaintiffs).

Lastly, Defendant UNCHCS challenges as "speculative" (Docket Entry 24 at 10) Plaintiff Bone's assertion that "he has been denied assurances that he will receive his billing in Braille in the future" (id.). In that regard, Defendant UNCHCS argues that "[Defendant NHI]'s alleged failures to provide [Plaintiff Bone] with documents in his preferred format were discrete acts, [and therefore] the continuing[]violation doctrine is inapplicable." (Id.) Plaintiffs respond by denying that they have relied on the continuing violation doctrine, which they describe as "inapposite because [Defendant] UNC[HCS] has not argued that Plaintiffs' claims are untimely." (Docket Entry 26 at 9 n.2.) Defendant UNCHCS does not address this matter in its reply. (See Docket Entry 27 at 1-15.)

As Plaintiffs have indicated, the continuing violation doctrine generally applies to charges of untimeliness. See Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (recognizing that "[t]he continuing violation theory allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination").) Defendant UNCHCS's argument on this front does not concern the timeliness of Plaintiff's claims; rather, it appears aimed at allegations in the Amended Complaint that Defendants' actions "constitute[d] an ongoing and continuous

violation of" Title II, Section 504, and Section 1557 (Docket Entry 18, ¶¶ 39, 71, 87). Those allegations, in turn, seemingly relate to the principle that "[a] plaintiff seeking injunctive relief shows redressability by 'alleg[ing] a continuing violation or the imminence of a future violation' of the statute at issue." <u>Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.</u>, 204 F.3d 149, 162 (4th Cir. 2000) (quoting <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 108 (1998)). Defendant UNCHCS evidently contends that Plaintiff Bone lacks standing to pursue injunctive relief against Defendant UNCHCS because he has failed to allege "an injury in fact that is . . . likely to be redressed by a favorable judicial decision" (Docket Entry 24 at 10), by failing to adequately allege a "continuing violation" (<u>id.</u>).

However, because Plaintiff Bone also seeks compensatory damages against Defendant UNCHCS (<u>see</u> Docket Entry 18, ¶¶ 42, 73, 89), Plaintiff Bone would possess standing to pursue claims against Defendant UNCHCS even if the Court ultimately denies injunctive relief because he has failed to show "a continuing violation or the imminence of a future violation," <u>Friends of the Earth</u>, 204 F.3d at 162. <u>See</u> <u>Weigel v. Maryland</u>, 950 F. Supp. 2d 811, 827 (D. Md. 2013) (recognizing that "standing for retrospective relief can be based on past injuries alone"), <u>appeal dismissed</u>, No. 13-1903 (4th Cir. June 10, 2014).[6]

_____

[6] Defendant UNCHCS raises the same basic challenge as to Plaintiff Miles (<u>see</u> Docket Entry 24 at 12), who (like Plaintiff Bone) also seeks compensatory damages (<u>see</u> Docket Entry 18, ¶¶ 42,
(continued...)

Accordingly, the Court should deny Defendant UNCHCS's request to dismiss Plaintiff Bone's claims against Defendant UNCHCS for lack of standing.

ii. Plaintiff Miles

Defendant UNCHCS next argues that Plaintiff Miles has not alleged a current injury and therefore lacks standing to bring claims against Defendant UNCHCS (Docket Entry 24 at 10-11), because (i) of the "highly speculative" nature of his alleged injury, given that he "has not availed himself of all possible modes of assistance in the past" (id. at 13) and (ii) "[e]ven if [Plaintiff] Miles suffered an injury, the prior instances in which he suggest[s] that he was injured are not sufficiently precise or specific to establish the necessity for injunctive relief" (id.). Defendant UNCHCS bases its first argument on evidence from Shane Rogers, the Director of Patient Experience, Patient Relations at University of North Carolina Hospitals ("Rogers Declaration"). (See id. at 11; see also Docket Entry 20-3.)

The Rogers Declaration states that

[i]n October 2018, [he] became aware that [Plaintiff] Miles requested visit summaries, instructions and bills in large print, i.e. 16 point font. [Rogers] spoke to [Plaintiff] Miles's attorney . . . at that time and was advised that [Plaintiff] Miles had not received visit summaries and instructions related to two medical visits in July 2018. [Rogers] communicated with the clinics and was advised that the requested communications were being sent to [Plaintiff] Miles in the 16 point font. [Rogers]

---

[6](...continued)
73, 89). As a result, this standing challenge falls short as to Plaintiff Miles (just as it does regarding Plaintiff Bone). See Weigel, 950 F. Supp. 2d at 827.

also communicated with Patient Financial Services to make
sure that itemized bills would be sent in the requested
16 point font.

(Docket Entry 20-3, ¶ 3.)

Next, the Rogers Declaration references an "October 16, 2018
letter" sent to Plaintiff Miles which included "UNC Health Care's
Notice of Nondiscrimination [("Notice")], in 16-point font print."
(Id., ¶ 4.)  According to the Rogers Declaration,  the Notice

advis[ed] [Plaintiff] Miles that [Defendant UNCHCS]
provides free aids and services to people with
disabilities to communicate effectively[,] including
written information in other formats [to include large
print], and [further] advis[ed] him that if he needed
these services to contact the Director of Patient
Relations in person or by mail, fax, or e-mail along with
specific contact information.

(Id.)  The Rogers Declaration further reports that "[Plaintiff]
Miles did not contact [Rogers] after [he] sent the October 16, 2018
letter."  (Id., ¶ 5; see also id., ¶ 6 (denying knowledge, prior to
filing of this action, of Plaintiff Miles visiting Defendant
UNCHCS's clinic on October 11, 2018, and October 19, 2018).)

Lastly, the Rogers Declaration asserts that

[o]n January 30, 2019, [Rogers] received a call from
[Plaintiff] Miles, who reported that he was in [Defendant
UNCHCS's] Dermatology Clinic. [Rogers] instructed the
staff at the clinic how to print instructions in the 16
point font that [Plaintiff] Miles requested[, and] then
left a voice mail message for [Plaintiff] Miles later
that same day asking [Plaintiff Miles] to call [Rogers]
if [Plaintiff Miles] had not received everything he
needed. [Plaintiff] Miles did not return [the] call.

(Id., ¶ 7.)

In response to Defendant UNCHCS's contention that Plaintiff
Miles failed to "respond to [its] offer of assistance" (Docket

Entry 24 at 11), Plaintiffs tendered the following statements via a declaration from Plaintiff Miles ("Plaintiff Miles Declaration") (Docket Entry 26-3):

> On the 10th and 19th of October, 2018, [Plaintiff Miles] visited a [Defendant] UNC[HCS] clinic and UNC Urgent Care. Every document [he] received was inaccessible, including consent forms, visit summaries, notices of [his] rights, and financial information.
>
> On or about October 20, 2018, [Plaintiff Miles] received a letter from [Defendant] UNC[HCS]'s Director of Patient Relations, Shane Rogers. [Plaintiff Miles] underst[oo]d the letter to have instructed [him] to work out [his] access issues directly with the clinics while [Defendant] UNC[HCS] continued to investigate how to provide [him] with large print. [Plaintiff Miles] did not hear anything further from Mr. Rogers for about three months.

