# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHN BONE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18cv994 |
| | ) | |
| UNIVERSITY OF NORTH CAROLINA | ) | |
| HEALTH CARE SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant UNCHCS's Motion for Judgment on the Pleadings" (Docket Entry 68) (the "Motion"). For the reasons that follow, the Court should deny the Motion.

## BACKGROUND

In December 2018, John Bone ("Bone"), Timothy Miles ("Miles"), the National Federation of the Blind, Inc. (the "NFB"), and Disability Rights North Carolina (individually, "Disability Rights NC," and collectively, the "Plaintiffs") initiated "this action against the University of North Carolina Health Care System (d/b/a UNC Health Care) ('UNC') and Nash [Hospitals, Inc.] ('Nash'), for denying blind individuals an equal opportunity to access their health care information, in violation of Titles II and III of the Americans with Disabilities Act of 1990 ([the] 'ADA'), 42 U.S.C. §§ 12131-12134, 12181-12189, Section 504 of the Rehabilitation Act

('Section 504'), 29 U.S.C. § 794(a), and Section 1557 of the Patient Protection and Affordable Care Act ('Section 1557'), 42 U.S.C. § 18116" (Docket Entry 1, ¶ 1; <u>accord</u> Docket Entry 18 (the "Amended Complaint"), ¶ 1).[1] Nash and UNC (collectively, the "Defendants") moved to dismiss the Amended Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"). (<u>See</u> Docket Entries 20, 28.) The undersigned recommended denying UNC's dismissal motion and granting in part and denying in part Nash's dismissal motion, advising that the Court dismiss, for lack of standing, "the Title III claim and all claims asserted by [NFB and Disability Rights NC] against [Nash]," but allow "all other claims [against Nash] to proceed." (Docket Entry 44 (the "Recommendation") at 51.)[2]

All parties objected to the Recommendation. (<u>See</u> Docket Entries 49-51.) As relevant here, UNC contended that the Recommendation errantly addressed UNC's Rule 12(b)(6) challenge to Plaintiffs' ADA and Section 504 claims, in which UNC had argued that "[t]he Amended Complaint fails to articulate sufficient allegations of discriminatory intent as to [UNC]'s actions toward the individual [P]laintiffs" (Docket Entry 21 at 19) and that

---

1 In January 2019, Plaintiffs amended their complaint to correct Nash's name. (<u>Compare</u> Docket Entry 1, ¶ 1, <u>with</u> Docket Entry 18, ¶ 1.)

2 Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

"Plaintiffs have not alleged sufficient facts to permit an
inference that the[ir] disability . . . was a 'motivating factor'
[in UNC's alleged conduct]" (id. at 21; see also id. (asserting
"that Plaintiffs cannot infer that UNC[] was motivated by
Plaintiff's [sic] disabilities in taking the actions or failing to
act as alleged by [P]laintiffs")).  (See Docket Entry 51 (the
"Objection") at 15-24.)   In regard to UNC's Rule 12(b)(6)
challenge, the Recommendation first states, inter alia:

> Title II of the ADA provides that "no qualified
> individual with a disability shall, by reason of such
> disability, be excluded from participation in or be
> denied the benefits of the services, programs, or
> activities of a public entity, or be subject[ed] to
> discrimination by any such entity."  42 U.S.C. § 12132.
> Similarly, Section 504 of the Rehabilitation Act declares
> that "[n]o otherwise qualified individual with a
> disability . . . shall, solely by reason of her or his
> disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial
> assistance."  29 U.S.C. § 794(a).
>
> To make out a claim under Title II or Section 504,[3]
> Plaintiffs must prove "(1) they have a disability;
> (2) they are otherwise qualified to receive the benefits
> of a public service, program, or activity; and (3) they
> were denied the benefits of such service, program, or
> activity, or otherwise discriminated against, on the
> basis of their disability." National Fed'n of the Blind
> v. Lamone, 813 F.3d 494, 503 (4th Cir. 2016).  The two
> claims "differ only with respect to the third element,

_____

3  "As [UNC] has observed, '"[c]laims under the ADA's Title II
and [Section 504 of] the Rehabilitation Act can be combined for
analytical purposes because the analysis is substantially the
same."'  (Docket Entry 24 at 17 (quoting Seremeth v. Board of Cty.
Comm'rs Frederick Cty., 673 F.3d 333, 336 n.1 (4th Cir. 2012)).)"
(Docket Entry 44 at 40 n.8 (second and third sets of brackets in
original).)

causation." <u>Halpern v. Wake Forest Univ. Health Scis.</u>, 669 F.3d 454, 461 (4th Cir. 2012). In that regard, "[t]o succeed on a claim under [Section 504], the plaintiff[s] must establish [they were] excluded solely by reason of [their] disability; [Title II of] the ADA requires only that the disability was a motivating cause of the exclusion." <u>Id.</u> at 461-62 (internal quotations omitted).

"A successful plaintiff in a suit under Title II of the ADA or [Section] 504 . . . is generally entitled to a full panoply of legal and equitable remedies." <u>Paulone v. City of Frederick</u>, 787 F. Supp. 2d 360, 373 (D. Md. 2011). However, "compensatory damages are available only upon proof of intentional discrimination or disparate treatment, rather than mere disparate impact." <u>Id.</u> "While the Fourth Circuit has not specifically addressed the standard required for proving intentional discrimination, the majority of circuits to have decided the issue have adopted a deliberate indifference standard, as have some district courts within the Fourth Circuit." <u>Smith v. N.C. Dep't of Safety</u>, No. 1:18CV914, 2019 WL 3798457, at *3 (M.D.N.C. Aug. 13, 2019) (unpublished) (Schroeder, C.J.) (citing <u>Green v. Central Midlands Reg'l Transit Auth.</u>, No. 3:17CV2667, 2019 WL 1765867, at *6 n.15, *9-10, *9 n.24 (D.S.C. Apr. 22, 2019) (unpublished), and <u>Godbey v. Iredell Mem'l Hosp. Inc.</u>, No. 5:12CV4, 2013 WL 4494708, at *4-6 (W.D.N.C. Aug. 19, 2013) (unpublished)). In order to prove deliberate indifference, "a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." <u>Silva v. Baptist Health S. Fla., Inc.</u>, 856 F.3d 824, 831 (11th Cir. 2017).

