# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL CASE NO. 1:18-CV-994-TDS-LPA

| | |
|---|---|
| JOHN BONE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM, <br><br> Defendant. | PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT |

Christopher A. Hodgson
N.C. State Bar No. 50135
Holly Stiles
N.C. State Bar No. 38930
Disability Rights North Carolina
3724 National Drive, Suite 100
Raleigh, NC 27612
Phone: 919-856-2195
Fax: 919-856-2244
chris.hodgson@disabilityrightsnc.org
holly.stiles@disabilityrightsnc.org

Jessica P. Weber
James O. Strawbridge
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD 21202
Tel: 410-962-1030
Fax: 410-385-0869
jweber@browngold.com
jstrawbridge@browngold.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

NATURE OF THIS ACTION ............................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ....................................................................... 1

QUESTIONS PRESENTED .............................................................................................. 5

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT ..................................................................................................................... 6

I.    UNCHCS DISCRIMINATES AGAINST BLIND INDIVIDUALS BY FAILING TIMELY TO PROVIDE DOCUMENTS IN ACCESSIBLE FORMATS. .......................................................................................... 6

    A.    John Bone, Timothy Miles, NFB Members, and Blind DRNC Constituents Are Individuals With Disabilities. ................................. 6

    B.    John Bone, Timothy Miles, NFB Members, and Blind DRNC Constituents Are Qualified to Receive Healthcare From UNCHCS. ......................................................................................... 7

    C.    UNCHCS Discriminates Against Blind Individuals, Including Plaintiffs. ...................................................................................... 8

        1.    UNCHCS failed to provide Mr. Miles with large-print versions of routinely-used documents and haphazardly provided improperly-formatted enlarged print versions of other documents. ................................................................ 9

        2.    Mr. Bone received only standard print or, in some instances, untimely Braille documents related to his Nash hospitalizations. ................................................................... 11

        3.    UNCHCS does not provide accessible formats of its written communications to blind individuals. ....................................... 12

II.    UNCHCS'S OBLIGATION TO ENSURE EFFECTIVE COMMUNICATION EXTENDS TO ITS NETWORK OF OWNED AND MANAGED HEALTHCARE ENTITIES, INCLUDING NASH. ... 13

    A.    UNCHCS Is Contractually Liable for the Failure of Its Managed Entities, Including Nash, to Provide Effective Communication. ..... 14

    B.    UNCHCS Must Ensure the Care Patients Receive at Affiliates Complies with Federal Disability Rights Law. ................................ 15

    C.    UNCHCS Is Liable for Its Own Inaccessible Communications. ..... 16

Case 1:18-cv-00994-TDS-LPA   Document 103-2   Filed 03/30/21   Page 2 of 30

III.    UNCHCS IS DELIBERATELY INDIFFERENT TO ITS OBLIGATION TO PROVIDE EQUALLY EFFECTIVE COMMUNICATION. .............. 17

      A.    Mr. Miles ......................................................................................... 18

      B.    Mr. Bone .......................................................................................... 23

IV.    INJUNCTIVE RELIEF REQUIRING UNCHCS TO COMMUNICATE EFFECTIVELY WITH BLIND INDIVIDUALS IS NECESSARY. ......... 24

CONCLUSION ................................................................................................ 26

Case 1:18-cv-00994-TDS-LPA   Document 103-2   Filed 03/30/21   Page 3 of 30

## NATURE OF THIS ACTION

Because Plaintiffs John Bone and Timothy Miles, along with other members of the National Federation of the Blind ("NFB") and blind constituents of Disability Rights North Carolina ("DRNC"), have the right to access their vital healthcare information privately, independently, and on a timely basis—just as sighted patients do—they filed this action under Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and Section 1557 of the Affordable Care Act ("Section 1557") against the University of North Carolina Health Care System ("UNCHCS") for its failure to ensure equally effective communication through the provision of accessible document formats. The undisputed evidence shows that UNCHCS has failed to communicate effectively with the blind and has done so with deliberate indifference. This Court should issue an injunction and schedule a trial on damages.

## STATEMENT OF UNDISPUTED FACTS

### Timothy Miles

Mr. Miles has low vision that is not correctable with prescription lenses, light sensitivity due to ocular albinism, and blood sugar fluctuations because of diabetes that further impair his vision. (Ex.1, Miles Decl. ¶¶3,6.) Because he cannot readily access documents in standard, 12-point (or smaller) font ("standard print"), Mr. Miles requires large-print documents. (*Id.* ¶¶4,5,8; Ex.2, UNCHCS Resp. to Miles RFA #2.)  Mr. Miles relies on large print in hard copy, a format he has used since childhood, especially

because the light emitted from computer screens makes reading electronic documents substantially more difficult for him. (Ex.1 ¶¶5,6,8.)

Mr. Miles has been a UNCHCS patient for at least twenty years. (Ex.1 ¶11.) At his appointments at UNCHCS-owned clinics and other practices, Mr. Miles regularly requests documents in large print. (*Id*. at ¶8.) UNCHCS has been aware of Mr. Miles's requests for large print since at least 2018. (Ex.3-B, Sept. 27, 2018 Letter from J. Weber to G. George.) Nonetheless, UNCHCS regularly provides standard-print documents to Mr. Miles, including intake forms, consent-for-treatment forms, HIPAA disclosures, and notices of patient rights and responsibilities. (Exs.1-A-B.) When UNCHCS has provided documents with enlarged text, these documents have frequently not complied with large-print best practices, have been difficult for Mr. Miles to read, and have often been provided weeks, months, or even years after the standard-print version. (Ex. 1, ¶¶ 20-21,23-24,26-28.) UNCHS has failed to provide Mr. Miles large-print documents consistently and on a timely basis—even after this lawsuit was filed. (Ex.1 ¶27; Ex.1-B.)