(Id., ¶¶ 15-16 (internal paragraph numbers omitted).)

The October 2018 letter, referenced by Rogers and Plaintiff Miles, appears to have addressed a number of issues. (See Docket Entry 20-4 at 1-4.) It includes a statement that Rogers's office would "continu[e] to investigate how [Plaintiff Miles's] access issue might be addressed to ensure effective communication regarding [his] care and treatment. In the meantime, [Plaintiff Miles could] call the appropriate clinic with any questions [he had]." (Id. at 2.) Given that statement and the fact that Plaintiff Miles's attorney had already notified the Patient Relations Office of Plaintiff Miles's need for vision-related services, Plaintiff Miles reasonably could have construed the October 2018 letter as the Plaintiff Miles Declaration indicates, notwithstanding the language in the attached Notice (as described by Rogers).

In any event, according to the Plaintiff Miles Declaration, Plaintiff Miles contacted Patient Relations on two later occasions for assistance, after he received an additional letter from Rogers, in standard print, but later followed by a large print version. (See Docket Entry 26-3, ¶¶ 20-25.) Specifically, the Plaintiff Miles Declaration states:

> On or about January 17, 2019, [Plaintiff Miles] received an inaccessible letter from Mr. Rogers in standard print by mail. . . . [Plaintiff Miles] could not read the letter on [his] own. [He] was told it [said that he] should contact the Patient Relations office whenever [he did] not receive visit summaries in large print. In early February, [Plaintiff Miles] received a large print version of what [he] believe[d] to be the same letter.

> Since receiving this second letter from Mr. Rogers, [Plaintiff Miles] has contacted [Mr. Rogers's] office twice for assistance.

> [Plaintiff Miles] first tried contacting the Patient Relations office on January 30, 2019, while [Plaintiff Miles] was at the dermatology clinic. [He] left a voicemail because no one answered. Mr. Rogers called back and talked to a nurse at the clinic. After the call, the nurse said that she still did not know how to print visit summaries in large print, and [Plaintiff Miles and the nurse] agreed that [Plaintiff Miles] would leave if the clinic could not print the summary in large print by the time [his] scheduled ride arrived. Although [Plaintiff Miles] waited thirty-minutes after [his] visit in hopes of receiving [his] visit summary in large print, [his] ride arrived and [he] had to leave the clinic without it. Mr. Rogers afterwards called and said he would figure out a way to mail the visit summary to [Plaintiff Miles].

> . . . .

> The second time [Plaintiff Miles] contacted Patient Relations was to request an accessible visit summary from [his] visit to the ophthalmology clinic. On or about January 11, 2019, [Plaintiff Miles] visited [Defendant] UNC[HCS]'s Eye Care Center. When [he] did not receive a visit summary at the end of [his] visit as he normally d[id], [he] emailed [his] medical provider at the Center

-21-

> . . . the next day to request a copy of the visit summary
> in large print. . . . [Plaintiff Miles] never received
> any response to [his] email from the clinic and contacted
> Patient Relations a few weeks later to obtain a copy. A
> person from Patient Relations returned [Plaintiff
> Miles's] call and said [he] would receive the visit
> summary in a couple days by mail.

(Docket Entry 26-3, ¶¶ 20-22, 25 (internal paragraph numbers omitted).)

The Rogers Declaration confirms that Plaintiff Miles contacted Rogers on January 30, 2019. (See Docket Entry 20-3, ¶ 7.) Therefore, contrary to Defendant UNCHCS's assertions, Plaintiff Miles did "respond to the offer of assistance" (Docket Entry 24 at 11). Nor do Plaintiff Miles's allegations of injury otherwise warrant characterization as too speculative to support standing at this preliminary stage.

The Court also should decline to dismiss this action based on Defendant UNCHCS's description of the Amended Complaint's allegations concerning Plaintiff Miles's injuries as not "sufficiently precise or specific to establish the necessity for injunctive relief" (id. at 13). Plaintiff Miles seeks compensatory damages. (See Docket Entry 18, §§ 42, 73, 89.) As a result, regardless of the availability of injunctive relief, his claims against Defendant UNCHCS can proceed because "standing for retrospective relief can be based on past injuries alone," Weigel, 950 F. Supp. 2d at 827.

In sum, at least at this juncture in the proceedings, Defendant's UNCHCS's standing attack on Plaintiff Miles falls short.

### iii. Plaintiffs NFB and DRNC

Defendant UNCHCS also maintains that Plaintiffs NFB and DRNC both lack associational standing. (See Docket Entry 24 at 13-15.) According to Defendant UNCHCS, Plaintiffs NFB and DRNC both "appear to assert associational standing based on the membership of . . . Plaintiffs Bone and Miles" (id. at 14), who lack standing to bring this action, such that neither Plaintiff NFB nor Plaintiff DRNC possess standing to sue (see id.). Plaintiffs respond that, because "[Plaintiff] Bone and [Plaintiff] Miles have standing, [Plaintiffs] NFB and DRNC also have standing through their members and constituents." (Docket Entry 26 at 13.)

As discussed previously, Plaintiffs Bone and Miles possess standing to pursue claims in their own right. Further, this action promotes Plaintiffs NFB's and DRNC's organizational purposes by seeking to "ensure that the blind have an equal opportunity to access information related to their health care." (Docket Entry 18, ¶ 10.) Lastly, the injunctive relief sought against Defendant UNCHCS would benefit members and constituents of Plaintiffs NFB and DRNC, without the need for participation of those other members. See generally Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977) (finding that, "[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured").

Under these circumstances, Plaintiffs NFB and DRNC possess standing to pursue this action against Defendant UNCHCS.

### 2. Defendant NHI

#### i. Plaintiff Miles

The NHI Dismissal Motion contends that "Plaintiffs consistently conflate the allegations directed at [Defendant] UNC[HCS] and [Defendant] NHI." (Docket Entry 29 at 15.) Further, according to Defendant NHI, "Plaintiffs attempt to confuse the factual allegations of [Plaintiff] Miles and [Plaintiff] Bone." (Id.) In its response, Plaintiffs assert that, "[c]ontrary to [Defendant NHI]'s arguments otherwise, [Plaintiff] Miles does not assert any claims against [Defendant NHI], nor do any Plaintiffs assert claims against [Defendant NHI] rooted in [Defendant] UNC[HCS]'s conduct." (Docket Entry 32 at 2 n.2.) Because Plaintiffs concede that they have not stated a claim against Defendant NHI based on allegations concerning Plaintiff Miles (see id.), the Court need not analyze the issue of standing in regards to Plaintiff Miles and Defendant NHI.