Here, [UNC] disputes that it "denied [Plaintiffs] the benefits of [a] service program or activity . . . on the basis of their disability," <u>Lamone</u>, 813 F.3d at 503. (<u>See</u> Docket Entry 24 at 18-20.) In this regard, [UNC] first argues that Plaintiffs have failed to "articulate sufficient allegations of discriminatory intent as to [UNC's] actions toward the individual [P]laintiffs." (<u>Id.</u> at 18.) In particular, [UNC] contests the sufficiency of the allegations that Plaintiff NFB's counsel "informed [UNC] that it was violating Title II . . . by failing to provide accessible formats for blind persons generally, not specifically, and that [UNC ']declined [an] offer to work collaboratively, on a systemic basis to fix the problem and continued to

4

violate the law.'"   (Id. (quoting Docket Entry 18, ¶ 41).) . . . .

The Amended Complaint alleges the following concerning the claims under Title II and Section 504:

> [UNC's] refusal to communicate with blind patients in an equally effective manner, through the provision of alternative formats, was done intentionally or with deliberate indifference to the protected rights of [Bone, Miles, other NFB members, and Disability Rights NC] constituents. For example, even after counsel for Plaintiffs wrote to Defendants, informed them that they were violating Title II of the ADA [and Section 504], among other laws, by failing to provide accessible formats for blind patients, and offered to work collaboratively to fix the problem, Defendants declined Plaintiffs' offer and continued to violate the law.  [Plaintiff] Miles was unable to obtain large print documents during two of his latest visits to [UNC] medical practices and facilities in October 2018, after [UNC] had been notified of this issue by Plaintiffs' counsel.

(Docket Entry 18, ¶ 41; accord id., ¶ 72.)

The Amended Complaint thus describes two incidents when (despite prior communications from Plaintiffs' counsel) [UNC] failed to provide Plaintiff Miles with documents in an accessible format. (See id., ¶¶ 41, 72.) . . . . [Accordingly], Plaintiffs have adequately alleged that their counsel reached out to [UNC] about its failure to provide blind patients with accessible documents in order to avoid "harm to a federally protected right," Silva, 856 F.3d at 831, but that [UNC] "failed to act on that likelihood," id.[4]

---

4 "Even absent sufficient allegations to show discriminatory intent (via deliberate indifference) by [UNC], injunctive relief would remain available. See Silva, 856 F.3d at 831 (stating that 'proving the failure to provide a means of effective communication, on its own, permits [] injunctive relief'). As Plaintiffs have requested injunctive relief under Title II and Section 504, those claims would proceed regardless of the sufficiency of the allegations of discriminatory intent." (Docket Entry 44 at 43 n.9
(continued...)

5

Next, [UNC] argues that Plaintiffs "have not alleged sufficient facts to permit an inference that their disability . . . was a motivating factor." (Docket Entry 24 at 20.) However, [UNC] has not explained how Plaintiffs inadequately pled facts to permit such an inference. (See id.) Moreover, in response, Plaintiffs countered that ["UNC]'s argument conflates causation with intent." (Docket Entry 26 at 17.) [UNC] did not address that counter-argument in its reply brief. (See Docket Entry 27 at 1-15.) "[P]roving the failure to provide a means of effective communication, on its own, permits [] injunctive relief." Silva, 856 F.3d at 831. Plaintiffs have adequately alleged that [UNC] "failed to communicate effectively by denying [Plaintiffs] the auxiliary aid of alternative formats" (Docket Entry 26 at 17). (See Docket Entry 18, ¶¶ 41, 72.)

(Docket Entry 44 at 40-44 (certain ellipses and brackets in original).)

As to UNC's Rule 12(b)(6) challenge to Plaintiffs' Section 1557 claim, the Recommendation states:

Section 1557 of the Affordable Care Act [(at times, the "ACA")], "entitled, 'Nondiscrimination,' provides that 'an individual shall not, on the ground[s] prohibited under . . . [S]ection 504 . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity.'" Basta[ v. Novant Health Inc.], No. 3:19cv64], 2019 WL 3310098[,] at *6 [(W.D.N.C. July 23, 2019)] (quoting 42 U.S.C. § 18116) (emphasis omitted). Here, [UNC] simply argues that its earlier challenge to the sufficiency of Plaintiffs' Title II allegations also defeats Plaintiffs' Section 1557 claim, because "[t]he causation element for disability discrimination under the Rehabilitation [A]ct is stricter than that under the ADA," and because "Plaintiffs assert their [Section 1557] claim in part on the basis of discrimination due to disability." (Docket Entry 24 at 21.) However, as

---

4(...continued)
(final set of brackets in original).)

discussed above, Plaintiffs have sufficiently alleged
facts to support Title II and Section 504 claims.

(Docket Entry 44 at 46 (ellipses and certain brackets in
original).)