<u>John Bone</u>

Mr. Bone is blind and must rely on sighted individuals for access to standard print documents. (Ex.4, Bone Decl. ¶3.) Mr. Bone can privately and independently access written communications in Braille. (*Id.* ¶4.)

Mr. Bone was admitted to Nash General Hospital in December 2016. (*Id.* ¶5; Woods Decl. ¶4, ECF No.28-7.) Nash Hospitals, Inc. ("Nash"), which owns Nash

General Hospital, does business as "Nash UNC Health Care"[1] and is a subsidiary of Nash

Health Care Systems ("NHCS"). (Weisner Decl. ¶¶3, 4, 7, ECF No.28-9.) Pursuant to a

2014 Management Services Agreement ("MSA"), NHCS and its subsidiaries (including

Nash) became affiliated with, and part of, UNCHCS. (Ex.5, 2014 MSA; Ex.6, UNCHCS

30(b)(6) (Ellington) Dep. 24:4-16, 46:1-25, 47:17-48:17, 65:23-66:2.)

 During his December 2016 hospitalization, Mr. Bone requested written

communications in Braille, and Nash recorded his request for Braille medical bills on

December 13, 2016. (Ex.4 ¶6; Cash Decl. ¶8, ECF No.28-1.)

 Mr. Bone did not receive Braille versions of any documents provided to him

during his hospitalization—including documents he needed to sign. (Ex.4 ¶¶7-9.) On

January 10, 2017, Nash sent a standard-print hospital bill to Mr. Bone. (Cash Decl. ¶9.)

Nash claims it sent him a Braille version of that bill in April 2017, (*id.* ¶¶8, 11), but Mr.

Bone never received it, (Ex.4 ¶¶20-21.) Nash's contractors also sent Mr. Bone standard-

print bills after his hospitalization, which he never received in Braille. (*Id.* ¶¶10-11.).

 Mr. Bone underwent surgery at Nash General Hospital in June-July 2017. (*Id.* ¶13;

Cash Decl. ¶13.) Nash again sent Mr. Bone a standard-print hospital bill. (Cash Decl.

¶13.) Only after Mr. Bone complained on October 24, 2017, did Nash send a Braille

version of this bill in early January 2018—six months post-hospitalization. (Ex.4 ¶¶20-

21; Cash Decl. ¶¶14, 15, 19.) Mr. Bone received only standard-print bills from Nash's

contractors related to his 2017 hospitalization. (Ex.4 ¶21.).

---

[1] *See* https://www.nashunchealthcare.org/about-us/.

From August–December 2017, UNCHCS's central billing office sent Mr. Bone five standard-print bills for physician services performed at Nash General Hospital in June-July 2017. (Exs.4-A-E; Ex.7, Wade Dep. 193:12-200:21.) UNCHCS also sent Mr. Bone standard-print appointment reminders post-surgery, which he never received in Braille. (Ex.4 ¶18; Exs.4-F-H; Ex.8, Patton-Tolbert Dep. 79:21-81:13.)

Because Mr. Bone could not read these medical bills, he could not independently confirm their accuracy or determine when payment was due. (Ex.4 ¶¶11, 17-18.) On May 30, 2017, Nash sent Mr. Bone's bill for his December 2016 hospitalization to collections. (Cash Decl. ¶12.) In 2017, two Nash contractors also referred Mr. Bone's bills to collections. (Ex.4 ¶12.)

<u>Organizational Plaintiffs</u>

The NFB is a non-profit advocacy organization that "assists[] the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers" to equal opportunity in areas such as "healthcare." (Ex.9, Riccobono Decl. ¶4.) The NFB has tens of thousands of members, including about 200 who reside in North Carolina. (*Id.* ¶¶4,6.) Mr. Miles and Mr. Bone are NFB members. (*Id.* ¶6.)

DRNC is North Carolina's protection and advocacy agency. (Ex.10, Knowlton-Marcus Decl. ¶4.) All blind individuals residing in North Carolina are constituents of DRNC. (*Id.* ¶¶6, 11.) Mr. Bone and Mr. Miles are constituents of DRNC, as is Dr. Ricky Scott. Dr. Scott is a blind resident of North Carolina who requires Braille or accessible electronic formats to access documents independently. (Ex.11, Scott Decl. ¶¶2-3.)

4

Although Dr. Scott requested written communications in Braille or accessible formats from UNC Family Medicine West and UNC Rex Hospital, entities owned and/or controlled by UNCHCS,[2] he has never received these accessible formats from UNCHCS or its affiliates. (*Id.* ¶¶6-12.)

## QUESTIONS PRESENTED

1. Does UNCHCS discriminate against blind individuals, including Mr. Miles and Mr. Bone, by failing to communicate with them in an equally effective manner through the timely provision of accessible formats?

2. Does UNCHCS act with deliberate indifference when it fails to provide equally effective communication?

3. Is injunctive relief warranted to stop UNCHCS from failing to communicate effectively with the blind?

## LEGAL STANDARD

Summary judgment is appropriate where there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Facts are viewed in the light most favorable to the non-moving party. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001).

---

[2] Ex.12, UNCHCS Organizational Chart.

5

**ARGUMENT**

## I.     UNCHCS DISCRIMINATES AGAINST BLIND INDIVIDUALS BY FAILING TIMELY TO PROVIDE DOCUMENTS IN ACCESSIBLE FORMATS.

To prevail under Title II of the ADA, Section 504, and Section 1557, Plaintiffs

must establish "(1) they have a disability; (2) they are otherwise qualified to receive the

benefits of a public service, program, or activity; and (3) they were denied the benefits of

such service, program, or activity, or otherwise discriminated against, on the basis of

their disability." *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016);

*see Halpern v. Wake Forest Univ. Health Scis*., 669 F.3d 454, 461 (4th Cir. 2012); 42

U.S.C. § 18116 (prohibiting discrimination under Section 1557 on same grounds as

Section 504); 45 C.F.R. § 92.102 (incorporating Title II effective-communication

standards in Section 1557).[3] The undisputed evidence establishes each of these elements.