#### ii. Plaintiff Bone

Defendant NHI argues that Plaintiff Bone "has not suffered adverse financial impact from [Defendant] NHI, nor is [he] likely to be denied communications in Braille in the future" (Docket Entry 29 at 9 (internal footnote omitted)) and, as such, Defendant NHI asserts that "[Plaintiff] Bone does not have standing to bring this suit" (id.). In that regard, Defendant NHI initially contended that its "contractors' billing activities are not within the scope

of [its] public accommodation" (id. at 1) and therefore, "to the extent [Plaintiff] Bone suffered harm, his injury is not fairly traceable to [Defendant] NHI" (id.). Defendant NHI based that argument upon the assertion that "[t]he contractor[s'] billing function[s] do[] not take place within [Defendant] NHI's facilities or any public accommodation owned, operated, or controlled by [Defendant] NHI." (Id.)

In their response, Plaintiffs countered that "Title III, Section 504, and Section 1557 all make clear that covered entities are responsible for the actions of their contractors." (Docket Entry 32 at 10.) In its reply, Defendant NHI did not address that argument, simply stating "the issues for which Plaintiffs seek redress in this lawsuit were resolved by [Defendant] NHI, and the medical providers identified by Plaintiffs in the Amended Complaint approximately one year before this lawsuit was filed, as evidenced by the declarations filed contemporaneously herewith and [Defendant] NHI's Initial Memorandum and supporting declarations." (Docket Entry 33 at 1.) Plaintiffs then moved for leave to file a surreply and included a proposed surreply, along with related attachments (Docket Entries 40, 40-1, 40-2, 40-3). Defendant NHI responded in opposition (Docket Entry 41) and Plaintiffs replied (Docket Entry 42).

"The Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina only allow for the filing of a motion, a response to a motion, and a reply." DiPaulo v. Potter, 733 F. Supp. 2d 666, 670 (M.D.N.C. Aug. 23,

2010) (Schroeder, J.) (referencing Local Rules 7.3 & 56.1). "Parties do not have the right to file a surreply." Id. (citing Johnson v. Rinaldi, No. 1:99CV170, 2001 WL 293654, at *7 (M.D.N.C. Feb. 16, 2001) (unpublished) (noting absence of "authority establishing a right to file a surreply")). "Generally, courts allow a party to file a surreply only when fairness dictates based on new arguments raised in the previous reply." Id. (citing United States v. Falice, No. 1:04CV878, 2006 WL 2488391 (M.D.N.C. Aug. 25, 2006) (unpublished), and Khoury v. Meserve, 268 F. Supp. 2d 600, 605–06 (D. Md. 2003), aff'd, 85 F. App'x 960 (4th Cir. 2004)).

In its reply in support of dismissal, Defendant NHI abandoned its previous argument that any injury sustained from its contractors' actions could not lead to liability for Defendant NHI. (See Docket Entry 33 at 1-15.) Instead, Defendant NHI's reply asserts that "this Court need not reach the question of what amount of control is required to impose liability on a hospital for the actions of medical providers under the various federal statutes because the evidence demonstrates that each of the medical providers either provided [Plaintiff] Bone a Braille invoice, offered to provide [Plaintiff] Bone a Braille invoice (which [Plaintiff] Bone declined), or wrote off the balance of [Plaintiff] Bone's account." (Id. at 7.) As support for that position, Defendant NHI relies on multiple new declarations from the referenced medical providers, as well as a summary of each. (See id. at 2-5.) Because Defendant NHI did present a new argument in

-26-

its reply brief and introduced new evidence in support, the Court will grant Plaintiffs' motion for leave to file a surreply (Docket Entry 40) and will accept Plaintiffs' proposed Surreply and related attachments (Docket Entries 40-1, 40-2, 40-3).

## 1. Injury in Fact

Turning to the substance of the parties' dispute over Plaintiff Bone's standing, Defendant NHI argues that Plaintiff Bone has not suffered an injury in fact because Defendant NHI "remedied any harm that [it] could have caused Plaintiff Bone in 2017, a full year before the Complaint was filed." (Docket Entry 29 at 13 (citing declaration of Lynn Cash ("Cash Declaration") (Docket Entry 28-1)).) Specifically, Defendant NHI asserts that its remedy involved "send[ing] Braille bills to [Plaintiff] Bone, . . . ceas[ing] all collection activities, and ma[king] sure that [Plaintiff] Bone's NHI accounts had never been reported to any consumer reporting agencies." (Id.) Plaintiffs respond that "[Plaintiff] Bone has suffered a concrete injury [because Defendant NHI] . . . failed to timely provide [Plaintiff] Bone medical bills in an accessible format, as they do for sighted patients." (Docket Entry 32 at 6.) Moreover, citing the Cash Declaration, Plaintiffs maintain that Defendant NHI did not provide the first Braille billing document to Plaintiff Bone until "nearly four months after it became available" (id. at 7), and then proceeded to "refer [Plaintiff] Bone to collections a month and a half later without sending a second or final notice to [him]" (id.). Plaintiffs also assert that Defendant NHI failed to timely provide Plaintiff Bone

-27-

with the second Braille billing document.  (<u>Id.</u> (citing Plaintiff
Bone's declaration ("Plaintiff Bone Declaration") (Docket Entry 26-
1)).)   In its reply, Defendant NHI argues that the Amended
Complaint lacks "evidence to support [Plaintiffs'] contention that
[Defendant] NHI provided untimely Braille invoices to [Plaintiff]
Bone in particular, given the timing of the medical billing process
for all patients."  (Docket Entry 33 at 6.)

Both the Amended Complaint and the Plaintiff Bone Declaration
state that Plaintiff Bone informed Defendant NHI's "hospital and
provider staff that he was blind and needed to receive medical
bills in Braille. . . . . [but that] the hospital . . . initially
[did not] sen[d] bills to [Plaintiff] Bone in Braille.  Instead,
[Plaintiff] Bone received all of the bills related to his hospital
visits in print."  (Docket Entry 18, ¶¶ 17-18; <u>see also</u> Docket
Entry 26-1, ¶¶ 9, 10, 11, 13.)   The Plaintiff Bone Declaration
further asserts that "[Defendant NHI] . . . sent second and third
bill notices in print.   [He] could not read the notices and
therefore did not know the payments were overdue or to whom the
payments should be made.  As a result, [he] accrued late fees and
the hospital . . . referred [him] to [a] collection agency."
(Docket Entry 26-1, ¶ 13.)   Additionally, the Plaintiff Bone
Declaration avers that he did not receive a medical bill in Braille
from Defendant NHI until "[a]fter [he] obtained an attorney
. . . ."  (<u>Id.</u>, ¶ 15.)  Similarly, the Amended Complaint alleges
that, "[o]nly after counsel for [Plaintiff] Bone wrote to

[Defendant NHI,] did it agree to provide Braille invoices for previously sent bills." (Docket Entry 18, ¶ 21.)