As noted, UNC objected to the Recommendation, contending that
it "failed to abide the requirement in this circuit since *Gentry v.*
*E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 236 (4th Cir.
2016) that a 'district court correctly applie[s] a "but-for"
causation standard' to ADA claims." (Docket Entry 51 at 15-16
(brackets in original).) The Objection continued:

> UNC[] recognizes that this Court, in a recent ruling
> on the Magistrate Judge's [r]ecommendation in a different
> case brought under the ADA and [Rehabilitation Act],
> stated in a footnote that "[t]hough the [the United
> States Court of Appeals for the] Fourth Circuit's use of
> the [less-demanding] 'motivating cause' standard in ADA
> cases has been criticized, it continues to be the
> controlling law in this circuit." *Smith*, 1:18CV914, 2019
> WL 3798457 at *2 n.1. However, because this statement
> constitutes dicta on an issue which was not briefed, and
> because it did not contend with (or at least did not
> mention) *Gentry*, it need not be deemed controlling.

> In *Gentry*, the Fourth Circuit concluded that "[t]he
> Supreme Court's analysis in *Gross* [*v. FBL Financial*
> *Services, Inc.*, 557 U.S. 167 (2009)] dictates" that the
> phrase "discriminate . . . on the basis of" in Title I of
> the ADA, like the phrase "discriminate . . . because of"
> which had been at issue in *Gross*, "calls for a 'but-for'
> causation standard." [Gentry, 816 F.3d] at 234-35.

> More critical as relates to the present Title II
> case, the *Gentry* court in reaching its conclusion both
> (1) explicitly stated that under Supreme Court
> jurisprudence the standard which is relevant to Title II
> — "by reason of" — also "connote[s] 'but-for' causation"
> as opposed to "motivating factor" causation, *id.* at 236
> (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S.
> 338, 350-51 (2013)), and (2) explicitly abrogated its

7

holding *in a prior Title II opinion* that the "'motivating factor' standard should apply [to] Title II" — and took pains in doing so to note that the earlier case had been decided "without the benefit of *Gross*[," id.] at 235 n.3 (abrogating *Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999)).

Under the correct "but-for" standard, the Amended Complaint fails to state colorable Title II claims because Plaintiffs in no way allege that but for their disabilities, they would have received the benefit they understandably sought — more efficient provision of alternative formats of standardized hospital documents.

(Docket Entry 51 at 16-17 (emphasis, ellipses, and certain brackets in original) (parallel citations omitted).)

The Objection further maintained, <u>inter alia</u>, that the Amended Complaint describes "*bureaucracy*, plain and simple." (<u>Id.</u> at 19 (emphasis in original).) According to UNC:

[T]he ADA's laudable purpose is to "address[] *discrimination* against individuals with disabilities" in order to achieve "the elimination of *discrimination*," 42 U.S.C. § 12101(b)(1) — not the elimination of the ineluctable imperfections inherent in all human institutions. Plaintiffs do not allege that non-disabled individuals seeking, out of convenience, to receive large print documents have received or would receive them without the same administrative lapses or delays, born of nothing more than the ordinary bureaucratic rigidity which will tend to confront any non-routine matter. They have not alleged, to illustrate further, that patients with Limited English Proficiency, to whom UNC[] also has legal obligations, have not frequently encountered similar frustrations.

(Docket Entry 51 at 20 (emphasis and second set of brackets in original).)

Accordingly, the Objection contended, "[b]ecause the Amended Complaint fails to satisfy circuit precedent which requires a Title

8

II plaintiff to plausibly allege that the state or local government defendant would have conducted itself differently toward him 'but for' his disability, it does not state a claim and must be dismissed." (<u>Id.</u> at 23.) Moreover, "[i]f, as just argued, *Gentry* compels that the phrase 'by reason of such disability' in Title II be understood to denote a 'but-for' standard of causation," the Objection asserted, "then *a fortiori* the same must be true of the phrase 'solely by reason of her or his disability' that appears in Section 504 of the Rehabilitation Act (29 U.S.C. § 794) and, by cross-reference, in Section 1557 of the ACA." (Docket Entry 51 at 23.) "Thus," in UNC's view (as stated in the Objection), "the same deficiencies which cause the Amended Complaint to fall short of stating a claim for relief under Title II must also cause it to fall short of stating claims under the [Rehabilitation Act] and ACA. These claims, too, should be dismissed." (<u>Id.</u> at 23-24.)

On March 5, 2020, "find[ing] that the [parties'] objections do not alter the substance of the Recommendation," the Court (per Chief United States District Judge Thomas D. Schroeder) reached a determination "in accord with" the Recommendation, which it adopted. (Docket Entry 57 (the "Order") at 1; <u>see</u> <u>id.</u> at 3.) The Court therefore (1) denied UNC's dismissal motion, (2) granted, for lack of standing, Nash's dismissal motion as to "the Title III claim and all claims asserted by [NFB and Disability Rights NC]," and (3) otherwise denied Nash's dismissal motion, holding that "all

other claims [against Nash] will be allowed to proceed." (<u>Id.</u> at 3.)

On May 15, 2020, the parties submitted their joint discovery proposal, which recommended that discovery commence on June 30, 2020. (<u>See</u> Docket Entry 66 at 1.) The Court (per the undersigned) adopted this discovery plan. (<u>See</u> Text Order dated May 22, 2020.) However, the following month UNC filed the Motion (<u>see</u> Docket Entry 68 at 4) and simultaneously moved to stay its discovery obligations pending resolution of the Motion (<u>see</u> Docket Entry 70) (the "Stay Motion").[5] The Motion rests on the theory that the Recommendation and Order conflict with <u>Gentry</u> and <u>Comcast Corp. v. National Ass'n of African American-Owned Media</u>, ___ U.S. ___, 140 S. Ct. 1009 (2020), issued March 23, 2020, which (per UNC) impose a "but for" causation requirement for Plaintiffs' claims. (<u>See</u> Docket Entry 68 at 2-3.) In addition, the Motion contends that the Amended Complaint fails to allege "that UNC[] would have responded differently toward blind individuals' requests for timely alternative-format documents 'but for' their disability," necessitating dismissal of Plaintiffs' claims. (Docket Entry 68 at 3-4.) Because, according to UNC, <u>Comcast</u> "obliges the Court to

---

5 Nash similarly filed a motion for judgment on the pleadings and moved to stay its discovery obligations pending resolution of such motion. (<u>See</u> Docket Entries 72, 74.) Thereafter, Nash and the relevant Plaintiffs settled all claims against Nash, prompting Nash's dismissal from this litigation (<u>see</u> Docket Entries 96, 97) and mooting that motion for judgment on the pleadings.