### A.     John Bone, Timothy Miles, NFB Members, and Blind DRNC Constituents Are Individuals With Disabilities.

Plaintiffs are blind individuals and organizations whose members and constituents

include blind individuals. An individual has a disability pursuant to the ADA, Section

504, and Section 1557 if he or she has a physical or mental impairment that substantially

limits a major life activity. 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9)(B), (20)(B); 45

---

[3] Title II applies to public entities and Sections 504 and 1557 apply to entities and health programs/activities that receive federal funding, respectively. *See* 42 U.S.C. § 12131; 29 U.S.C. § 794(b)(1); 45 C.F.R. § 92.3(a)(1). UNCHCS is a public entity providing health programs/activities and receiving federal funds. (Ex.14, UNCHCS Resp. to DRNC RFA #1; Ex.15, UNCHCS Resp. to NFB RFAs #1, 2.)

C.F.R. § 92.102(c). Because major life activities include "seeing," individuals whose vision cannot be corrected by prescription lenses are substantially limited in seeing and are persons with a disability. 42 U.S.C. § 12102(1), (2)(A), (4)(E).

Mr. Bone has no vision. (Ex.4 ¶3.) Mr. Miles has ocular albinism and low vision that cannot be corrected with prescription lenses, and his vision is further exacerbated at times by diabetes. (Ex.1 ¶¶3,6.) Mr. Bone and Mr. Miles are thus substantially limited in seeing and individuals with disabilities. (Ex.13, UNCHCS Resp. to Bone RFAs #1, 2, 3; Ex.2, RFAs #1, 2, 3.) Because Mr. Bone, Mr. Miles, and other blind individuals are NFB members and DRNC constituents, these organizations have members or constituents who qualify as individuals with disabilities. (Ex.9 ¶6; Ex.10 ¶¶12-13.)

### B. John Bone, Timothy Miles, NFB Members, and Blind DRNC Constituents Are Qualified to Receive Healthcare From UNCHCS.

Plaintiffs, or their members or constituents, are qualified to receive healthcare from UNCHCS, because they "meet[] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by [UNCHCS,] a public entity." 42 U.S.C § 12131(2). *See* 45 C.F.R. § 84.3(l)(4).[4] Their past and current receipt of UNCHCS's healthcare services demonstrates this.

Mr. Bone received healthcare services from Nash, an affiliate of UNCHCS, in 2016 and 2017. (Ex.4 ¶¶5,13.) Mr. Miles is a current patient of UNCHCS and has been a

---

[4] Under Section 1557, individuals with disabilities need not be "qualified" for healthcare services. *See e.g.*, 45 C.F.R. § 92.102.

patient for at least twenty years. (Ex.1 ¶11; Ex.2, RFA #15.) Because Mr. Bone and Mr. Miles are NFB members and DRNC constituents, these organizations have members or constituents who are qualified to receive UNCHCS' healthcare services. In addition, blind DRNC constituent Dr. Ricky Scott is also a current UNCHCS patient qualified to receive its healthcare services. (Ex.11 ¶¶4-5, 13.)

### C. UNCHCS Discriminates Against Blind Individuals, Including Plaintiffs.

Title II, Section 504, and Section 1557 prohibit UNCHCS from discriminating against people with disabilities. These laws affirmatively require covered entities to communicate as effectively with individuals with disabilities as with nondisabled individuals, and to provide auxiliary aids or services when necessary for equally effective communication. 42 U.S.C. § 18116; 28 C.F.R. § 35.160(a)-(b), 45 C.F.R. §§ 84.52, 92.102. A public entity must "give primary consideration to the requests of individuals with disabilities" when determining what type of auxiliary aid or service is necessary. 28 C.F.R. § 35.160(b)(2). Furthermore, "to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.*

Auxiliary aids or services necessary for effective communication with blind patients include Braille, large print, and accessible electronic formats. *See* 28 C.F.R. § 35.104; 45 C.F.R. §§ 84.52(d)(3), 92.101(b)(1). Because healthcare information can be complex and miscommunications can "lead to misdiagnosis and improper or delayed

Case 1:18-cv-00994-TDS-LPA   Document 103-2   Filed 03/30/21   Page 11 of 30

medical treatment," 28 C.F.R. Pt. 35, App A (Section 35.160—"Communications"),

providing auxiliary aids for effective communication in the healthcare context is critical.

UNCHCS provides patients many kinds of documents relating to their healthcare

in standard print.[5] UNCHCS identifies many of these documents as "medically

significant or vital to patient care," including consent-to-treatment forms, patient

histories, and after-visit summaries. (Ex.16 86:11-87:5.) Nevertheless, UNCHCS has

failed to ensure that blind patients like Mr. Bone and Mr. Miles receive equally effective

communication about vital healthcare matters through the timely provision of these

documents in accessible formats.

       1.     UNCHCS failed to provide Mr. Miles with large-print versions of routinely-used documents and haphazardly provided improperly-formatted enlarged print versions of other documents.

---

[5] The written information UNCHCS provides patients includes:
- post-visit care discharge instructions;
- after-visit summaries that explain the outpatient care received and provide a medication list, relevant educational materials, and treatment instructions;
- consent-to-treatment forms;
- appointment reminders;
- intake questionnaires to gather information for the medical record;
- patient rights and responsibilities information;
- HIPAA disclosures that inform patients about legal rights;
- promotional materials regarding UCNHCS's services;
- financial assistance information for uninsured patients;
- medical bills; and
- communications from Patient Relations staff regarding patient healthcare complaints.