Defendant NHI's evidence, provided through the Cash Declaration, reflects that Cash mailed a Braille invoice four months after Plaintiff Bone's December 2016 visit. (See Docket Entry 28-1, ¶ 9, 10, 11.) The Cash Declaration then states that, "in or around May 30, 2017, [Plaintiff] Bone's NHI invoice for the December 2016 treatment was sent to collections." (Id., ¶ 12.) Further, despite Plaintiff Bone's request for Braille documents during his June-July 2017 visit to [Defendant] NHI (see Docket Entry 26-1, ¶ 11), the Cash Declaration acknowledges that, "[Defendant] NHI sent an invoice to [Plaintiff] Bone for these services, which was not in Braille" (Docket Entry 28-1, ¶ 13).

Next, the Cash Declaration provides that, "in or around October 24, 2017, [she] received a call from [Plaintiff] Bone indicating that he did not receive [Defendant] NHI's invoice in Braille for the December 2016 admission." (Id., ¶ 14.) As a result, "[o]n or about October 26, 2017, [she] . . . requested another Braille copy of [Plaintiff] Bone's NHI invoice for his December 2016 admission. [She] also requested that the invoice for [Plaintiff] Bone's NHI admission in June-July 2017 be translated into Braille." (Id., ¶ 15.) Further, according to the Cash Declaration, "[i]n or around October 30, 2017, [she] verified with NHI's collection agency that [Plaintiff] Bone's past due NHI invoices had not been reported to any consumer reporting agency.

[She also] confirmed that [Defendant] NHI's collection agency had ceased collection activity." (Id., ¶ 16.)

The Cash Declaration additionally states that, "[a]fter consultation with [Plaintiff] Bone's attorney, . . . [Defendant] NHI wrote off forty percent (40%) of [Plaintiff] Bone's outstanding balances with [Defendant] NHI, which was reflected on the invoices sent . . . in the fall of 2017 for Braille translation." (Id., ¶ 17.) Lastly, the Cash Declaration avers that she received and mailed Braille invoices, via certified mail, for Plaintiff Bone's December 2016 admission and June-July 2017 admission on December 11, 2017, and December 18, 2017, respectively. (See id., ¶¶ 18, 19.)

Therefore, accepting Defendant NHI's assertions as true, (i) it sent the Braille invoice for Plaintiff Bone's December 2016 treatment nearly four months later; (ii) it then referred Plaintiff Bone to a collection agency less than two months later; (iii) it took remedial steps only after Plaintiff Bone's attorney intervened; and (iv) it sent a Braille invoice for Plaintiff Bone's June-July 2017 hospitalization six months later.

Defendant NHI also argues that "[Plaintiff] Bone's medical providers who worked in or through [Defendant NHI] resolved [Plaintiff] Bone's issues concerning his medical invoices more than a year before the lawsuit was filed." (Docket Entry 33 at 6.) In support of that argument, Defendant NHI references each provider and offers a brief summary of the actions taken to provide Braille invoices, write off Plaintiff Bone's past due amounts, and either

cease collection activity or confirm that no collection activity had occurred. (Id. at 2-5.) Plaintiffs' Surreply disputes Defendant NHI's contention regarding provision of Braille invoices, asserting that "[Plaintiff] Bone has not received any Braille communications from the contractors related to his visits to [Defendant NHI] in 2016 and 2017." (Docket Entry 40-1 at 5.) Consistent with that position, Plaintiff Bone tendered a second declaration in which he denied receiving any Braille invoices from contractors (see Docket Entry 40-2, ¶¶ 5-7, 9-11), and Plaintiff Bone's previous attorney submitted a declaration indicating that several of Defendant NHI's contractors did not address Plaintiff Bone's issues (see Docket Entry 40-3, ¶¶ 4-6).

Given this record, the Court should deem sufficient (for present standing purposes) the Amended Complaint's claim that "[Defendant] NHI's failure to communicate effectively with blind patients . . ., as occurred with [Plaintiff] Bone, increases their chances of incurring fines and damaging their credit scores, due to late payment of medical bills received in standard print" (Docket Entry 18, ¶ 52).

## 2. Compensatory Damages

Defendant NHI next asserts that Plaintiff Bone "has not set forth any facts that would merit compensatory damages" (Docket Entry 29 at 17), because "[n]either the Amended Complaint nor the record evidence support a finding that [Defendant] NHI acted with deliberate indifference" (id.). Plaintiffs correctly contend that "[Defendant NHI] has conflated two legal issues: the power of this

Court to redress [Plaintiff] Bone's injuries . . . and the sufficiency of [Plaintiff] Bone's allegations regarding such relief." (Docket Entry 32 at 15; <u>see also</u> Docket Entry 33 at 1-15 (failing to contest that argument in reply).)  In that regard, the Fourth Circuit has "agree[d] that it is inappropriate to first consider the merits of a claim when determining whether a party has standing under Article III of the Constitution." <u>Covenant Media of N.C., L.L.C. v. City of Monroe, N.C.</u>, 285 F. App'x 30, 33 (4th Cir. 2008) (citing <u>Warth</u>, 422 U.S. at 500); <u>see also</u> <u>Covenant Media of S.C., L.L.C. v. City of N. Charleston</u>, 493 F.3d 421, 429 (4th Cir. 2007) (noting that "[a] plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case").

The Court thus should conclude that Plaintiff Bone possesses standing to seek compensatory damages under Section 504 and Section 1557 against Defendant NHI; however, "Title III does not allow a private party to seek monetary damages, [but rather only] provide[s] for injunctive relief." <u>Basta v. Novant Health, Inc.</u>, 3:19CV64, 2019 WL 3310098, at *3 (W.D.N.C. July 23, 2019) (unpublished) (citing 42 U.S.C. § 12188).  Accordingly, the Court must assess Plaintiff Bone's standing to pursue injunctive relief against Defendant NHI, pursuant to Title III.

### 3. Injunctive Relief

As to such injunctive relief, Defendant NHI argues that "Plaintiffs rely on a chain of unlikely events concerning supposed future health events to predict potential injury [for Plaintiff

Bone]." (Docket Entry 33 at 9.) In particular, Defendant NHI
identifies various considerations that weigh against Plaintiff
Bone's standing to seek injunctive relief, including that:
(a) "proximity, without potential harm, is insufficient to
establish imminence" (id.); (b) "[Plaintiff] Bone's intent to
return to [Defendant NHI] in the future is speculative and
conditional" (id. at 10); and (c) "[Plaintiff] Bone cannot point to
an irreparable injury that will occur absent an injunction" (id. at
12).