10

enter judgment on the pleadings in [its] favor," UNC also urged the Court to stay its discovery obligations pending entry of such judgment. (Docket Entry 70 at 1.)

Plaintiffs opposed both the Motion and the Stay Motion, asserting, <u>inter alia</u>, that the Motion improperly "attempt[s] to relitigate arguments the Court rejected at the motion-to-dismiss stage" (Docket Entry 78 at 5) and that "*Comcast* adds nothing new to the intent analysis in disability discrimination cases" (<u>id.</u> at 5-6). (<u>See generally</u> Docket Entries 78, 79.) Thereafter, the Court (per the undersigned) denied the Stay Motion, explaining:

> [The Stay Motion] ask[s] the Court to stay discovery, pending resolution of [the Motion]. In denying [the Stay Motion], the Court generally agrees with Plaintiffs that [the Motion] re-hash[es] arguments already addressed in [the] Order adopting [the] Recommendation. The Court further rejects [UNC's] contention that the decision in [<u>Comcast</u>,] ___ U.S. ___, 140 S. Ct. 1009 (2020), clearly invalidates the analysis in [the] Order and [the] Recommendation. That decision involves a different statute than the ones at issue in this case and, particularly given the distinctive requirements of Title II of the [ADA], the Court does not find a sufficient basis to conclude that resolution of [the Motion] should occur before discovery proceeds.

(Text Order dated Aug. 27, 2020.)

## DISCUSSION

### I. Rule 12(c) Standards

As with a Rule 12(b)(6) motion, "[a] Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact." <u>Massey v. Ojaniit</u>, 759 F.3d 343, 353 (4th Cir. 2014) (internal quotation

11

marks omitted) (brackets in original). Moreover, the same standards apply to a Rule 12(b)(6) and a Rule 12(c) motion. See id. Accordingly, although the "Rules do not flatly bar a defendant from asserting a Rule 12(c) motion for judgment on the pleadings simply because he or she previously asserted a Rule 12(b)(6) motion to dismiss," a Rule 12(c) motion does not provide "an opportunity to *re-litigate* issues raised and decided in a motion to dismiss." Burke v. Nationstar Mortg. LLC, No. 3:14cv837, 2016 WL 4231705, at *5 (E.D. Va. Aug. 9, 2016) (internal quotation marks omitted) (emphasis in original); see also Alexander v. City of Greensboro, No. 1:09cv293, 2011 WL 3360644, at *4 (M.D.N.C. Aug. 3, 2011) (explaining that, in resolving Rule 12(c) motion, "the court will not reconsider issues that it addressed fully at the Rule 12(b)(6) stage").

In evaluating a Rule 12(c) motion, the Court considers only the pleadings, (1) taking all factual allegations in the relevant complaint as true, (2) taking all factual allegations in the answer "as true only where and to the extent they have not been denied or do not conflict with the [relevant] complaint," and (3) drawing all reasonable inferences in favor of the nonmoving party. Alexander v. City of Greensboro, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011) (internal quotation marks omitted); accord Massey, 759 F.3d at 353 (explaining that, in analyzing Rule 12(c) motions, courts "accept all well-pleaded allegations of [a] complaint as true and draw all

12

reasonable factual inferences in [a plaintiff's] favor"). To survive either a Rule 12(b)(6) or a Rule 12(c) motion, a complaint must only "state[] a plausible claim for relief." Massey, 759 F.3d at 353 (internal quotation marks omitted). To qualify as plausible, a claim must include sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Nevertheless, the complaint need not contain detailed factual recitations, as long as it provides "the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks and ellipsis omitted). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

## II.  Relevant Legal Background

As the United States Supreme Court has explained regarding the creation of the Rehabilitation Act:

> Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference — of benign neglect. Thus, Representative Vanik, introducing the predecessor to § 504 in the House, described the treatment of the handicapped as one of the country's "shameful oversights," which caused the handicapped to live among society "shunted aside, hidden,

13

and ignored." 117 Cong. Rec. 45974 (1971). Similarly, Senator Humphrey, who introduced a companion measure in the Senate, asserted that "we can no longer tolerate the invisibility of the handicapped in America . . . ." 118 Cong. Rec. 525-526 (1972). And Senator Cranston, the Acting Chairman of the Subcommittee that drafted § 504, described the [Rehabilitation] Act as a response to "previous societal neglect." 119 Cong. Rec. 5880, 5883 (1973). *See also* 118 Cong. Rec. 526 (1972) (statement of cosponsor Sen. Percy) (describing the legislation leading to the 1973 [Rehabilitation] Act as a national commitment to eliminate the "glaring neglect" of the handicapped). Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.

   In addition, much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the [Rehabilitation] Act construed to proscribe only conduct fueled by a discriminatory intent. For example, elimination of architectural barriers was one of the central aims of the [Rehabilitation] Act, *see, e.g.*, S. Rep. No. 93-318, p. 4 (1973), U.S. Code Cong. & Admin. News 1973, pp. 2076, 2080, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped. Similarly, Senator Williams, the chairman of the Labor and Public Welfare Committee that reported out § 504, asserted that the handicapped were the victims of "[d]iscrimination in access to public transportation" and "[d]iscrimination because they do not have the simplest forms of special educational and rehabilitation services they need . . . ." 118 Cong. Rec. 3320 (1972). And Senator Humphrey, again in introducing the proposal that later became § 504, listed, among the instances of discrimination that the section would prohibit, the use of "transportation and architectural barriers," the "discriminatory effect of job qualification . . . procedures," and the denial of "special educational assistance" for handicapped children. *Id.*, at 525-526. These statements would ring hollow if the resulting legislation could not rectify the harms resulting from action that discriminated by effect as well as by design.