(Ex.16, UNCHCS 30(b)(6) (Rogers) Dep. 26:9-35:2; Ex.17, Reese Dep. 40:22-41:23, 67:15-68:20, 79:22-81:21, 88:22-89:13; Ex.18, Romeo Dep. 49:14-52:21.)

Despite being aware of Mr. Miles's request for large print since at least September 2018 (Ex.3-B; Ex.2, RFAs #4, 5, 7), UNCHCS has consistently failed to provide Mr. Miles large-print versions of documents since then—including after this lawsuit was filed, (Ex.1 ¶¶18-19,22,24,27; Exs.1-A-B). UNCHCS never timely provided large-print versions of commonly-used registration forms (including HIPAA disclosures, consent-to-treatment forms, and patient rights and responsibilities notifications) to Mr. Miles. (Ex.1 ¶27; Ex.17 59:3-6, 73:15-17, 77:3-6, 78:6-10, 83:15-84:3, 89:2-9; Ex.18 74:6-11, 83:9-12; Ex.19, Slagle Dep. 65:8-69:11.) UNCHCS also never sent him appointment reminders in large print. (Exs.1-A-C; Ex.8 73:4-8, 76:16-23; Ex.20, First Cass Decl. ¶3A-B; Ex.21, Second Cass Decl. ¶3B.) When UNCHCS has attempted to provide large-print documents, it often has done so only months—or sometimes years—after providing a standard-print version. (Ex.1 ¶¶ 20,22-25.) Furthermore, these documents often have failed to adhere to best practices regarding font size, formatting, color contrast, and other issues and have therefore been difficult or, in parts, impossible for Mr. Miles to read. (Ex.7 103:1-104:1, 125:18-131:2; Ex.7-29; Ex.22 Perez de Paz Dep. 119:12-122:3,[6] 145:18-149:19;[7] Ex.23-A Quon Rep. at 7; Ex.23-B Quon Supp. Rep. at 2; Ex.1 ¶¶20-

---

[6] The document referred to as exhibit 59 in Perez de Paz Dep. 119:12-122:3 is the September 8, 2020, after-visit summary from UNC/UPN Urgent Care at Carolina Pointe II, MILES 1248-1255, Ex. 1-B.

[7] The documents referred to as exhibit 66 in Perez de Paz Dep. 145:18-149:19 are the July 17, 2019, welcome notice and print after-visit summary from UNC Ophthalmology/Kittner Eye Center, MILES 927-942, Ex. 1-B.

21,23-24,27.)[8]  By continuing to provide Mr. Miles standard print documents and consistently failing to provide him with timely large-print documents that conform to best practices for large print and that he can readily read, UNCHCS fails to communicate as effectively with Mr. Miles as it does with sighted patients.

> 2. Mr. Bone received only standard print or, in some instances, untimely Braille documents related to his Nash hospitalizations.

Although it is undisputed that Nash recorded Mr. Bone's request for Braille documents on December 13, 2016, (Ex.4 ¶6; Cash Decl. ¶8.), Nash failed to provide Mr. Bone a copy of his hospital bill in Braille until, at the earliest, April 2017—five months later, (Cash Decl. ¶¶8, 11).[9] Nash's contractors sent Mr. Bone only standard-print invoices related to his December 2016 hospitalization and never provided Braille versions. (Ex.4 ¶¶10-11,21.)

It is also undisputed that, despite being on notice of Mr. Bone's need for Braille when he was hospitalized a second time at Nash in June-July 2017, UNCHCS, Nash, and Nash's contractors continued to send him inaccessible print invoices and appointment reminders following that hospital stay. (Cash Decl. ¶13; Ex.4 ¶¶16-19.) Nash made no effort to provide Mr. Bone with Braille documents until he called to complain on October 24, 2017 (Cash Decl. ¶¶14-15)—and even then, Mr. Bone did not receive a Braille

---

[8] Dennis Quon is the Director of Document Accessibility Solutions at Crawford Technologies and is an expert in systemically creating accessible formats, as outlined in his expert reports. (Exs.23-A-B.)
[9] UNCHCS manages Nash and is responsible for Nash's compliance with federal disability rights laws. *See* Section II, *infra.*

11

version of the June-July 2017 hospital bill until January 2, 2018, six months after his hospitalization, (*Id.* ¶19). Mr. Bone also only received standard-print invoices from Nash's contractors, which were never provided in Braille. (Ex.4 ¶21). And UNCHCS directly sent Mr. Bone standard-print bills and appointment reminders through the end of 2017, which were similarly never sent in Braille. (Ex.8 79:21-81:13; Ex.20 ¶3A-B.)

Although it takes only a few days to convert bills to Braille, (Ex.7 74:19-75:1, 164:10-165:3 (one or two days); Ex.16 79:24-80:17 ("a couple days")), it took months to do so for Mr. Bone. Because of this substantial delay, unless he relied on third-party assistance (which sighted patients need not do), Mr. Bone could not confirm the accuracy of his invoices or pay in a timely fashion, which can be critical to avoiding late fees or referrals to collections agencies. (Ex.4 ¶¶11,17.) Providing Braille invoices months after standard-print invoices is not "timely" and therefore not effective. *See* 28 C.F.R. § 35.160(b)(2). Providing bills and appointment reminders in a format Mr. Bone could not privately and independently access is also ineffective communication. *Id.*

> 3. UNCHCS does not provide accessible formats of its written communications to blind individuals.