Regarding the first consideration, Defendant NHI challenges
Plaintiffs' assertion that "liv[ing] seven miles from Nash General
Hospital . . . is sufficient to establish that future injury will
occur." (Id. at 9.) According to Defendant NHI, Plaintiff Bone
must "allege[] that the ADA violations described in the [Amended
C]omplaint [were] still in place at the time of the commencement of
the action." (Id.) Defendant NHI maintains that Plaintiff Bone
cannot make such a showing, because "[i]ssues concerning
[Plaintiff] Bone's invoices, the only accommodation [Plaintiff]
Bone sought from [Defendant] NHI and medical providers through Nash
General Hospital, had been resolved approximately one year prior to
the commencement of this action." (Id. at 9-10 (internal citation
omitted).) Further, Defendant NHI emphasizes that "[Plaintiff]
Bone has not alleged an ongoing medical condition that requires
treatment at Nash General Hospital . . . . [or] treat[ment] by
[Defendant] NHI or the medical providers at issue since July 2017."
(Id. at 10.) Lastly, Defendant NHI notes that "neither [Defendant]

-33-

NHI nor any of the medical providers at issue ever refused to provide Braille invoices to [Plaintiff] Bone . . . . [He therefore] cannot point to an irreparable injury that will occur absent an injunction from this Court." (Id. at 11-12.)

In order to establish entitlement to injunctive relief under Title III, Plaintiffs, more specifically Plaintiff Bone, must establish "a real or immediate threat that [he] will be wronged again -- a likelihood of substantial and immediate irreparable injury." Lyons, 461 U.S. at 111 (internal quotation marks omitted). "In other words, . . . [Plaintiff Bone] 'must demonstrate a *real* and *immediate* threat of repeated injury in the future.'" National Alliance for Accessibility, Inc. v. Waffle House, Inc., No. 5:10CV375, 2011 WL 2580679, at *2 (E.D.N.C. Jun. 29, 2011) (unpublished) (emphasis in original) (quoting Chapman v. Pier I Imports Inc., 631 F.3d 939, 946 (9th Cir. 2011)).

A plaintiff's "profession of an 'intent' to return to the places [he] had visited before . . . is simply not enough." Lujan, 504 U.S. at 564. "Such 'some day' intentions -- without any description of concrete plans, or indeed even any specification of when the some day will be -- do not support a finding of the 'actual or imminent' injury . . . ." Id. "In assessing the plausibility of a plaintiff's claim that []he is likely to return to the site of the discrimination . . ., [this Court has found] the following factors helpful: '(1) the plaintiff's proximity to the defendant's place of public accommodation; (2) the plaintiff's past patronage; [and] (3) the definitiveness of the plaintiff's plan to

return . . . .'" <u>Payne v. Chapel Hill N. Props., LLC</u>, 947 F. Supp. 2d 567, 573 (M.D.N.C. 2013) (Schroeder, J.).[7]

### a. Proximity

The Amended Complaint asserts that "[Plaintiff] Bone, a resident of Rocky Mount, North Carolina, relies on [Defendant NHI] for his emergency medical needs" (Docket Entry 18, ¶ 15) and that "[Defendant NHI] is [Plaintiff] Bone's local hospital" (<u>id.</u>, ¶ 7). The Plaintiff Bone Declaration further details that he "lives about seven and half miles from Nash General Hospital." (Docket Entry 26-1, ¶ 5.) Given that Plaintiff Bone resides so closely to [Defendant NHI]'s hospital, this factor weighs in favor of standing. <u>See generally</u> <u>Daniels v. Arcade, L.P.</u>, 477 F. App'x 125, 130 (4th Cir. 2012) ("deem[ing] the allegation [of intent to return] plausible because [the plaintiff] reside[d] in relatively close proximity to [defendant's business]"); <u>see also</u> <u>id.</u> at 127 (observing that the plaintiff's residence "is located about 20 miles from [the defendant's business]").

### b. Past Patronage

Although "multiple prior visits to a place of public accommodation are not sufficient to show a likelihood of future harm in the absence of additional allegations," <u>Payne</u>, 947 F. Supp. 2d at 574-75, "[c]ourts have found that a plaintiff's past patronage of a defendant's place of business is probative of a likelihood to return," <u>id.</u> at 574. The Amended Complaint alleges

---

[7] Courts also have considered "the plaintiff's frequency of nearby travel," <u>Payne</u>, 947 F. Supp. 2d at 573; however, that factor lacks applicability here.

that Plaintiff Bone "has been a patient of [Defendant NHI] . . . and its contractors since 2016." (Docket Entry 18, ¶ 7.) The Plaintiff Bone Declaration further provides that his "first visit to Nash General Hospital was on or about December 13, 2016." (Docket Entry 26-1, ¶ 8; see also id., ¶ 11 (reporting that the "second visit to Nash General Hospital started on June 29, 2017, and ended on July 4, 2017").) Neither the Amended Complaint nor the Plaintiff Bone Declaration set forth any facts regarding any later visits. (See Docket Entries 18, 26-1.) Under these circumstances, Plaintiff's past patronage weighs in favor of standing, albeit only "slightly," Payne, 947 F. Supp. 2d at 575.

### c. Plans to Return

"Although a plaintiff does not need to engage in the 'futile gesture' of re-visiting a place of business that [fails to provide accommodations to disabled individuals], []he must still prove that []he would visit the business in the imminent future but for those [failures]." Id. (quoting Steger v. Franco, Inc., 228 F.3d 889, 892–93 (8th Cir. 2000)). The Amended Complaint alleges that "Nash [General Hospital] is [Plaintiff] Bone's local hospital and [Plaintiff Bone] intends to return to Nash [General Hospital] as future medical needs arise." (Docket Entry 18, ¶ 7.) The Plaintiff Bone Declaration likewise states that he "plan[s] to visit Nash General Hospital for [his] future emergency medical treatment needs." (Docket Entry 26-1, ¶ 18.)

Defendant NHI contests the adequacy of those allegations by asserting that "[Plaintiff] Bone has not alleged sufficient facts

to establish that he will ever need similar medical services."
(Docket Entry 33 at 10-11.)  In that regard, as Defendant NHI has
observed, "[Plaintiff] Bone has not alleged an ongoing medical
condition that requires treatment at Nash General Hospital." (Id.
at 10; see also Docket Entry 18, ¶¶ 7, 15-22; Docket Entry 26-1,
¶¶ 6, 7, 18.)  In the context of this case, that factor tilts the
balance against standing for Plaintiff Bone to pursue injunctive
relief against Defendant NHI, as shown by rulings from other
courts, which have declined to find standing for injunctive relief
in similar circumstances.  See, e.g., McCullum v. Orlando Reg'l
Healthcare Sys., Inc., 768 F.3d 1135, 1146 (11th Cir. 2014)
(denying injunctive relief in part because plaintiff "failed to
establish a real and immediate threat that he would be readmitted
to either defendant hospital"); Proctor v. Prince George's Hosp.
Ctr., 32 F. Supp. 2d 830, 833 (D. Md. 1998) (finding injunctive
relief inappropriate absent evidence to suggest that the plaintiff
was "likely to return to [the defendant hospital] in the near
future").