Alexander v. Choate, 469 U.S. 287, 295-97 (1985) (ellipses and

certain brackets in original) (footnotes omitted).

14

In turn:

> Congress enacted the [ADA] in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Pub. L. No. 101-336, § 2(b)(1), 1990 U.S.C.C.A.N. (104 Stat.) 327, 329 (codified at 42 U.S.C. § 12101(b)(1)). The [ADA] prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111-12117; public services, under Title II, 42 U.S.C. §§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189. *See Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

> \* \* \* \* \* \*

> Title II creates a remedy for "any person alleging discrimination on the basis of disability" and provides that the "remedies, procedures, and rights" available under Title II are the "remedies, procedures, and rights set forth in section 794a of [the Rehabilitation Act]." *Id.* § 12133. Section 794a of the Rehabilitation Act, in turn, provides that the available "remedies, procedures, and rights" are those set forth in Title VII of the Civil Rights Act. 29 U.S.C. § 794a(a)(1) (2000).

> Pursuant to congressional instruction, *see* 42 U.S.C. § 12134(a), the Attorney General has issued regulations implementing Title II of the ADA. *See* 28 C.F.R. pt. 35 (2007). These regulations provide further guidance interpreting many of the provisions of Title II. Although the Supreme Court has yet to decide whether the regulations are entitled to the full deference afforded under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984), the [Supreme] Court has counseled that the views expressed by the Department of Justice in the implementing regulations "warrant respect." Olmstead v. L.C., 527 U.S. 581, 597-98 (1999).

> In addition to the provisions of the statute and the implementing regulations, Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation Act and its implementing regulations. 42 U.S.C. § 12201(a); *see also Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998). Moreover, because the ADA "echoes and expressly refers to Title VII, and because the two statutes have the same purpose," courts

15

confronted with ADA claims have also frequently turned to precedent under Title VII. *See, e.g.*, *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) (collecting cases). Thus, courts have construed Title II of the ADA to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. *See, e.g.*, *Wis. Cmty. Servs.[, Inc. v. City of Milwaukee*], 465 F.3d [737,] 753 [(7th Cir. 2006)]; *Tsombanidis[ v. West Haven Fire Dep't*], 352 F.3d [565,] 573 [(2d Cir. 2003)]; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) (citing Title VII cases in discussing disparate treatment and disparate impact claims under Title I of the ADA).

A Helping Hand, LLC v. Baltimore Cty., 515 F.3d 356, 361-62 (4th Cir. 2008) (certain brackets and ellipses in original) (parallel citations omitted).

Taken together, Title II, Section 504, and Section 1557 (collectively, the "Acts") prohibit the exclusion of individuals with disabilities from the services, activities, and programs, including health programs, of entities receiving public funding. More specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly declares that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

16

financial assistance." 29 U.S.C. § 794(a). Further, pursuant to Section 1557, "an individual shall not, on the ground[s] prohibited under . . . [S]ection [504], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116; <u>see also</u> <u>Lockwood v. Our Lady of the Lake Hosp., Inc.</u>, Civ. No. 17-509, 2018 WL 3451514, at *1 (M.D. La. July 17, 2018) (finding that analysis of Section 504 claim would "apply equally" to Section 1557 claim because "Section 1557 . . . incorporates [Section 504]'s definition of disability and provides the same protections for people with disabilities as [Section 504]").

Notably, the Acts "impose[] an affirmative obligation to make 'reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services' to enable disabled persons to receive services or participate in programs or activities," <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 488 (4th Cir. 2005) (discussing Title II) (quoting 42 U.S.C. § 12131(2)). <u>See also, e.g.</u>, <u>Pierce v. District of Columbia</u>, 128 F. Supp. 3d 250, 266 (D.D.C. 2015) ("[T]he express prohibitions against disability-based discrimination in Section 504 and Title II include *an affirmative obligation* to make benefits, services, and programs accessible to

17

disabled people." (emphasis in original)); <u>Lockwood</u>, 2018 WL
3451514, at *1 (explaining that Section 1557 "provides the same
protections for people with disabilities as [Section 504]"); 45
C.F.R. § 92.105 (requiring entities under Section 1557 to "make
reasonable modifications to [their] policies, practices, or
procedures when such modifications are necessary to avoid
discrimination on the basis of disability," and specifying that,
"[f]or the purposes of this section, the term 'reasonable
modifications' shall be interpreted in a manner consistent with the
term as set forth in the regulation promulgated under Title II of
the [ADA]").

As concerns communication, regulations under the ACA require
relevant entities to "take appropriate steps to ensure that
communications with individuals with disabilities are as effective
as communications with others in such programs or activities, in
accordance with the standards found at 28 [C.F.R. §§] 35.160
through 35.164." 45 C.F.R. § 92.102. The first of those cross-
referenced ADA regulations obliges "[a] public entity [to] furnish
appropriate auxiliary aids and services where necessary to afford
individuals with disabilities . . . an equal opportunity to
participate in, and enjoy the benefits of, a service, program, or
activity of a public entity." 28 C.F.R. § 35.160(b)(1). Moreover,
although recognizing that "[t]he type of auxiliary aid or service
necessary to ensure effective communication will vary in accordance

18

with the method of communication used by the individual; the
nature, length, and complexity of the communication involved; and
the context in which the communication is taking place," the
regulations specify that:

> In determining what types of auxiliary aids and
> services are necessary, a public entity shall give
> primary consideration to the requests of
> individuals with disabilities. In order to be
> effective, auxiliary aids and services must be
> provided in accessible formats, in a timely manner,
> and in such a way as to protect the privacy and
> independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2).