UNCHCS's failure to provide accessible formats of written communications to blind patients who need them extends beyond the individual Plaintiffs. DRNC constituent Dr. Scott's experience, for example, is consistent with that of Mr. Bone and Mr. Miles. Dr. Scott has requested communications in Braille or accessible electronic formats from UNC Family Medicine West and Rex UNC Hospital, which are owned and/or controlled by UNCHCS. (Ex.11 ¶¶5-6; Ex.12.) Nevertheless, Dr. Scott has never received Braille or

12

accessible electronic documents from UNCHCS. (Ex.11 ¶¶6-12.) UNCHCS's own data underscores its broad failure to provide accessible formats to blind patients. The UNCHCS Medical Center—just one part of UNCHCS comprising UNC Hospitals at Chapel Hill and various clinics—served 304,289 patients in 2020 alone. (Ex.24, UNCHCS Resp. to DRNC Second Interrogs. No.20.) Because about 2.5 percent of North Carolinians are blind or have "serious difficulty" seeing even with glasses, the Medical Center should expect to have served over 7,000 blind or low-vision patients in 2020. (Ex.25-B, Morris Supp. Rep. at 2.)[10] But UNCHCS has identified only 175 patients as sight-impaired and recorded only three requests for large print and zero requests for Braille. (Ex.26, UNCHCS Supp. Resp. to NFB's Second Interrogs. No.22.) UNCHCS's failure to provide critical healthcare documents in accessible formats to the blind is pervasive.

## II. UNCHCS'S OBLIGATION TO ENSURE EFFECTIVE COMMUNICATION EXTENDS TO ITS NETWORK OF OWNED AND MANAGED HEALTHCARE ENTITIES, INCLUDING NASH.

UNCHCS is responsible for Nash's failure to communicate effectively with Mr. Bone because: (1) UNCHCS admits it is contractually obligated to ensure Nash's compliance with federal disability rights laws; (2) UNCHCS is obligated under Title II, Section 504, and Section 1557 to ensure that any entity through which it provides

---

[10] Dr. Megan Morris is an expert in, *inter alia*, best practices for effective communication in healthcare settings, as outlined in her expert reports. (Exs.25-A-B.)

13

services complies with these laws; and (3) UNCHCS directly sent Mr. Bone inaccessible documents related to his care at Nash.

### A. UNCHCS Is Contractually Liable for the Failure of Its Managed Entities, Including Nash, to Provide Effective Communication.

UNCHCS admits it is contractually obligated to ensure Nash's provision of effective communication. The 2014 MSA "outlines UNC's responsibilities to provide oversight and management" for Nash. (Ex.6 46:1-17.) Under the MSA, UNCHCS is responsible for "day-to-day operations" at Nash, including Nash's "operational compliance with applicable federal, state, and local laws," including the ADA. (Ex.5 § 2(a)-(b), Ex. A(a)(i); Ex.6 50:22-51:6.) UNCHCS also agreed to manage Nash "in accordance with all applicable laws" and to provide administration and management services so as "to maintain all necessary licenses, certifications, permits, and other approvals required by applicable laws and regulations to its operations." (Ex.5 at § 1(b), Ex. A(a)(ii); *see* Ex.6 59:4-7.) To fulfill its MSA responsibilities, UNCHCS works with Nash "to make sure that [Nash is] in compliance" with federal laws. (Ex.6 54:2-4.)[11]

---

[11] UNCHCS's responsibility for Nash's compliance with federal disability rights laws includes a responsibility to ensure Nash's contractors comply with those laws. 42 U.S.C. § 12182(b)(1)(A)(i)–(iii) (prohibiting places of public accommodation from discriminating "through contractual, licensing, or other arrangements"); *accord* 45 C.F.R. § 84.4(b)(1) (Section 504); 45 C.F.R. § 92.3(a) (Section 1557). Covered entities like Nash are responsible for the discriminatory conduct of their contractors under the ADA and Section 504. *E.g.*, *Clinton L. v. Delia*, 2012 WL 5381488, at *5–6 (M.D.N.C. Oct. 31, 2012); *Gil v. Winn-Dixie Stores, Inc.*, 257 F. Supp. 3d 1340, 1347 (S.D. Fla. 2017).

14

If Nash is not operating in compliance with federal law, UNCHCS should know about it. (Ex.6 55:7-20.) And if UNCHCS "had reason to believe that there was an issue" at Nash, UNCHCS "would act on it" and "work to fix it." (*Id.* 52:16-18, 54:2-7.) If a managed entity were doing something it should not, "UNC Health would come in and say that has to be resolved." (*Id.* 31:19-23.)

Under the MSA, UNCHCS is contractually liable for Nash's violation of federal law. UNCHCS's MSAs with other managed entities are similar to its MSA with Nash. (*Id.* 26:3-8, 26:25-27:9.)

### B. UNCHCS Must Ensure the Care Patients Receive at Affiliates Complies with Federal Disability Rights Law.

UNCHCS must ensure the network of healthcare providers operating under its banner, including Nash, do not discriminate when providing healthcare. Title II, Section 504, and Section 1557 apply broadly to "all services, programs, and activities" and "all operations" of public entities. *See* 28 C.F.R. § 35.102; 29 U.S.C. § 794(b)(1)(A); 42 U.S.C. § 18116; *Melton v. Orange Cnty. Democratic Party*, 304 F. Supp. 2d 785, 787 (M.D.N.C. 2004), *aff'd*, 111 F. App'x 707 (4th Cir. 2004). A public entity like UNCHCS, therefore, is liable for services it provides through contracts, licenses, as well as "other arrangements," 28 C.F.R. § 35.130(b)(1)—indeed, Title II applies to "anything a public entity does." *Seremeth v. Bd. of Ct. Comm'rs Frederick Cnty.*, 673 F.3d 333, 338 (4th Cir. 2012).

UNCHCS provides healthcare services through Nash because Nash is part of the UNCHCS network. (Ex.6 19:3-8; Ex.27, Additional Servs. Agreement at UNCHCS310

15

("UNCHCS provides health care services . . . through both owned and managed health care systems and hospitals").) When Nash patients receive bills and appointment reminders, these documents thank them "for choosing UNC Health Care." (Exs.4-A-E.)[12] Because UNCHCS provides healthcare services through Nash—through a "contractual, licensing, or other arrangement[]"—UNCHCS must ensure Nash complies with disability rights laws. *See* 28 C.F.R. § 35.130(b)(1); 28 C.F.R. pt. 35 App. B (2017) ("All governmental activities of public entities are covered, even if they are carried out by contractors.").