Here, Plaintiffs have failed to "provide indicia of concrete
plans to support a finding that [Plaintiff Bone] will suffer an
actual or imminent injury necessary for standing." Payne, 947 F.
Supp. 2d at 576.  Even considering that the proximity element
weighs in Plaintiff Bone's favor, he has only visited Defendant NHI
on two occasions and has failed to establish a likelihood of return
in the future.  Therefore, Plaintiffs lack standing to seek
injunctive relief against Defendant NHI.  Moreover, because Title

III "does not allow a private party to seek monetary damages," Basta, 2019 WL 3310098, at *6, the Court should dismiss the Title III claim.

### iii. Plaintiffs NFB and DRNC

Defendant NHI argues that Plaintiffs NFB and DRNC both lack associational standing. (See Docket Entry 29 at 18-19.) According to Defendant NHI, "[Plaintiffs] NFB and DRNC both seek to establish associational standing on claims against [Defendant] NHI on the assertion that [Plaintiff] Bone, a member of both organizations, has standing." (Id. at 18.) Defendant NHI maintains that, because Plaintiff Bone lacks standing to bring this action, neither Plaintiff NFB nor Plaintiff DRNC have standing to sue. (Id. at 18-19.) Plaintiffs respond that, because "[Plaintiff] Bone, a member of NFB and constituent of DRNC, has standing, [Plaintiffs] NFB and DRNC also have standing to pursue claims on behalf of their members and constituents." (Docket Entry 32 at 18.)

As discussed previously, Plaintiff Bone possesses standing to pursue compensatory damages under Section 504 and Section 1557. However, Plaintiff Bone lacks standing to pursue injunctive relief against Defendant NHI under Title III and Plaintiffs NFB and DRNC do not seek compensatory damages against Defendant NHI under Section 504 or Section 1557. (See Docket Entry 18, ¶¶ 42, 73, 89). As a result, Plaintiffs NFB and DRNC lack standing for any claims against Defendant NHI.

## C. Mootness - Defendant NHI

Defendant NHI argues that, "[i]n a similar vein as to lack of standing, [Plaintiff] Bone's claims are now moot." (Docket Entry 29 at 19.) To support this argument, Defendant NHI again asserts that "the issues between [Plaintiff] Bone and [Defendant] NHI have been resolved at this time." (Id. at 20.) Defendant NHI bases this argument on previously-referenced evidence that the "United States Postal Service delivered [Plaintiff] Bone by certified mail . . . Braille billings for both hospital admissions a year before this lawsuit was filed." (Id.) Plaintiffs counter that "[Plaintiff] Bone's injuries remain unresolved and are therefore not moot . . . . [He] has yet to receive Braille invoices from [Defendant NHI]'s contractors for two prior visits to [Defendant NHI]." (Docket Entry 32 at 19 (citing Docket Entry 18, ¶ 21 and Docket Entry 26-1, ¶¶ 15-17).) Further, Plaintiffs state that Defendant NHI provided bills only "months late and thus untimely." (Id.)

The Fourth Circuit has held that "[a] case becomes moot, and thus deprives federal courts of subject matter jurisdiction, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Pashby v. Delia, 709 F.3d 307, 316 (4th Cir. 2013) (internal quotations omitted). Given the above-described dispute over the resolution of Plaintiff Bone's past injuries, the Court should not treat his claims under Section 504 and Section 1557 as moot.

**D. Title II and Section 504 Claims - Defendant UNCHCS**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act declares that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

To make out a claim under Title II or Section 504,[8] Plaintiffs must prove "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." National Fed'n of the Blind v. Lamone, 813 F.3d 494, 503 (4th Cir. 2016). The two claims "differ only with respect to the third element, causation." Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012). In that regard, "[t]o succeed on a claim under [Section 504], the

---

[8] As Defendant UNCHCS has observed, "'[c]laims under the ADA's Title II and [Section 504 of] the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same.'" (Docket Entry 24 at 17 (quoting Seremeth v. Board of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 336 n.1 (4th Cir. 2012)).)

plaintiff[s] must establish [they were] excluded solely by reason of [their] disability; [Title II of] the ADA requires only that the disability was a motivating cause of the exclusion." Id. at 461-62 (internal quotations omitted).

"A successful plaintiff in a suit under Title II of the ADA or [Section] 504 . . . is generally entitled to a full panoply of legal and equitable remedies." Paulone v. City of Frederick, 787 F. Supp. 2d 360, 373 (D. Md. 2011). However, "compensatory damages are available only upon proof of intentional discrimination or disparate treatment, rather than mere disparate impact." Id. "While the Fourth Circuit has not specifically addressed the standard required for proving intentional discrimination, the majority of circuits to have decided the issue have adopted a deliberate indifference standard, as have some district courts within the Fourth Circuit." Smith v. N.C. Dep't of Safety, No. 1:18CV914, 2019 WL 3798457, at *3 (M.D.N.C. Aug. 13, 2019) (unpublished) (Schroeder, C.J.) (citing Green v. Central Midlands Reg'l Transit Auth., No. 3:17CV2667, 2019 WL 1765867, at *6 n.15, *9-10, *9 n.24 (D.S.C. Apr. 22, 2019) (unpublished), and Godbey v. Iredell Mem'l Hosp. Inc., No. 5:12CV4, 2013 WL 4494708, at *4-6 (W.D.N.C. Aug. 19, 2013) (unpublished)). In order to prove deliberate indifference, "a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." Silva v. Baptist Health S. Fla., Inc., 856 F.3d 824, 831 (11th Cir. 2017).

Here, Defendant UNCHCS disputes that it "denied [Plaintiffs] the benefits of [a] service program or activity . . . on the basis of their disability," Lamone, 813 F.3d at 503. (See Docket Entry 24 at 18-20.) In this regard, Defendant UNCHCS first argues that Plaintiffs have failed to "articulate sufficient allegations of discriminatory intent as to [Defendant] UNCHCS's actions toward the individual plaintiffs." (Id. at 18.) In particular, Defendant UNCHCS contests the sufficiency of the allegations that Plaintiff NFB's counsel "informed [Defendant] UNCHCS that it was violating Title II . . . by failing to provide accessible formats for blind persons generally, not specifically, and that [Defendant] UNCHCS "declined [an] offer to work collaboratively, on a systemic basis to fix the problem and continued to violate the law.'" (Id. (quoting Docket Entry 18, ¶ 41).) Further, Defendant UNCHCS contends that Plaintiffs' allegations concerning Plaintiff Miles do not suffice, in light of Defendant UNCHCS's "contemporaneous efforts to reach out to [Plaintiff] Miles to provide assistance [which] elicited no response from [Plaintiff] Miles." (Id. at 19.)