Regulations regarding the Rehabilitation Act similarly oblige
recipients of federal funds to "[e]nsure that communications with
their applicants, employees and beneficiaries are effectively
conveyed to those having impaired vision and hearing." 28 C.F.R.
§ 42.503(e). They further require such recipients "that employ[]
fifteen or more persons [to] provide appropriate auxiliary aids to
qualified handicapped persons with impaired sensory, manual, or
speaking skills where a refusal to make such provision would
discriminatorily impair or exclude the participation of such
persons in a program or activity receiving Federal financial
assistance." 28 C.F.R. § 42.503(f).[6] "Such auxiliary aids may

---

6    In addition, "[d]epartmental officials may require
recipients employing fewer than fifteen persons to provide
auxiliary aids when this would not significantly impair the ability
of the recipient to provide its benefits or services." Id.

include brailled and taped material, qualified interpreters, readers, and telephonic devices." Id.

### III. Analysis

In its Motion, UNC maintains that Gentry and Comcast impose a "but for" causation requirement for Plaintiffs' claims that precludes liability unless Plaintiffs allege "that UNC[] would have responded differently toward blind individuals' requests for timely alternative-format documents 'but for' their disability" (Docket Entry 68 at 3-4). (See id. at 2-4; see also, e.g., Docket Entry 69 at 7 (asserting that Plaintiffs' claims "fail as a matter of law" because they do not "allege that UNC[] would have responded differently to requests from sighted individuals for alternative format documents such as large print").) This contention lacks merit.

As a preliminary matter, UNC's Rule 12(c) arguments largely repackage its rejected Rule 12(b)(6) arguments. (Compare, e.g., Docket Entry 51 at 15-17, 23 (arguing that Fourth Circuit in Gentry imposed but-for causation standard for ADA claims and that, "[b]ecause the Amended Complaint fails to satisfy circuit precedent which requires a Title II plaintiff to plausibly allege that the state or local government defendant would have conducted itself differently toward him 'but for' his disability, it does not state a claim and must be dismissed," id. at 23), with Docket Entry 68 at 2-4 (asserting that "'but for'" standard applies and that Amended

20

Complaint "fails to state a[] claim[]" because it "nowhere alleges, implicitly or explicitly, that UNC[] would have responded differently toward blind individuals' requests for timely alternative-format documents 'but for' their disability," id. at 3-4.)  This circumstance alone justifies denial of the Motion.  See, e.g., Alexander, 2011 WL 3360644, at *4 (declining, in resolving Rule 12(c) motion, to "reconsider issues that [the court] addressed fully at the Rule 12(b)(6) stage").  In addition, UNC's Rule 12(c) contentions fail on their merits.

To begin, in its Objection and its Motion, UNC argues that the Fourth Circuit in Gentry "explicitly abrogated its holding" in Baird "that the '"motivating factor" standard should apply [to] Title II.'"  (Docket Entry 51 at 17 (quoting Gentry, 816 F.3d at 235 n.3); accord Docket Entry 83 at 3.)  Relying exclusively on Gentry, UNC further asserts:

> The text of the ADA, and by extension the R[ehabilitation Act] and ACA, "calls for a 'but-for' causation standard" — not only in its prohibition against employers discriminating "on the basis of" disability (Title I), but also in its prohibition against public entities and recipients of federal funds excluding individuals from their programs "by reason of" disability (Title II).

(Docket Entry 69 at 13 (citing Gentry, 816 F.3d at 235).)

Contrary to UNC's contentions, Gentry did not abrogate Baird. See Gentry, 816 F.3d at 235 n.3.  Rather, recognizing that Baird, "an ADA Title II case[,] . . . . [wa]s not controlling," id., in Gentry, which involved a claim under Title I of the ADA, see id. at

21

233, the Fourth Circuit merely "decline[d the plaintiff's request] to extend *Baird*'s analysis to th[e <u>Gentry</u>] case," <u>id.</u> at 235 n.3. Notably, since <u>Gentry</u>, the Fourth Circuit has continued to apply <u>Baird</u>'s motivating factor standard to Title II claims.  For instance, the Fourth Circuit explained in 2018:

> The ADA's Title II and the Rehabilitation Act "differ only with respect to the third element, causation." *Halpern*[,] 669 F.3d [at] 461[.]  "To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Id.* at 461–62 (quoting *Baird*[,] 192 F.3d [at] 468–69]).

<u>Wicomico Nursing Home v. Padilla</u>, 910 F.3d 739, 750 (4th Cir. 2018).  Accordingly, as this Court (per Chief Judge Schroeder) has previously recognized, <u>Baird</u>'s motivating cause standard "continues to be the controlling law in this circuit."  <u>Smith</u>, 2019 WL 3798457, at *2 n.1.

Furthermore, <u>Lamone</u>, a Title II decision that the Fourth Circuit issued contemporaneously with <u>Gentry</u>,[7] undermines UNC's broader argument that, "[b]ecause the Amended Complaint fails to allege that UNC[] would have responded differently to requests from sighted individuals for alternative format documents such as large print, all the claims asserted fail as a matter of law" (Docket Entry 69 at 7; <u>accord, e.g.</u>, <u>id.</u> at 12-13, 18, 20-21).  In <u>Lamone</u>,

---

7    The judge who wrote <u>Lamone</u> also wrote <u>Gentry</u> (argued in December 2015, less than two months after <u>Lamone</u>, and decided in March 2016, less than one month after <u>Lamone</u>).  <u>See</u> <u>Gentry</u>, 816 F.3d at 228, 231; <u>Lamone</u>, 813 F.3d at 494, 498.

various disabled Maryland voters and the NFB (collectively, the "Maryland plaintiffs") sued Maryland election officials regarding Maryland's absentee voting procedures, which required individuals to mark by hand hardcopy absentee ballots, which they could obtain via "mail, fax, or by downloading and printing [the ballot] from a website." Lamone, 813 F.3d at 498. By 2012, Maryland had developed an early version of an "online ballot marking tool," id. (internal quotation marks omitted), which enabled voters who obtained their ballots online to "mark their choices electronically and then print out a completed ballot," id. at 499. "Importantly for individuals with certain disabilities, the ability to use the tool on their own computers may enable them to use the personal assistive devices that they ordinarily use to interface with the computer, such as a refreshable Braille display, to mark their ballot choices." Id.