### C. UNCHCS Is Liable for Its Own Inaccessible Communications.

UNCHCS not only failed to ensure Nash complied with federal disability rights laws—it also created and sent inaccessible, standard-print bills and appointment reminders directly to Mr. Bone. Following his June-July 2017 hospitalization at Nash, Mr. Bone received five bills for physician services from UNCHCS's Patient Financial Services ("PFS"). (Exs.4-A-H; Ex.7 196:6-13, 198:13-200:1.) UNCHCS was responsible for generating the statements and transmitting them to patients. (Ex.7 30:12-16, 32:3-15, 34:13-16; 177:16-19; Ex.16 44:25-45:21.) The bills are from "UNC Physicians," contain "UNC Health Care" (not Nash) branding, thank Mr. Bone "for choosing UNC Health

---

[12] According to UNCHCS, its affiliation with Nash provides Nash patients "[a]ccess to cutting-edge research and treatments at UNC Health Care," expands "locally-available patient care services," and improves Nash patient care and experience. "Nash Health Care announces affiliation with UNC Health Care," Dec. 16, 2013, https://news.unchealthcare.org/2013/12/nash-health-care-announces-affiliation-unc-health-care/.

16

Care," require Mr. Bone to pay "UNC Health Care," and list the UNCHCS PFS phone number should Mr. Bone have questions. (Exs.4-A-E.)

UNCHCS also created and sent three appointment reminders to Mr. Bone for post-surgery follow-up appointments. (Exs.4-F-H; Ex.8 79:21-81:13.) Like the bills, the appointment reminders state they are from "UNC Health Care," contain "UNC Health Care" branding, and thank Mr. Bone "for choosing UNC Health Care." (Exs.4-F-H.) Because UNCHCS was responsible for creating and sending these communications to Mr. Bone, it is directly liable for the failure to provide them timely in Braille.[13]

## III.  UNCHCS IS DELIBERATELY INDIFFERENT TO ITS OBLIGATION TO PROVIDE EQUALLY EFFECTIVE COMMUNICATION.

Although UNCHCS was aware of Mr. Miles's and Mr. Bone's requests for accessible documents, it continued to communicate with them in standard print for months—and, in the case of Mr. Miles, years—after learning of those requests. That refusal to follow the law in the face of ample notice constitutes deliberate indifference, entitling Plaintiffs to damages. *See Smith v. N.C. Dep't of Safety*, 2019 WL 3798457, at *3 (M.D.N.C. Aug. 13, 2019) (Schroeder, C.J.).

A defendant acts with "deliberate indifference" if it (1) "knew that harm to a federally protected right was substantially likely" and (2) "failed to act on that

---

[13] At a minimum, these UNCHCS-generated documents show that UNCHCS and Nash act jointly in providing healthcare services to Nash patients, further requiring UNCHCS to ensure that Title II is satisfied. *See* ADA Technical Assistance Manual II-1.3000 ("Where public and private entities act jointly, the public entity must ensure that the relevant requirements of Title II are met . . . .").

likelihood." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017). The first prong is satisfied if a defendant has notice of its legal obligations and a plaintiff's accommodation request. *See Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 395 (D. Md. 2011). Regarding the second, a defendant need not harbor discriminatory animus when failing to act; damages are warranted even if harm to a protected right resulted from "thoughtlessness and indifference." *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829–29 (D. Md. 1998).

UNCHCS has been aware of its effective communication obligations—which have been the law for 44 years under Section 504 and 31 years under the ADA[14]—since at least 2016 (Ex.28, 2016 Effective Communication policy), and it has been aware of Mr. Miles's and Mr. Bone's requests for alternate formats since at least September 2018 and December 2016, respectively (Ex.3-B; Cash Decl. ¶8). Yet it has "failed to act" to ensure compliance with these obligations—even after Plaintiffs brought the present litigation.

### A. Mr. Miles

Before April 2019, UNCHCS lacked policies and procedures to ensure effective communication with patients with disabilities. Its written policy had "minimal information" about effective communication (Ex.25-A at 9), and did not explain how staff were to record requested accessible formats or provide them to patients, (Ex.29, Aug. 2017 Effective Communication policy). There was no uniform process for recording requests in patients' electronic records and no "specific place to find that

---

[14] 42 Fed. Reg. 22,677 (May 4, 1977); Pub. L. No. 101-933, 104 Stat. 327 (1990).

information" once recorded. (Ex.30, Williams Dep. 160:15-18.) UNCHCS also lacked processes for responding to Mr. Miles's large-print document requests in 2018. Only for billing did UNCHCS assign staff to manually check his account for outgoing bills, which UNCHCS concedes was a "stop gap" measure not feasible at scale. (Ex.7 103:1-16, 104:9-105:1.) This stop-gap measure did not work—Mr. Miles routinely received inaccessible documents. The failure to implement reasonable policies and procedures to ensure compliance evinces deliberate indifference. *See Biondo v. Kaledia Health*, 935 F.3d 68, 76 n.4 (2d Cir. 2019) (hospital acts with deliberate indifference if it "fail[s] to put in place a policy that would reasonably enable a patient to obtain the relief guaranteed by [Section 504]").

UNCHCS already knew what was required to ensure effective communication in other contexts: for patients with limited English proficiency, the 2016 effective communication policy outlined, *inter alia*, how to record translation requests, which documents required translation, and how to procure translators. (Ex.29.) UNCHCS chose not to adopt such policies to ensure effective communication with patients with disabilities.