The Amended Complaint alleges the following concerning the claims under Title II and Section 504:

> [Defendant] UNC[HCS]'s refusal to communicate with blind patients in an equally effective manner, through the provision of alternative formats, was done intentionally or with deliberate indifference to the protected rights of [Plaintiff] Bone, [Plaintiff] Miles, and other [Plaintiff] NFB members and [Plaintiff] DRNC] constituents. For example, even after counsel for Plaintiffs wrote to Defendants, informed them that they were violating Title II of the ADA [and Section 504], among other laws, by failing to provide accessible formats for blind patients, and offered to work collaboratively to fix the problem, Defendants declined

-42-

> Plaintiffs' offer and continued to violate the law.
> [Plaintiff] Miles was unable to obtain large print
> documents during two of his latest visits to [Defendant]
> UNC[HCS] medical practices and facilities in October
> 2018, after [Defendant] UNC[HCS] had been notified of
> this issue by Plaintiffs' counsel.

(Docket Entry 18, ¶ 41; accord id., ¶ 72.)

The Amended Complaint thus describes two incidents when (despite prior communications from Plaintiffs' counsel) Defendant UNCHCS failed to provide Plaintiff Miles with documents in an accessible format. (See id., ¶¶ 41, 72.) Further, as discussed previously, the record does not establish that Plaintiff Miles unreasonably failed to respond to Defendant UNCHCS's "contemporaneous efforts . . . to provide assistance" (Docket Entry 24 at 19). In light of the foregoing, Plaintiffs have adequately alleged that their counsel reached out to Defendant UNCHCS about its failure to provide blind patients with accessible documents in order to avoid "harm to a federally protected right," Silva, 856 F.3d at 831, but that Defendant UNCHCS "failed to act on that likelihood," id.[9]

Next, Defendant UNCHCS argues that Plaintiffs "have not alleged sufficient facts to permit an inference that their disability . . . was a motivating factor." (Docket Entry 24 at 20.) However, Defendant UNCHCS has not explained how Plaintiffs

---

[9] Even absent sufficient allegations to show discriminatory intent (via deliberate indifference) by Defendant UNCHCS, injunctive relief would remain available. See Silva, 856 F.3d at 831 (stating that "proving the failure to provide a means of effective communication, on its own, permits [] injunctive relief"). As Plaintiffs have requested injunctive relief under Title II and Section 504, those claims would proceed regardless of the sufficiency of the allegations of discriminatory intent.

inadequately pled facts to permit such an inference.  (See id.)
Moreover, in response, Plaintiffs countered that Defendant
"UNC[HCS]'s argument conflates causation with intent." (Docket
Entry 26 at 17.)  Defendant UNCHCS did not address that counter-
argument in its reply brief.  (See Docket Entry 27 at 1-15.)
"[P]roving the failure to provide a means of effective
communication, on its own, permits [] injunctive relief." Silva,
856 F.3d at 831.  Plaintiffs have adequately alleged that Defendant
UNCHCS "failed to communicate effectively by denying [Plaintiffs]
the auxiliary aid of alternative formats" (Docket Entry 26 at 17).
(See Docket Entry 18, ¶¶ 41, 72.)

Lastly, Defendant UNCHCS argues that Plaintiffs' allegation
that Defendant "UNCHCS has not ensured that its affiliated entity,
[Defendant NHI], complies with Title II of the ADA . . . appears to
misapprehend the nature of the contractual relationship between
[Defendant] UNCHCS and [Defendant NHI]." (Docket Entry 24 at 20.)
In connection with this argument, Defendant UNCHCS refers to
administrative material titled "The Guidance to the ADA Regulation
on Nondiscrimination on the Basis of Disability in State and Local
Government Services, Appendix B to Part 35, Title 28 of the Federal
Regulations." (Id.)  Defendant UNCHCS then confusingly states that
it "was not providing governmental services on behalf of the State"
(id.), Defendant NHI "does not contract with [Defendant] UNCHCS to
provide governmental services on behalf of [Defendant] UNCHCS"
(id.), and that "[Defendant] UNCHCS was not providing management
services for patient billing to [Defendant NHI]" (id.).  In its

-44-

response, Plaintiffs also reference the "Title II Technical Assistance Manual," in arguing that, "[u]nder Title II, a public entity is liable for its own discriminatory actions and the discriminatory actions of private entities with whom it has a contractual relationship." (Docket Entry 26 at 18.)

"The United States Department of Justice has provided administrative materials . . . . [which] are entitled to deference because Congress directed the Department to issue implementing regulations, provide manuals explaining the responsibilities of covered entities, and enforce Title II in court." Melton v. Orange Cty. Democratic Party, 304 F. Supp. 2d 785, 787 (M.D.N.C. 2004) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984)). The Title II Technical Assistance Manual ("Manual") specifically provides that "Title II is intended to apply to all programs, activities, and services provided or operated by State and local governments." The Americans with Disabilities Act: Title II Technical Assistance Manual II-1.2000 (Nov. 1993). The Manual further declares that

> [p]ublic entities are not subject to [T]itle III of the ADA, which covers only private entities. Conversely, private entities are not subject to [T]itle II. In many situations, however, public entities have a close relationship to private entities that are covered by [T]itle III, with the result that certain activities may be at least indirectly affected by both titles.

Id., § 1.3000.

Defendant UNCHCS has not disputed the fact that it qualifies as a public entity. (See Docket Entry 24 at 1-23; see also Docket Entry 27 at 1-15.) However, Defendant UNCHCS appears to dispute

its liability for actions of its affiliated entity, Defendant NHI.
(See Docket Entry 24 at 20.)  As discussed previously, the Court
need not determine the relationship between Defendants (or the
ultimate significance thereof) at this stage in the proceedings,
particularly given that Title II specifically applies to "all
programs, activities, and services provided or operated by State
and local governments," Melton, 304 F. Supp. 2d at 787.

In sum, Plaintiffs have adequately stated a claim against
Defendant UNCHCS under Title II and Section 504.