Maryland used "[a]n early, non-accessible version of" this online ballot marking tool during the 2012 primary elections. Id. After that election, questions arose regarding the necessity of certifying the tool under Maryland law, with the Maryland Attorney General opining that such certification remained unnecessary. Id. Nevertheless, due to lingering certification concerns, the Maryland State Board of Elections (the "Maryland Board") made the tool available only to overseas and military absentee voters in the 2012

23

general election.  See id. at 500.  "Use of the tool in the 2012 primary and general elections was apparently uneventful."  Id.

Following the 2012 elections, the Maryland General Assembly passed a law requiring the Maryland "Board to certify any online ballot marking tool prior to use by voters."  Id.  The certification process required at least four of the five members of the Maryland Board to vote for certification.  See id.  The Maryland Board continued improving the online absentee ballot marking tool, particularly increasing its accessibility for individuals with disabilities, and obtained independent audits attesting to the tool's security.  See id.  However, apparently due to certain members' lingering security concerns, the Maryland Board failed to certify the tool, thereby preventing its use in Maryland's elections.  See id. at 500-01.

In 2014, the Maryland plaintiffs sued, seeking a declaratory judgment that Maryland's absentee voting process violated the Rehabilitation Act and the ADA, "as well as an injunction requiring state election officials to make the online ballot marking tool available for use starting with the 2014 general election."  Id. at 500.  After a bench trial, the district court found that the Maryland "plaintiffs had established that they had been denied meaningful access to absentee voting in Maryland in violation of Title II of the ADA and Section 504 of the Rehabilitation Act" and entered a declaratory judgment to that effect.  Id. at 502.  The

24

district court further determined that the Maryland "plaintiffs' proposed remedy, access to the online ballot marking tool, was a reasonable modification that did not fundamentally alter Maryland's voting program." Id. Accordingly, "the district court entered a permanent injunction prohibiting [the defendant state election officials] from violating [the Maryland] plaintiffs' rights under the ADA and the Rehabilitation Act and requiring [the] defendants to make the online ballot marking tool available to [the Maryland] plaintiffs for the 2014 general election." Id.

On appeal, the Fourth Circuit affirmed those findings. Characterizing the Maryland plaintiffs' claims as proceeding under "the theory that [the] defendants have failed to make reasonable accommodations that would afford disabled individuals meaningful access to Maryland's absentee voting program," id. at 503 n.5,[8] the Fourth Circuit noted that the parties disputed only the third element of the Maryland plaintiffs' Title II claims, namely "whether [they] were denied the benefits of a public service,

_____

8  In so doing, the Fourth Circuit rejected the defendants' contention that the Maryland plaintiffs presented a "disparate impact" claim under Title II, noting that although "some sort of disparity will necessarily be present in cases of discrimination, that does not mean that all discrimination cases are legally evaluated as 'disparate impact' cases." Id.; see also id. (explaining that "Title II allows plaintiffs to pursue three distinct grounds for relief:  (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations"). As in Lamone, Plaintiffs proceed under the "reasonable accommodations" theory of Title II, a "distinct ground[] for relief," Lamone, 813 F.3d at 503 n.5. (See, e.g., Docket Entry 18, ¶¶ 31-42.)

25

program, or activity on the basis of their disability," id. at 503.[9]  The Fourth Circuit then concluded, based on the record, "that Maryland's absentee voting program does not provide disabled individuals an 'opportunity to participate . . . equal to that afforded others,'" namely the ability to "mark their absentee ballots without assistance."  Id. at 506 (certain internal quotation marks omitted) (ellipsis in original) (quoting 28 C.F.R. § 35.130(b)(1)(ii)).  The "sharp disparity" between non-disabled voters and disabled voters under Maryland's absentee program "ma[d]e[] obvious that [the] defendants have provided 'an aid, benefit, or service [to disabled individuals] that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.'"  Id. (final set of brackets in original) (quoting 28 C.F.R. § 35.130(b)(1)(iii)).  Emphasizing that "[t]he ADA requires more," id., the Fourth Circuit "affirm[ed] the district court's conclusion that[,] by effectively requiring disabled individuals to rely on the assistance of others to vote absentee, [the] defendants have not provided [the Maryland] plaintiffs with meaningful access to Maryland's absentee voting program," id. at 507.

---

9  UNC likewise challenges only the third element of Plaintiffs' Title II claims.  (See Docket Entries 68, 69, 83.)

26

The Fourth Circuit also affirmed the district court's findings that the online marking tool constituted a reasonable modification that did not fundamentally alter Maryland's voting program. <u>See id.</u> at 507-10. Accordingly, the Fourth Circuit affirmed the district court's issuance of an injunction requiring the defendants to make the online ballot marking tool available to the Maryland plaintiffs. <u>See id.</u> at 508, 510. Of particular relevance here, in affirming the district court, the Fourth Circuit noted:

> We recognize that some of the standard analytic language used in evaluating ADA claims — "failure to make reasonable accommodations"; "denial of meaningful access" — carries with it certain negative connotations. We would be remiss in not highlighting that <u>the record is devoid of any evidence that the defendants acted with discriminatory animus in implementing Maryland's absentee voting program</u>. Indeed, we recognize that Maryland's decision to provide "no excuse" absentee voting to all its citizens provides a benefit that is far from universal across the United States.
>
> <u>However, the ADA and the Rehabilitation Act do more than simply provide a remedy for intentional discrimination. They reflect broad legislative consensus that making the promises of the Constitution a reality for individuals with disabilities may require even well-intentioned public entities to make certain reasonable accommodations. Our conclusions here are not driven by concern that [the] defendants are manipulating the election apparatus intentionally to discriminate against individuals with disabilities; our conclusions simply flow from the basic promise of equality in public services that animates the ADA.</u>

<u>Id.</u> at 510 (emphasis added).