After Mr. Miles took legal action, UNCHCS changed its written policies and procedures (Ex.30 163:2-14; Ex.7 101:13-102:17, 132:16-21), but made no effort to ensure their implementation. For instance, although the 2019 effective communication policy states that UNCHCS will assess the needs of patients with disabilities at registration (Ex.31, May 2019 Effective Communication policy, at § V.C.), UNCHCS

19

supervisors do not know if staff collect and record disability-related information at registration, or even if they are supposed to, (*E.g.*, Ex.18 70:24-71:10, 72:18-22; Ex.19 72:19-74:1; Ex.16 115:7-13, 117:1-6; Ex.30 105:11-17). Registration supervisors did not even recognize the 2019 policy at their depositions. (Ex.18 70:6-16, 71:18-72:2, 73:1-7; Ex.19 72:3-4, 85:2-15; Ex.17 43:1-5, 49:21-50:3.) Even where a request for accessible formats is recorded, staff do not review such requests before future appointments to ensure the requested format is provided at the appointment. (Ex.18 57:11-18, 69:10-14; Ex.19 77:9-14; Ex.17 66:10-20.) And supervisors do not know how staff should obtain accessible formats when requested. (Ex.17 44:23-45:16, 59:7-60:1, 71:10-72:6, 97:1-8, 103:12-17; Ex.18 75:8-20, 76:13-22; Ex.19 68:22-69:5, 97:11-14.) This failure to implement the new policy in practice underscores UNCHCS's deliberate indifference. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275–76 (2d Cir. 2009) (deliberate indifference exists if hospital "had a general policy of providing interpreters, but [staff] was unaware of any practice of scheduling an interpreter in advance").

These implementation failures have directly impacted Mr. Miles. Since at least September 2018, UNCHCS has known of Mr. Miles's request for large print. Yet even after this lawsuit was filed, UNCHCS continues to routinely provide him with standard print documents and the enlarged-print documents it provides often do not conform to best practices for large print and Mr. Miles cannot readily access them. (Exs.1-B-C.) *See also Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("a public entity does not 'act' by proffering just any accommodation"). Mr. Miles even received a letter

20

from Patient Relations in standard print addressing UNCHCS's prior failure to provide large print. (ECF No.26-4.) This pattern of failure over years underscores UNCHCS's deliberate indifference. *See Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 399 (D. Md. 2011) ("pattern of failure to provide" a requested auxiliary aid or service evinces deliberate indifference).

These failures are no accident; they stem from UNCHCS leadership's lack of direction and oversight. UNCHCS's Section 1557 coordinator—who is responsible for compliance with the disability rights statutes—does not even know if all UNCHCS entities have an effective communication policy. (Ex.30 17:5-10, 26:8-16, 37:10-21, 137:9-17, 138:2-5, 139:8-21.) Years after this lawsuit was filed, she has only now included a review of effective communication procedures as part of a 2022 work plan and only "[b]ecause of Mr. Miles['s] case." (*Id.* 193:19-199:5.) She has delegated her Section 1557 responsibilities, primarily to the Patient Relations department, but exercises no oversight. (*Id.* 17:14-17, 18:18-21, 19:11-13, 21:5-7.) The head of Patient Relations at the Medical Center, Shane Rogers, spends five percent of his time on accessibility-related issues. (Ex.16 110:25-111:5.) Patient Relations' handling of Mr. Miles's large-print requests has been ineffective; Patient Relations has no training in creating accessible documents and has limited its involvement to attempting to instruct clinic staff on enlarging after-visit summaries. (Ex.22 12:4-13:4, 28:4-6, 29:4-16, 82:8-21, 104:14-107:5, 108:18-109:4, 123:4-124:14, 127:21-128:19; Ex.32, UNCHCS 30(b)(6) (Rogers Second Dep.) 48:3-17.) Similarly, the failure of UNCHCS's large-print bills to conform

21

to best practices is not accidental; it reflects UNCHCS's choice to design the bills without consulting experts or following publicly-available best practices. (Ex.7 103:1-19, 125:18-131:2; Ex.7-29; Ex.22 119:12-122:3,[15] 145:18-149:19;[16] Ex.23-A at 7; Ex.23-B at 2.)

UNCHCS knows how to establish reliable processes and procedures when it so chooses. Unlike here, UNCHCS has implemented processes to ensure registration staff collect language-preference information—including by prompting them, within the electronic health records system, to collect this information if they fail to do so. (Ex.8 23:14-25:1-6.) If a patient has a Spanish-language preference recorded, Spanish appointment reminders are automatically generated for that patient. (*Id.* 72:22-24, 75:3-12.) Yet UNCHCS has not done the same for individuals requiring large print. (*Id.* 73:4-12, 76:16-23.) While registration staff have "an entire catalog of forms that have been translated into Spanish," they do not keep copies of commonly-used forms in alternate formats on hand. (Ex.16 88:12-18, 90:2-10; Ex.17 89:2-5.) Unlike here, UNCHCS translates patient-specific materials into Spanish in advance of appointments. (Ex.16 91:7-20.)

Even when it comes to providing accessible formats, UNCHCS knows how to do better. UNCHCS could have created FYI flags for blind patients and linked those flags to automatic processes to create alternate-format documents, as far back as 2014. (Ex.7 165:13-166:14; Ex.8 39:12-19.) It chose not to. And when UNCHCS automated the

---

[15] *See supra* n.6
[16] *See supra* n.7

creation of large-print bills in 2019, it declined to do the same for appointment reminders and other frequently-sent documents—even after its vendor said it could easily do so. (Ex.33, Sept. 28, 2018-Oct. 3, 2018 E-mail exchange; Ex.20 ¶3A-C; Ex.21 ¶3B-D.) These choices amount to deliberate indifference.