### E. Section 1557 Claim – Defendant UNCHCS

Section 1557 of the Affordable Care Act, "entitled,
'Nondiscrimination,' provides that 'an individual shall not, on the
ground[s] prohibited under . . . [S]ection 504 . . . be excluded
from participation in, be denied the benefits of, or be subjected
to discrimination under, any health program or activity.'" Basta,
2019 WL 3310098 at *6 (quoting 42 U.S.C. § 18116) (emphasis
omitted).  Here, Defendant UNCHCS simply argues that its earlier
challenge to the sufficiency of Plaintiffs' Title II allegations
also defeats Plaintiffs' Section 1557 claim, because "[t]he
causation element for disability discrimination under the
Rehabilitation [A]ct is stricter than that under the ADA," and
because "Plaintiffs assert their [Section 1557] claim in part on
the basis of discrimination due to disability." (Docket Entry 24
at 21.)  However, as discussed above, Plaintiffs have sufficiently
alleged facts to support Title II and Section 504 claims.

**F. Section 1557 Claim - Defendant NHI**

Defendant NHI argues that Plaintiffs have failed to state a claim under Section 1557 as "[e]ffective communication under [Section 1557] does not require communication in Braille, nor is proof of receipt required." (Docket Entry 29 at 21.) According to Defendant NHI, Section 1557 "requires only that '[a] covered entity . . . take appropriate steps to ensure that communications with individuals with disabilities are <u>as effective as communications with others</u> in health programs and activities.'" (<u>Id.</u> (quoting 45 C.F.R. § 92.202) (emphasis in original).) Further, Defendant NHI contends that Plaintiffs have "conflate[d] the allegations against [Defendant] NHI with the allegations against [Defendant] UNC[HCS]" and that such "conclusory statements do not meet the standards for stating a claim." (<u>Id.</u> at 21-22.)

In their response brief, Plaintiffs counter that, "[w]hile covered entities have some flexibility to decide between auxiliary aids that provide equally effective communication, they do not have the option of simply failing to ensure equally effective communication, as [Defendant NHI] has done here." (Docket Entry 32 at 21.) Plaintiffs further maintain that the allegations set forth in the Amended Complaint "support Plaintiffs' claim that [Defendant NHI] has failed and is failing to meet its obligation to provide blind individuals an equal opportunity to use and benefit from its health care programs and activities by failing to provide blind patients like Plaintiff Bone with accessible formats such as Braille." (<u>Id.</u> at 22 (brackets and ellipses omitted).) Lastly,

Plaintiffs assert that "the Amended Complaint clearly sets forth the specific unlawful actions and omissions taken by [Defendant NHI] that violated Section 1557." (Id. at 23.)  Defendant NHI does not address those counter-arguments in its reply brief.  (See Docket Entry 33 at 1-15.)

As referenced previously, Section 1557 states that "'an individual shall not, on the ground[s] prohibited under . . . [S]ection 504 . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity.'"  Basta, 2019 WL 3310098, at *6 (quoting 42 U.S.C. § 18116) (emphasis omitted); see also Lockwood v. Our Lady of the Lake Hosp., Inc., Civ. No. 17-509, 2018 WL 3451514, at *1 (M.D. La. July 17, 2018) (unpublished) (finding that analysis of Section 504 claim would "apply equally" to Section 1557 claim as "Section 1557 . . . incorporates [Section 504]'s definition of disability and provides the same protections for people with disabilities as [Section 504]").  As such, pursuant to relevant regulations, "[a] covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities, in accordance with the standards found at 28 CFR § 35.160 through 35.164."  45 C.F.R. § 92.202.  In turn, the cross-referenced regulations state that "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a

service, program, or activity of a public entity."  28 C.F.R.

§ 35.160(b)(1).  Further:

> In determining what types of auxiliary aids and services
> are necessary, a public entity shall give primary
> consideration to the requests of individuals with
> disabilities.  In order to be effective, auxiliary aids
> and services must be provided in accessible formats, in
> a timely manner, and in such a way as to protect the
> privacy and independence of the individual with a
> disability.

28 C.F.R. § 35.160(b)(2).

Defendant NHI correctly observes that "effective communication with [Plaintiff] Bone does not amount to a mandate for Braille communications" (Docket Entry 29 at 21); however, the Amended Complaint alleges, as noted by Plaintiffs (see Docket Entry 32 at 22), that Defendant NHI failed to provide Plaintiff Bone "an equally effective alternative method for reading print documents" and further alleges that Defendant NHI delivered Braille documents in an "untimely" fashion (Docket Entry 18, ¶ 82).  Although Section 1557 does not mandate the provision of Braille documents, it does require "accessible formats, in a timely manner."  28 C.F.R. § 35.160(b)(2).

In addition, Defendant NHI's argues that Plaintiffs have "introduced new, conclusory allegations . . . that conflate the allegations against [Defendant] NHI with the allegations against [Defendant] UNC[HCS]."  (Docket Entry 29 at 21.)  Contrary to Defendant NHI's position, the Amended Complaint sufficiently alleges facts to support a claim, in a non-conclusory manner, that both Defendant UNCHCS and Defendant NHI "have failed and are failing to meet their obligations to notify blind individuals of

how they can obtain information in alternative formats" (Docket Entry 18, ¶ 81), and that both "have failed and are failing to meet their obligation to provide blind individuals with an equal opportunity to use and benefit from their health care programs and activities" (id., ¶ 82). Further, the Amended Complaint contains sufficient allegations regarding Defendant UNCHCS's relationship with Defendant NHI. (See id., ¶¶ 13, 16, 21, 22, 33, 34, 66, 67, 68, 70, 71, 72.) Lastly, as previously discussed, Plaintiffs addressed Defendant NHI's contention that Defendant "NHI has not participated in any way with any of the alleged communications with or treatment of Plaintiff [] Miles" (Docket Entry 29 at 7), by clarifying that "[Plaintiff] Miles does not assert any claims against [Defendant NHI]" (Docket Entry 32 at 2 n.2).

For these reasons, Defendant NHI has not shown that Plaintiffs failed to state a claim under Section 1557.

## III. CONCLUSION

At this stage, Plaintiffs possess standing to pursue their claims against Defendant UNCHCS. Conversely, Plaintiffs NFB and DRNC lack standing to proceed against Defendant NHI. Further, although Plaintiff Bone has adequately alleged facts affording him standing (and avoiding a mootness bar) for Section 504 and Section 1557 claims against Defendant NHI, he has failed to establish standing as to his Title III claim against Defendant NHI. Finally, Defendants have not shown that Plaintiffs' Title II, Section 504, and/or Section 1557 claims fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the UNCHCS Dismissal Motion (Docket Entry 20) be denied.

**IT IS FURTHER RECOMMENDED** that the NHI Dismissal Motion (Docket Entry 28) be granted in part and denied in part as follows: the Title III claim and all claims asserted by Plaintiffs NFB and DRNC against Defendant NHI be dismissed for lack of standing, but all other claims be allowed to proceed.

**IT IS ORDERED** that Plaintiffs' Motion for Leave to File a Surreply (Docket Entry 40) is **GRANTED.**

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

September 13, 2019