Here, UNC asserts that Plaintiffs' claims fall short "[b]ecause the Amended Complaint fails to allege that UNC[] would have responded differently to requests from sighted individuals for

27

alternative format documents such as large print." (Docket Entry
69 at 7; see also, e.g., Docket Entry 83 at 1 (asserting that
"Plaintiffs have failed to allege that [UNC's] conduct was *in any*
*way* motivated by Plaintiffs' disabilities" (emphasis in
original)).) As Lamone makes clear, this argument misconstrues
UNC's legal obligations under the Acts. In Lamone, certification
requirements and security concerns, not the Maryland plaintiffs'
disabilities, motivated the Maryland election officials' failure to
provide the online ballot marking tool for use — by any Maryland
voters — after the 2012 elections. Thus, UNC's arguments that
Plaintiffs' claims fail (1) because they do not assert that UNC
would provide accessible documentation to non-disabled individuals
who requested such material (see, e.g., Docket Entry 69 at 20-21)
and/or (2) because the Amended Complaint identifies non-
discriminatory reasons for UNC's failure to provide accessible
documents, including that UNC's billing system purportedly could
not produce such documents (see, e.g., id. at 21), miss the mark.

    Nor does Comcast alter that analysis. Comcast involved a
claim under 42 U.S.C. § 1981, "which guarantees, among other
things, '[a]ll persons . . . the same right . . . to make and
enforce contracts . . . as is enjoyed by white citizens.'"
Comcast, __ U.S. at __, 140 S. Ct. at 1013 (ellipses and brackets
in original). Originating as part of the Civil Rights Act of 1866,
id., __ U.S. at __, 104 S. Ct. at 1015, and "designed to eradicate

28

blatant deprivations of civil rights, clearly fashioned with the purpose of oppressing the former slaves," General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 388 (1982), Section 1981 "can be violated only by purposeful discrimination," id. at 391. In Comcast, the plaintiff "argue[d] that a § 1981 plaintiff only bears the burden of showing that race was a 'motivating factor' in the defendant's challenged decision, not a but-for cause of its injury," at least at the pleading stage of the litigation. Comcast, __ U.S. at __, 140 S. Ct. at 1014. In so arguing, the plaintiff "ask[ed the Supreme Court] to draw on, and then innovate with, the 'motivating factor' causation test found in Title VII of the Civil Rights Act of 1964." Id., __ U.S. at __, 140 S. Ct. at 1017. Looking to Section 1981's "text, its history, and [relevant] precedent," id., __ U.S. at __, 140 S. Ct. at 1014, the Supreme Court rejected that argument, reversing the lower court's conclusion that "[a] § 1981 plaintiff doesn't have to point to facts plausibly showing that racial animus was a 'but for' cause of the defendant's conduct," id., __ U.S. at __, 140 S. Ct. at 1013. See id., __ U.S. at __-__, 140 S. Ct. at 1014-19.

Unlike Section 1981, designed to remedy "blatant deprivations of civil rights" that "oppress[ed] the former slaves," General Bldg. Contractors, 458 U.S. at 388, shortly after the Civil War, the Rehabilitation Act and ADA — modern statutes passed more than 100 years after the Civil Rights Act of 1866 — target

29

discrimination that usually arises not from "invidious animus, but rather [from] thoughtlessness and indifference – [from] benign neglect," Choate, 469 U.S. at 295, or, stated differently, discrimination that primarily results from "apathetic attitudes rather than affirmative animus," id. at 296. Moreover, unlike Section 1981, see Comcast, __ U.S. at __, 140 S. Ct. at 1017-18, "the ADA echoes and expressly refers to Title VII, and . . . the two statutes have the same purpose," A Helping Hand, 515 F.3d at 362 (internal quotation marks omitted). Accordingly, courts have "frequently turned to precedent under Title VII" to resolve ADA claims. Id. Further, under binding circuit precedent, Title VII's "motivating factor" causation standard applies to Title II claims. See Baird, 192 F.3d at 470 ("conclud[ing] that the causation standards applicable in Title VII actions are applicable to violations of [Title II]"). Thus, Comcast neither constitutes an "analogous holding" (Docket Entry 68 at 3) nor "obliges the Court to order complete judgment as a matter of law on the pleadings in favor of UNC[]" (id. at 1).

In sum, UNC's Rule 12(c) contentions lack merit. Moreover, focused exclusively on its (previously rejected) argument for applying a different causation standard, UNC offers nothing to undermine this Court's prior conclusion that, under applicable standards, the Amended Complaint states viable Title II, Section 504, and ACA claims against UNC (see Docket Entry 44 at 50-51;

Docket Entry 57 at 1, 3).  (<u>See generally</u> Docket Entries 68, 69, 83.)  Accordingly, the Court should reject UNC's request "to render judgment on the pleadings in [its favor] on all counts asserted against it in the Amended Complaint" (Docket Entry 68 at 4).

<u>**CONCLUSION**</u>

As the Court has already determined, Plaintiffs have alleged plausible claims for relief under the Acts.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 68) be denied.

This 4th day of February, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**