### B. Mr. Bone

UNCHCS also has been deliberately indifferent to Mr. Bone's need for Braille. Although UNCHCS is responsible for Nash's compliance with the ADA, Section II, *supra*, UNCHCS has made no effort to ensure Nash's compliance. UNCHCS does not know if Nash has an effective communication policy regarding accessible formats, or whether, at the time of Mr. Bone's two hospitalizations at Nash, it was possible for Nash to note in Mr. Bone's electronic medical record that he was blind and needed Braille. (Ex.13 RFAs #2-3.) While UNCHCS is responsible for ensuring that Nash patients' requests for bills in accessible formats are fulfilled (Ex.7 209:16-210:10), UNCHCS does not know how such requests are communicated from Nash to UNCHCS's billing department (Ex.34, UNCHCS Resp. to Bone Interrog. #18), and does not know if Mr. Bone's health record currently indicates he needs Braille, (Ex.13 at RFA #15).

UNCHCS took no steps to provide Mr. Bone with Braille documents (both before and after learning of his complaint), nor did it communicate with Nash contractors regarding Mr. Bone's request for Braille. (Ex.35, UNCHCS Resp. to First Interrogs. #3, 11; Ex.7 204:17-20, 208:2-9.) UNCHCS never even investigated Nash's underlying effective communication policies and procedures. (Ex.30 63:19-64:9, 69:12-70:1, 72:5-

23

11.) By "fail[ing] to put in place a policy that would reasonably enable a patient to obtain the relief guaranteed by the [disability rights statutes] by complaining to the [Nash] staff with whom [Mr. Bone] has contact," *Biondo*, 935 F.3d at 76 n.4, UNCHCS acted with deliberate indifference.

Worse, UNCHCS declined to address its own inaccessible communications with Mr. Bone even after learning that he needed Braille. On December 5, 2017, UNCHCS's general counsel notified Mr. Bone (through counsel), on behalf of Nash, that his Nash bill was on hold until he received a Braille version; three weeks later, UNCHCS sent Mr. Bone another standard-print bill. (Ex.3-A, Dec. 5, 2017 E-mail from G. George to H. Stiles; Ex.4-E, Dec. 28, 2017 bill.) UNCHCS's "pattern of failure to provide" requested accessible formats constitutes deliberate indifference. *Paulone*, 787 F. Supp. 2d at 399.

## IV.     INJUNCTIVE RELIEF REQUIRING UNCHCS TO COMMUNICATE EFFECTIVELY WITH BLIND INDIVIDUALS IS NECESSARY.

The Court should enjoin UNCHCS to implement systemic changes across its network to ensure that all UNCHCS affiliates provide equally effective communication to Plaintiffs or their members or constituents.[17] Injunctive relief is appropriate when a plaintiff shows: (1) irreparable injury, that (2) cannot be adequately compensated for with monetary damages; (3) the balance of hardships tilts in favor of plaintiff; and (4)

---

[17] Given the range of UNCHCS facilities and affiliates that have failed to provide timely accessible formats to Plaintiffs or their constituents or members (non-exhaustively: UNC Medical Center, the numerous clinics Mr. Miles visited, Nash, and UNC Rex Hospital), only injunctive relief across the entire UNCHCS network will ensure future legal compliance in a systemic, rather than ad hoc, manner.

equitable relief is in the public interest. *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017). All four prongs are met here.

First, "irreparable harm can be presumed from a violation of civil rights statutes such as the ADA," *Pathways Psychosocial Support Ctr., Inc. v. Town of Leonardtown*, 223 F. Supp. 2d 699, 717 (D. Md. 2002)—especially where, as here, the failure to ensure effective communication can imperil plaintiffs' health. (Ex.25-A at 9.). Second, damages cannot ensure that Plaintiffs, or their members or constituents, can privately and independently access critical healthcare information on a timely basis. Third, the balance of hardships tips in favor of Plaintiffs. Without an injunction, blind individuals will continue to be deprived of equal access to medical information. An injunction requiring UNCHCS to comply with existing laws imposes no burden but "merely seeks to prevent the defendants from shirking their responsibilities." *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986). Finally, the "public interest lies with preserving access to health care for individuals," through the eradication of discrimination. *See Pashby v. Delia*, 709 F.3d 307, 330–31 (4th Cir. 2013). The injunctive relief sought in Plaintiffs' proposed order reflects best practices for systematically and timely providing equally effective communication with the blind, as outlined in Mr. Quon's and Dr. Morris's expert reports. (*See* Exs.23-A-B; Exs.25-A-B.)

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment and Order a trial on damages.

Respectfully submitted this 30th day of March, 2021.

/s/ Holly Stiles
Christopher A. Hodgson
N.C. State Bar No. 50135
Holly Stiles
N.C. State Bar No. 38930
Disability Rights North Carolina
3724 National Drive, Suite 100
Raleigh, NC 27612
Phone: 919-856-2195
Fax: 919-856-2244
chris.hodgson@disabilityrightsnc.org
holly.stiles@disabilityrightsnc.org

/s/ Jessica P. Weber
Jessica P. Weber
James O. Strawbridge
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD 21202
Tel: 410-962-1030
Fax: 410-385-0869
jweber@browngold.com
jstrawbridge@browngold.com

*Counsel for Plaintiffs*

26

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL CASE NO. 1:18-CV-994-TDS-LPA

| | |
|---|---|
| JOHN BONE, et al., | |
| Plaintiffs, | |
| v. | **CERTIFICATE OF COMPLIANCE** |
| UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM, | |
| Defendant. | |

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for Plaintiffs' Memorandum of Law in Support of Plaintiffs' Partial Motion for Summary Judgment is less than 6,250 words. In making this certification, the undersigned has relied upon Microsoft Word and its word count feature.

This the 30th day of March, 2021.

/s/ Jessica P. Weber
Jessica P. Weber
James O. Strawbridge
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD 21202
Tel: 410-962-1030
Fax: 410-385-0869
jweber@browngold.com
jstrawbridge@browngold.com

27