**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JOHN BONE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18cv994 |
| | ) | |
| UNIVERSITY OF NORTH CAROLINA | ) | |
| HEALTH CARE SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court on (i) the "Motion for Partial Summary Judgment" (Docket Entry 103) ("Plaintiffs' Motion") filed by John Bone, Timothy Miles, the National Federation of the Blind, Inc. (the "NFB"), and Disability Rights North Carolina (individually, the "DRNC," and collectively, the "Plaintiffs"); (ii) "Defendant UNC Health Care System's Motion for Summary Judgment Against Plaintiff Timothy Miles" (Docket Entry 107) ("Defendant's Miles Motion"); (iii) "Defendant UNC Health Care System's Motion for Summary Judgment Against Plaintiff John Bone" (Docket Entry 109) ("Defendant's Bone Motion"); (iv) "Defendant UNC Health Care System's Motion for Summary Judgment Against Plaintiff The National Federation of the Blind" (Docket Entry 111) ("Defendant's NFB Motion"); (v) "Defendant UNC Health Care System's Motion for Summary Judgment Against Plaintiff Disability Rights of North Carolina" (Docket Entry 112) ("Defendant's DRNC Motion"); and (vi) "Plaintiffs' Motion to Seal" (Docket Entry 104) (the "Sealing

Motion"). For the reasons that follow, the Court (i) should grant in part and deny in part Plaintiffs' Motion, Defendant's Bone Motion, and Defendant's NFB Motion; (ii) should deny Defendant's Miles Motion and Defendant's DRNC Motion; and (iii) will deny the Sealing Motion without prejudice.

<u>**BACKGROUND**</u>

## I. Procedural History

In December 2018, Plaintiffs initiated "this action against the University of North Carolina Health Care System (d/b/a UNC Health Care) ('[at times, UNCHCS]') and Nash [Hospitals, Inc.] ('[at times,] Nash'), for denying blind individuals an equal opportunity to access their health care information, in violation of Titles II and III of the Americans with Disabilities Act of 1990 ([the] 'ADA'), 42 U.S.C. §§ 12131-12134, 12181-12189, Section 504 of the Rehabilitation Act ('Section 504'), 29 U.S.C. § 794(a), and Section 1557 of the Patient Protection and Affordable Care Act ('Section 1557'), 42 U.S.C. § 18116" (collectively, the "Acts") (Docket Entry 1, ¶ 1; <u>accord</u> Docket Entry 18 (the "Amended Complaint"), ¶ 1).[1] As this Court (per the undersigned United States Magistrate Judge) previously explained:

> According to the Amended Complaint, [Bone] is "blind and uses Braille to make and receive written communications." (Docket Entry 18, ¶ 7.) Similarly, the

---

1 In January 2019, Plaintiffs amended their complaint to correct Nash's name. (<u>Compare</u> Docket Entry 1, ¶ 1, <u>with</u> Docket Entry 18, ¶ 1.)

2

Amended Complaint alleges that [Miles] is "blind and cannot read standard print. He relies on large print or electronic documents that he can enlarge to make and receive written communications." (Id., ¶ 8.) The Amended Complaint identifies [NFB] as a non-profit corporation that "promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, health care, employment, family and community life, transportation, and recreation." (Id., ¶ 9; see also id. ("The vast majority of [NFB's] approximately 50,000 members [including Bone and Miles] are blind persons who are recognized as a protected class under federal laws.").) Finally, the Amended Complaint describes [DRNC] as a non-profit corporation "authorized to pursue administrative, legal, and other appropriate remedies to protect and advocate for the legal rights of individuals with disabilities and to redress incidents of discrimination in the state." (Id., ¶ 11; see also id., ¶ 12 ("[DRNC] represents the interests of its blind constituents in North Carolina who require medical documents in alternative formats.").)

In turn, the Amended Complaint alleges that Defendant UNCHCS "is an integrated health care system owned by the state of North Carolina[,] established by state law, N.C.G.S. § 116-37. [UNCHCS] currently consists of UNC Hospitals and its provider network . . . and eleven affiliate hospitals and hospital systems across the state, including [Nash]," with its "principal place of business [] in Chapel Hill, North Carolina." (Id., ¶ 13.) The Amended Complaint further identifies [Nash] as a "non-profit hospital affiliate" of [] UNCHCS, which "employs and contracts with numerous providers for the delivery of medical services in its facilities," with a "principal place of business [] in Rocky Mount, North Carolina." (Id., ¶ 14.) According to the Amended Complaint, both [] UNCHCS and [Nash] receive "federal financial assistance from the Department of Health and Human Services." (Id., ¶ 60.)

The Amended Complaint asserts that "Titles II and III of the ADA, Section 504, and Section 1557 require [UNCHCS and Nash] to communicate in an equally effective manner with all blind individuals, and to ensure that their contractors . . . do the same." (Id., ¶ 2.)

3

Moreover, the Amended Complaint maintains that [UNCHCS and Nash] and their contractors violate these laws by "depriv[ing] blind individuals of full and equal access to their medical services, programs, and activities. They provide critical communications, such as health care notices, visit summaries, follow-up instructions, forms, questionnaires, invoices, and other types of documents, only in standard print, a format inaccessible to blind individuals." (<u>Id.</u>, ¶ 3.) In particular, the Amended Complaint states that:

> ineffective communication with blind . . . patients . . . compromises their ability to review, and, if necessary, respond to communications on a timely basis, and forces them to rely on and divulge private medical and financial information to sighted third parties for assistance. This disrupts blind patients' access to their health care, prevents them from understanding and following medical instructions, and results in unfair financial penalties for not being able to access and pay medical bills on time, all leading to significant financial and personal hardship.

(<u>Id.</u>)

To support its claims, the Amended Complaint sets forth the following facts . . . .:

## A. Plaintiff Bone

[] Bone [is] a resident of Rocky Mount, North Carolina, [and] relies on [Nash] for his emergency medical needs.

[He] visited Nash General Hospital to receive emergency medical services in December 2016, and again in or about June and July 2017. During [] Bone's 2016 visit [and 2017 hospitalization], he received services from [Nash] directly and from its contractors . . . . Upon information and belief, all of these entities are either components of [UNCHCS] and/or [Nash].

During these two hospital visits, [] Bone informed hospital and provider staff that he was blind and needed to receive medical bills in

4

Braille.  The staff did not ask [] Bone to take any
additional steps to obtain medical bills in
Braille.

Neither the hospital nor its contractors
initially sent bills to [] Bone in Braille.
Instead, [] Bone received all of the bills related
to his hospital visits in print.

[] Bone could not read the print bills and did
not know how much money he owed or who[m] to pay
for his two emergency medical visits.

The hospital and its contractors continued
sending [] Bone second and final bill notices in
print; he accrued late fees; and [Nash] and at
least three of its contractors referred him to
collection agencies.  The creditors pursued payment
from [] Bone and threatened him.

Only after [Bone's counsel] wrote to [Nash]
did it agree to provide Braille invoices for
previously sent bills.  None of [Nash]'s
contractors, however, have provided Braille
invoices.  Thus, [] Bone still does not know how
much money he owes for his two emergency medical
visits.  Furthermore, [UNCHCS, Nash], and their
contractors have all failed to address whether []
Bone could expect to receive Braille documents
going forward without attorney involvement.  They
have not provided any assurances that the hospital
system would ensure timely provision of alternative
formats on a systemic basis.

(Id., ¶¶ 15-21 (internal paragraph numbers omitted).)

**B. Plaintiff Miles**

[] Miles resides in Chapel Hill, North
Carolina and is a regular patient of several
different medical practices operating out of
[UNCHCS, which h]e visits . . . at least once every
six months and often more frequently.  For example,
between June and August 2018, [] Miles visited
three different UNC practices. . . .

During visits to [UNCHCS] providers, [] Miles
receives standard[-]print versions of documents and

5

often asks the staff for large[-]print versions of the documents instead. These include notices he is asked to sign, forms, visit summaries, and follow-up instructions. [UNCHCS] providers consistently refuse to provide [] Miles with these documents in large print. Some providers have offered to read documents aloud to [] Miles, but this is not effective for [] Miles, who, particularly in the case of visit summaries and follow-up instructions, wants to have a document to take home with him to review after his visits. He does not want to be forced to memorize all of the information contained in these documents. With respect to notices, these documents are often long[,] and provider staff typically paraphrase and attempt to summarize the contents, rather than read the entire notice verbatim. Such summarizing does not provide [] Miles with all of the same information contained in the standard[-]print notices.

[] Miles also receives all of his invoices from [UNCHCS] providers in standard print. These invoices typically come from [UNCHCS]'s billing department directly and [Miles] has called [UNCHCS] to request large[-]print copies. For example, in December 2017, [] Miles called the billing department to ask for an end of year summary of all of his bills in large print. The billing department responded by telling [Plaintiff] Miles that it would 'look into it.' He never heard back from the billing department about this request or received large[-]print documents as a result. On other occasions, the billing department has told [] Miles that its medical billing system does not allow for large[-]print billing statements. Only following a letter from [] Miles's counsel regarding [UNCHCS]'s failure to provide accessible formats[] did [UNCHCS] mail [] Miles large[-]print documents related to some recent visits with [UNCHCS] providers.

[UNCHCS] has failed to ensure that [] Miles receives large[-]print documents in a timely manner, independent of attorney involvement. For example, after [UNCHCS] mailed [] Miles these select large[-]print documents, [] Miles visited two different [UNCHCS] practices on or about

6

October 10, 2018, and October 19, 2018. During each visit, [] Miles requested large[-]print documents, but was told by staff that they could not provide them. During one of his visits, [] Miles could not access the provider's instructions that he received in standard print at the end of his visit. Although staff attempted to read the instructions out loud to him, he was not feeling well at the time and believed he was unlikely to be able to remember all of the instructions. [] Miles wants to be able to access his health care information independently, without having to disclose personal medical information to third parties. He could do so if [UNCHCS] and its contractors provided him with large[-]print documents.

(Id., ¶¶ 23-26 (internal paragraph numbers omitted).)

Based on its allegations, the Amended Complaint requests that the Court: (1) issue a declaratory judgment; (2) order injunctive relief; (3) award compensatory damages and attorneys fees; and (4) grant other "just and proper" relief. (Id. at 22-23.)

(Docket Entry 44 at 2-7 (certain brackets and ellipsis in original).)[2]

Nash and UNCHCS moved to dismiss the Amended Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"). (See Docket Entries 20, 28.) As relevant to the current motions, UNCHCS contended that it lacked control over Nash (see, e.g., Docket Entry 24 at 2), and that NFB and DRNC lacked associational standing (see id. at 2, 13-15). For its part, Nash maintained that Bone, NFB, and DRNC — the parties who pursed claims against it (see, e.g., Docket Entry 44 at 24

---

2 Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

(noting that Miles did not bring claims against Nash)) — lacked standing to sue Nash on the theory that, inter alia, Bone "[wa]s [not] likely to be denied communications in Braille[, his preferred format,] in the future" (Docket Entry 29 at 9 (internal footnote omitted)).

Concluding (i) that the Amended Complaint "sufficiently linked the failure to provide [] Bone with Braille billing documents to [] UNCHCS, through its relationship with [Nash] and [Nash's] contractors" (Docket Entry 44 (the "Recommendation") at 14-15; see also id. 44-46 (addressing UNCHCS's argument "that Plaintiffs' allegation that [] 'UNCHCS has not ensured that its affiliated entity, [Nash], complies with Title II of the ADA . . . appears to misapprehend the nature of the contractual relationship between [] UNCHCS and [Nash]'" (ellipsis and certain brackets in original))) and (ii) that NFB and DRNC possess associational standing to pursue their claims against UNCHCS (id. at 23-24), the undersigned recommended that the Court deny UNCHCS's dismissal motion. (See id. at 50-51.) However, because (i) Bone, NFB, and DRNC pursued a Title III claim against Nash, (ii) Title III affords only injunctive relief rather than compensatory damages, and (iii) Bone failed to establish a likelihood of returning to Nash in the future (see id. at 32-38), the Recommendation advised dismissal of the Title III claim against Nash (id. at 50-51). In addition, because NFB and DRNC derived their standing to sue Nash through Bone but

8

did not themselves pursue compensatory damages against Nash, the undersigned concluded that Bone's lack of standing to pursue injunctive relief against Nash deprived NFB and DRNC of standing to pursue their Section 504 and Section 1557 claims against Nash. (See id. at 38.)  The Recommendation thus proposed dismissal of NFB's and DRNC's claims against Nash for lack of standing. (See id. at 50-51.)

As relevant here, UNCHCS objected to the Recommendation on the grounds that the Amended Complaint describes "*bureaucracy*, plain and simple." (Docket Entry 51 (the "Objections") at 19 (emphasis in original).)  According to UNCHCS:

> [T]he ADA's laudable purpose is to "address[] *discrimination* against individuals with disabilities" in order to achieve "the elimination of *discrimination*," 42 U.S.C. § 12101(b)(1) — not the elimination of the ineluctable imperfections inherent in all human institutions. Plaintiffs do not allege that non-disabled individuals seeking, out of convenience, to receive large[-]print documents have received or would receive them without the same administrative lapses or delays, born of nothing more than the ordinary bureaucratic rigidity which will tend to confront any non-routine matter. They have not alleged, to illustrate further, that patients with Limited English Proficiency, to whom UNCHCS also has legal obligations, have not frequently encountered similar frustrations.

(Docket Entry 51 at 19-20 (emphasis and second set of brackets in original).)

"[F]ind[ing] that the [parties' various] objections do not alter the substance of the Recommendation" (Docket Entry 57 at 1), the Court (per Chief United States District Judge Thomas D.

Schroeder) reached a determination "in accord with the [Recommendation]" (id.), which it adopted (see id. at 3). As such, the Court dismissed the Title III claim, as well as NFB's and DRNC's claims, against Nash but otherwise denied the dismissal motions. (See id. at 1-3.)

Thereafter, UNCHCS moved for judgment on the pleadings, relying in large part on arguments from its Objections. (See, e.g., Docket Entry 98 at 20-21 (comparing arguments).) Because, "[a]s the Court has already determined, Plaintiffs have alleged plausible claims for relief under the Acts" (id. at 31), the undersigned recommended that the Court deny that motion (see id.). The Court (per Chief Judge Schroeder) adopted that recommendation. (See Docket Entry 106 at 1.) Meanwhile, Bone, NFB, and DRNC settled their claims against Nash, resulting in its dismissal with prejudice from this action. (See Docket Entries 96, 97.)[3]

Plaintiffs and UNCHCS subsequently filed cross-motions for summary judgment (see Docket Entries 103, 107, 109, 111, 112 (collectively, the "Summary Judgment Motions")), in connection with which Plaintiffs moved to seal certain documents (see Docket Entry 104 at 2). As relevant to the Summary Judgment Motions, the record reflects the following:

_____

3 Nash did not admit liability as a part of this settlement. (Docket Entry 96 at 2.)

10

## II.  John Bone

Bone is and has always been "totally blind."  (Docket Entry 110-10 at 2 (16:8-14); <u>see also</u> Docket Entry 103-7, ¶ 3 (averring that "[Bone is] blind").)  "Because [he] ha[s] no vision, [he] cannot read documents in standard print and must rely on sighted individuals to read such documents to [him]."  (Docket Entry 103-7, ¶ 3.)  However, "[he] can privately and independently read Braille documents."  (<u>Id.</u>, ¶ 4.)

Nash General Hospital serves as the closest hospital to Bone's residence in Rocky Mount, North Carolina.  (<u>See</u> <u>id.</u>, ¶ 2; Docket Entry 110-10 at 33 (60:22-24).)[4]  On December 13, 2016, Bone experienced a medical emergency, in connection with which an ambulance took him to Nash General Hospital.  (<u>See</u> Docket Entry 103-7, ¶ 5; Docket Entry 110-10 at 34 (61:14-23).)  Nash admitted Bone "for three or four days."  (Docket Entry 103-7, ¶ 5; <u>see also</u> Docket Entry 110-10 at 8 (28:18-19) (testifying that Bone "was [at the hospital] from the 13th of December until the 16th of December").)  "During [his] stay, [Bone] informed the hospital staff and other medical providers, including nurses, doctors, and someone [he] understood to be a social worker, that [he] was blind and needed to receive all medical documents and bills in Braille."  (Docket Entry 103-7, ¶ 6.)  "[S]pecifically[, Bone]

---

4  "Vidant Hospital in Tarboro" qualifies as "next closest hospital to [Bone]."  (Docket Entry 110-10 at 33-34 (60:25-61:1).)

request[ed] . . . [a]ny documents that a sighted person should be able to read" (Docket Entry 110-10 at 9 (29:22-25)), as well as "[his] bills" (id. at 10 (30:2)) in Braille. In responding to those requests, Nash staff stated that they would "'see what [they] c[ould] do, but [they] really c[ouldn]'t do anything about it.'" (Id. at 11 (31:18-23); see also id. at 12 (33:7-13) (indicating that "the response from everybody that [Bone] made the request of" was, "'We'll see what we can do'"); Docket Entry 103-7, ¶ 8 ("Individuals to whom [he] made [his] request either said it was not possible to provide [him] with Braille documents or said they would look into it.").)

Bone began requesting Braille documents "when [he] was in the emergency room during th[e] day" on December 13, 2016, and continued making his requests after his transfer to an inpatient hospital room. (Docket Entry 110-10 at 9 (29:17-21).) "[Bone] made a request every day to everybody that would come in" (id. (29:20-21); see also id. (29:3-5) ("Every day [Bone] was in the hospital, [he] made requests [for Braille materials. He] made requests to doctors and everybody [he] could talk to.")), requesting Braille documents "at least 20 or 30 times" during this stay (id. at 12 (33:14-18)). "Despite [his] requests, [Bone] did not receive Braille versions of any documents that were provided to [him], including documents [that he] needed to sign, while [he] was at the hospital." (Docket Entry 103-7, ¶ 7; see also Docket Entry

12

110-10 at 10 (30:10-11) ("[T]hey didn't give [Bone] Braille, and they had [him] sign stuff."), 20 (42:12-19) (testifying that Bone never received Braille documents regarding this stay, either during or afer his stay).)  In addition, even though he asked "what it was that [he] w[as] signing," people did "not really" explain to Bone "what it was that [he] w[as] asked to sign."  (Docket Entry 110-10 at 10-11 (30:22-31:2); see also id. (30:7-31:17) (discussing non-Braille documents provided for Bone's signature).)  Moreover:

> During this visit, [Bone] was not provided with information about [his] right to effective communication and auxiliary aids; [he] was not provided with an accessible copy of UNC Health Care or Nash General Hospital grievance procedures or nondiscrimination policies; [he] was not referred to an ADA or Section 1557 Coordinator; [he] was not referred to a Patient Relations office; and no one explained to [him] if there were other steps [that he] needed to take in order to obtain Braille documents.

(Docket Entry 103-7, ¶ 9.)

"After [Bone] was discharged, Nash and several other entities (which [he] understand[s] to be Nash contractors) that provided [him] with healthcare services during [his] hospitalization, including Emergency Coverage Corporation, Nash X-Ray Associates, NC Inpatient Medicine Associates, and Rocky Mount Urology Associates, sent [him] medical bills in print."  (Id., ¶ 10.)  "Because the bills were in print, [Bone] could not read them and could not independently confirm the accuracy of the invoices or pay them in a timely fashion."  (Id., ¶ 11.)  Although Bone's friend Rod Gyorke helps him with non-Braille materials that he receives in the mail

13

(see Docket Entry 120-6 at 7-8 (39:14-40:2)), Bone instructed
Gyorke not to open the materials from Nash "because [Bone was]
going to try to figure out what to do about getting them put in
Braille" (Docket Entry 110-10 at 24 (49:20-22); see also id.
(49:17-22)). "Two Nash contractors then referred [Bone's] bills to
collection agencies, and these collection agencies sent [him] new
billing notices — again, in standard print." (Docket Entry 103-7,
¶ 12.) A few weeks after his discharge, Bone began receiving
collection calls "regarding [his] stay at Nash" (Docket Entry 110-
10 at 29 (55:18)). (See, e.g., id. at 27-29 (53:10-55:24)
(discussing calls).)

On or about June 29, 2017, Bone broke his hip in a fall,
leading to his emergency admission to Nash General Hospital, where
he ultimately underwent a partial hip replacement. (See id. at 32-
33 (59:3-60:16); see also Docket Entry 103-7, ¶ 13 (explaining that
Bone "visited Nash General Hospital for a second time to receive
emergency medical services, including surgery, in 2017").) As with
his earlier emergency admission, the rescue squad transported Bone
by ambulance to Nash General Hospital due to its proximity; Bone
did not request that they take him to that particular hospital.
(See Docket Entry 110-10 at 33-34 (60:20-61:13).) Bone's visit to
Nash General Hospital "started on June 29, 2017, and ended on July
4, 2017." (Docket Entry 103-7, ¶ 13.) "During [his] second visit,
[Bone] again asked hospital staff and medical providers to provide

14

[him] with medical bills and all other documents related to [his] healthcare in Braille." (Id., ¶ 14; see also Docket Entry 110-10 at 33 (60:17-19) (testifying that Bone "identif[ied] the need for Braille" during his emergency admission to Nash General Hospital).) Bone did not receive any Braille materials during this admission. (See Docket Entry 110-10 at 20 (42:4-19).) Gyorke stayed with Bone during his time in the emergency room, but Bone declined his assistance on paperwork because Bone "wanted it in Braille" (id. at 35 (63:24-25)). (See id. (63:14-25).) Again:

> During this visit, [Bone] was not provided with information about [his] right to effective communication and auxiliary aids; [he] was not provided with an accessible copy of UNC or Nash General Hospital grievance procedures or nondiscrimination policies; [he] was not referred to an ADA or Section 1557 Coordinator; [he] was not referred to a Patient Relations office; and no one explained to [him] if there were other steps [that he] needed to take in order to obtain Braille documents.

(Docket Entry 103-7, ¶ 15.)

After his discharge from Nash General Hospital, "[Bone] went to [the] Bryant T. Aldridge Rehab Center" (Docket Entry 110-10 at 6 (22:11-12)), a component of Nash (see Docket Entry 103-8 at 2), from July 4, 2017, through July 13, 2017 (Docket Entry 110-10 at 6 (22:24-25)). At the rehab center, "[t]hey d[id] not give [Bone] any Braille copies of anything, and [he] asked them about that, and they told [him] that they didn't . . . think they could do it, and [Bone] told them it was the Americans with Disabilities Act, but they didn't seem to care." (Id. at 16 (37:5-10).) Once more:

15

Despite [Bone's] requests for Braille, Nash and several other entities (which [he] understand[s] to be Nash contractors), including Carolina Rehabilitation and Surgical Associates, Emergency Coverage Corporation, Hospitalist Medicine Physicians of North Carolina (Sound Physicians), Nash X-Ray Associates, and Providence Anesthesiology Associates, sent [him] medical bills in print after [he] was discharged from the hospital.

(Docket Entry 103-7, ¶ 16.)

"Because the bills were in print, [Bone] could not read them and could not independently confirm the accuracy of the invoices or pay them in a timely fashion." (Id., ¶ 17.) Gyorke "read for [Bone] where [the print mail] had come from" (Docket Entry 121-3 at 4 (78:13-14)), but they "didn't open [it]" (id. (78:16)). (See id. at 3-4 (77:18-78:16).) Gyorke told Bone that most of the bills came from "Nash, UNC Nash is what they call it" (id. at 5 (79:5-6); see also id. (79:2-6)), and Bone testified at his deposition that he does not have a reason to believe that he received invoices from UNCHCS (Docket Entry 122-7 at 7 (98:12-17); see also Docket Entry 121-3 at 5 (79:7-14) (testifying that he did not "receive any bills from UNC Health Care System")). However, Bone subsequently averred that, "[a]fter [his] second visit to Nash General Hospital, [he] received documents from UNC Health Care (as opposed to Nash), some of which were bills for services [he] received at Nash. [He] could not read these documents because they were in print." (Docket Entry 103-7, ¶ 18.) Bone attached to his affidavit "copies of documents [that he] received in the mail in 2017, which [he]

16

understand[s] have 'UNC Health Care' branding on them." (Id., ¶ 19; see also Docket Entry 105-7 at 5-52.)

"Months after [Bone's] second hospitalization, in or around October 2017, [he] called Nash to complain that [he] still had not received bills in Braille. On that call, [he] again requested Braille bills." (Docket Entry 103-7, ¶ 20.) During this call, the representative with whom he spoke asked Bone if he "was . . . going to pay [his hospital bills]" (Docket Entry 114-12 at 12 (83:19)) and he refused, explaining that, "until they got put in Braille, [he] wasn't going to pay them" (id. at 13 (84:4-5)). (See id. at 12-13 (83:10-84:5).) In response, "[the representative] just hung up" (id. at 13 (84:7)). (See id. (84:6-9).)

Bone further averred:

> After [he] obtained an attorney, Nash finally sent [him] billing in Braille. The first time [that he] received Nash billing in Braille was in or around early January 2018. However, Nash contractors never sent [him] any bills in Braille related to either of [his] two hospitalizations. [He] ha[s] not received any of the print documents [that] UNC Health Care previously sent [him] in Braille either.

> Because [he] had not paid [his] bills, creditors pursued payment from [him], including by calling [him] at night. These calls were extremely stressful for [him].

(Docket Entry 103-7, ¶¶ 21-22 (internal paragraph numbering omitted).)

Lynn Cash, Nash's Supervisor of Patient Services (Docket Entry 28-1, ¶ 2), "was responsible for inputting much of the information [in Nash's patient inquiry system] pertaining to [Nash] providing

17

Braille invoices to [Bone] in response to his requests in 2016 and 2017" (id., ¶ 6). Per Cash, "[i]n the regular course of business, any interaction between a Patient Services staff member of [Nash] and a patient regarding billing is entered into the patient inquiry system." (Id., ¶ 4.) She averred to these facts:

An entry on the patient inquiry report notes Bone's request for a Braille invoice in connection with his December 2016 admission. (See id., ¶ 8.)[5] The insurance payment cycle rendered that invoice "ready for billing" on January 10, 2017. (Id., ¶ 9.) "On January 30, 2017, [Cash] sent [the] invoice to a Braille translating company, Language Access Network in Columbus, Ohio" (id.). After receiving an initial quote in February 2017 and an updated quote in March 2017 (see id.), Cash received a Braille copy of Bone's invoice on April 5, 2017, and "documented this receipt in the patient inquiry system" (id., ¶ 10). The following day, she mailed the invoice via regular U.S. mail to Bone's home address and likewise documented that activity in the patient inquiry system. (See id., ¶ 11.) Because Nash had received no payment from Bone as

---

5    The accompanying patient inquiry report bears an entry dated December 13, 2016, which states: "PT also requested for his bill to be sent to him in Brelle [sic] because he is blind. I informed my supervisor." (Docket Entry 28-2 at 5 (all-cap font omitted).) The source of this note does not appear on the redacted copy of the inquiry report that Nash provided. (See id.)

18

of May 30, 2017, it sent his December 2016 invoice to collections. (See id., ¶ 12.)[6]

"After [] Bone's second in-patient admission to [Nash] in June-July of 2017, [Nash] sent a[ standard-print] invoice to [] Bone for these services" (id., ¶ 13). In October 2017, "[Cash] received a phone call from [] Bone indicating that he [had] not receive[d the December 2016 invoice] in Braille" (id., ¶ 14). Cash explained the delay in procuring the Braille invoice, noted her April 2017 mailing, and confirmed Bone's home address. (See id.)[7] Shortly thereafter, Cash contacted Language Access Network to obtain another copy of the December 2016 invoice, as well as Braille transcription of the invoice from Bone's June-July 2017

---

6  The patient inquiry report contains no entries between May 30, 2017, and October 18, 2017.  (See Docket Entry 28-2 at 3.)

7  The patient inquiry report contains the following note from Cash dated October 24, 2017:

> +called [sic] and spoke with patient —
>
> Regarding Braille Statement — He stated he did not receive the statement I mailed in April.  I explained it took me a bit of working to get the statement but I mailed it as soon as I received it. He stated he has an attorney working on this and they should be contacting us [L]__ [sic] so he is not at liberty to discuss much with us.
>
> I did verify his address with him and it is correct.

(Docket Entry 28-2 at 3 (all-cap font omitted).)

admission.  (See id., ¶ 15.)[8]  Cash also verified that Nash's collection agency had not reported "Bone's past due [Nash] invoices . . . to any consumer reporting agency" (id., ¶ 16) and ensured "that [the] agency had ceased collection activity" (id.).

On December 11, 2017, Cash received and mailed, via certified mail, the Braille transcription of Bone's December 2016 invoice. (Id., ¶ 18; see also id. (averring that receipt indicates delivery to Bone's home address on December 13, 2017).)[9]  A few days later, Cash received the Braille transcription of the second invoice, which she sent to Bone in the same manner.  (See id., ¶ 19; see also id. (averring that receipt indicates delivery to Bone's home address on January 2, 2018).)

In connection with his two admissions, Bone received at least ten collection calls.  (See Docket Entry 110-10 at 38 (76:6-14).) "[He] really do[es]n't remember" (id. (76:20)) how many calls he

_____

8  "After consultation with [] Bone's attorney, Holly Stiles, [Nash] wrote off forty percent (40%) of [] Bone's outstanding balances with [Nash], which was reflected on the invoices sent to Language Access Network in the fall of 2017 for Braille translation."  (Id., ¶ 17.)

9  This certified mail signature receipt bears the name "John Bone" in legible handwriting that appears to match the handwriting identifying the relevant address.  (See Docket Entry 28-5 at 4.) However, the January certified mail receipt (discussed in the following paragraph) bears an illegible mark for the "Signature of recipient" (Docket Entry 28-6 at 5), similar to the illegible mark appearing in Bone's affidavit signature (see Docket Entry 103-7 at 4), and a legible handwritten address, which appears in a different handwriting than on the December receipt (compare Docket Entry 28-5 at 4, with Docket Entry 28-6 at 5).

received "about the unpaid balance from [his] December 2016 visit"
(id. (76:18-19)), but he estimates three.  (See id. (76:15-21).)
Those calls stopped in 2017 (see id. (76:22-24)) but started again
approximately four weeks after his discharge from rehab (see id. at
39 (77:4-10)).  "[Bone] do[es]n't remember" (id. at 46 (90:10))
"the last time [that he] received a phone call from a collection
agency relating to any of [his] visits at Nash" (id. (90:7-9)), but
he would "say sometime 2017, about summer of – spring of 2017"
[sic] (id. (90:10-11)).

Bone lost sleep from "the fact that [he] had bills that
weren't paid" (id. at 48 (95:20)) and from the collection agencies
calling him, which "was aggravating" (id. (95:23)).  (See id.
(95:19-24); see also id. at 43 (86:9-12, 17-22) (discussing impact
of calls).)  Some of them also told him that he would be charged
late fees if he did not pay his bill, which he found threatening.
(See id. at 44 (88:6-14).)  Bone specifically experienced stress
regarding UNCHCS, worrying "if [he] owed them any money" (Docket
Entry 113-12 at 33 (100:17-18); see also id. at 30 (97:13-16) ("I
don't know if I owe UNC anything.  I don't know a thing about
what's going on.  So, yeah, I suffered, you know, stress and
wondering about what UNC was trying to pull.")).  Although he did
not know whether "[UNCHCS] was trying to collect money from [him]"
(id. at 34 (101:7-8); see also id. (101:6-18)), Bone testified at
his deposition that, because he had "never been to UNC" (id. at 33

21

(100:6)), "[he] ha[d no] reason to believe [UNCHCS] ever sent [him] any invoices" (id. at 31 (98:12-13); see also id. (98:12-17)) and could not "distinguish between harm that [he] suffered as a result of Nash's conduct versus harm that [he] suffered as a result of [UNCHCS]'s conduct" (id. at 32-33 (99:23-100:1)). (See id. at 31-34 (97:12-101:18).) Nevertheless, as Bone explained, the only information he possesses about the relationship between Nash and UNCHCS is "that [UNCHCS] bought out Nash" (id. at 27 (91:8-9); see also id. (91:5-12)), but "[he] do[es]n't know who's hired by UNC and who's hired by Nash and who's hired by what" (id. at 34 (101:20-22)).

In 2018, Bone received materials from Nash in Braille, which he believes "was a bill" (id. at 39 (113:3)) that "w[as] way unpaid" (id. at 38 (112:24)). He read the bill, learning what he owed, but "didn't pay any attention . . . because [he] wasn't going to pay it" (id. at 39 (113:6-8)) "because of the wrong that had been done, [he] just felt like [he] needed compensation" (id. (113:13-14)). Bone "guess[es] everything at Nash was forgiven" (id. at 25 (89:25)) when he and Nash settled the instant action, but he noted that "[he] do[es]n't know for sure" if the same thing happened with the "rehab center" bills, although "[he] thinks [it] did" (id. at 26 (90:1-6)). Via the settlement, Bone also received compensation from Nash for stress and emotional injuries, although

22

he "do[es]n't think [the provided amount] was fair" (<u>id.</u> at 36 (109:3)).  (<u>See</u> <u>id.</u> at 35-36 (108:22-109:12).)

### III.  Timothy Miles

Miles has been "legally blind from birth." (Docket Entry 108-12 at 7 (22:13-14).)  More specifically, "[Miles] ha[s] vision loss so significant that it is not fully correctable with prescription lenses.  [His] vision is further impaired when there are changes in [his] blood sugar levels caused by diabetes," and he remains "at high risk to develop glaucoma." (Docket Entry 103-4, ¶ 3.)  As a result, "[Miles] cannot read standard[-]print documents (size 12-point font or less).  [He] cannot see the individual letters, ascertain if there are columns or tables, and the page generally appears as a blur to [him]." (<u>Id.</u>, ¶ 4; <u>see also</u> Docket Entry 108-12 at 32 (91:7-9) (explaining that under "no circumstances ever in [his] life" has Miles "be[en] able to read 10[-]point font").)

Miles also possesses "a condition known as ocular albinism" (Docket Entry 103-4, ¶ 6), which makes him "extremely sensitive to light" (<u>id.</u>).  "For example, the light emitted by computer screens is too bright for [his] eyes.  [He] get[s] headaches, floaters in [his] vision, and experience[s] fatigue when [he] look[s] at a screen for even short periods of time.  [He] must take frequent breaks to read and respond to an e-mail." (<u>Id.</u>)

Because of his ocular albinism, "[Miles] wear[s] dark shades." (Docket Entry 108-12 at 3 (18:6-7).)  He also uses two different

23

prescription glasses, "one for distance and one for up close," which can "bring[ him] a minimum amount of clarity about what [he is] trying to see." (Id. at 5 (20:19-21).) However, that ability "[d]epend[s] on what [his] diabetes is doing, if the sugars are too high, it's still blurry." (Id. (20:23-24).)

Miles utilizes certain assistive technology, including particularly two screen-reading devices on his computer, JAWS Fusion and ZoomText. (See Docket Entry 120-2 at 11-12 (45:18-46:2), 13 (53:5-25).)[10] ZoomText provides "multiple levels of certain magnification" (id. at 12 (46:6-7); see also id. (46:5-16) (explaining how ZoomText works)); JAWS Fusion, in turn, can read documents aloud and edit documents much like the voice-dictation feature on an iPhone, such that JAWS Fusion "talks, [] types, [and] speaks out as you type" (id. at 14 (54:11); see also id. (54:1-13)). PDF documents must be "set up accessible-wise" (id. (54:19-20)) for Miles to use his screen readers. (See id. at 14-15 (54:15-55:7).) Miles also uses VoiceOver and some of his iPhone's standard accessibility features. (See Docket Entry 108-12 at 17-19 (51:16-53:4).)

Miles's eyesight has deteriorated in the last three to four years. (See id. at 34 (93:19-20).) "[His eyesight] really gets

_____

10  Miles testified that he will use his computer "[o]nce or twice a day" (id. at 10 (44:17)) to check emails, participate in Zoom meetings, search the internet, or type letters. (See id. at 10-11 (44:14-45:17).)

24

bad when there's a lot of stress" or "when [his] diabetes, [his] sugars are up and down" (id. at 3-4 (18:24-19:1)), which causes "severely blurred vision" (id. at 3 (18:13-14)). In such instances, his vision becomes too blurry to see even with his glasses. (See id. at 6 (21:14-18).) When Miles experiences floaters in his vision, he prefers 24-point font or higher, but if "the floaters, the headaches, the stress, the tension, the diabetes, the sugars going up and down" (id. at 35 (94:19-21)) are "all . . . going on[,] . . . [he] would step away from [reading] until [he] feel[s] better" because, in such situation, "[i]t doesn't make any sense to [try reading]" (id. at 36 (95:6-8)).

"[Miles] can read written material when it is provided to [him] in properly formatted large print. [He] was once able to access size 16-point font, but, in recent years, [his] eyes adjust more slowly to changes in light and [he] ha[s] experienced worsening eye strain. [He] now require[s] a minimum of size 18-point font to access printed text." (Docket Entry 103-4, ¶ 8.) Miles does not "need black and white documents in a different font size than color documents." (Docket Entry 120-2 at 20 (96:2-3); see also id. (96:4) (explaining that "size is the key point").)

Miles has been a "patient of [UNCHCS] since the 1990s." (Docket Entry 103-4, ¶ 11.) For instance, Miles has visited UNC Ophthalmology for "more than 20 years" (Docket Entry 108-12 at 24 (70:9)), on an annual basis beginning in approximately 1999.

25

(See id. (70:2-20).) At his deposition in late February 2021, Miles could recall five different UNCHCS clinics that he visits at least once a year: Dermatology, Endocrinology, Nephrology, Ophthalmology, and Urology. (See id. at 25-26 (71:2-72:12).) However, "[he] routinely visit[s UNCHCS] clinics and plan[s] to continue receiving care from UNC Health Care-affiliated medical providers." (Docket Entry 103-4, ¶ 12.) Since at least 2016, Miles has been a patient of fourteen different UNCHCS providers:

    a. UNC Hospitals Diabetes & Endocrinology Clinic
    b. UNC Hospitals Urology
    c. UNC Ophthalmology/Kittner Eye Center
    d. UNC Hospitals Emergency Department
    e. UNC Dermatology Center
    f. UNC Sleep Disorders Center
    g. UNC Hospitals Kidney Specialty and Transplant Clinic
    h. UNC/UPN Urgent Care at Carolina Pointe II
    i. UNC Hospitals Heart & Vascular Center
    j. UNC Otolaryngology ("ENT")
    k. UNC Hospitals Carolina Pointe II Radiology and Laboratory
    l. UNC Hospitals McLendon Lab
    m. UNC Orthopaedics
    n. UNC Hospitals OT/PT Clinic

(Id.)

At his deposition, Miles testified that he cannot recall the first time that he requested large-print documents from UNCHCS, but it was more than ten or fifteen years ago and "almost certain[ly] occurred by 19]99" (Docket Entry 108-12 at 28 (74:4)). (See id. at 27-28 (73:14-74:11); see also id. at 30 (77:5) (describing time frame as "about 19 years ago").) As Miles explained, "[he woul]d routinely ask for large print." (Id. at 28 (74:3).) "It's hard

26

for [Miles] to pinpoint down a time [when UNCHCS first failed to honor his large-print request]" (<u>id.</u> at 30 (77:10)), "[b]ut [Miles] d[id] remember [a] sleep study and all the documents [that he] had to sign and read and things like that in that time frame" (<u>id.</u> (77:12-14)), although he could not recall when the sleep study occurred (<u>see</u> <u>id.</u> at 30-31 (77:15-78:4)).

In response to the question of "other than requesting documents in larger font at the sleep study, whenever that was, and not receiving them, when was the next time that [he] recall[ed] making a request for large font or large print from anyone at [UNCHCS] and not getting it" (<u>id.</u> at 31 (78:5-9)), Miles expressed an inability to recall each instance, given his "incapacitated" state during some such encounters and the amount of time elapsed since his requests. (<u>See</u> <u>id.</u> (78:10-20).) However, he remembered not receiving large-print documents "starting the time frame of the After Visit Summaries coming." (<u>Id.</u> (78:10-11).)[11]

Miles also recalled a specific incident with a blood drawing lab, where he asked for a large-print version of a Consent for Treatment form that they asked him to sign and was told that "[t]hey couldn't do that[,] . . . they didn't have the, the means to make a larger copy, either the printer wouldn't copy larger or something like that." (<u>Id.</u> at 40 (113:14-16); <u>see also</u> <u>id.</u> (113:5-

_____

11 Miles previously testified that "[he] do[es]n't recall UNC starting anything with After Visit Summaries until much into the late to mid 2000s." (<u>Id.</u> at 28 (74:6-8).)

27

20).)  In addition, rather than reading the Consent to Treatment form as he requested, "[t]hey just summarized it" (id. (113:25)). (See id. at 40-41 (113:17-114:5).)  Each time he goes in for a "treatment of any sort," Miles is "asked to sign a Consent for Treatment form" (id. at 44 (122:22-24)), none of which have ever been provided to him in size 18-point font or larger.  (See id. at 44-46 (122:22-124:1).)  However, he "had someone read [a Consent to Treatment form] to [him] way before, so [he] had a sense of what it's about."  (Id. at 44 (122:20-21).)

Miles also testified to specific experiences of other UNCHCS providers failing to provide large-print documents.  For instance, he encountered problems with documents from the Nephrology Clinic, including diabetes-related information and the After Visit Summary, as well as information on the "ways and foods and things that [he] could eat" (id. at 49 (133:16)).  (See id. at 49-52 (133:5-134:25, 136:2-137:5).)  He explained that a dietician attempted to create an enlarged document depicting foods and such that he could eat:

> She went to the copier to blow it up herself.
>
> But it's an image.  So the image gets blurrier the bigger you make it.  So half of the picture was on one page and the other half of the picture was on another page.  But [he] couldn't see the picture anyway because it was all blurred.
>
> And the words stayed the same size.  So if they're, whatever size they are, obviously a size that [he]

> couldn't see, that didn't change.  She just moved the
> image over to a bigger sheet of paper at 150 percent.[12]

(Id. at 49-50 (133:19-134:3).)  Miles "w[as] unable to make out what the pictures were" (id at 50 (134:18-19)) as a result of the blurriness of the pictures (see id. (134:23-25) (acknowledging possibility that potentially elevated sugars worsened his vision at the time)).  The Nephrology Clinic ultimately provided certain information that the doctor wanted Miles to know regarding diabetes and kidney care, as well as the After Visit Summary, in an enlarged format, but at least for the After Visit Summary, Miles thinks that occurred "after the second visit" (id. at 52 (137:3-5)).  (See id. at 51-52 (136:6-137:5).)

Miles also recalled problems receiving his requested large-print documents from the Urology Department and Ophthalmology Department, as well as in connection with a stress test he underwent.  (See, e.g., id. at 52 (137:24-25), 53-54 (139:8-140:22).)  Further, although he "routinely ask[s]" (id. at 56 (148:12)), he cannot estimate the number of requests that he has made for large-print materials that UNCHCS did not honor.  (See id. (148:9-19).)  However, Miles believes that his attorneys

---

12  Miles does not actually know the magnification that the dietician used but accepted the 150 percent number based on defense counsel's questioning.  (See id. at 50 (134:9-14); see also id. at 49 (133:17-19) ("And I must add to that to let you know that that 150 percent you're talking about, that was not something that I did.  She went to the copier to blow it up herself.").)

possess "all the documents that [he has] had where they were not large[-]print copies."  (Id. at 52 (137:13-15).)

As to his experience requesting and receiving large-print documents at UNCHCS facilities, Miles averred as to the following: Despite his regular requests for large-print materials in the years preceding this lawsuit, he has received numerous standard-print documents from UNCHCS, "including intake questionnaires, consent forms requiring [his] signature, notice forms, visit summaries, medical bills, and other documents."  (Docket Entry 103-4, ¶ 13.) The copies of such documents that Miles has retained reveal "more than 35 health care visits at [UNCHCS] from January 2015 to September 2018" (id., ¶ 14).  After each visit, "[UNCHCS] sent [him] home with, or mailed to [him], at least one inaccessible standard[-]print document" (id.), copies of which Miles has attached to his declaration (see id.; see also Docket Entry 105-4 at 17–225).  "[T]h[ose] documents . . . underrepresent the number of inaccessible documents [UNCHCS] provided to [him] during this period because [he] was required to review and sign standard[-]print documents during the check in process for these visits, copies of which [he] did not always receive and therefore do[es] not possess."  (Docket Entry 103-4, ¶ 14.)

"In September 2018, [his] attorneys contacted [UNCHCS] on [his] behalf regarding [his] request for large[-]print versions of documents" (id., ¶ 15), after which contact he received "an

30

enlarged[-]print document summarizing [his] patient financial account activity going back to January 25, 2017" (id., ¶ 16), but not "the bills themselves" (id.). Around that same time, he also received an enlarged-print letter from UNC Hospitals Patient Experience Director, Shane Rogers, "explain[ing] that [UNCHCS] was investigating how it _might_ be able to respond to [his] request and instruct[ing] _Miles_ to call [his UNCHCS] providers directly with any questions." (Id., ¶ 17 (emphasis in original).)

Despite those developments, UNCHCS failed to comply with his large-print requests in October 2018. (See id., ¶¶ 18-19.) For example, during an appointment on October 19, 2018, UNC/UPN Urgent Care at Carolina Pointe II provided Miles with "a standard[-]print intake form, privacy notice, payment receipt, and after-visit summary" (id., ¶ 18; see also Docket Entry 105-39 at 21-35 (copies of standard-print documents from visit on October 19, 2018)). The record also contains other examples of standard-print documents that "[Miles] received from [UNCHCS] from the time [his] attorneys contacted [UNCHCS] regarding [his] need for accessible formats in September 2018 up to the filing of this lawsuit on December 3, 2018" (Docket Entry 103-4, ¶ 19; see also Docket Entry 105-39 at 6-20 (copies of standard-print documents dated October 10, 2018), 37-42 (copies of standard-print billing statement and charity care application dated October 25, 2018)).

31

UNCHCS continued to provide inaccessible documents "[a]fter this lawsuit was filed" (Docket Entry 103-4, ¶ 20; see also id. (Miles describing December 2018 receipt of enlarged-print documents from appointment on October 19, 2018)). In that regard, several formatting barriers impeded Miles's access to some information within the enlarged-print documents that UNCHCS began to provide at that time. (See id., ¶¶ 20-21 (averring that such documents contained blurry icons, varying text sizes and text cases, columns, and colored text); see also, e.g., Docket Entry 105-39 at 229-53 (copies of such documents).) During an appointment at UNC Hospitals Kidney Specialty and Transplant Clinic on December 5, 2018, Miles received an enlarged-print after-visit summary that contained those same formatting barriers. (See Docket Entry 103-4, ¶ 21.) Miles "was also approached during [that] appointment by the clinical dietician, who said she received a call from the Patient Relations Department about [Miles's large-print] request" (id.). "She indicated that [he] had 'singled her out' and was clearly unhappy with [him]." (Id.) They discussed (and disagreed about) the accessibility of the food chart she previously had provided, after which discussion "she emailed [him] a link to another standard[-]print version of the food chart." (Id.)

Contacting Patient Relations, an experience Miles described as "stressful and uncomfortable" (id., ¶ 31), provided little assistance. (See id., ¶ 30 ("Although Patient Relations has known

about [Miles's] need for large print since at least October 16, 2018, when the office wrote to [him], [his] providers are still unprepared to meet [his] need for large print when [he] show[s] up at appointments scheduled weeks in advance.").) For instance, Miles contacted Patient Relations after "an appointment with UNC Ophthalmology/Kittner Eye Center on January 11, 2019" (id., ¶ 23) yielded no large-print documents. Approximately one month later, Miles received "a partially enlarged[-]print copy of the after-visit summary" (id.), which he still could not access given the above-described formatting barriers (see id. (averring that icons, text size and case, columns, and color barriers rendered document inaccessible)).

Similarly, during an appointment at UNC Dermatology Center on January 30, 2019, Miles left a voicemail for Rogers regarding his receipt of a standard-print consent form, welcome packet, and after-visit summary. (Id., ¶ 24.) Although Rogers called back and attempted to instruct a nurse about how to obtain a large-print after-visit summary, "[Miles] had to leave the clinic without a large-print after-visit summary . . . [because his] scheduled ride had arrived" (id.). "Because [Miles] did not receive an accessible after-visit summary the day of [his] appointment, [he] could not consult it to answer questions from a pharmacist about how [his] dermatologist wanted [him] to apply a newly prescribed medication." (Id.) The enlarged-print version that Miles received by mail a few

33

days later "contained the same formatting barriers described previously, including icons, text size and case, column, and color barriers." (Id.)

The delay by UNCHCS in attempting to honor Miles's large-print requests presents problems, as he sometimes does not receive such documents "for days, weeks, months, or even years after [his] healthcare visit[s]" (id., ¶ 26). For example, in September 2020, Miles received after-visit summaries from UNC Hospitals Diabetes and Endocrinology relating to visits in September 2018 and April 2019, as well as a consent form relating to a sleep study in March 2019. (Id., ¶ 25.) That delay "denies [him] access to []his [healthcare] information and impairs [his] ability to care for [him]self at home." (Id., ¶ 26.) On one occasion, despite his repeated follow-up with UNC Orthopaedics, several weeks elapsed before Miles "receive[d] a large-print copy of instructions for exercises [he] was told to do at home . . . which delayed [his] ability to do the exercises" (id., ¶ 27; see also id. (noting that "pictures illustrating [] exercises [] are too small for [his] use and appear blurry to [him]")).

In all, "[Miles] ha[s] seen a [UNCHCS] provider at least 35 more times since this case began more than two years ago, for a total of at least 70 times since 2015." (Id.)[13] During that time,

---

13  Miles's affidavit bears the date of March 29, 2021. (See Docket Entry 103-4 at 16.)

> [his] access to large[-]print documents has not improved
> much.   When  [he]  check[s]  in  for  [his]  visit,  [he]
> continue[s] to be presented inaccessible standard[-]print
> documents   to   review   and   sign,   to   be   provided
> standard[-]print after-visit summaries, and to receive
> inaccessible standard[-]print documents in the mail from
> [UNCHCS].

(Id.; see also id. (cataloging recent examples of standard-print or

otherwise inaccessible bills, consent forms, intake questionnaires,

and after-visit summaries).)  During one recent appointment, "[he]

did not receive any documents to sign prior to receiving medical

treatment, but [he] was aware of a sighted patient being provided

with  treatment,  billing,  and  HIPAA  notices  to  sign  prior  to

treatment."  (Id.)  According to Miles:

> The failure of [UNCHCS] to provide [him] materials in
> large print during [his] medical visits prevents [him]
> from timely accessing the written follow-up instructions
> [he]  receive[s],  accurately  updating  [his]  general
> practitioner   and   pharmacist   about   new   medical
> instructions, or fully understanding [his] rights as a
> patient.    Without  timely  access  to  large[-]print
> materials,  [he is]  often  forced  to  discuss  medical
> information with third parties that [he] would rather
> keep private.

(Id., ¶ 28.)

"No UNCHCS staff member has ever referred [him] to the Patient

Relations  office,  the  Section  1557  Coordinator,  or  the  ADA

Coordinator  for  assistance  getting  large[-]print  formats"  (id.,

¶ 29), nor has Miles "[]ever witnessed any clinic staff attempt to

seek  assistance  from  Patient  Relations  or  others  at  [UNCHCS]  for

help fulfilling [his] request for large[-]print documents" (id.).

Additionally, Miles harbors "concern[s] that requesting help from

35

Patient Relations negatively affects [his] relationship with the clinics and medical providers." (Id., ¶ 32.)

Miles noted that he suffers from neck strain, back strain, and headaches as a result of UNCHCS's failure to provide the requested large-print documents. (See Docket Entry 108-12 at 63 (163:8-13).) He described feeling "stuck in a loop of waiting for information to move forward" (id. (163:13-14)), explaining that he had "tr[ied] to follow the directions from Patient Relations" (id. (163:16-17)) to notify staff when they did not meet his requests. (See id. (163:13-24).) Miles, however, fears how staff will react to his requests. (See id. at 67 (177:2-4); see also id. (177:5-8) ("[I]f people are aware that a person has brought a charge against their employer, they could treat you differently, not assist you when you need assistance.").) Although some of this fear arose after Miles filed the instant action, he clarified that

> some of that fear was there before because like asking, and [he] can ask again and they still don't do it or give [him] the accommodation, then the attitude can be don't bother me, the attitude, how that works out, whether [they] don't speak to [him], or [they] just ignore [him], then that could be emotionally and psychologically draining on [him] to have to endure that when [he's] already sick, trying to get help.

(Id. (177:15-22).)

Miles has a UNCHCS MyChart account, which he understands to be "[a] place to get messages or find out about your medical visits and things like that" (id. at 57 (149:17-18)). (See id. (149:14-25).) Miles has never attempted to access MyChart on his phone,

36

opting instead to use his laptop.  (See Docket Entry 121-2 at 3 (150:10-13).)  Miles initially stated that he has used MyChart to access test results and appointments (see Docket Entry 108-12 at 58 (152:4-7)), but he subsequently clarified that he required someone else to read the test results to him (see Docket Entry 120-2 at 24 (154:5-19)), and he uses his screen reader to read appointment reminder emails (see Docket Entry 108-12 at 58-59 (152:10-153:25)).

In addition, Miles has "[n]ot really" (id. at 58 (152:4)) tried to access his After Visit Summaries from MyChart.  (See id. (152:2-7); see also id. (152:17-20) (Miles testifying that "[his] preference" prevented him from reading After Visit Summaries on MyChart).)  Miles does not recall ever attempting to open an After Visit Summary from MyChart and printing it at his desired magnification, but he believes that document encryption would prevent his access in that manner.  (See id. at 58-59 (152:21-153:14).)  Miles explained that he has not attempted to enlarge the After Visit Summary from MyChart because he "only use[s] paper when it comes to that" (id. at 59 (153:10)).  (See id. (153:8-10).)

"[M]ore often than not" (id. at 55 (142:1)), "[a]s of this last year" (id. (142:3)), "[Miles] receive[s] the After Visit Summaries in large print" (id. (142:2)).  (See id. (142:1-3).)  That development "[i]s relevant to [Miles]" (id. (142:7)), i.e.,

> being able to see that it's in large print when [he] leave[s].  Because sometimes [he] ha[s] to go and [he] can't see all of it.

37

[He] may — one thing about those summaries, some of the text is, like the title, that may be in a different, bold or something like that. It may be, and it may be 18 high.

[He] can't readily do it right then because either something has just occurred with the treatment and [he's] not feeling well or [his] paratransit ride is coming to get [him], so [he's] got to go. So [he's] probably going to look at it later.

So the attempt might have been made, but you just don't know until you get to it later on.

(Id. (142:9-22).)

Miles further understands that UNCHCS provided him with the contact information for Rogers "for the purpose of trying to meet [his] . . . request for accommodations" (id. at 65 (175:15-16)). (See id. at 64-65 (174:20-175:17).) However, when asked whether he felt, "as a general matter, [that UNCHCS] was trying to meet [his] requests" (id. at 64 (174:6-8)), Miles expressed "mixed" feelings "[b]ecause it's so infrequent to know what [he's] going to expect to get, [he] do[es]n't, [he] can't measure that. . . . [He] would not be able to measure it." (Id. (174:9-13).)

At some point, UNCHCS personnel told Miles that two billing systems existed, one for UNC Physicians and one for UNC Hospitals, "[b]ut when they send [him his] bills in large print, it's all of them together. They just put them together. And [he] write[s] one check for the whole thing." (Id. at 68 (200:5-7); see also id. at 68-70 (200:2-202:15).) Miles believes he probably accrued a late fee "prior to them providing [him] with large[-]print bills" (id.

at 68 (200:23-24)), "[b]ut it wouldn't be anything substantial" (id. at 69 (201:1)).

### IV.  Dr. Ricky Scott[14]

Dr. Ricky Scott, a blind resident of Raleigh, North Carolina, "ha[s] been a patient of [UNCHCS] since 2015" (Docket Entry 103-14 (the "Scott Declaration"), ¶ 4).  (See id., ¶¶ 2-3.)  He cannot "read printed materials" (id., ¶ 2), but he can "read documents in Braille or in accessible electronic formats that [he] can access on [his] computer using screen[-]reader software, which converts written text to speech or to Braille on a refreshable Braille display" (id.).  "[He] routinely visit[s] UNC Family Medicine West, averaging two to three visits each year.  [He] also received services at Rex Laboratory Services at UNC Rex Hospital around February 2020, and typically ha[s] lab work done at UNC Rex Hospital every couple of years."  (Id., ¶ 5.)

Pertinent to this case, Dr. Scott has not received "accessible written materials in Braille or electronic formats" (id., ¶ 6) from UNC Family Medicine West or Rex Laboratory Services, despite his requests for the same (see id.).  For example, when Dr. Scott made such a request during a visit to UNC Family Medicine West on February 27, 2019, "clinic staff informed [him] that they only

_____

14  Plaintiffs disclosed Dr. Scott as a potential witness in their initial and supplemental disclosures (see Docket Entry 123-4 at 3; Docket Entry 123-5 at 3) and provided affidavits from him both in opposing UNCHCS's dismissal motion (see Docket Entry 26-2) and in supporting Plaintiffs' Motion (see Docket Entry 103-14).

provide documents in print and that if [he] wanted to review these documents, [he] should ask a sighted person for assistance." (Id.) Likewise:

> During [Dr. Scott's] visits to UNC Family Medicine West and Rex Laboratory Services, staff have presented [him] with only standard[-]print consent forms to sign. [He] ha[s] never been provided Braille or accessible electronic formats of these documents, nor have staff offered to read or summarize them to [him]. [He] do[es] not know the information contained in the consent forms.

(Id., ¶ 7.) "[He] ha[s] also received inaccessible print visit summaries and billing receipts from UNC Family Medicine West and ha[s] never been provided Braille or accessible electronic versions of these documents." (Id., ¶ 8.)

Dr. Scott activated a UNC MyChart account two or three years ago with the understanding that it would allow him "to review [his] after-visit summaries and lab results in an accessible electronic format." (Id., ¶ 9.) Although "[he] regularly use[s a screen-reader program,] JAWS[,] to access properly designed electronic documents and websites[,] . . . the documents available on [his] UNC MyChart account were not readable by JAWS[,] and [he] could not access any of the information in these documents." (Id., ¶ 10.) "This past year, [he] asked UNC Family Medicine West to stop sending [him] documents through UNC MyChart and cancel [his] account because it is inaccessible and useless to [him]." (Id., ¶ 11.)

40

"[Dr. Scott] continue[s] to be unable to privately and independently access consent forms, after[-]visit summaries, lab results, bills, and other important health care and billing information from [UNCHCS] and its affiliates because this information is only provided to [him] in print or an inaccessible electronic format." (<u>Id.</u>, ¶ 12.) "[He] intend[s] to continue seeing medical providers at UNC Family Medicine West and UNC Rex Hospital. These two medical providers are close to [his] home; they are only about nine miles from [his] residence." (<u>Id.</u>, ¶ 13.)

## V.  DRNC

A North Carolina nonprofit organization (Docket Entry 103-13, ¶ 3), "[DRNC] is designated as the Protection and Advocacy [(a 'P&A')] for North Carolina. Each State and United States Territory has a designated P&A organization pursuant to federal law." (<u>Id.</u>, ¶ 4.)[15] As North Carolina's designated P&A, "[DRNC] is authorized to pursue administrative, legal, and other appropriate remedies to protect and advocate for the legal rights of individuals with disabilities and to redress incidents of discrimination in the state. [DRNC] has the authority to prosecute actions in its own name and on behalf of its constituents." (<u>Id.</u>, ¶ 5.) Per "[DRNC]'s bylaws, [DRNC] constituents are residents of North

---

15 Congress created the "[P&A] network to advocate for people with disabilities, to be a watchdog" (Docket Entry 114-18 at 4 (30:9-11)), empowering P&As to conduct "monitoring and investigations work" (<u>id.</u> (30:13)).

41

Carolina with disabilities, as that population is defined by federal and/or state law." (Id., ¶ 6.)

"[DRNC] represents the interests of, and is accountable to, members of the North Carolina disability community, and its funding is dependent on compliance with a governance structure that ensures oversight and control by the disability community." (Id., ¶ 7.) "[DRNC]'s constituents include blind patients of UNCHCS and/or its affiliates throughout North Carolina." (Id., ¶ 11.) As blind residents of North Carolina, Bone, Miles, and Dr. Scott (see, e.g., Docket Entry 103-7, ¶¶ 2-3; Docket Entry 103-4, ¶¶ 2-3; Docket Entry 103-14, ¶¶ 2-3) qualify as DRNC constituents. (Docket Entry 103-13, ¶ 12.)

"[DRNC] participates in this action seeking to benefit all DRNC constituents who require accessible versions of standard[-]print documents to have equal access to the written information [that] UNCHCS and its affiliates provide to sighted patients and guarantors." (Id., ¶ 13.) "Ending disability-based discriminatory practices by North Carolina health care providers, including those practices that deprive blind individuals of effective communication, is directly in keeping with [DRNC]'s overarching purpose: the protection of, and advocacy for, the rights of North Carolinians with disabilities." (Id., ¶ 14.) DRNC asserts only associational standing in this action. (See Docket Entry 114-20 at 1 (email from DRNC's counsel to UNCHCS's counsel indicating that

42

"[DRNC] assert[s] associational standing based on the standing of [its] constituents [] Miles and [] Bone, and not organizational standing based on harms directly to DRNC"); Docket Entry 120-11 at 3 (indicating in DRNC discovery response that "[DRNC] participates in this action as an associational plaintiff representing the interests of its blind constituents who are patients of UNCHCS and/or its affiliates throughout North Carolina").)

## VI. NFB

A nonprofit organization,

[NFB] is the oldest and largest national organization of blind persons, with affiliates in all 50 states, Washington, D.C., and Puerto Rico. The vast majority of its tens of thousands of members are blind persons who are recognized as a protected class under federal laws. The NFB is widely recognized by the public, Congress, executive agencies of government, and the courts as a collective and representative voice on behalf of blind Americans and their families. The NFB promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, healthcare, employment, family and community life, transportation, and recreation.

The ultimate purpose of the NFB is the complete integration of the blind into society on a basis of equality. This objective includes the removal of legal, economic, and social discrimination. As part of its mission and to achieve these goals, the NFB has worked actively to ensure that the blind have an equal opportunity to access information related to their health care.

The NFB has approximately 200 blind members who reside in North Carolina, including [] Bone and [] Miles.

43

(Docket Entry 103-12, ¶¶ 4-6 (internal paragraph numbering omitted); _see also_ Docket Entry 103-4, ¶ 10 (noting Miles's membership in NFB since 1990); Docket Entry 103-7, ¶ 23 (noting Bone's membership in NFB since 1970s).)

"Pursuant to the NFB's mission and purpose, NFB has a strong interest in ensuring that its blind members, including [] Bone and [] Miles, can access their critical health care information on a private and equal basis." (Docket Entry 103-12, ¶ 7.) Accordingly, "[w]hen [UNCHCS] declined the NFB's invitation to work collaboratively to remedy its failure to communicate effectively with the blind, [NFB] decided to bring a lawsuit against UNCHCS to challenge its discriminatory conduct." (Docket Entry 121-9, ¶ 14.) However, the NFB works toward its mission through avenues other than litigation, to include by engaging in "advocacy efforts before legislative and regulatory bodies" (_id._, ¶ 4) and "operat[ing] a variety of programs offering resources and support to blind individuals" (_id._; _see also_ _id._, ¶ 5 (listing programs), ¶ 6 (describing provision of scholarships and awards)).

The NFB further pursues its mission by "engag[ing] in research to help deepen [its] understanding of the real problems that blind people face and to help blind people increase independence, self-respect, and self-determination." (_Id._, ¶ 7; _see also_ _id._ (identifying topics of current research projects).) Moreover, the NFB "develop[s] and offer[s] assistive technology and accessible

44

resources to the blind" (id., ¶ 8) and "offers NFB-NEWSLINE, a free audio news service that provides access to more than 500 publications, emergency weather alerts, and job listings, to anyone who is blind or otherwise print-disabled" (id.). "[T]he NFB also operates the Center of Excellence in Nonvisual Access ("CENA["]), which is a concentrated center of expertise, best practices, and resources that enables businesses, government, and educational institutions to more effectively provide accessible information and services to the blind community." (Id., ¶ 9; see also id. (listing numerous CENA initiatives).)

Consistent with the foregoing, "[l]itigation expenses represent only a fraction of [NFB's] overall expenditures each year." (Id., ¶ 11; see also id. (averring as to total annual expenses ranging from $23.6 to 25.2 million, with litigation expenses ranging from $3.4 to 4.7 million, in 2018 and 2019).) Additionally, "[t]he vast majority of the NFB's revenue comes from contributions from individuals and organizations" (id., ¶ 12), whereas litigation-derived revenues generally "comprise only about 5% of [NFB's] total revenue each year" (id.). Further:

> While the NFB tries to budget for litigation expenses in its budget each year, the budgeted amount represents an educated guess. If the need for litigation exceeds the budgeted amount, [NFB] will try to pursue litigation important to [its] priority areas by redirecting funds within the organization. Conversely, if [its] litigation costs are under budget, [it is] able

45

> to direct additional resources to [its] many other
> non-legal projects and services in furtherance of [its]
> mission.

(Id., ¶ 13.)

"The NFB has devoted staff time and paid significant legal fees and litigation costs, including deposition costs and expert witness fees, to pursue this litigation. Had [it] not needed to litigate this case against UNCHCS, the NFB would have directed these resources either to other litigation in furtherance of [its] mission or to [its] non-legal programs and services." (Id., ¶ 14.) "[I]n 2018, when [NFB] agreed to take on this case, [it had] to find the money to do it" from somewhere "other than in [its] litigation budget." (Docket Entry 113-17 at 19 (78:16-18); see also id. (78:19-20) (explaining that "[NFB] had to plan on resources that [it] hadn't planned to use" to pursue instant action).) NFB directly pays the fees of outside counsel in this action (see Docket Entry 122-14 at 5-6 (33:8-34:20)), but has not conducted investigations or other work relating to this matter "independent[ly] of legal counsel" (id. at 15 (70:10-13) or "[b]eyond the general work that [it] does to promote accessible documents" (id. (70:19-20)). (See id. at 11-16 (54:7-56:20, 67:1-17, 70:2-71:20).) Finally, NFB does not seek compensatory damages on its own behalf. (See Docket Entry 108-17 at 3.)

46

## VII. September 2018-January 2019 Correspondence

As noted, on September 27, 2018, Plaintiffs' outside counsel wrote to Nash and UNCHCS, "c/o Glenn George, Senior Vice President and General Counsel" (Docket Entry 113-16 at 1) regarding "[a]ccessible patient communications" (id. (emphasis omitted)). That letter stated:

> Dear Ms. George:
>
> You previously discussed a matter affecting our client, John Bone, with our former colleague Holly Stiles. Mr. Bone received treatment at Nash General Hospital in December 2016 and again in late June/early July 2017. Mr. Bone is blind; he cannot read print and relies on Braille to make and receive written communications. When Mr. Bone is not provided information in Braille, it denies him full and equal access to critical information. UNC Health Care System acknowledged Mr. Bone's right of equal access and began providing Mr. Bone with billing statements in Braille.
>
> Yet numerous healthcare providers operating out of Nash General Hospital still have not ensured that Mr. Bone has equal access to inpatient healthcare services. These providers include Carolina Rehab & Surgical Associates, Emergency Coverage Corporation, Hospitalist Medicine Physicians of North Carolina, PLLC d/b/a Sound Physicians, NC Inpatient Medicine Associates, and Providence Anesthesiology Associates. Edgecombe County Rescue, an ambulance operator that transported Mr. Bone to Nash General Hospital on both occasions, is also amongst the providers who failed to provide equal access to information. None of these providers fulfilled Mr. Bone's request for accessible information during his hospital stays or provided Mr. Bone with billing statements in Braille as requested. At least four of these providers sent Mr. Bone's account to collections companies, which then attempted to collect payment on Mr. Bone's alleged account balance via print collections notices.
>
> Unfortunately, lack of equal access to critical health care and medical billing documents within the UNC

47

Health Care System is not unique to Mr. Bone. We also represent [NFB], which has several members, including Mr. Bone, who have been unable to obtain the alternate formats they need from UNC Health Care System employees and contractors. NFB member Timothy Miles is a blind individual who frequently visits various medical providers at UNC Medical Center. Although Mr. Miles has repeatedly asked these providers to send him visit summaries, instructions, and bills in large print, the providers, contractors, and/or employees of UNC Health Care System have routinely told him that they cannot honor his alternate[-]format request. Mr. Miles has also made requests for accessible billing statements directly to UNC Medical Center's billing department, most recently in December 2017. The billing department has responded by telling Mr. Miles either that it would "look into it" or that its medical billing system does not allow for large[-]print billing statements. This failure to provide accessible formats extends to notices given in providers' offices, forms patients are required to complete, and many other communications of a personal nature. For instance, although Mr. Miles can successfully navigate accessible websites using screen[-]access software (JAWS and ZoomText), because UNC Health Care System's MyChart online system for patients was not designed to be accessible, it is incompatible with this software. Mr. Miles cannot log into or use the online portal to learn about his appointments and review visit summaries. To access this information he must find third parties to read him his important and private medical information. With the procedures, programs, and practices currently in place within the UNC Health Care System, Mr. Miles must choose between not accessing his medical information or for[]going his right to privacy.

Mr. Bone, Mr. Miles, and other NFB members, as blind individuals, qualify as individuals with a disability under the [ADA], the Rehabilitation Act, and the laws of the State of North Carolina. Numerous providers operating out of or in connection with Nash General Hospital and UNC Medical Center are violating these laws, as well as Section 1557 of the Patient Protection and Affordable Care Act, by not providing Mr. Bone, Mr. Miles, and other blind patients with alternate formats of print communications. UNC Health Care System has an obligation not to contract, license, or make other arrangements that subject individuals with disabilities, like Mr. Bone and Mr. Miles, to discrimination. See 28

48

C.F.R. § 35.130; 28 C.F.R. Pt. 35, App. A (2010) (addressing responsibility of public entities to ensure accessibility, regardless of whether delivered directly or via contractors and other licensing arrangements). Therefore, UNC Health Care System must ensure that the health care providers with whom it contracts are providing accessible communications to Mr. Bone, Mr. Miles, and other blind patients.

We would prefer to work constructively with UNC Health Care System to reach a mutually agreeable and comprehensive resolution of this matter. You have proven amenable to working together to resolve disability-related issues in the past, and we are hopeful that we can work together and bypass the expense, risk, and procedural wrangling of litigation. Ideally, our collaboration would result in a model patient accessibility program that all sides can discuss proudly. If we are not able to come to a mutually satisfactory solution to remove the barriers to blind patients' private and independent access to their health care, we will proceed to litigation.

We look forward to hearing from you by October 11, 2018.

(Docket Entry 113-16 at 1-3.)

George responded via a letter dated October 11, 2018, the substance of which stated:

I am writing in response to your letter, dated September 27, 2018, regarding accessible patient communications and issues experienced by two of your clients at Nash UNC Healthcare ("Nash") and UNC Medical Center, respectively. Nash, UNC Medical Center, and the UNC Health Care System as a whole acknowledge the right of patients to effective communications regarding their healthcare and take seriously the concerns raised in your letter. We have begun thoroughly investigating the specific issues raised in your letter and have taken, and will continue to take, steps to resolve those issues and improve our internal processes, as described below. We will also take this opportunity to review our policies and procedures to ensure ongoing compliance with applicable law.

49

As stated in your letter, Nash contracts with several physician groups on an independent contractor basis to provide certain clinical services at Nash. Each of these groups is responsible for its own billing and collections, and Nash does not exercise authority or oversight over its independent contractors with respect to these activities. However, Nash shares your interest in ensuring that Nash patients receive accessible billing communications, regardless of whether those communications originate from Nash or one of its independent contractors. Accordingly, Nash will be reaching out to each of these groups — Carolina Rehab & Surgical Associates, Emergency Coverage Corporation/Team Health, Hospitalist Medicine Physicians of North Carolina, PLLC, and Providence Anesthesiology Associates — to request that they investigate the specific issues raised in your letter and develop an appropriate resolution in direct communication with you or your client, as appropriate. Please note that NC Inpatient Medicine Associates is no longer associated with Nash and Edgecombe County Rescue is not in any way, nor has it ever been, affiliated with Nash.

The Patient Financial Services and Patient Relations departments of UNC Health Care System have also investigated the issues raised regarding UNC Medical Center and are currently working on fulfilling the requests of the individual identified in your letter. I would be pleased to discuss the resolution of these specific issues if your client could provide UNC Medical Center with a written request or HIPAA authorization that permits me to do so.

Finally, we have noted your concerns regarding "My UNC Chart," the online platform that allows patients to log in and access their medical information from their personal computer or electronic device. As you are likely aware, My UNC Chart is licensed by the UNC Health Care System from Epic Systems Corporation ("Epic"). We are continuing to investigate how those issues might be addressed to ensure that patients who have self-identified as needing auxiliary aids for effective communication receive appropriate access throughout their care and when being billed for that care.

I am hopeful that this letter provides you with sufficient information regarding the steps that the UNC Health Care System, and specifically UNC Medical Center

50

and Nash, are taking to achieve our mutual goal of
ensuring that patients with communication disabilities
obtain effective and accessible communications regarding
their healthcare.  Please do not hesitate to reach out to
me should you wish to discuss further.

(Id. at 4-5.)

On October 23, 2018, George sent a second, one-paragraph
letter to Plaintiffs' counsel, which stated:

We believe we have a solution to the concerns raised
in your letter of September 27, 2018, regarding Mr.
Miles'[s] access to UNC MyChart.  We understand that
MyChart is compatible with the JAWS screen[-]access
software you referenced in your letter, but the
functionality does vary depending on the web browser
used.  We would suggest that Mr. Miles try using a
different web browser — we are told that Explorer 11
works particularly well, if that is an option.  If Mr.
Miles continues to need technology support for this, we
are happy to arrange a call for him with someone in our
technology department.  Alternatively, if Mr. Miles uses
an Apple or Android cell phone, he should be able to
download the UNC MyChart Mobile App and use the built in
screen readers in the IOS and Android operating systems.

(Id. at 6.)

Meanwhile, Rogers[16] sent Miles a large-print letter dated
October 16, 2018, bearing "Access Complaints, Section 1557" as the
subject, which stated:

We recently received a letter from the law firm of
Brown Goldstein Levy regarding your request for visit
summaries, instructions and bills in large print.  There
was also a complaint about your inability to use UNC
Health Care's MyChart application because it is not
compatible with your screen[-]access software.  I am
writing you as UNC Health Care's Section 1557 Coordinator
to respond to your concerns.

---

16  The letter's signature block identifies Rogers as the
"Director of Patient Experience[,] UNC Hospitals."  (Id. at 9.)

Further conversations with one of your counsel, Chris Hodgson (North Carolina Disability Rights), clarified that the visit summaries and instructions were related to visits with your ophthalmologist and nephrologist providers in July[] 2018. My office has been in communication with both of those clinics, and I understand that the requested materials are being mailed to you using the 16[-]point font your attorney requested. I also understand that Patient Financial Services has or will be sending to you itemized bills, also in 16[-]point font.

Regarding MyChart, "My UNC Chart" is a software product licensed by UNC Health Care from Epic Systems Corporation, the company that provides our electronic medical records system. We are continuing to investigate how your access issue might be addressed to ensure effective communication regarding your care and treatment. In the meantime, you may call the appropriate clinic with any questions you may have.

Thank you for the opportunity to address these issues. You may appeal this response by submitting a written appeal within fifteen (15) days of receipt of this letter. The appeal must be submitted to the Section 1557 Coordinator at: Director of Patient Experience, Patient Relations Department, 101 Manning Drive, Chapel Hill, NC 27514; via fax at (984) 974-8895; or via e-mail at patient.relations@unchealth.unc.edu. The Section 1557 Coordinator (or designee) will forward the appeal to the Chief Medical Officer, Chief Operating Officer, or Chief Nursing Officer, or his/her designee, with the appeal to be heard by the most appropriate of those individuals based on the source of the grievance and issues involved. The individual hearing the appeal shall issue a written decision in response to the appeal no later than thirty (30) days after its filing.

Please also be advised that you have the right to pursue administrative remedies instead of or in addition to submitting an appeal of this response. Please see the enclosed Notice of Nondiscrimination for information regarding how you may submit a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights.

(Id. at 7-9 (large font and emphasis omitted).)

52

The letter also enclosed a large-print UNC Health Care nondiscrimination notice. (See id. at 10-14.) The notice states that "UNC Medical Center (UNC Hospitals, UNC Faculty Physicians, and UNC Health Care Shared Services Center Pharmacy) . . . does not discriminate on the basis of . . . disability" (id. at 10 (large font omitted)) and "[p]rovides free aids and services to people with disabilities to communicate effectively with [it], such as: . . . [w]ritten information in other formats (large print, audio, accessible electronic formats, other formats)" (id.). It further states: "If you need these services, contact the UNC Medical Center Director of Patient Relations (*contact information below*)." (Id. (large font omitted) (italics in original).)[17]

On January 14, 2019, Rogers[18] sent Miles another letter, this time in standard print, entitled **"Access Issues"** (Docket Entry 108-15 at 1 (emphasis in original)), which stated:

> Following up on my letter to you of October 12, [sic] 2018, I want to ensure that you are able to obtain any clinic discharge summaries or other documentation in the 16[-]point font that you have requested. Should you be advised by clinic staff that they are unable to provide that to you, please contact Jayson F. Perez De Paz in Patient Relations at 984-974-5006 to assist. Mr.

_____

17 The provided contact information contains the same mailing address and fax as in the letter, but directs correspondence to a different email address and job title (i.e., Director of Patient Relations) than in Rogers's letter to Miles. (Compare id. at 8, with id. at 10-11.)

18 Rogers's signature block identifies him as the "Director of Patient Relations[,] UNC Hospitals." (Docket Entry 108-15 at 1.)

53

Perez De Paz is available to instruct our clinic staff on
how to print in larger font from our medical record
system or can facilitate those documents being mailed to
you.

Please let me know if you are having continuing
issues.

(Id.)[19]

## VIII.  UNCHCS

### A.  General Overview

As the University of North Carolina website explains:

UNC Health is an integrated health care system owned
by the state of North Carolina and based in Chapel Hill.
Known as "North Carolina's Health Care System," UNC
Health provides care to patients in all of the state's
100 counties through its 11 hospitals, 13 hospital
campuses, and hundreds of clinical practices.  It is one
of the nation's leading academic health care systems, a
$5.4 billion enterprise, with more than 33,000 employees
from Hendersonville to Jacksonville.

UNC Health, https://www.northcarolina.edu/institution/unc-health-

care-system/ (last visited Jan. 6, 2022).

For its part, the UNCHCS website describes the UNC Health

System[20] as follows:

_____

19  "A couple weeks later, the Patient Relations office resent
[Miles] a large-print format of what [he] believe[s] to be the same
letter."  (Docket Entry 103-4, ¶ 22.)

20  Per a rebranding effort, UNCHCS has adopted "UNC Health"
as its new name and logo.  See https://www.unchealthcare.org/
("North Carolina's largest academic health system has launched a
new brand identity to reflect a new focus, approach and commitment
to transformational change as it seeks to improve North
Carolinians' health in the 21st century.  Headquartered in Chapel
Hill and affiliated with the University of North Carolina School of
Medicine, UNC Health is composed of 12 hospitals and hundreds of
(continued...)

54

> UNC Health is a not-for-profit integrated health care
> system owned by the state of North Carolina and based in
> Chapel Hill. Originally established Nov. 1, 1998, by
> N.C.G.S. 116-37, UNC Health currently comprises UNC
> Hospitals and its provider network, the clinical programs
> of the UNC School of Medicine, and fourteen hospitals and
> eighteen hospital campuses statewide.

https://www.unchealthcare.org/about-us/ (last visited Jan. 6,

2022). The website further states that "Nash UNC Health Care,

based in Rocky Mount, joined the UNC Health Care system in 2014."

Id.

Statutorily created, UNCHCS is "governed and administered as

an affiliated enterprise of The University of North Carolina,"

N.C. Gen. Stat. § 116-37(a)(1).[21] UNCHCS describes every hospital

in its system other than UNC Hospital at Chapel Hill as "[a]n

affiliate hospital" (Docket Entry 103-9 at 4 (24:1)). (See id.

(24:1-11).) "There would be two different ways that [a hospital]

would be an affiliated hospital with UNC Health. One would be

through some type of ownership, member substitution, controlling

interest, whatever it may be. The other is through a management

agreement." (Id. (24:6-11).)

---

20(...continued)
clinic locations from Hendersonville to Jacksonville.") (last
visited Jan. 6, 2022).

21 UNCHCS, a public entity providing health care programs and
activities, receives federal financial assistance and funds from
the Department of Health and Human Services. (See Docket Entry
103-17 at 3; Docket Entry 103-18 at 3.)

"[UNCHCS] ha[s] a management agreement [with Nash.  It]
call[s] them MSAs, management services agreement."  (Id. (24:15-
16); see also id. (24:12-16).)[22]  UNCHCS maintains similar but not
identical MSAs with each managed affiliate.  (See id. at 5-6
(26:25-27:6); see also id. at 6 (27:8-9) ("They're generally
similar in the services that [UNCHCS] provide[s].").)  "[UNCHCS]
manage[s] those entities through the C Suite primarily through the
CTM [sic] of the local entity.  They're not the [sic] run the same
way as the owned entities."  (Id. at 5 (26:5-8).)

UNCHCS's Rule 30(b)(6) witness, Christopher Ellington,
"President of Network Hospitals for [UNCHCS] . . . and Executive
Vice President and Chief Financial Officer for UNC Hospitals at
Chapel Hill" (Docket Entry 20-1, ¶ 1), provided the following
explanation of the difference in how UNCHCS runs managed
affiliates:  "Since they're managed, under — except for very
specific circumstances, [UNCHCS] do[es]n't do day-to-day work, [it]
manage[s and] provide[s] some oversight, but [it] do[es]n't
necessarily do the actual day-to-day work."  (Docket Entry 103-9 at
5 (26:11-15).)  He elaborated on the distinction between management
and "day-to-day work" (id. (26:17)) as follows:

> So management is providing consulting type of
> direction using expertise from [UNCHCS]. Day-to-day work
> is the actual fixing of something.  If it were a
> maintenance person, for example, it would be the actual

---

22  By contrast, UNCHCS owns UNC Physicians Network, LLC
("UNCPN").  (See, e.g., Docket Entry 103-15 at 2.)

56

fixing of something. Management would be just consulting
on proper technique and stuff like that.

(Id. (26:18-24).)

Affiliate hospitals set their own policies, including
effective communication policies. (See Docket Entry 108-4 at 2
(27:16-19).) Practically speaking, using the effective
communication policy as an example, this arrangement means that

> [managed affiliates] would do their own communication
> policies unless they needed some help or there was
> something that was going on throughout the whole system
> that can be done more efficiently to get a group
> together, do it one time and make the recommendation.
> Ultimately those managed entities, because their [sic]
> managed, they're not owned, not controlled, make their
> own decisions in the end, and they may align exactly with
> what UNC is doing, in some cases they may not.

(Id. at 2-3 (27:21-28:6); see also id. at 3 (27:20).) Managed
affiliates "both" create their own policies and receive support or
input from UNCHCS in creating policies. (Id. at 4 (29:2); see
also id. at 3-4 (28:23-29:2).)

UNCHCS (via Ellington) identified "COVID [a]s a good example"
of a situation where UNCHCS would provide support or input for a
policy. (Id. at 4 (29:3-5).) Ellington explained:

> So [UNCHCS is] trying to determine what are the proper
> policies of visitation for example. [UNCHCS] may come up
> with a policy and send it out as a recommendation. If
> you're an entity's case [sic] they may drive a policy and
> ask [UNCHCS] to opine on it. It could go both ways.

(Id. (29:5-10).) Whether a managed affiliate remains "free to
reject" a policy that UNCHCS suggests or whether a policy must "be
adopted by the management entity" (id. (29:13-14)) "depends on what

57

the issue is" (id. (29:15)).  Using the COVID policy example again, Ellington explained:

> If it's an issue about the visitation, for example, what that local entity needs to do is take into account culture, the threat risk that they have, how the facility is laid out.  And come to some conclusion locally.  Where [the] management agreement comes in is if [UNCHCS] felt like the[ managed affiliate] w[as] making a decision that would harm a patient or was unsafe, that's where [UNCHCS] would step in and take it a little stronger.  But typically, if it's a good valuable policy that has been through good group decision making, it can be adopted locally, and sometimes they have to tweak it to meet their specific needs.

(Id. (29:16-25); Docket Entry 110-3 at 7 (30:1-2).)

When asked what would happen if a managed affiliate refused to adopt a recommended policy (see Docket Entry 110-3 at 7 (30:3-6)), Ellington responded:

> What [UNCHCS] would do, again, I'm speaking practically, whatever the resolutions are in the contract, I'm sure they're there, what I would do is I would sit down and discuss it with the CEO, the COVID policy, maybe there's a clinical advisor in place as well.  If we can't resolve then I would discuss it with the board chair and we would take it at that level.

(Id. (30:7-14).)  As for what would happen "[i]f the board chair says, 'No, I'm siding with the management entity and I'm not going to adopt this policy'" (id. (30:15-17)), Ellington stated:

> Fortunately that hasn't happened where we've come to that.  Where it's been something that's quite material or consequential.  What I would do then is go back to our contract and determine if there was an uncurable breach and we would have to decide what the business rationale is that comes after that.

(Id. (30:18-24).)

58

When asked whether "[g]etting patient information in a format the[ patient] can receive or understand . . . touches on patient harm" (id. at 8 (31:13-15)), Ellington said:

> I don't necessarily I [sic] agree with the term harm.  I was using the term harm as physical harm and I think that might be construed differently by different people.  I will answer the question a little differently which is if we knew that there was something we were supposed to be doing and we weren't, then that is where [UNCHCS] would come in and say that has to be resolved.

(Id. (31:16-23).)

Each managed affiliate does its own training on policy, managed by its staff.  (See id. at 8-9 (31:24-32:4).)  UNCHCS provides the substance of the training "[d]epending on what the topic is" (id. at 9 (32:9)) and "identifie[s] things that needed to be covered in the training" (id. (32:17-18)).  (See id. (32:19).)  Ellington explained:

> [W]hat happens is we will look at certain things from joint commission for example, that says these are required annual compliance training annually, we'll do that and make sure that those are done.  I think when you get down to individual policies at the local level, that's where we would rely on our local staff managers, directors.

(Id. (32:10-16).)

However, under its management services agreement with Nash, "[UNCHCS] has responsibility for making sure that Nash operates in compliance with [federal, state, and local] laws" (id. at 12

59

(50:23-25); see also id. at 12-13 (50:23-51:1)). When asked to interpret "section 2, subsection (b)" (Docket Entry 113-4 at 13 (49:1)), the pertinent provision of the MSA between UNCHCS and Nash, Ellington acknowledged that UNCHCS possessed such responsibility (see Docket Entry 110-3 at 12-13 (50:5-51:1)), stating that UNCHCS would "put programs in to try to maintain [its] compliance with . . . all federal, state and local laws, licenses, [and] certification" (id. at 12 (50:18-21)). More specifically, Ellington explained:

> The way — practically speaking, the way that we manage these entities is through our local leaders, number 1. We also put programs in place and require programs to be in place to follow these laws and have subject matter experts. If we're doing radiology, we have a nuclear camera, there are certain nuclear regulatory commission laws, there's joint commission that comes in and reviews things. There's CAP in our labs, we require a compliance program to require audits. So we're doing all we can to sort of surround laws to comply with the laws but also provide safe patient care. . . .

(Docket Entry 103-9 at 12 (51:16-52:2).)

According to Ellington, the MSA made UNCHCS responsible for Nash's compliance with the ADA (see Docket Entry 110-3 at 13 (51:2-6)) and its effective communication requirement, to the extent such requirement qualified as "operational compliance with an applicable federal law" (id. (51:11-12); see also id. (51:7-14)). Ellington elaborated on that responsibility in the following exchange from his deposition:

> [Plaintiffs' Counsel:] In the [UNCHCS] side though, if I wanted to know if something fell within the services

60

that [UNCHCS] is providing under subsection (b), who would be the person who could tell me definitely, yes, that's a service that we're providing under subsection (b) to [e]nsure operational compliance with applicable federal, state and local laws?

[Ellington:] For the purposes of your question, you could easily start with me. That would be a place to start. I may have to defer to one of those subject matter experts that I rely on to manage an entity the size of Nash with 2,000 employees and [a] couple hundred million dollars in revenue, but you could certainly start with the applicable leader at [UNCHCS].

[Plaintiffs' Counsel:] My question for you is[,] is the operational compliance, the responsibility that UNC Health System has for operational compliance with applicable federal laws, does that include responsibility for operational compliance, for example, [with] effective communication requirements of a particular federal disability law?

[Ellington:] I would assume that it would. And we would, again, work with our local partners to make sure that they were in compliance. If we knew that there was a problem, that's when we would act on it. If we had reason to believe that there was an issue.

[Plaintiffs' Counsel:] Am I understanding responsibility for operational compliance is not a proactive, it's a reactive, in other words, if you found out there's a problem?

[Ellington:] No, those are your words.

Let's go back to how practically [a] management agreement works. We manage the entity through the local leaders. We don't necessarily do the work of the day-to-day. I mentioned a little while ago we would make sure that they had a compliance program that meets all the requirements that are necessary for a compliance program. Within that, we would look at the OIG standards saying these are the things they're targeting. So we would look at 48 hour stays, moon app, whatever the case may be.

Within that, there would be audits that would be done so that we could see where the compliance is.

61

Within there, there's a group of attorneys that would look at physician contracts to make sure the compensation was appropriate within Stark guidelines. So those are a combination of local, but it's mostly oversight to effectuate having those reviews done.

[Plaintiffs' Counsel:] Okay. So if you found out, for example, that Nash was not operating in compliance with a federal law, like, for example, an effective communication requirement, that would be something you would be aware of if that had happened?

[Ellington:] Right, in this case that's when I became aware of it. So we then found out how do you get certain types of bills in certain type of format out of Epic or from some third[]party. Once we know that, we communicate to our companies, say everybody be aware of this. Some may have already known about it and had no issues with it and others maybe were not aware and now that they were, would be compliant.

(Docket Entry 108-4 at 10 (53:4-25); Docket Entry 103-9 at 14-15 (54:1-55:20).)[23]

---

23 As for whether Ellington "d[id] anything about it" (Docket Entry 110-3 at 15 (56:16-17)) once he "bec[a]me aware that a patient of Nash General Hospital complained that he had not been provided effective communication" (id. (56:10-12); see id. (56:10-17)), Ellington responded:

I spoke to the CEO. I don't recall who told me about it specifically, but any patient complaint that would make it all the way to me would require some followup. So I did call the CEO. I asked them what they had done. I recall him telling me that there was some — they ended up getting the bill out in whatever form it needed to be done. There was another comment about clinic maybe, one of the clinics there, and after that, I don't believe we really had much followup from that at all. Part of this has been recently. So at that point, it would have felt fairly resolved. There was a complaint, the complaint was resolved, and subsequently we moved on.

(Id. at 15-16 (56:18-57:6)).

(continued...)

Managed affiliates handle their own registration, patient relations, and health information management, but vary on whether they handle their scheduling and revenue cycle. (Docket Entry 110-3 at 9-10 (32:20-33:21).) Nash handles the majority of its revenue cycle, although "[t]here are pieces of it they don't do." (Id. at 10 (33:16-17); see also id. (33:13-18).)

## B. Relevant Agreements

UNCHCS and Nash entered into an MSA effective April 1, 2014. (See Docket Entry 120-22 (the "Agreement") at 1.) Pursuant to that Agreement, UNCHCS bears:

(a) Responsibility for day-to-day operations of [Nash] and its subsidiaries, including its facilities, personnel, and supplies, but with the understanding that the specific management of various [Nash] practices will be subject to subsequent agreement(s) between the parties ("Practice Agreement(s)");

---

23(...continued)
As for whether he took "steps to discuss providing additional formats at other network entities . . . [o]nce [he] became aware that a patient in Nash General Hospital had complained he didn't get information in the format he needed" (id. at 16 (57:11-15)), Ellington stated:

Someone would have done that. I didn't have to do it because once it was known there was an issue and how to solve the issue, we would share that — in the event that comes up with other entities, this is the process you follow. . . .

(Id. (57:16-20).)

(b) Responsibility for Health System[24] administration, including, but not limited to, [Nash's], [Nash Hospitals, Inc. ("NHI")]'s and, as may be applicable, other [Nash] subsidiaries' operational compliance with applicable federal, state, and local laws, applicable licenses, certifications, and accreditation standards, and their continued participation in governmental programs, including Medicare and Medicaid;

*****

(d) Management and administration of [Nash's], NHI's and, as may be applicable, the other [Nash] subsidiaries' business office functions, including, but not limited to, billing and collection activities, accounting and bookkeeping functions, and accounts payable and purchasing activities (subject to the terms of any applicable Practice Agreement(s)); [and]

*****

(i) Development and administration of [Nash's] and its subsidiaries' information technology strategic plan.

(Id., § 2.)

Exhibit A to the Agreement further specifies that the management services that UNCHCS provides under the Agreement "are expected to include, but not be limited to" (id. at 14):

(i) Responsibility for day-to-day operations of [Nash] and its Facilities, including repairs, maintenance, and supplies;

---

24  The Agreement defines the Health System as encompassing wholly owned subsidiaries of Nash Health Care Systems (the signatory to the Agreement), to include, inter alia, Nash Hospitals, Inc. (See id.) In excerpting the Agreement above, the undersigned employs the shorthand "Nash" in place of other acronyms denoting such entities. The Agreement further defines the "Facilities" (referenced in the excerpted paragraphs above) to include Nash General Hospital, Nash Day Hospital, Bryant T. Aldridge Rehabilitation Center, and Coastal Plain Hospital.

64

(ii) Administration and management of [Nash] and its subsidiaries (subject to any Practice Agreement(s)), consistent with their resources, in a manner necessary to maintain all necessary licenses, certifications, permits, and other approvals required by applicable laws and regulations to its operations, including Joint Commission certification and continued participation in the Medicare and Medicaid programs;

(iii) Oversight and control over [Nash]'s and its subsidiaries' personnel (subject to any Practice Agreement(s));

* * * * * *

(x) Development and management of an information technology strategic plan; and more particularly, if at any time within sixty (60) months of the execution of the Management Agreement, [Nash] should choose to convert its EHR[25] system to a common IT platform with [UNCHCS] (the EPIC EHR system), [UNCHCS] shall implement the conversion (hardware, software, data conversion, installation, etc.) for a cost to [Nash] that will be determined consistently and equitably among all entities within [UNCHCS], including but not limited to UNC Hospitals in Chapel Hill, North Carolina and Rex Hospital, Inc. in Raleigh, North Carolina. [UNCHCS] and [Nash] will work together to further define the expected software costs should [Nash] convert to a common IT platform with [UNCHCS] (EPIC EHR) within the sixty (60) month time period. If and when [Nash] should choose to convert its EHR system to this common IT platform within the designated time period, [UNCHCS] shall arrange for the provision of the necessary equipment, software and associated services such that the allocated cost to [Nash] is determined without any mark-up of cost by [UNCHCS], consistent with the cost allocation methodology used for entities owned by [UNCHCS], and in no event to exceed the comparable then-current market rate that [Nash] could obtain on its own.

(xi) Analysis and support for improvement of clinical processes, patient safety and clinical efficiency at the Facilities;

---

25 "EHR" signifies electronic health record. (<u>See, e.g.,</u> Docket Entry 103-28 at 7.)

(xiv) Support for improving [Nash]'s patient experience programs, including application at the Facilities of programs such as [UNCHCS]'s "Commitment for Caring" and "Carolina Care" initiatives, as such programs are in effect from time to time;

(xv) Inclusion of [Nash]'s management in programs focused on [UNCHCS] system enhancement activities, such as system-wide roundtables, functional teams and other similar forums;

* * * * *

(xviii) Access for [Nash] staff to human resources development and nursing practice education and research programs that are provided at no cost to [UNCHCS] employees. . . .;

(xix) [Nash] Board of Commissioners and NHI Board of Directors education programs;

(xx) Support [Nash]'s strategic planning processes, with appropriate involvement of the [Nash] Board of Commissioners and the Corporate Officers; [and]

(xxi) Assist [Nash] in the development of a medical staff development plan . . . .

(Id. at 14-15 (larger font size in EPIC paragraph omitted).)

Exhibit A to the Agreement also provides a "Detailed Description of Management Services" (id. at 16 (emphasis omitted)), which states in relevant part:

Hospital Operations: Administrative oversight to all business, administrative and executive functions of the Hospital, consistent with and subject to the policies, procedures and objectives and periodic directives of the [Nash] Board of Commissioners, including but are not limited to, the following:

1. Preparation of administrative and financial reports for presentation to the [Nash] Board of Commissioners and the NHI Board of Directors.

* * * * *

66

3. Preparation of reports for the Board of Commissioners and the NHI Board of Directors, Medical and Allied Health Staff as appropriate, including (1) general activities and performance within the Hospital and (2) federal and state regulations and local developments that affect Health System operations.

*****

6. Providing oversight and direction for the establishment of policies and operating procedures for the Health System.

*****

8. Recommending and assisting in the development of process improvement initiatives or focused studies to impact the outcomes and provide the necessary support to understand the root causes of outcomes that need improvement.

Financial Management: Supervision of the business office functions such as accounting, patient billing, medical information management, accounts payable and purchasing and being responsible for the preparation of the operating and capital budgets. . . .

*****

Legal. Provision of and arranging for the provision of legal services for legal issues related to the Health System in the ordinary course of business. . . .

Compliance. Access to [UNCHCS] compliance department and programs, including compliance education and programing support/materials, establishment of annual compliance work plans, and assistance with review and resolution of [Nash]'s and its subsidiaries' compliance matters.

*****

Staff Education: Access to the [UNCHCS] human resources development and the nursing practice education and research educational offerings covering clinical and management topics. . . .

67

<u>Board Education:</u> Access to programs on the following topics:

- Health care trends and issues

*****

- Other program content as appropriate

(<u>Id.</u> at 16-17.)

The Agreement further states that

[UNCHCS] shall at all times throughout the term of this Agreement manage the Facilities and the Health System in accordance with all policies, standards and procedures relating to the operation of the Health System that presently exist or as may from time to time be established by the Board of Commissioners, the Board of Directors of NHI, and, as may be applicable, the governing boards of the other subsidiaries of [Nash], in accordance with any regulatory requirements to which the Facilities or the Health System are bound, in accordance with all applicable laws, and in a manner that furthers the charitable purposes of [Nash].

(<u>Id.</u>, § 1(b).) In addition, "[i]n its role as manager, [UNCHCS] will not have the authority, directly or indirectly, to perform, and will not perform, any medical function. [UNCHCS] may, however, advise physicians as to the relationship between their respective performances of medical functions and the overall administrative and business functioning of the Facilities." (<u>Id.</u>, § 1(c).)

Moreover,

[UNCHCS] will employ (either itself or by one of its subsidiaries) and provide an individual to serve as [Nash]'s Chief Executive Officer ("CEO"); and the Parties may also mutually agree that one or more other members of [Nash]'s Corporate Officers Group (each an "Officer") will become employed by [UNCHCS] . . . . Such individual(s) shall be subject to the ongoing review and approval of the Board of Commissioners of [Nash]. With

68

respect to day-to-day management, the CEO shall report to the Chief Operating Officer for System Affiliations of [UNCHCS] and any other Officer(s) employed by [UNCHCS] shall report to their respective [UNCHCS] supervisors. With respect to their overall responsibilities and duties, however, the CEO shall report to the Board, and any other Officer(s) employed by [UNCHCS] shall report to the CEO.

(Id., § 3(a).)

Finally, the Agreement specifies the following regarding the

relationship between UNCHCS and Nash:

(a) Nothing herein shall be construed as giving [Nash] control over, or the right to control, the judgment or actions of [UNCHCS] or individuals performing services on behalf of [UNCHCS] with respect to the Management Services rendered hereunder, and [UNCHCS] shall at all times act as and be deemed to be an independent contractor, subject to the contractual conditions, obligations and limitations set forth herein.

(b) This Agreement shall not be construed as creating a partnership or joint venture. Except as explicitly set forth herein, neither Party shall hold itself out as or act as an agent of the other Party, nor have the power to obligate the other Party with respect to third parties in any way (except to the extent [UNCHCS] acts on behalf of the Health System in fulfilling its obligations to [Nash] under this Agreement); provided, however, that the CEO and the Officers employed by [UNCHCS] shall have such powers as shall be delegated to them by [Nash].

(c) The Parties understand and agree that the [Nash] Board of Commissioners shall retain certain "Reserve Powers" over the Health System as required by law, and the [Nash] Board of Commissioners and the NHI Board of Directors shall, in accordance with state and federal law and regulations, common law and their governing documents, retain ultimate authority over the governance and operations of the Health System as is normal and proper for the governing boards of similar organizations. Nothing herein shall be construed as giving [UNCHCS] control over or any right to control the governance of [Nash] or its subsidiaries and their respective Boards, including, but not limited to, the independent actions of

69

the Boards to adopt and apply Bylaws, oversee the medical staff of the Hospital and make all decisions related to credentialing of providers at the Hospital and other facilities.

(d) By entering into this Agreement, [Nash] is not delegating any of the powers, duties or responsibilities required to be performed exclusively by the Board of Commissioners, the NHI Board of Directors or the governing boards of the other [Nash] subsidiaries consistent with applicable accreditation standards, North Carolina hospital licensure laws, CMS Medicare Conditions of Participation (42 U.S.C. § 482, et seq.), requirements under the law applicable to North Carolina non-profit corporations, and other laws, rules and requirements applicable to [Nash] and its subsidiaries that prohibit or limit such delegation by their respective governing boards. . . .

(Id., § 8.)

UNCHCS and NHI entered into an "Additional Services Agreement" (Docket Entry 103-30 at 2 (emphasis and all-cap font omitted)), effective July 1, 2017, pursuant to which UNCHCS agreed to provide certain additional services. (See id.)[26] This agreement identifies NHI as "an affiliate of UNCHCS" and states that "UNCHCS provides health care services throughout the State of North Carolina, through both owned and managed health care systems and hospitals." (Id.) It notes that "UNCHCS, either itself or through a subsidiary, agrees to provide [the relevant additional services] . . . in accordance with prevailing industry standards and best practices, as customized and adapted for UNCHCS, and in

---

26  The version of this agreement in the record does not delineate the relevant additional services. (See id. at 1-7.)

70

compliance with all applicable laws, regulations, policies, procedures, and contractual requirements." (Id.)

## C. EPIC

UNCHCS utilizes an "electronic medical record and . . . affiliated systems that go with it called Epic. Epic is the integrated system that has the medical information, managed clinical information, and the billing components go with that as well." (Docket Entry 108-4 at 7 (42:13-18).) Used by many healthcare providers, "EPIC is a [customizable] comprehensive electronic health record software program with applications for the outpatient and inpatient settings, as well as scheduling and patient portal, among others." (Docket Entry 103-28 at 8.) "[UNCHCS] only ha[s] one instance of Epic that is rolled out across [its] system," and "[UNCHCS] actively manages that system." (Docket Entry 108-4 at 8 (43:3-5).)

On September 28, 2018, Nash switched from its standalone system, which "[UNCHCS] w[as] not actively involved in the day-to-day management of keeping up" (id. (43:6-8)), to UNCHCS's EPIC system. (See id. at 7-8 (42:7-43:13) (clarifying meaning of Ellington's averment that "UNCHCS did not begin actively managing revenue cycle services including billing services to Nash [] until September 28, 2018").) Notably, though, this September 2018 date "[wa]s for [Nash] hospital" (Docket Entry 122-8 at 7 (179:8); see also id. (179:6-8)), whereas Nash physicians "possibl[y]" — and at

71

least in certain instances, definitely (see Docket Entry 103-10 at 26-32 (194:9-200:21)) — obtained "access [to] Epic before the hospital went live in September[] 2018" (Docket Entry 122-8 at 7 (179:11-12)). (See Docket Entry 103-10 at 24 (177:2-21); Docket Entry 122-8 at 6-7 (178:3-179:20).) Moreover, "[UNCHCS] did play a role" in Nash's "previous system or billing" prior to this transition to EPIC. (Docket Entry 108-4 at 8 (43:15-17).) However, per Ellington, that role remained limited to certain issues, such as "insurance denials[] or . . . "difficulty collecting patient balances due after insurance paid" (id. (43:20-22); see also id. (43:17-25) (explaining that UNCHCS would refer vendors or suggest techniques)).

Managed affiliates opting into EPIC must adopt certain services but can decide against adopting other services. (See Docket Entry 113-4 at 21-22 (82:1-83:25).)[27] Nash opted against "full shared services" (id. at 21 (82:18); see also id. (82:18-20)), "elect[ing] to continue running their business office functions locally" (id. (82:20-21)). The record does not reveal what this means "[a]s it pertains to the revenue cycle" (id. (82:22)), except that, Ellington testified, "billing, followup, those type of things, they're just not on the list for [UNCHCS] to

_____

27 Ellington's testimony in the record does not specify which services qualify as optional and which remain mandatory. (See, e.g., id.) However, he noted that owned entities get all the required items "and the billing and everything else." (Id. at 21 (82:8); see also id. (82:1-11).)

72

do on [Nash's] behalf" (id. at 22 (83:5-6)). (See id. at 21-22 (82:22-83:6).) However, UNCHCS has a separate "Billing Services Agreement with Nash" (id. at 22 (83:14-15)), so UNCHCS conducts "some amount of billing . . . for Nash" (id. (83:15-16); see also id. (83:17-22)) (Ellington describing one such agreement for cardiology clinic that Nash requested based on "specific expertise in physician billing for cardiology")).

Moreover, Craig Wade, UNCHCS Executive Director of Hospital Patient Financial Services (see Docket Entry 123-6 at 3),[28] testified that his department conducted billing for various Nash operations, including Nash Cardiology and UNC Orthopedics at Nash, at least as of August 2017. (Docket Entry 103-10 at 26-32 (194:9-200:21); see also Docket Entry 105-7 at 5-36 (containing bills Wade's department sent to Bone on behalf of Nash Cardiology and UNC Orthopedics at Nash).)[29] As Wade explained, "physicians come into Epic before the hospitals, typically." (Docket Entry 122-8 at 7 (179:19-20); see also Docket Entry 121-7 at 15-16 (155:1-156:18) (elaborating on transition procedures and explaining that "[UNCHCS]

28    Wade's department bears responsibility for billing patients for all "services . . . billed out of the Epic environment" (Docket Entry 103-10 at 24 (177:17-19)).

29  When Nash-related physicians "came into [UNCHCS's] system, then they were no longer referenced as [Nash Health Care Systems], they become UNC Healthcare System Physicians." (Docket Entry 103-10 at 24 (177:2-4); see also Docket Entry 105-7 at 5-36 (billing services from Nash Cardiology and UNC Orthopedics at Nash under "UNC Physicians" name).)

typically move[s its] physicians into Epic way ahead of the hospitals").) Once an entity joins EPIC, Wade's department bears responsibility for ensuring fulfilment of requests for alternate-format patient financial statements, regardless of whether a person makes the request to the affiliate or Wade's department directly. (See Docket Entry 103-10 at 34-36 (208:10-210:10).)

"[UNCHCS] went live with Epic" in 2014. (Docket Entry 121-8 at 3 (34:12-13).) EPIC's "model system" contains FYI flag functionality, so "[FYI flags] have been available [to UNCHCS] since 2014." (Id. (34:11-13); see also Docket Entry 103-10 at 23 (166:3-5) ("The [flag] functionality has always been there. We just didn't have a unique FYI flag for the visually impaired.").) FYI flags exist "for visibility and awareness" (Docket Entry 103-11 at 5 (39:15-16)), but (as a default) the patient FYI flags that registration adds do not further impact the system. (See id. (39:3-19); see also id. (39:3-11) (explaining that, although one can record sight-impaired patient flags and identify needed auxiliary aids in EPIC, such flag does not, by default, "generate[] any kind of automatic processes for generating large[-]print documents").) Accordingly, with the possible exception of visually impaired guarantor flags,[30] UNCHCS relies on staff to "read the

---

[30] According to Jeri Williams, UNCHCS's Section 1557 coordinator (see Docket Entry 103-33 at 3 (17:10)), the visually impaired flags that registration staff set do not trigger large-print billing; rather, "[b]illing cycle staff, or back end staff
(continued...)

74

flag" to issue materials in large print. (Docket Entry 108-6 at 11 (51:9); see also id. (51:5-9).) Yet, UNCHCS's "[health information management] department has the ability to add beyond the flag. They can put something in the chart that has more impacts within the system." (Docket Entry 103-11 at 5 (39:16-18).)

UNCHCS can "create new flags [in EPIC] when it wants to" (Docket Entry 121-8 at 3 (34:14-15)) via "a fairly quick process" (id. (34:20)). (See id. (34:14-20).) However, "if there are workflows or other decisions associated with [creating a flag], that would take longer." (Id. (34:20-22).) In UNCHCS's EPIC system, "patient FYI flags" constitute "optional data elements" so the failure to enter such flag does not trigger an alert or notify the person entering the information "that they didn't fill out that patient flag" (Docket Entry 103-11 at 4 (25:9-10)). (See

_____

30(...continued)
along the billing collection side of staff" must set "a billing flag [f]or large print." (Docket Entry 108-5 at 14 (122:3, 6-7); see id. (122:1-11); see also id. (122:13-17) ("It would be nice, to your over [sic] point, that by setting a flag it automatically generated that, but I think it's not that — that connection is not there. So someone would have to set a separate flag for billing.").) Per Wade's testimony, once staff create a large-print FYI flag in the guarantor field, future bills to that guarantor will automatically issue in large print; however, it remains unclear from the excerpt of his testimony in the record which staff members create the necessary guarantor flag. (See Docket Entry 121-7 at 12-14 (151:7-153:17).) Per UNCHCS's summary judgment briefs, though, "[b]illing flags in EPIC are set by billing cycle or back-end billing collection staff" (Docket Entry 108 at 6), and "[i]n 2019, UNCHCS implemented a process for flagging sight-impaired patients so billing can flag the patients' needs for printing bills" (id.).

75

id. (25:3-11).)  By contrast, the demographic information field contains yellow and red alerts.  (See id. at 3 (24:7-23); Docket Entry 121-8 at 4 (51:15-18).)  A UNCHCS employee, Julie Patton-Tolbert,[31] described the way these alerts function as follows:

> When a registrar completes registration and finishes the workflow, there is a check.  And if those items are left blank, it will appear as a message in a list for the registrar to collect that data element.  A recommended item would be yellow like a hazard sign, whereas a required would be red like a stop.

(Docket Entry 103-11 at 3 (24:10-15).)

"[B]ecause [EPIC's alert] workflow is across the board" (Docket Entry 121-8 at 5 (52:1)), decisions regarding alerts "go through an approval process" (id. at 4 (51:21)).  (See id. at 4-5 (51:19-52:13).)  A UNCHCS "governance group called Access Advisory Group, [which] has representation from every entity leadership[,] . . . weigh[s] in on th[e] decision[]" (id. at 5 (52:13-16)) to classify "a flag as red or yellow" (id. (52:18)).  (See id. (52:13-20).)  The Access Advisory Group votes on whether to designate something as a red alert; they usually achieve a unanimous consensus before adding a red alert, such that Patton-Tolbert does not know of an situation "where red flags have been added and there was somebody [in that group] that was still not in agreement with it being a red flag" (id. at 6 (53:13-15)).

_____

31  Patton-Tolbert appears to work in an IT capacity at UNCHCS.  (See Docket Entry 103-11 at 6 (72:1-21); Docket Entry 121-8 at 3 (34:8-25); see also Docket Entry 121 at 46 (associating Patton-Tolbert with "UNCHCS's central IT department").)

(See id. at 5-6 (52:17-53:16).) "Patient Access leaders across the system" (Docket Entry 121-5 at 12 (100:4), including Danielle Reese,[32] Megan Romeo,[33] and Todd Slagle,[34] participate in the Access Advisory Group, which convenes bimonthly, along with the Information Support Department, to discuss "any training, or any changes within EPIC" (id. (100:17-18)). (See id. (100:1-20).)

UNCHCS utilizes a vendor, AccuDoc Solutions, to print and mail hard-copy materials to patients, including bills and, in some circumstances, appointment reminders. (See, e.g., Docket Entry 103-10 at 5 (34:1-7); Docket Entry 103-11 at 6 (72:12-21), 8 (75:6-12), 9 (76:7-10); Docket Entry 108-6 at 5-7 (39:21-41:2); Docket Entry 121-7 at 14 (153:3-17).) UNCHCS sends AccuDoc electronic images to print, utilizing "two separate extracts[, o]ne . . . for

---

32  Reese serves as the "Health Care System Executive Director for Patient Access [at UNCHCS]" (Docket Entry 122-12 at 2 (8:11-14)), with responsibilities including "registration" (id. (8:17-21)).

33  "[Romeo's] official job title is director of clinical business operations, but [her] working job title is director of front end operations" (Docket Entry 122-11 at 2 (8:23-25)).  In that capacity "[she is] responsible for the registration and check-in function at [UNCHCS's] new Eastowne Medical Office Building that is opening next month" (i.e., March 2021), as well as "work[ing] with other leadership and groups throughout the outpatient services umbrella at the medical center . . . to establish best practices or workflows or help them with any areas th[at] could be struggling" (id. at 3-4 (9:20-10:3)).

34  Slagle reports to Reese (Docket Entry 103-20 at 9 (50:19-22)) and "oversee[s] registration and [sic] [certain] entities [at UNCHCS]" (Docket Entry 103-22 at 8 (72:20)); however, the record omits the portion of his testimony delineating his precise duties and entities involved (see Docket Entries 103-22, 120-21, 121-10).

Spanish-speaking patients, for where their demographics identified their language as Spanish[, and t]he other . . . for English-speaking patients [who] had English as their primary language" (Docket Entry 103-11 at 8 (75:19–23)). (See id. (75:1–23); see also Docket Entry 103-10 at 5 (34:1-7), 31 (199:1-18) (explaining that Bone bill dated December 28, 2017, "was a file extracted out of EPIC to IT to AccuDoc").) "[UNCHCS] ha[s] Spanish templates, versions available for documents, text reminders, phone reminders, and MyChart." (Docket Entry 103-11 at 8 (75:3-5).) However, during the period that Patton-Tolbert's department oversaw appointment reminders sent by mail, which extended through at least February 2020 (see id. at 9 (76:7-23)), "[it] did not have a process in place with AccuDoc for large[-]print [printed] reminders" (id. (76:21-23)). Accordingly, UNCHCS, through AccuDoc, sent a standard-print appointment reminder (i) to Miles on February 6, 2020 (see id. (76:7-23)), and (ii) to Bone, on behalf of UNC Orthopedics at Nash, for which UNCHCS handled sending appointment reminders (see id. at 10-12 (79:25-81:9)).[35]

Per email correspondence between AccuDoc and Wade on September 28, 2018, AccuDoc "can easily accommodate the large[-]print statement. It's just an alternate format of [UNCHCS's] existing

---

35    Although Patton-Tolbert's department handles sending appointment reminders (see id. at 6 (72:4-21)), to her knowledge, nobody contacted her department regarding sending appointment reminders to Bone in Braille (see id. at 12 (81:10-13)).

statement that [AccuDoc woul]d use." (Docket Entry 103-36 at 3.) AccuDoc can also provide Braille statements, but through a third-party vendor. (See id.) As for "[w]hat would tell [AccuDoc's] system when to generate[ the relevant format]" (id.), AccuDoc stated: "Any document that we create can have alternate formatting. We'd just need to establish the parameters for identification and distribution." (Id. at 2; see also id. (detailing process).)

According to declarations that Robb C. Cass, Jr., President of AccuDoc, provided on February 24, 2021 (see Docket Entry 103-23 at 2-3), and March 1, 2021 (see Docket Entry 103-24 at 2-3), "AccuDoc . . . generate[s] and send[s] to individuals on behalf of or at the direction of [UNCHCS]" eight categories of documents: Appointment Reminders, Client Statements, Financial Assistance Applications, Itemized Statements, Patient Statements, Payment Receipts, Physician Letters, and Set-Off Debt Collection Act Letters. (Docket Entry 103-23 at 2.) Between December 1, 2016, and February 24, 2021, AccuDoc provided a total of eight documents in large print (five in 2019 and three in 2020) on UNCHCS's behalf and did "not receive[] any requests for [B]raille communications to be sent from UNCHCS." (Id. at 2-3.)[36] All eight large-print

---

36 Wade testified that, in the two decades that he has worked there, as far as he knows, UNCHCS has never generated a Braille patient statement. (See Docket Entry 103-10 at 7 (75:4-7).) He does not know the process by which AccuDoc provides Braille documents through its vendor (see id. at 6-7 (74:4-75:20)) or "how long it [typically] takes to convert a patient statement into (continued...)

documents consisted of patient statements.  (See Docket Entry 103-24 at 3.)  "AccuDoc uses a template for Large Print communications" (Docket Entry 103-23 at 3), which "AccuDoc's IT Department created . . . in cooperation with UNC personnel.  During this process, AccuDoc generated multiple sample documents and sent to UNC for changes and updates until the final document template was approved by UNC" (id.).  "AccuDoc only has a large[-]print template for Patient Statements."  (Docket Entry 103-24 at 3.)

"[UNCHCS] sends daily files to AccuDoc for statement production.  Within the statement file, there is a data item that indicates that a large[-]print or [B]raille statement should be created for that document."  (Docket Entry 103-23 at 3.)  "AccuDoc only receives the [B]raille or large[-]print indicator in the Patient Statement file(s)."  (Docket Entry 103-24 at 3.)  "Upon receiving the request for the statement to be printed in the Large Print Format, AccuDoc changes the statement to Large Print using the pre-approved template, and sends them to the recipient via US Mail."  (Docket Entry 103-23 at 3.)  "Documents requested in [B]raille are sent to a third-party vendor for creation and distribution via US Mail to the recipient."  (Id.)

---

36(...continued)
[B]raille" (id. at 6 (74:15-18)), but he expects that "it should [take] one to two business days [to generate a patient statement in Braille]" (id. (74:21-75:1)).

80

At some point, Patton-Tolbert's department apparently switched from sending printed appointment reminders to emailed versions via MyChart. (Docket Entry 103-11 at 6 (72:7-21), 10 (79:10-16).) MyChart does not contain a large-print template for these appointment reminders. (See id. at 7 (73:9-12).) Instead, it "depend[s] on the screen resolution and settings by the patient." (Id. (73:12-13).) As for billing statements on MyChart, Rogers does not know if they "[a]re accessible to people using screen[-]reading software" (Docket Entry 108-6 at 10 (50:10-11)). (See id. (50:4-12).) Nevertheless, he stated that "billing is obviously an important facet of the healthcare experience to our patients." (Id. at 29 (108:23-25).)

Documents generated from EPIC include these billing statements on MyChart, as well as After Visit Summaries, discharge instructions, and medication lists. (See id. at 3-4 (37:8-38:4), 5 (39:6-16), 8 (42:17-24), 10 (50:7-8).)[37] According to Wade, as of January 2021, four hospitals in the UNCHCS system had not yet joined EPIC: UNC Lenoir, UNC Onslow, UNC Rockingham, and UNC Southeastern. (Docket Entry 121-7 at 15 (155:1-9).) According to Slagle in February 2021, "UNC Rockingham is going live on Epic, [he] believe[s] it's in May of [2021]." (Docket Entry 121-10 at 4 (31:1-2).) However, per Patton-Tolbert in March 2021, "all of

_____

37 Any UNCHCS entity using EPIC, including managed affiliates, provide the same documents from EPIC. (See, e.g., id. at 3-5 (37:2-39:20).)

81

[UNCHCS's] hospitals and entities are on Epic. So it's across the board." (Docket Entry 121-8 at 7 (58:17-18).) This uniformity extends to "[m]anaged and owned" hospitals as well as "practices that are part of the UNC Physicians Network." (Id. (58:19-23).) Per Rogers's Rule 30(b)(6) deposition, UNCHCS expects any entity, owned or managed, using EPIC to create FYI flags for patients with disabilities, including communication disabilities. (Docket Entry 108-11 at 2 (7:12-22).)

Prior to implementation of this new flagging approach in 2019, clinicians could make a note in the patient's chart regarding specific communication needs. (See Docket Entry 113-10 at 11-12 (78:4-79:13); Docket Entry 121-4 at 8 (154:3-12).) These notes lacked the "prominen[ce]" of the flags (Docket Entry 121-4 at 8 (154:9); see id. (154:3-12)) and "would require every staff member and provider to read all of the patient's notes to find the patient's disability status" (Docket Entry 103-28 at 13). Moreover, the patient's medical record contains "a lot of information" (Docket Entry 121-4 at 10 (160:9), "and there wasn't an easy way — there was not one specific place to find that information" (id. (160:17-18)), an issue the flags "w[ere] meant to answer" (id. (160:19)). (See id. at 9-10 (159:10-160:20).)

D. Accessibility Matters

In conjunction with efforts to standardize patient financial statements between hospitals and physicians, UNCHCS created a

large-print template in April 2019. (See Docket Entry 103-10 at 8 (101:1-17).) Per Wade, UNCHCS initiated creation of this large-print template in response to Miles's request to receive large-print materials. (See id. at 8-9 (101:18-102:17).) To Wade's knowledge, no UNCHCS patients had requested large-print financial statements before 2019. (Id. at 9 (102:18-21).) Wade worked with hospitals' and physicians' IT departments and AccuDoc to create the large-print template. (See id. at 8 (101:1-8).)

Wade generally understands that, under accessibility guidelines, "if a patient indicates a need for a patient statement in a specific format" (Docket Entry 121-7 at 10 (109:17-19)), UNCHCS must "comply with that request and . . . build processes to make it efficient" (id. (109:20-21)) to accommodate anyone with a similar request. (See id. at 10-11 (109:10-110:1).) However, Wade possesses no special expertise in "what the technical requirements should be for a large[-]print document so that it is accessible to blind or low[-]vision individuals" (id. at 11 (110:6-8)). He also does not know if anyone on the group creating the large-print templates possesses such expertise. (See id. at 10 (109:1-9).) The large-print template that UNCHCS created contains sections that do not utilize large print. (See Docket Entry 103-10 at 14-19 (126:5-131:2) (examining May 2020 large-print hospital patient financial statement sent to Miles).)

UNCHCS first used the large-print template in May 2019.  (See id. at 12 (105:6-14).)  Wade described the process in place before 2019 for patients requesting a large-print statement as follows:

> It was a very manual process and the volume was only one. And so, once we were made aware of the — of the request, then we monitored that account.  And when any statement would generate for that account, we would contact the patient and let them know that a statement would be generated, they would get two statements, one would be generated through our normal system, and then we would take that statement — we, my office, would then take that statement and take it to the printer and enlarge it multiple times, put in an envelope, contact the patient, let them know it was in the mail from us directly, and we would mail it out.

(Id. at 10 (103:5-16); accord id. at 11 (104:9-16) ("When we became aware of the patient need . . . the account was assigned to — for someone to monitor and they would look at the account, and when a statement was to be generated, that representative can see in Epic when a statement is generated, and then they would take that statement and enlarge it then mail it out.  It was — their account was just monitored.").)  Wade clarified that his department followed this procedure for all patient statements mailed to Miles, the relevant patient.  (See id. at 10-11 (103:17-104:1).)  This process did not appear in any written UNCHCS policy (see id. at 11 (104:2-7)); instead, it represented "a stop gap measure" (id. at 12 (105:1)) that lacked sustainability if multiple patients requested large-print materials (see id. at 11-12 (104:17-105:1)).

In or around 2018 (see Docket Entry 108-3 at 7 (64:7-11)), UNCHCS tasked Jayson Perez de Paz, in the Patient Relations

84

department, with assisting in the provision of alternative-format documents to Miles. (See, e.g., Docket Entry 108-15 at 1.) This request "came from Glenn George" (Docket Entry 108-3 at 3 (27:17-19)) and represents the only instance Perez de Paz can recall regarding provision of alternative-format documents. (See id. (27:6-20).) Perez de Paz explained that he understood "[Miles] ha[d] reached out to, to UNC, because he ha[d] not received paper — any papers that a patient would receive with large print size" (Docket Entry 114-3 at 2 (17:18-20)), and Perez de Paz got "requests from either Glenn George[ or her] office asking for assistance getting the clinics to provide . . . information [Miles] had asked for" (id. at 3 (18:1-5)). When Perez de Paz learns that Miles "[i]s requesting or has requested a document, [Perez de Paz] reach[es] out to the clinic leadership" (id. (18:9-10)), provided it "is part of the UNC Medical Center" (id. (18:16-17)), rather than directly to Miles's providers (see id. (18:6-21)).

Perez de Paz serves as a UNCHCS patient experience advisor (see Docket Entry 103-25 at 4 (13:13-15)), a job that does not require understanding how to convert documents to alternative formats (see id. at 5 (28:4-6)). Because of Miles, Perez de Paz "now [is] aware of After Visit Summaries, and when patients request that, [he] guess[ed his office] can ask for assistance for the clinics to see if they can enlarge those, or any documents, [he] guess[ed]." (Id. (28:10-14).) The Patient Relations Department

85

possesses "view only" access to EPIC, which means that they "cannot change any information in Epic or forward any information to any patient" and also cannot convert documents themselves. (<u>Id.</u> at 6 (29:8-14).) "[T]hat's why [Perez de Paz] rel[ies on] other people to send requests and see who can help [his office] really." (<u>Id.</u> (29:14-16).) At some point, Perez de Paz obtained instructions for printing enlarged-print After Visit Summaries, which he shared with certain entities. (<u>See id.</u> at 8-10 (104:14-106:11).) "[Perez de Paz] think[s that he] called a couple of clinic — units in the hospital who [sic] try to see how they have found that in the past, and that's how [he] came across this information, but [he is] not sure — [he] do[es]n't remember who exactly or where [he] got it from." (<u>Id.</u> at 10 (106:6-11).)

Perez de Paz attempted to test out these instructions to confirm that they worked, but "[b]ecause [he] ha[s] 'View only['] access to EPIC,] it wouldn't give [him] that option. That's why [he] was just providing to people what [he] received." (<u>Id.</u> (106:17-20); <u>see id.</u> at 10-11 (106:12-107:1).) These instructions on printing enlarged After Visit Summaries "are . . . the only type of instructions that [Perez de Paz] ha[s] when it comes to converting documents to alternate formats" (<u>id.</u> at 11 (107:2-4)). (<u>See id.</u> (107:5).) Although "[Perez de Paz] didn't see it [him]self because it wouldn't let [him] do it" (<u>id.</u> at 11-12 (107:20-108:1)), he believes that EPIC provides options for

86

printing more than just the After Visit Summaries in enlarged format. (See id. (107:9-108:7).) Perez de Paz also thinks that "any document that is given to a patient or is part of medical records would be uploaded in the [EPIC] system" (id. at 12 (108:11-13)), but he does not know what documents receive such treatment. (See id. (108:8-17).) In addition, he does not know whether EPIC permits enlargement of other documents using similar instructions. (See id. at 12-13 (108:18-109:4).)

Perez de Paz conducted "some monitoring activities" (id. at 18 (123:18)) regarding Miles. (See id. (123:17-21) ("[Plaintiffs' Counsel:] You referenced before that you were doing some monitoring activities. Was this the type of monitoring activity that you were doing? [Perez de Paz:] Yes. I mean, yes, if you call it that way. I'm alert[ing ]the clinic.").) More specifically, Perez de Paz contacted clinics to request that Miles receive an enlarged After Visit Summary. (See, e.g., id. at 19 (124:1-7).) Perez de Paz does not remember why he identified only After Visit Summaries in his communications with the clinics (see, e.g., id. at 7 (82:1-21), 13 (109:7-19), 18-19 (123:4-124:10), 20-21 (127:18-128:19)), but believes that the request he received only referenced After Visit Summaries (see id. at 7 (82:18-21)).

Both before and after UNCHCS instituted a policy regarding provision of alternative-format materials to the blind, "[i]t would be rare" (Docket Entry 108-3 at 6 (63:17)) for Perez de Paz to

87

receive calls asking for assistance with alternative-format requests. (See id. (63:1-17).) Perez de Paz has not noticed a change or any increase in providers contacting him for assistance with alternative-format requests since early 2019. (See id. at 6-7 (63:18-64:4).) He also does not recall receiving any requests from physicians for assistance regarding alternative-format materials. (See id. at 3 (27:13-20).) Finally, asked who in Patient Relations "has the authority to go to when it goes to auxiliary aids and services and how to provide them" (id. at 5 (62:8-11)), Perez de Paz identified Rogers (id. (62:12)), noting that "he would be the most knowledgeable" (id. (62:13-14)).

As Director of Patient Relations, Rogers serves as UNC Medical Center's (sole) civil rights coordinator, a role that UNCHCS created in response to Section 1557, although the job functions existed previously. (See Docket Entry 108-6 at 26-27 (104:21-105:24), 30 (110:6-12).) Serving as "the civil rights coordinator" does not constitute Rogers's "sole job function" (id. at 30 (110:13-14); see id. (110:15)), but instead makes up only a "very low" percentage of his job responsibilities (Docket Entry 103-19 at 22 (111:3)). Although he "would have difficulty actually quantifying a percentage" (id. (111:5-6)), he agreed that it represents "5 percent" of his job (see Docket Entry 108-6 at 30 (110:25); Docket Entry 103-19 at 22 (111:1-6)). As discussed in more detail below, UNC Medical Center's "Procedure for effective

88

communication with patients with disabilities" (Docket Entry 103-19 at 22 (111:8-9)) contemplates oversight by "[t]he civil rights coordinator network entity" (id. (111:11-12); see also id. (111:7-17); Docket Entry 108-10 at 5).

UNCHCS has created four iterations of an effective communication policy since 2016. (See Docket Entries 108-7 to 108-10.) At his deposition, Rogers did not recall if the 2016 effective communication policy mentions anything about recording information regarding a patient's communication needs, but the "current practice is to make a note or flag in Epic that will have specific instructions. . . . — specific communication requirements for an individual patient." (Docket Entry 113-10 at 10-11 (77:23-78:3).)[38] However, notwithstanding that UNCHCS's "standardized

_____

38 Rogers further testified that training on providing auxiliary aids and services does not say anything about keeping accessible copies of frequently used materials on hand (see id. at 13 (81:4-9)) and that he does not know of a policy for generating documents (id. at 7 (50:13-16)). He also indicated that "there's been no blanket training to train staff on any – every scenario they might encounter [regarding communication needs]" (Docket Entry 108-6 at 21 (94:8-9)). According to Rogers, staff would know the appropriate steps in such situations "[b]y taking the time to be humane and work with that patient so that they can [e]nsure effective communication." (Id. (94:12-14); see id. (94:10-11).) As for what steps UNCHCS took under the 2016 policy "to [e]nsure that patients with vision loss who needed large[-]print format could see [documents]" (id. (94:15-18)), Rogers responded: "Again, if a patient needed said document, we would rely upon them to indicate that need to us, at which point . . . we would work to get that document printed in larger font" (id. (94:19-22)). As for how staff would know the appropriate aid, Rogers stated that "[they] depend upon the patient to inform [them] of this need." (Id. at 22 (95:5-6); see id. (95:2-4).)

process for indicating in the electronic medical record the patient communication [sic] requested auxiliary aids . . . . [i]s the FYI flag" (Docket Entry 103-19 at 24 (117:11-14)), UNCHCS does not monitor to ensure that "FYI flag[s] ha[ve] been created for each patient who has a communication disability and needs information in an alternate format" (id. (117:16-18); see id. (117:15-19)) and does not have a way to "assess whether or not this FYI flag is being added reliably" (id. (117:20-21); see id. (117:20-23)).

As noted, UNCHCS created an "Effective Communication for Limited English Proficiency Patient and Patients with Disabilities" policy in July 2016. (See Docket Entry 108-7 at 1.) This policy focused heavily on communication with individuals with limited English proficiency. (See id. at 1-5.) However, it specified that UNCHCS would "take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others" (id. at 5) and would "provide appropriate auxiliary aids and services to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the UNCHCS service at issue" (id.). (See also id. (stating that hearing-impaired patients could request certified sign language interpreter by emailing Interpreter Services in advance or by calling Patient Relations for immediate needs).) The 2017 effective communication

90

policy[39] again focused on individuals with limited English proficiency (see Docket Entry 108-8 at 1-7) and provided the same "Procedure for Effective Communication for Patients with Disabilities" (id. at 5 (emphasis omitted)) as the 2016 policy (compare Docket Entry 108-7 at 5, with Docket Entry 108-8 at 5).

UNCHCS revised its policy in April 2019 and again in May 2019. (Compare Docket Entry 108-8 at 1, with Docket Entry 108-9 at 1, and Docket Entry 108-10 at 1; see also Docket Entry 108-6 at 26-27 (104:4-105:8) (explaining that April 2019 policy revision occurred because "there[ wa]s language that needed to be updated in terms of notice of nondiscrimination" and discussing changes).) The 2019 policies largely mirror each other, except that, inter alia, the May 2019 version also includes a Notice of Nondiscrimination. (Compare Docket Entry 108-9 at 1-13, with Docket Entry 108-10 at 1-17.) The 2019 policies contain a more-detailed procedure for communicating with patients with disabilities. (See Docket Entry 108-9 at 5-7; Docket Entry 108-10 at 5-7.) This more-developed approach begins in the rationale section, where the policies state:

> As further described in Section V below, auxiliary aids and services will be provided to patients with communication disabilities to ensure effective, meaningful communication with, and equal access to

---

39  The copies of the 2017 and 2019 policies in the record indicate that they apply to the "UNC Medical Center" but their content refers to the obligations and procedures of UNCHCS generally, without limitation to the UNC Medical Center component thereof. (See, e.g., Docket Entry 108-8 at 1; Docket Entry 108-9 at 1; Docket Entry 108-10 at 1.)

91

[UNCHCS]'s services by, these patients. [UNCHCS] will work with each patient to provide the patient's requested accommodation or a reasonable alternative accommodation.

(Docket Entry 108-9 at 1; Docket Entry 108-10 at 1; cf. Docket Entry 108-7 at 1 (stating only that "UNCHCS will also take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities"); Docket Entry 108-8 at 1 (same).)

As relevant here, Section V of the 2019 policies tasks "[t]he Civil Rights Coordinator at each Network Entity covered by th[e] policy [with] providing appropriate notice, training and monitoring of the Network Entity's ongoing compliance with [the policy's] requirements." (Docket Entry 108-10 at 5.)[40] Section V obligates UNCHCS to "take appropriate steps to ensure that both oral and written communications with individuals with disabilities are as effective as communications with others" (id.), a "duty [that] extends to 'companions' of the patient if it will impact the patient's care" (id.). Section V contemplates that UNCHCS will (i) assess communication needs at registration and (ii) record communication disabilities, as well as requested auxiliary aids and services, in the electronic medical record. (See id. at 5–6; see also id. at 6 (stating that other UNCHCS staff should likewise

_____

40 Because the 2019 policies contain the same information in Section V (compare id. at 5–7, with Docket Entry 108-9 at 5–7), the citations that follow above reference only the May 2019 policy.

92

document disability-related information and communicate with registration if identification of disability occurs elsewhere).)

Regarding the applicable procedure, Section V directs "Network Entities on Epic" to use EPIC FYI flags to indicate a patient's communication disability and to record requested auxiliary aids and services. (See id. at 6 (referencing "tip sheet" on Attachment C).)[41] Per Section V, registration staff should use the EPIC guarantor field to flag requests for alternative-format billing statements (see id.) and should contact "the Network Entity's Civil Rights Coordinator . . . [i]f the guarantor field does not contain the patient's [or non-patient guarantor's] requested format" (id.).

With respect to the provision of auxiliary aids and services, Section V specifies that "[UNCHCS] will provide reasonable and appropriate auxiliary aids and services to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the [UNCHCS] service

---

41  Attachment C, which bears the "Epic @ UNC Training" logo, states:

> [UNCHCS] will take appropriate steps to ensure that both oral and written communication with individuals having disabilities are as effective as communication with others. Patients should know these services are provided at no cost to the patient and/or the patient's companion. This Tip Sheet will provide users with the process to add FYI Flags and how to utilize Smart Text and Smart Lists to document the appropriate details.

(Id. at 13.)  The document then provides step-by-step instructions for "Adding an FYI Flag for Sight[-]Impaired Patients."  (Id.)

at issue." (Id.; see also id. (referencing additional information on Attachment A).)[42] For blind and low-vision patients, Section V indicates that such aids and services qualify as necessary "when[, inter alia,] providing the patient with documents or written communications that affect access to, retention in, or termination or exclusion from a provider's services or benefits, or which require a response from the patient." (Id. at 6–7.) Under those circumstances, Section V indicates that staff should provide "reasonably accessible" written communications and determine specific patient needs via consultation with the patient. (See id. at 7.) Moreover, Section V suggests that "staff may communicate information in written materials concerning treatment, benefits, services, waivers of rights, and consent forms by reading out loud and explaining these forms to the patient in a private area when the patient is present at a [UNCHCS] facility." (Id.) Finally, Section V directs staff to honor a patient's choice of auxiliary aid or service "unless another equally effective means of communication is available or use of the chosen means would result in a fundamental alteration or in an undue burden" and to consult the "Network Entity's Civil Rights Coordinator . . . if questions or concerns arise regarding the patient's choice of auxiliary aid or service." (Id.)

---

42 Attachment A provides, in full, as follows: "Call Patient Relations at 984-974-5006." (Id. at 10.)

94

Notably, although the three most recent effective communication policies in the record identify him as their "owner" (Docket Entry 108-8 at 1; Docket Entry 108-9 at 1; Docket Entry 108-10 at 1), Rogers does not know if registration staff must ask patients about their need for alternative-format documents (see Docket Entry 103-19 at 24 (117:1-6)). Further, although the 2016 Effective Communication Policy[43] "does not specify that [Patient Relations can help with printing alternative-format documents] specifically" (Docket Entry 108-6 at 14 (72:21)), Rogers interprets the policy as directing people to call Patient Relations "[i]f they are not able to effectively manage [provision of alternative-format documents] at the time with the patient" (id. (72:12-14)), on the theory that "patient relations is a department that staff know to call should they need assistance of this type" (id. (72:22-24)). (See id. at 14-15 (72:1-73:14).)[44]

_____

43  The 2017 policy likewise does not direct individuals to contact Patient Relations for assistance with providing auxiliary aids and services to blind individuals. (See Docket Entry 108-7.)

44  Testifying as a Rule 30(b)(6) witness a few weeks later, Rogers further indicated that "[staff] shouldn't need to contact [Patient Relations] to print an after[-]visit summary in large print" (Docket Entry 121-11 at 4 (47:22-23)), "[b]ecause there's a button in Epic that allows you to print the after[-]visit summary in large print" (id. at 4-5 (47:25-48:2)). Rogers explained that he cannot print from EPIC but "watched a large[-]print document be generated from Epic." (Id. at 3 (9:3-4).) More specifically, "[he] watched someone print out an after[-]visit summary and . . . [observed] a button, for lack of a better word, . . . indicating the option of printing like large font. It gave three options, regular font, large font or larger font, that's
(continued...)

95

However, Reese, who oversees registration at UNCHCS (see Docket Entry 103-20 at 6-7 (44:23-45:5); Docket Entry 122-12 at 2 (8:2-21)), testified that registration staff members should contact "Interpreter Services . . . if there is a need to create a[n accessible] document . . . [for] a blind patient" (Docket Entry 103-20 at 29 (103:12-16); see id. (103:17).) Reese explained that her department would "coordinate with Interpreter or Translation Services regarding the provision of accessible formats for documents presented during Registration" (id. (103:18-22)).

Reese admittedly lacks "familiar[ity] with UNC Medical Center's Effective Communication Policy for Limited Proficiency Patients and Patients with Communication Disabilities" (id. at 5 (43:1-5)), and, although UNCHCS reception staff bear responsibility for assessing the communication needs of patients with disabilities and entering the appropriate FYI flag into EPIC (see, e.g., id. at 5-6 (43:13-44:1); Docket Entry 108-10 at 5-6), she does not recall if an assessment of patients' disability-related communication needs occurs at registration (Docket Entry 103-20 at 5-6 (43:20-44:1)). More specifically, Reese denied knowledge about whether

---

44(...continued)
not a technical term . . . , but that is an option that you would press and it would automatically print out in larger than standard font." (Id. (9:8-17).) As for whether "that information [is] written down somewhere that would explain how to print an after [-]visit summary in large print" (id. at 5 (48:5-7)), Rogers stated: "It could potentially be . . . in the Epic training manual." (Id. (48:8-10).)

EPIC prompts registration staff to record communication needs (see id. at 6 (44:2-6)) or whether registration staff (i) check for FYI flags during registration (see id. at 12 (66:10-13)), (ii) look at the day's scheduled appointments to "anticipate the need for accessible[-]format documents" (id. at 22 (83:9-10)), or (iii) receive training on such matters (see id. at 12 (66:10-20), 22 (83:8-14)). Reese also could not explain what "is supposed to happen the next time a document is supposed to be given to [a] patient" after the addition of the flag to "EPIC stating that they need an accessible format," such as "large print" (id. at 12 (66:4-9)), or what registration staff does after viewing such a flag (see id. at 16 (73:1-6)).

Per Reese, if patients report to registration staff receipt of documents they cannot access due to visual impairment, "[registration] will work to resolve the complaint, and contact the Translation or Interpreter Services for available formats for the patient" (id. at 28 (97:5-8)). (See id. (97:1-8).) Registration staff would also notify Patient Relations and anyone who came in contact with the patient of the complaint. (See id. (97:9-13).) Reese lacks awareness of any policy or procedure indicating that staff should contact Patient Relations with complaints about inaccessible documents, but says registration staff would know to do so due to "[t]raining procedures" (id. (97:21)). (See id. (97:14-21).)

Romeo lacks familiarity with UNCHCS's 2019 effective communication policies, which she had not seen before her deposition. (See Docket Entry 103-21 at 9 (70:6-8), 10-11 (71:18-72:2); see also id. at 11-12 (72:25-73:7).) In addition, she denied knowledge of (i) a standard process for how registration staff should respond if they see a flag for large-print or Braille documents (see id. at 8 (69:10-15); (ii) any training directing registration staff to look for such flags (see id. (69:15-20)); and (iii) any quality assurance review applicable to the registration procedure (see id. (69:21-23)). Further, although UNCHCS's 2019 effective communication policies task registration staff with identifying communication needs (see id. at 9-10 (70:20-71:2)), Romeo disclaimed "any idea how registration would assess someone's communication needs at registration" (id. at 11 (72:19-22); see also id. at 10 (71:3-6)) and any "know[ledge of] . . . processes in place to make sure that [such assessments] happen[] at the[] clinics" (id. at 10 (71:7-9); see also id. (71:10)).

As for whether "large[-]print versions of documents [are] stored anywhere at registration," Romeo answered "[n]ot that [she is] aware of, no." (Id. at 13 (74:6-8).) She similarly does not know about electronic storage of a large-print format. (See id. (74:9-11).) Nor does Romeo "know if registration staff are provided with instructions on how to convert standard[-]print documents to large print" (id. (74:12-14)). (See also id.

98

(74:15).)  Because Romeo does not convert documents herself, she "do[es]n't think given [her] role [that she] would be expected to know [how to convert documents], . . . but [she] would be expected to know who to direct [registration staff] to if they needed to assistance in figuring that out."  (Id. (74:19-22); see also id. (74:16-18).)  For EPIC documents, like after-visit summaries, "[Romeo] would direct them to the ISD or Epic training team."  (Id. at 14 (75:1-3).)[45]  For documents not in EPIC, Romeo "do[es]n't know offhand who [she] would reach out to first, but if it's a policy, likely the policy owner."  (Id. (75:5-7); see also id. (75:4).) However, for documents other than policies, Romeo would direct registration staff to interpreter services because that department often handles requests for converting documents from English to Spanish.  (See id. (75:8-20) (explaining that registration staff partner with interpreter services for that purpose).)

According to Romeo, registration does not bear responsibility for converting needed documents to large print.  (See id. (75:21-24).)  Instead, "[she] think[s] it would be their responsibility to

_____

45  Romeo believes that ISD stands for Information Services Department.  (Docket Entry 121-13 at 3 (16:9-11).)  She reported the existence of a "training department through [their] ISD department that trains staff on technical training like how to use [their] medical records system and [their] scheduling system" (id. (16:1-4)), for example, "how to use the system, like where to point, where to click, what the functions of the medical records system are" (id. (16:15-18)).  She further clarified that this system "is the Epic system" (id. (16:21)) and the training remains specific to EPIC.  (See also id. (16:19-23).)

99

provide the large[-]print document that has been converted either electronically or a paper copy that has been provided for them that's in a larger print." (Id. at 15 (76:8-11).) However, she noted "that [registration staff] may not have the tools or know what the standard or proper, you know, font size, for example, may be, and if they don't have that to provide to them, then they should reach to interpreter services who would provide the appropriate document." (Id. (76:17-22); see also id. (76:13-16).)

As for what should happen "[i]f a patient complains to registration at a clinic about not receiving large[-]print documents" (id. at 16 (83:17-19)), Romeo does not know "how all complaints are handled" (id. (83:21-22)), but, typically if registration staff receive complaints they cannot resolve themselves, they work with clinic leadership to resolve it (see id. (83:22-25)). Romeo further lacks awareness of any structure "for communicating accessible[-]format issues across departments at [UNCHCS]." (Id. (83:13-15); see also id. (83:16).)

According to Romeo, registration staff receives required technical training, including on using EPIC, from the ISD department as well as mandatory new hire orientation. (See Docket Entry 121-13 at 3-4 (16:1-17:7), 5-6 (19:1-20:6).) They also can take optional operational training from UNCHCS's learning and organizational development department, which trains staff throughout UNCHCS, including at the different entities. (See id.

100

at 3-4 (16:5-17:21), 5 (19:14-19), 6-7 (20:7-21:5).) Finally, UNCHCS staff must undergo annual training, which Romeo described as "very general trainings that would apply to all employees of the healthcare system" (id. at 7 (21:17-19)), but, to Romeo's knowledge, such programs do not include training on effective communication with people with disabilities. (Id. (21:6-23).)

Jeri Williams serves as UNCHCS's Section 1557 coordinator. (See Docket Entry 103-33 at 3 (17:10).) Williams's job responsibilities include "ensur[ing] that [UNCHCS] complies with [applicable] federal laws, rules, and regulations" (id. at 7 (26:10-11)), including Section 1557 (id. (26:20-21)), the ADA, and Section 504 (id. at 8 (37:10-21); see also id. (37:19-21) (describing compliance with ADA and Section 504 as within purview of Williams and her team)). Williams "ha[s] delegated various components of [her] 1557 responsibilities to various individuals, predominantly patient relations" (id. at 3 (17:14-16)), specifically at the Medical Center (see id. at 4 (18:12-21)). "As far as oversight [of those individuals]" (id. at 5 (19:5)), Williams expects that patient relations would alert her to "issues . . . of significance" (id. (19:6-7); see also id. (19:1-4)). However, Williams does not have scheduled check-ins, receive reports, or exercise other forms of oversight regarding those to whom she delegated her Section 1557 responsibilities. (See id. at

6 (21:1-9) (indicating, inter alia, that "[p]atient relations does not report to [Williams]").)

Conversely, compliance officers at the UNCHCS-owned entities report directly to Williams, who holds staff meetings with them. (See id. at 9 (64:10-19).) She also holds monthly 30-minute meetings "as a touch point" with the compliance officers at the managed affiliates, "but they know that they can e-mail or call [her] anytime with any questions they have." (Id. (64:8-9); see also id. (64:1-19).) "[D]uring one of these monthly one-on-one meetings" (Docket Entry 110-4 at 8 (66:5-6)), the Nash compliance officer, Ms. Woods, alerted Williams to an ADA-related issue, specifically regarding provision of Braille documents to Bone. (See, e.g., id. at 8-9 (66:1-67:9).) When asked whether Williams "followed up with [Woods] at all about this issue" after that conversation, Williams responded: "I'm sure I did, I'm sure I did, just to say how — how are things going." (Id. at 9 (67:10-14).) However, Williams did not provide "any advice or information about responding to this issue." (Id. (67:15-16); see also id. (67:17).) Moreover, despite the fact that provision of the Braille documents did not occur until "sometime after [Bone] requested the[m]" (id. at 11 (69:1-2)),[46] Williams did not follow up with Ms. Woods or stay

---

46  Williams indicated that she did not know the specific duration, but she knew some period elapsed "[b]ecause we had to request those documents in [B]raille two times" (id. (69:6-7) (emphasis added)).  (See id. at 10-11 (68:15-69:7) (discussing (continued...)

102

in touch with the issue (see id. (69:8-11)) or "follow up at all about procedures generally at Nash providing auxiliary aid[]s and services, including [B]raille" (id. (69:13-15)). (See id. (69:16).)

Williams does not know for certain whether each owned or managed affiliate possesses an effective communication policy or whether they have adopted the effective communication policy from the UNCHCS Medical Center. (See id. at 13-15 (137:3-139:21).) "[She] know[s that] Nash has a policy" (id. at 14 (138:19)) but does not know whether Nash adopted the Medical Center policy (see id. at 15 (139:3-4)).

In the late summer or early fall of 2016, UNCHCS issued a nondiscrimination notice regarding Section 1557. (See Docket Entry 113-5 at 13 (101:1-19).) According to Williams, UNCHCS did so "[t]o ensure that [it was], in fact, providing free auxiliary aid[]s and services for those individuals with hearing or sight loss and that [it] also share[s] grievance information as well." (Id. (101:10-13).) However, the information that Williams's office disseminated did not "include how to provide the [f]ree auxiliary aid[]s and services for individuals with disabilities." (Id. at 14 (103:7-9); see also id. (103:10).) According to Williams, "operations . . . would have been responsible for that." (Id.

---

46(...continued)
timing of Nash providing Braille documents to Bone).)

(103:10-11).) As for whether "anyone from operations pushed out that information . . . around the same time, October[] 2016" (<u>id.</u> (103:12-14)), Williams stated:

> The poster that were [sic] going out to be posted, in huddles, it[] was addressed in huddles, it would've been addressed just hands-on learning. If there were other — other system changes, that would have been handled by clinical instructors and ISD architects, if you will, but compliance wouldn't have pushed it out.

(<u>Id.</u> (103:15-21).)

The compliance office conducts work plans based on risk assessments. (<u>See, e.g.</u>, Docket Entry 108-5 at 19 (193:6-18).) As for whether UNCHCS's risk assessments or work plans have "ever covered effective communication under the ADA or [S]ection 504 or [S]ection 1557" (<u>id.</u> (193:10-11)), Williams stated:

> Section 1557 was on the work plan probably in 17, 18, we did conduct audits to . . . make sure that we had the right notices up on each of the websites. So there were several things that we looked at to make sure everything was in line with what the work group identified.

(<u>Id.</u> (193:12-18).) Other than that work around the notice of nondiscrimination, UNCHCS has conducted no subsequent work plan or risk assessment relating to effective communication (<u>see id.</u> at 19-20 (193:19-194:2); <u>accord</u> Docket Entry 121-4 at 17 (198:16-20)), but, "[b]ecause of Mr. Miles['s] case" (Docket Entry 121-4 at 18 (199:5); <u>see also id.</u> at 17-18 (198:21-199:5)), it plans to conduct some work around this topic in 2022 (<u>id.</u> at 18 (199:2-3); <u>see also id.</u> at 17 (198:11-15) (explaining that approval of work plan would occur in July 2021 for implementation in 2022)). "[Williams] was

104

the one to make the decision that [they] should put it on the plan for [2022]." (Id. at 18 (199:15-16); see also id. (199:12-17).)

Williams further testified about employee training, which includes information regarding the ADA, Section 504, and/or Section 1557 (see Docket Entry 110-4 at 21 (216:15-18)), and explained that annually all employees must take the same exams as new hires take (see id. (216:12-14)). Williams also stated that, aside from Onslow, Lenoir, and Wayne, she believes everyone else in the UNCHCS system undergoes the same new employee and annual training (with potentially some entity-specific material tailoring). (See Docket Entry 121-4 at 19 (218:1-12).) When asked about training regarding effective communication outside the new employee and annual training (see id. (218:13-16)), Williams responded as follows: "Certainly, it's going to vary by department but as I said, back in 2016 or 2017 there was a lot of communication and information at that point in time. I think as the flags were put in, there would have been education on those as well." (Id. (218:17-21).)

Williams's department, the compliance office, provides substantive input regarding the ADA, Section 504, and Section 1557 for the annual training that encompasses those three statutes. (See Docket Entry 108-5 at 22-24 (206:16-207:21, 209:5-19).) Notably, though, the effective communication annual training module lacks "training about how to actually record requests for auxiliary aid[]s and services in EPIC." (Id. at 25 (210:5-7); see also id.

105

(210:4-15).)    Instead, Williams believes the module (or an attachment) provides contact information for the appropriate department (such as patient relations).  (See id. (210:8-15).)

Williams does not know if registration staff ask about a patient's visual impairment or need for auxiliary aids and services.  (See id. at 10 (106:3-18).)  However, if a patient self-identifies as blind, Williams indicated that registration staff should put a flag in EPIC "to explain what the disability is" and should "ask a series of questions [about] what type of auxiliary aid[] they might need."  (Id. at 11 (107:2-6); see also id. at 10-11 (106:19-107:6).)  If the conversation regarding blindness and required aids occurs somewhere other than at registration, staff participating in that conversation "would be able to enter the flag" (id. at 11 (107:11); see also id. (107:9-11)).  Williams indicated that the questions regarding auxiliary aids "would be similar to what's on the notice of nondiscrimination, whether they need a reader, whether they need — prefer recording, would like for people to read to them, would ask for enlarged font size or [B]raille."  (Id. at 13 (109:2-6); see also id. (109:6-7) (observing that "there are places within the [electronic health] record where that would be noted").)

Finally, when asked if UNCHCS keeps on hand large-print or Braille versions of documents, Williams stated:  "I don't know about [B]raille, but all they would have to do is hit the plus

106

button [at the bottom of the PDF on EPIC] to enlarge it and print it out." (Docket Entry 121-4 at 3 (113:5-7); see also id. (113:1-11).) Williams assumes that registration follows this process when someone requests a large-print document, "[e]ither that, or [they] go to a [photocopier to] expand the size of a document on a printer to make it work." (Id. at 4 (114:8-10); see also id. (114:2-12).)[47]

## E.  Accessible Document Standards

Plaintiffs submitted expert reports from Dennis Quon, "a subject matter expert in document accessibility" (Docket Entry 103-26 at 4), and Megan Morris, a professor whose "academic research focuses on provider and healthcare organization-level factors that impact the quality of care delivered to patients with disabilities, including policies and procedures for effective communication with patients with disabilities and best practices for documenting patients' disability status" (Docket Entry 103-28 at 4).[48]  Both experts purported to identify deficiencies in UNCHCS's handling of

_____

47   In his deposition, Rogers similarly interpreted the provision of large-print auxiliary aids under the effective communication policy to require "printing a document out in a larger font size." (Docket Entry 108-6 at 16 (74:9-10); see also id. (74:3-8).) He further defines a large font size as "what the patient could see. This would vary by patient. The goal here is to effectively communicate with our patients so it would vary from situation to situation." (Id. (74:12-15); see also id. (74:11).)

48  Morris also served as a clinician for nine years, during which time she utilized EPIC. (See id.)

its effective communication obligations. (See, e.g., Docket Entry 103-26 at 10-11; Docket Entry 103-28 at 6-7.)

For instance, Morris described measures that healthcare organizations should take to ensure that patients with disabilities "receive the same information about their healthcare and are able to direct their care to the same extent as patients without disabilities" (Docket Entry 103-28 at 6), to include systems for collecting, recording, and displaying disability-related information (see id.), as well as "processes to ensure the prompt provision of requested accessible document formats or other requested auxiliary aids and services" (id.). Morris asserted that, for returning patients, such provision should occur "at the time of the patient's appointment." (Id.) Furthermore, per Morris, healthcare systems should review their processes for documenting disability status and providing accommodations and should ensure that employees and contractors receive adequate training on those subjects. (See id.)

Against that background, Morris opined that, "[a]lthough UNCHCS has made some efforts to be accessible to patients with disabilities, these efforts appear to be reactionary and not systematic or comprehensive, which undermines the ability of UNCHCS to meet the needs of its patients with disabilities" (id. at 12). In support of that opinion, Morris noted the relatively little time that Rogers devoted to his duties as Civil Rights Coordinator (see

108

id.) and the "significant gaps in [his] knowledge regarding how patients are identified and provided accommodations" (id. at 14). Morris further criticized various aspects of UNCHCS's effective communication policies, including their one-time focus on Limited English Proficient ("LEP") patients (to the exclusion of patients with other communication needs) (see id. at 12–13), and highlighted problems with the current design of the FYI field in EPIC (see id. at 13). Additionally, in Morris's view, UNCHCS had failed to (i) assess its own processes for recording disabilities and providing accommodations (see id.) and (ii) implement systems to share disability-related information across providers and staff members (see id. at 13–14).

Morris also provided a supplemental expert report, in which she maintained her original opinion regarding UNCHCS's efforts and further opined that "that UNCHCS does not have adequate processes and systems in place to timely and adequately provide needed auxiliary aids and services for patients with visual disabilities. While UNCHCS has attempted to 'check the boxes' for compliance with the [ADA], Section 504 . . ., and Section 1557 . . ., these efforts seem to be surface-level only." (Id. at 45.) Morris included "some specific examples to support [her] opinions" in this supplemental report. (Id.) In that regard, Morris challenged UNCHCS's reliance on "patient-specific monitoring processes" (id. at 46), such as Perez de Paz's practice of alerting clinics (before

109

each of Miles's scheduled appointments) about his need for large-print materials (see id. at 45–46).  (See also id. at 46 (describing stop-gap measure of tracking Miles's account for purposes of sending large-print patient statement).)

Moreover, Morris noted that "key UNCHCS leaders [lacked] an adequate understanding of whether and how UNCHCS policies meant to ensure effective communication with blind patients are being implemented on the ground."  (Id.; see also id. at 46–48 (observing that Williams had delegated compliance-related responsibilities and stating that Rogers, Reese, Perez de Paz, and Wade lacked knowledge about effective communication policies and/or procedures).) Finally, Morris opined that, by failing to collect patient data concerning disabilities, UNCHCS had neglected to address health disparities consistent with the Affordable Care Act ("ACA"), which "includes disability in the requirements for demographic characteristics for the purposes of tracking disparities in care" (id. at 48).  (See id. (referencing efforts by UNCHCS "to increase [] collection of patient data concerning race, ethnicity and primary language").)

For his part, Quon opined:

(1) large institutions like UNCHCS can quickly provide blind and low-vision patients with accessible document formats, including at the point of service, pursuant to several different approaches, (2) the provision of accessible documents can be automated in order to ensure timely and consistent delivery of such documents, and (3) it appears that UNCHCS has not consistently implemented processes, procedures, and/or workflow plans

110

to ensure consistent, timely production of accessible document formats across UNCHCS entities.

(Docket Entry 103-26 at 5.) As to the final point, Quon critiqued the absence of "automated processes pursuant to which [a large-print] request automatically triggers the use of large[-]print templates for systemically[ ]generated documents, such as after-visit summaries or appointment reminders." (Id. at 10.)[49] Regarding the accessibility of invoices and other documents generated by UNCHCS, Quon identified numerous barriers, including font size, font color, and table formatting. (See id. (describing barriers on large-print invoice template and noting noncompliance with "Clear Print Accessibility Guidelines or the APH Guidelines for Print Document Design"); see also id. at 10-11 (describing review of several documents downloaded from Miles's MyChart account, which documents "lack metadata tags that would facilitate their use in conjunction with a screen reader").)

Quon also provided a supplemental report, based on his review of Wade's deposition, certain UNCHCS discovery responses, and seventeen additional documents Miles received from UNCHCS. (See id. at 34.) Per the supplemental report, those documents further

─────────────

49 According to Quon, entities can configure EPIC to automatically provide accessible print documents (see id. at 9-10), including by creating large-print templates (see id. at 7), templates that contain accessibility "tags" to create the necessary accessibility metadata to enable screen readers to "read" the resulting PDF files (see id.), and templates for printing in Braille (see id. at 7-8).

111

support Quon's third opinion, that UNCHCS "has not consistently implemented processes, procedures, and/or workflow plans to ensure consistent, timely production of accessible document formats across UNCHCS entities." (Id.) Quon also opined "that UNCHCS is not consistently and adequately providing individuals who require large print with the quality of large[-]print documents they can readily access." (Id.)

According to Quon, the conversion of a standard-print document into a large-print document requires more than merely increasing the font size, particularly because "design techniques traditionally used in documents intended for sighted individuals may render a document inaccessible to blind or low-vision individuals even if that document contains enlarged font." (Id.; see also id. at 36 (indicating that "[s]imply enlarging a document . . . is inadequate" because such practice "tends to magnify barriers to accessibility associated with the original, including columns, inadequate contrast, and other issues").) Accordingly, Quon opined that organizations should follow best practices in creating documents for blind and low-vision individuals, with attention to "issues such as color contrast, formatting, line spacing, margins, and paper orientation." (Id. at 35; see also id. at 35–36 (identifying authorities on large-print best practices and summarizing guidance for contrast, font size,

112

typeface, spacing, and other document properties).)[50] Quon explained that UNCHCS had not consistently followed those best practices, resulting in the creation of "documents that contain enlarged font but are not accessible to blind and low-vision individuals." (Id. at 35.)

In that regard, Quon noted that UNCHCS had failed to provide accessible billing statements, first by simply enlarging them and later by utilizing a large-print billing statement template that contains standard-size (or smaller) print. (See id. at 36–37.) As far as electronic documents on MyChart, Quon identified numerous formatting barriers, rejecting the assertion by UNCHCS (during discovery) that enlarging such documents (via a magnification function on a computer) renders them accessible to blind or low-vision patients. (See id. at 37–38.) Quon then suggested other means of responding to specific needs of UNCHCS patients, including creating "large-print templates of varying font size . . . for each document type" (id. at 38). (See also id. (explaining that UNCHCS could flag large-print request in billing statement data exported to third-party vendors).)

In a section of his supplemental report entitled "document analysis" (id. at 39 (emphasis and underlining omitted)), Quon evaluated the accessibility of the "17 additional documents [he

---

50  Quon testified that these best practices enable creation of documents that the majority of sight-impaired individuals can access. (See Docket Entry 122-5 at 2 (65:8-22).)

113

reviewed] in conjunction with []his supplemental report" (<u>id.</u>).[51]
Upon review of those "billing statements, after-visit summaries,
consent for treatment forms, appointment reminders, correspondence,
and patient instructions" (<u>id.</u>), Quon deemed such documents
generally inaccessible. (<u>See</u> <u>id.</u> at 39–43.) For instance, several
patient statements "lack[] metadata tags that would allow [them] to
be read effectively by a screen reader" (<u>id.</u> at 39) and reflect
numerous formatting barriers, including small font size and serifed
and colored fonts (<u>see</u> <u>id.</u>; <u>accord</u> <u>id.</u> at 39–41). In addition,
Quon asserted that neither letter sent by Rogers to Miles (in
October 2018 and January 2019) complied with large-print best
practices. (<u>See</u> <u>id.</u> at 42–43.)

**DISCUSSION**

**I. Summary Judgment Motions**

**A. Relevant Standards**

  1. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). A genuine dispute of material fact exists "if the

---

  51 Quon does not know whether Miles, specifically, could read
the materials he examined in his report, as Quon "do[es] not
understand his condition" (Docket Entry 122-5 at 7 (71:2-3);
<u>see</u> <u>id.</u> at 6-7 (70:23-71:3)); rather, Quon examined the materials
from the perspective of their compliance with accessibility best
practices (<u>see</u> <u>id.</u> at 5-6 (69:25-70:4)).

114

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

115

2. The Acts and Applicable Regulations

As the United States Supreme Court has explained regarding the creation of the Rehabilitation Act:

> Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference — of benign neglect. Thus, Representative Vanik, introducing the predecessor to [Section] 504 in the House, described the treatment of the handicapped as one of the country's "shameful oversights," which caused the handicapped to live among society "shunted aside, hidden, and ignored." 117 Cong. Rec. 45974 (1971). Similarly, Senator Humphrey, who introduced a companion measure in the Senate, asserted that "we can no longer tolerate the invisibility of the handicapped in America . . . ." 118 Cong. Rec. 525-526 (1972). And Senator Cranston, the Acting Chairman of the Subcommittee that drafted [Section] 504, described the [Rehabilitation] Act as a response to "previous societal neglect." 119 Cong. Rec. 5880, 5883 (1973). *See also* 118 Cong. Rec. 526 (1972) (statement of cosponsor Sen. Percy) (describing the legislation leading to the 1973 [Rehabilitation] Act as a national commitment to eliminate the "glaring neglect" of the handicapped). Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.
>
> In addition, much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the [Rehabilitation] Act construed to proscribe only conduct fueled by a discriminatory intent. For example, elimination of architectural barriers was one of the central aims of the [Rehabilitation] Act, *see, e.g.*, S. Rep. No. 93-318, p. 4 (1973), U.S. Code Cong. & Admin. News 1973, pp. 2076, 2080, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped. Similarly, Senator Williams, the chairman of the Labor and Public Welfare Committee that reported out [Section] 504, asserted that the handicapped were the victims of "[d]iscrimination in access to public transportation" and "[d]iscrimination because they do not have the simplest forms of special educational and

116

rehabilitation services they need. . . ." 118 Cong. Rec. 3320 (1972). And Senator Humphrey, again in introducing the proposal that later became [Section] 504, listed, among the instances of discrimination that the section would prohibit, the use of "transportation and architectural barriers," the "discriminatory effect of job qualification . . . procedures," and the denial of "special educational assistance" for handicapped children. *Id.*, at 525-526. These statements would ring hollow if the resulting legislation could not rectify the harms resulting from action that discriminated by effect as well as by design.

Alexander v. Choate, 469 U.S. 287, 295-97 (1985) (ellipses and

certain brackets in original) (footnotes omitted).

In turn:

Congress enacted the [ADA] in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Pub. L. No. 101-336, § 2(b)(1), 1990 U.S.C.C.A.N. (104 Stat.) 327, 329 (codified at 42 U.S.C. § 12101(b)(1)). The [ADA] prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111-12117; public services, under Title II, 42 U.S.C. §§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189. *See Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

\* \* \* \* \* \*

Title II creates a remedy for "any person alleging discrimination on the basis of disability" and provides that the "remedies, procedures, and rights" available under Title II are the "remedies, procedures, and rights set forth in section 794a of [the Rehabilitation Act]." *Id.* § 12133. Section 794a of the Rehabilitation Act, in turn, provides that the available "remedies, procedures, and rights" are those set forth in Title VII of the Civil Rights Act. 29 U.S.C. § 794a(a)(1) (2000).

Pursuant to congressional instruction, *see* 42 U.S.C. § 12134(a), the Attorney General has issued regulations implementing Title II of the ADA. *See* 28 C.F.R. pt. 35 (2007). These regulations provide further guidance

117

interpreting many of the provisions of Title II. Although the Supreme Court has yet to decide whether the regulations are entitled to the full deference afforded under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984), the [Supreme] Court has counseled that the views expressed by the Department of Justice in the implementing regulations "warrant respect." Olmstead v. L.C., 527 U.S. 581, 597-98 (1999).

In addition to the provisions of the statute and the implementing regulations, Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation Act and its implementing regulations. 42 U.S.C. § 12201(a); *see also Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998). Moreover, because the ADA "echoes and expressly refers to Title VII, and because the two statutes have the same purpose," courts confronted with ADA claims have also frequently turned to precedent under Title VII. *See, e.g.*, *Fox v. General Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) (collecting cases). Thus, courts have construed Title II of the ADA to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. *See, e.g.*, *Wisconsin Cmty. Servs.*[*, Inc. v. City of Milwaukee*], 465 F.3d [737,] 753 [(7th Cir. 2006)]; *Tsombanidis*[ *v. West Haven Fire Dep't*], 352 F.3d [565,] 573 [(2d Cir. 2003)]; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) (citing Title VII cases in discussing disparate treatment and disparate impact claims under Title I of the ADA).

A Helping Hand, LLC v. Baltimore Cnty., 515 F.3d 356, 361-62 (4th Cir. 2008) (certain brackets and ellipses in original) (parallel citations omitted).

Taken together, the Acts prohibit the exclusion of individuals with disabilities from the services, activities, and programs, including health programs, of entities receiving public funding. More specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability,

118

be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly declares that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Further, pursuant to Section 1557, "an individual shall not, on the ground[s] prohibited under . . . [S]ection [504], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ." 42 U.S.C. § 18116; see also Lockwood v. Our Lady of the Lake Hosp., Inc., Civ. No. 17-509, 2018 WL 3451514, at *1 (M.D. La. July 17, 2018) (unpublished) (finding that analysis of Section 504 claim would "apply equally" to Section 1557 claim "[b]ecause . . . Section 1557 [] incorporates [Section 504]'s definition of disability and provides the same protections for people with disabilities as [Section 504]").

Notably, the Acts "impose[] an affirmative obligation to make 'reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation

119

barriers, or the provision of auxiliary aids and services' to
enable disabled persons to receive services or participate in
programs or activities," Constantine v. Rectors & Visitors of
George Mason Univ., 411 F.3d 474, 488 (4th Cir. 2005) (discussing
Title II and quoting 42 U.S.C. § 12131(2)).  See also, e.g., Pierce
v. District of Columbia, 128 F. Supp. 3d 250, 266 (D.D.C. 2015)
("[T]he express prohibitions against disability-based
discrimination in Section 504 and Title II include *an affirmative
obligation* to make benefits, services, and programs accessible to
disabled people." (emphasis in original)); Lockwood, 2018 WL
3451514, at *1 (explaining that Section 1557 "provides the same
protections for people with disabilities as [Section 504]"); 45
C.F.R. § 92.105 (requiring entities under Section 1557 to "make
reasonable modifications to [their] policies, practices, or
procedures when such modifications are necessary to avoid
discrimination on the basis of disability," and specifying that,
"[f]or the purposes of this section, the term 'reasonable
modifications' shall be interpreted in a manner consistent with the
term as set forth in the regulation promulgated under Title II of
the [ADA]").  An accommodation may qualify as reasonable even if it
deviates from "best practices," Seremeth v. Board of Cnty. Comm'rs
Frederick Cnty., 673 F.3d 333, 340 (4th Cir. 2012) (interpreting,
inter alia, 28 C.F.R. § 35.130(b)(7)).

Case 1:18-cv-00994-TDS-LPA   Document 125   Filed 01/14/22   Page 120 of 188

As concerns communication, regulations under the ACA require subject entities to "take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with the standards found at 28 [C.F.R. §§] 35.160 through 35.164." 45 C.F.R. § 92.102(a). The first of those cross-referenced ADA regulations obliges "[a] public entity [to] furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). Although recognizing that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place," the regulations specify that, "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. § 35.160(b)(2).

Regulations regarding the Rehabilitation Act similarly oblige recipients of federal funds to "[e]nsure that communications with their applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing." 28 C.F.R.

§ 42.503(e). They further require such "recipient[s] that employ[] fifteen or more persons [to] provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance." 28 C.F.R. § 42.503(f). "Such auxiliary aids may include brailled and taped material, qualified interpreters, readers, and telephonic devices." Id.

As far as the generally applicable procedure, a request for a reasonable accommodation from "a disabled individual unable to access a program or service . . . begins an interactive process with the public entity . . . providing the service," Givens v. Naji, No. 3:17CV222, 2019 WL 4737618, at *6 (W.D. Pa. Sept. 11, 2019) (unpublished) (relying in part on cases involving Title I claims), recommendation adopted, 2019 WL 4736991 (W.D. Pa. Sept. 27, 2019) (unpublished). In that regard:

> A public entity's duty on receiving a request for accommodation is well settled by . . . case law and by the applicable regulations. It is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation . . . . "[M]ere [ ] speculat[ion] that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Acts create a duty to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." Furthermore, the Attorney General's regulations require the public entity to "give primary consideration to the requests of the individual with disabilities" when determining what type of auxiliary aid

122

> and service is necessary. 28 C.F.R. § 35.160(b)(2).
> Accordingly, a public entity does not "act" by proffering
> just any accommodation: it must consider the particular
> individual's need when conducting its investigation into
> what accommodations are reasonable.

Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001), as amended on denial of reh'g, (9th Cir. 2001) (internal citation and footnote omitted) (brackets in original); see also Williams v. Wake Cnty., No. 5:01CT173, 2004 WL 2660656, at *4 (E.D.N.C. Jan. 21, 2004) (unpublished) ("A public entity's duty on receiving a request for accommodation is well settled. . . . It is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation. . . ." (ellipses in original)), aff'd, 101 F. App'x 897 (4th Cir. 2004). A violation of the ADA "occurs when the interactive process is wrongly ended by the relevant public entity." Givens, 2019 WL 4737618, at *6.

Against that background, some courts have tasked plaintiffs with the burden to "establish the existence of specific reasonable accommodations that [the public entity] failed to provide," Memmer v. Marin Cnty. Cts., 169 F.3d 630, 633 (9th Cir. 1999). Moreover, when a public entity provides an alternate accommodation (i.e., something other than what the disabled individual requested), some courts have required that the plaintiff demonstrate the unreasonableness of the alternate accommodation. See Duvall, 260 F.3d at 1137 ("To prevail under the ADA, [the plaintiff] must show that the accommodations offered by the [public entity] were not

123

reasonable, and that he was unable to participate equally in the proceedings at issue."); Memmer, 169 F.3d at 634 ("Because [the plaintiff] bears the burden of proof, she must show how the accommodations offered by [the public entity] were not reasonable."); Bartshe v. Commissioner of Vt. Dep't of Corr., No. 2:18CV166, 2020 WL 4754971, at *6 (D. Vt. July 17, 2020) (unpublished) (citing conflicting authority on which party bears burden and ultimately recommending partial grant of summary judgment based on the plaintiff's failure to establish unreasonableness of entity's chosen accommodation), recommendation adopted, 2020 WL 4748054 (D. Vt. Aug. 14, 2020) (unpublished); see also Marie v. Arizona Dep't of Econ. Serv., No. CV-17-3167, 2020 WL 977932, at *4 (D. Ariz. Feb. 28, 2020) (unpublished) (following Memmer). In contrast, the United States Court of Appeals for the Ninth Circuit (in apparent conflict with its earlier decisions in Memmer and Duvall) more recently has stated that, "[i]f the public entity does not defer to the [disabled] individual's request, then the burden is on the entity to demonstrate that another effective means of communication exists or that the requested auxiliary aid would otherwise not be required," Updike v. Multnomah Cnty., 870 F.3d 939, 958 (9th Cir. 2017).

Regardless of which party bears the burden to demonstrate the adequacy (or inadequacy) of a particular auxiliary aid, determining "the type of auxiliary aids required to be provided involves 'a

124

fact intensive inquiry often ill-suited for summary judgment.'" Brown v. Department of Pub. Safety & Corr. Servs., 383 F. Supp. 3d 519, 557 (D. Md. 2019) (quoting Reyes v. Dart, 17C9223, 2019 WL 1897096, at *6 (N.D. Ill. Apr. 29, 2019) (unpublished)); see also Updike, 870 F.3d at 958 ("[W]hether [public entity] provided appropriate auxiliary aids where necessary is [] fact-intensive exercise.")

### B. Analysis

Plaintiffs seek a combination of compensatory damages and injunctive relief against UNCHCS. (See, e.g., Docket Entry 103 at 2.) More specifically, Miles seeks both compensatory and injunctive relief from UNCHCS, and Bone purports to seek the same. (See, e.g., id.) However, Bone's claims against UNCHCS arise from his interactions with Nash-related entities in 2016 and 2017 (see, e.g., Docket Entry 103-2 at 5-7), and this Court has already determined that Bone lacks standing to pursue injunctive relief against Nash due to his "fail[ure] to establish a likelihood of return in the future" (Docket Entry 44 at 37). (See id. at 32-38; Docket Entry 57 at 1-3.) That failure precludes Bone's request for injunctive relief against UNCHCS, leaving only his request for compensatory damages. Finally, NFB and DRNC, on behalf of their members and constituents, including Miles and Dr. Scott, pursue solely injunctive relief. (See Docket Entry 103 at 2; see also Docket Entry 103-2 at 4.)

125

1. Violations of the Acts

To succeed on their claims under the ADA, Section 504, and Section 1557, Miles and Bone first must establish that "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." National Fed'n of the Blind v. Lamone, 813 F.3d 494, 503 (4th Cir. 2016) (Title II of ADA); see also Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012) (Title III of ADA and Section 504); Labouliere v. Our Lady of the Lake Hospital, Inc., Civ. Action No. 16-785, 2020 WL 2468772, at *2 & n.21 (M.D. La. May 13, 2020) (unpublished) (adopting same standards for Section 1557 claims as apply to Section 504 and ADA).

a. Miles

Miles has contended that UNCHCS violated the Acts by failing to timely provide accessible documents related to his medical care at myriad UNCHCS facilities. (See, e.g., Docket Entry 103-2 at 4-5.) UNCHCS has denied any violation on the grounds that Miles (i) possessed access to MyChart (see Docket Entry 108 at 13), (ii) failed to disclose to UNCHCS sufficient details about his variable visual difficulties (see id.), (iii) "understood the subject-matter of documents he requested in large-print before

126

making the request" (id. at 15–16), and (iv) "often received documents from UNCHCS in large-print" (id. at 15).

As far as the basic elements of Miles's claims, UNCHCS does not appear to dispute that he possesses a disability and remains "qualified" within the meaning of the Acts. (See Docket Entry 120 at 12-13.) In any event, individuals (like Miles) with vision problems that substantially limit their ability to see even with corrective lenses meet the disabled prong under the Acts. See 29 U.S.C. § 705(9)(B), (20)(B); 42 U.S.C. § 12102(1), (2)(A), (4)(E); 45 C.F.R. § 92.102(c). Neither the record nor UNCHCS's briefing identifies any qualification requirements for obtaining health care services at UNCHCS (see, e.g., Docket Entry 120 at 13), and Miles continues his long-time patronage of UNCHCS (see, e.g., Docket Entry 103-4, ¶¶ 11-12). Accordingly, the Court should deem the second prong satisfied.

However, UNCHCS has maintained that Miles cannot satisfy the third prong. (See, e.g., Docket Entry 120 at 14.) In particular, UNCHCS has argued that

> [it] cannot discriminate against Miles based on varying, partial disability-related requests it received from his representatives. Specifically, Miles'[s] testimony shows he is a moving target who cannot regularly access even the 16-point font his representatives demanded from UNCHCS. Providing preferred accessible formats to Miles, without full knowledge of Miles'[s] needs, requires UNCHCS to attain a standard of perfection the law does not mandate.

127

(Id. (internal citation omitted).)  For the following reasons, the Court should treat certain violations of the Acts as established as a matter of law but conclude, in other instances, that a factfinder must decide whether a violation occurred.

The record reflects that, inter alia, Miles, has received health care at numerous UNCHCS facilities, including UNC Ophthalmology/Kittner Eye Center (see Docket Entry 103-4, ¶ 12), for "more than 20 years" (Docket Entry 108-12 at 24 (70:9)).  In connection with that care, Miles routinely has asked UNCHCS staff for large-print materials (id. at 28 (74:3)), a practice dating back more than ten or fifteen years and "almost certain[ly to 19]99" (id. (74:4)).  (See id. at 27-28 (73:14-74:11).)  Miles testified that, for at least the last decade, UNCHCS has repeatedly failed to honor his request for large print.  (See, e.g., id. at 28 (74:6-8), 31 (78:10-20).)  For example, Miles recalled receiving standard-print documents associated with a sleep study in which he participated (see id. at 30 (77:12-14)), as well as a standard-print consent form that he had to sign (i) for a blood drawing lab (see id. at 40 (113:5-23)) and (ii) on all other occasions when he received treatment from UNCHCS (id. at 44 (122:22-24)).

"[Miles] had more than 35 health care visits at [UNCHCS] from January 2015 to September 2018.  [UNCHCS] sent [him] home with, or mailed to [him], at least one inaccessible standard[-]print document after each of these visits" and also required him (during

128

the registration process) to review and sign standard-print documents without providing take-home copies of the same. (Docket Entry 103-4, ¶ 14.) The inaccessible materials Miles received and retained during this period total approximately 200 pages. (See Docket Entry 105-4 at 21-225.) Such documents included bills, physician reports, receipts, after-visit summaries, discharge documents, medical records, appointment reminders, feedback-request forms, welcome packets, and instructions. (See id. at 18–20 (index of standard-print documents dated between January 6, 2015, and September 18, 2018).)

In September 2018, Plaintiffs' counsel wrote to UNCHCS, through its General Counsel Glenn George, noting Miles's repeated requests for large-print documents (including bills, instructions, and visit summaries) and the responses by "providers, contractors, and/or employees of [UNCHCS, who] routinely told [Miles] that they cannot honor his alternate[-]format request." (Docket Entry 113-16 at 2.) The letter also highlighted UNCHCS's "failure to provide accessible formats [of] notices given in providers' offices, forms patients are required to complete, and many other communications of a personal nature" (id.) and alerted UNCHCS to the incompatibility between MyChart and Miles's "screen[-]access software[, ]JAWS and ZoomText[]" (id.).

On October 11, 2018, George responded to Plaintiffs's counsel by letter, acknowledging Miles's large-print request (see id. at 4)

129

and "not[ing Plaintiffs'] concerns regarding 'My UNC Chart,'" the online platform that EPIC licensed to UNCHCS to enable "patients to log in and access their medical information from their personal computer or electronic device" (id. at 5). Per the letter, "[UNCHCS was] continuing to investigate how those issues might be addressed to ensure that patients who have self-identified as needing auxiliary aids for effective communication receive appropriate access throughout their care and when being billed for that care." (Id.)

Shortly thereafter, Rogers sent Miles a large-print letter directing him to "call the appropriate clinic with any questions [he] may have" (id. at 8) while UNCHCS "continu[ed] to investigate how [his] access issue might be addressed to ensure effective communication regarding [his] care and treatment" (id.). (See id. at 7–9.) A week later, George sent a letter to Plaintiffs' counsel expressing the belief that UNCHCS had found "a solution to the concerns raised in [counsel's] letter . . . regarding Mr. Miles'[s] access to UNC MyChart. [UNCHCS] underst[oo]d that MyChart [wa]s compatible with the JAWS screen[-]access software . . ., but the functionality d[id] vary depending on the web browser used." (Id. at 6.) Accordingly, George suggested that Miles use a particular web browser and stated that, "[i]f Mr. Miles continue[d] to need technology support for this, [UNCHCS would be] happy to arrange a call for him with someone in [its] technology department." (Id.)

130

As an alternative, George suggested that Miles download the UNC MyChart Mobile App to his cellphone and utilize "the built[-]in screen readers in the IOS and Android operating systems." (Id.)

Although UNCHCS's response to Plaintiffs' counsel suggested that UNCHCS would fulfill Miles's large-print requests, those efforts fell short in several respects. For example, although UNCHCS assigned Perez de Paz to conduct "some monitoring activities" (Docket Entry 103-25 at 18 (123:18)) regarding Miles (see id. (123:17-21)), Perez de Paz only requested that clinics provide Miles with enlarged After Visit Summaries (rather than large-print versions of all documents). (See, e.g., id. at 7 (82:1-21).) Furthermore, within a few weeks of Plaintiffs' counsel contacting UNCHCS on Miles's behalf, UNCHCS gave Miles another 30 pages of inaccessible standard-print (and smaller than standard-print) documents. (See Docket Entry 105-39 at 6-36.) Such documents included after-visit summaries, consent forms, letters, intake forms, privacy notices, and payment receipts. (See id. at 2 (index of standard-print documents dated between October 10, 2018 and October 19, 2018).)

With respect to standard-print documents that Miles received between January 6, 2015 and October 19, 2018, the Court should treat those communications as violating the Acts and reject UNCHCS's arguments on the grounds that UNCHCS has misconstrued the record and/or failed to provide evidentiary support for its

131

assertions. First, insofar as UNCHCS has suggested that the existence of MyChart precludes a violation of the Acts, UNCHCS has not shown that Miles possessed access to MyChart before October 23, 2018, when "UNCHCS provided instruction on Miles'[s] use of MyChart compatibly with his JAWS screen[-]access software or his phone, and offered to arrange a call for Miles with the technology department" (Docket Entry 108 at 16 (citing Docket Entry 108-14 at 6 (letter from George dated October 23, 2018))). Second, as far as Miles's obligation to provide UNCHCS with more information about his communication needs (see id.), any failure by Miles in that regard cannot excuse UNCHCS's years-long provision of standard-print documents (which UNCHCS has acknowledged Miles could not read (see id. at 7 ("With his visual acuity range, Miles cannot see standard print without use of a magnifying device."))).[52]

---

[52] UNCHCS's protestations on this point ring particularly hollow given that UNC Ophthalmology/Kittner Eye Center – Miles's eye doctor – numbered among the UNCHCS providers that failed to honor Miles's request for accessible large-print documents. (See, e.g., Docket Entry 103-4, ¶¶ 12, 23; Docket Entry 105-4 at 31-32 (inaccessible documents from UNC Ophthalmology including letter addressed "To Whom It May Concern" bearing date of February 9, 2016, from eye doctor stating: "This letter is to serve official notice that Mr. Timothy Miles has significant visual impairment. This is a permanent condition which is not going to improve. Please consider this and provide for accommodations as appropriate for individuals with severe visual impairment. Please feel free to contact me at any time[] if you have any questions.").) Additionally, some of UNCHCS's assertions about Miles lack support in the record. For instance, UNCHCS has suggested that "Miles admitted color contrast was not an issue." (Docket Entry 120 at 16 (citing Docket Entry 120-2 at 20 (96:2-4)).) However, the cited statement does not concede a lack of color contrast issues; it
(continued...)

Third, regarding whether Miles "understood the subject-matter of documents he requested in large[ ]print before making the request" (id. at 15-16 (citing Docket Entry 108-12 at 44 (122:16-21))), the cited testimony refers solely to Consent to Treatment forms and indicates only that "[Miles] had a sense of what it's about" because "[he] had someone read it to [him] way before." (Docket Entry 108-12 at 44 (122:20-21); see also id. (122:12-21).) The testimony further reveals that, although Miles must sign a Consent to Treatment form every time he goes for a treatment of any sort, he never received the form in 18-point font. (See id. at 44-46 (122:12-124:1).) It also bears emphasis that Miles testified in both specific and general terms about his lack of knowledge of information contained in inaccessible documents UNCHCS provided to him. (See, e.g., Docket Entry 108-12 at 49-50 (133:5-134:25), 52-53 (136:2-137:5).) Fourth, turning to UNCHCS's contention that, "[s]ince last year, Miles often received documents from UNCHCS in large[ ]print" (Docket Entry 108 at 15 (citing Docket Entry 108-12 at 55 (142:1-3))), the cited testimony concerns only provision of After Visit Summaries (see Docket Entry 108-12 at 55 (142:1-3)).[53]

_____

52(...continued)
merely indicates that Miles does not "need black and white documents in a different font size than color documents." (Docket Entry 120-2 at 20 (96:2-3); see also id. (96:4).)

53 That testimony further specifies merely that, more often than not within the past year, UNCHCS providers attempted to provide enlarged copies of After Visit Summaries, not that they
(continued...)

133

Finally, UNCHCS has relied on distinguishable authority in asserting that, "[w]hile UNCHCS's provision of large-print documents may be imperfect, the law allows imperfection." (Docket Entry 108 at 16 (citing <u>Bircoll v. Miami-Dade Cnty.</u>, 480 F.3d 1072, 1086-87 (11th Cir. 2007), and <u>Marie</u>, 2020 WL 977932, at *4).)  The first cited case involved the failure to provide an interpreter for a deaf motorist during "a DUI arrest on the roadside."  <u>Bircoll</u>, 480 F.3d at 1086.[54]  "[E]mphasiz[ing] that terms like reasonable are

_____

53(...continued)
actually provided accessible large-print After Visit Summaries. (<u>See</u> Docket Entry 108-12 at 55 (142:1-22).)

54    That case also involved the administration of an Intoxilyzer test at the jail following arrest.  <u>See</u> <u>id.</u> at 1087.  As to that matter, the court stated:

> Once Bircoll was arrested and arrived at the police station at 4:10 a.m., the exigencies of the situation were greatly reduced.  Nonetheless, time remained a factor in obtaining an Intoxilyzer test that accurately measured Bircoll's impairment, or lack thereof, while driving at 3:00 a.m.  [The officer] read the consent warning to Bircoll.  Hearing individuals, even if impaired by alcohol, at least hear the consent warning, and Bircoll is entitled to be placed on equal footing with other arrestees at the police station.  Thus, we conclude that at the police station, [the officer] was required to take appropriate steps to ensure that his communication with Bircoll was as effective as with other individuals arrested for DUI.

<u>Id.</u>  The court concluded that, under the relevant facts, including that Bircoll possessed some hearing, could lipread and read English, and "already had some knowledge of what [the officer] sought to communicate to him," <u>id.</u>, the officer communicated with Bircoll effectively by twice reading the consent form aloud to him one-on-one, in a lighted area, and by providing him a copy of the consent form to read, <u>see</u> <u>id.</u> at 1088.

134

relative to the particular circumstances of the case and the circumstances of a DUI arrest on the roadside are different from those of an office or school or even a police station," id., and that "[w]hat is reasonable must be decided case-by-case based on numerous factors," id., the Bircoll court stated:

> Here, Bircoll claims that he requested an interpreter, which [the officer] denies. Even assuming Bircoll asked for an oral interpreter, we conclude that waiting for an oral interpreter before taking field sobriety tests is not a reasonable modification of police procedures given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity. In DUI stops, as opposed to minor traffic offenses, the danger to human life is high. To protect public safety, [the officer] had to determine quickly, on the roadside at 3:00 a.m., whether Bircoll was sober enough to drive his car further or whether to impound his car and arrest him. DUI stops involve a situation where time is of the essence. Forestalling all police activity at a roadside DUI stop until an oral interpreter arrives is not only impractical but also would jeopardize the police's ability to act in time to obtain an accurate measure of the driver's inebriation. Moreover, field sobriety exercises are short tests that can be physically and visually demonstrated. DUI stops do not involve lengthy communications and the suspect is not asked to give a written statement. In sum, field sobriety tests in DUI arrests involve exigencies that necessitate prompt action for the protection of the public and make the provision of an oral interpreter to a driver who speaks English and can read lips per se not reasonable.

> * * * * *

> In any event, the actual communication between [the officer] and Bircoll was not so ineffective that an oral interpreter was necessary to guarantee that Bircoll was on equal footing with hearing individuals. Bircoll admits that he reads lips and usually understands fifty percent of what is said. In addition to verbal instructions, [the officer] gave physical demonstrations.

135

> During the traffic stop, Bircoll was able to respond to [the officer]'s directions about getting out of the car and providing his driver's license and insurance. While the communication may not have been perfect, Bircoll, by his own admission, understood that he was being asked to perform field sobriety tests. Bircoll also admits he actually tried to perform at least three of those tests. For all of the foregoing reasons, we conclude that Bircoll has failed to state an ADA claim regarding the field sobriety tests during his DUI arrest.

Id. at 1086-87 (internal citation and footnote omitted). The conclusion that a one-time failure to provide an oral interpreter[55] prior to conducting a field sobriety test during an early morning DUI stop does not violate the ADA in no way undermines the conclusion that UNCHCS's years-long provision of standard-print documents to Miles, its legally blind patient, violated the Acts.

The second cited case likewise involves a factually distinguishable scenario. See generally Marie, 2020 WL 977932, at *1. In that case, Marie, a blind individual receiving state benefits, requested in 2014 that a state agency, DES, communicate with "her by verbal and/or audio communication," id. at *2 (internal quotation marks omitted), and, within two weeks of receiving that request, DES assigned an employee, Ms. Quayle, to serve as a qualified reader for Marie, monitoring her account and reading all communications to her over the telephone. Id. "In 2014, Ms. Quayle also provided a number of additional accommodations to [Marie], including giving [Marie] her personal

---

55 An oral interpreter evidently facilitates communication through lip reading. See id. at 1086 n.18.

136

cell phone number so that [she] could call or text Ms. Quayle at any time." Id. In a few instances, Ms. Quayle missed a letter, "including an incident where [Marie] missed a deadline to reapply for benefits and was temporarily disenrolled. However, that incident was promptly corrected and did not result in any loss in SNAP or Medical Assistance benefits or any financial loss to [Marie]." Id. (internal citation omitted).

Subsequently:

> In June of 2017, in the course of preparing for this litigation, [Marie] submitted a Notice of Claim with the Arizona Attorney General, formally requesting that correspondence be sent to her in an electronically readable format rather than receiving the information verbally over the telephone. Within a few weeks of receiving the Notice of Claim, DES employee Monica Sheble reached out to [Marie] to determine exactly what accommodation she was requesting. [Marie] told Ms. Sheble that she would like correspondence to be emailed to her, rather than read over the phone. Ms. Sheble recommended to her supervisor that [Marie] be provided with her newly requested accommodation and the Deputy Director of DES Operations agreed. Within weeks of the request, Defendants thereafter began to train employees, including Ms. Quayle, on how to facilitate [Marie's] new accommodation request. Since 2018, DES converts [Marie's] notices into a searchable PDF and sends them to her over email. [Marie] agrees that she has received this accommodation starting in 2018, but requests a permanent injunction in order to ensure that the accommodation remains in place.

Id. (internal citations omitted).

As relevant here, the Marie court found that,

> by all accounts, including [Marie]'s, Ms. Quayle provided countless hours of support to [Marie] as her qualified reader, and [Marie] was very satisfied with the accommodations provided by DES through Ms. Quayle. There is no evidence in the record that [the d]efendants were

137

not providing a reasonable accommodation between 2014-17 when they provided [Marie] with a qualified reader, an accommodation that was specifically requested by [Marie] numerous times and is contemplated by the statute. Nor has [Marie] established, prior to her 2017 Notice, that she requested any accommodation other than a qualified reader. Therefore, [Marie] has not met her burden of establishing a violation of the ADA or Rehabilitation Act for the period between her 2014 accommodation request and her 2017 Notice of Claim.

Id. at *7 (internal citations omitted).

Further:

As to the accommodation request contained in her 2017 Notice, [Marie] does not dispute that DES is now converting correspondence into electronically readable documents. She admits that this is her preferred accommodation. However, [Marie] essentially alleges that [the d]efendants acted unreasonably due to the amount of time it took for her new requests to be put into place.

Within a few weeks after [Marie] filed her Notice of Claim, DES employee Monica Sheble contacted [Marie] to determine precisely the accommodation she was requesting. It is undisputed that after DES had clarified [Marie's] request, and after that request had been approved by the Deputy Director of DES Operations, Ms. Quayle was trained on the conversion of documents in September of 2017. Nina Ferrer, Deputy DES Human Resources Administrator, emailed Ms. Quayle following up on the training and sent written instructions on converting documents for [Marie] in September of 2017. Subsequent to the training, a number of months passed before a notice originated for [Marie]; therefore, initially, there were no notices for Ms. Quayle to convert. When the next notice did arrive months later, Ms. Quayle was unable to convert the document. Therefore, she called [Marie] and read the document to her as she had done for the past three years, remaining available to help [Marie] in any way. Ms. Quayle did not tell her supervisors or ask anyone else for assistance initially. When DES discovered that Quayle had technological issues with the conversion process, Quayle received additional training and thereafter began sending all of [Marie's] correspondence over email in June of 2018.

138

[The d]efendants acknowledge that there was a lapse in [Marie] receiving electronically converted documents after her 2017 request, which resulted in a few letters being read to [Marie] by a qualified reader rather than being converted. However, there is no evidence in the record that [Marie] did not receive this correspondence. While [Marie] did not receive her preferred accommodation for a few months, there is no requirement that a defendant provide a plaintiff with her preferred accommodations at all times. Rather, [Marie] has the burden to "establish the existence of specific reasonable accommodations that [the defendant] failed to provide," as well as how the accommodations offered by the defendant were not reasonable. [Marie] has not done so here.

As to the current accommodations she is receiving, [Marie] does not dispute that [the d]efendants have assigned a specific Special Assistance Worker to her case to convert and send all of her notices, and to be available to assist [Marie] with any issues related to her accounts. . . .

The Court agrees with [Marie] that it cannot be said that [the d]efendants provided a perfect accommodation at all relevant times. And while [the d]efendants acknowledge that there were some mishaps and the accommodations provided were not always "perfect," the law does not require a perfect accommodation, only a reasonable one. As discussed above, [Marie] has not provided evidence to dispute that the use of a qualified reader after her 2017 Notice of Claim was reasonable. Therefore, the Court finds that [the d]efendants took appropriate steps in providing a reasonable accommodation when they provided a qualified reader after [Marie's] 2017 Notice of Claim, until the conversion accommodation was in place. The evidence of record establishes that [the d]efendants have provided, and continue to provide, a reasonable accommodation to [Marie]. . . .

Id. at *8-9 (internal citations omitted) (granting summary judgment against the plaintiff on ADA and Section 504 claims).

The conclusion that DES did not violate the ADA and Section 504 through its isolated failures to provide Marie's preferred

139

accommodation, while still providing her accommodations that conveyed all information in the relevant communications, does not preclude the conclusion that the numerous standard-print documents that UNCHCS sent to Miles between January 2015 and October 2018 did violate the Acts. Unlike Marie, who received accessible communications, Miles indisputably could not read the numerous standard-print documents sent to him, which impaired his ability to participate in a health program.[56]

At bottom, UNCHCS has not contested that, over the course of several years, Miles received hundreds of pages of standard-print documents. (See Docket Entry 108 at 9 (acknowledging "instances when [Miles] did not receive invoices in [large] print"); see also id. (conceding failure to provide sleep study documents, as well as point-of-entry forms, "papers from the blood drawing lab and Nephrology Department, and [] Consent for Treatment Forms").) UNCHCS has attempted to soften those concessions by indicating that

---

56 UNCHCS also appears to suggest that Miles cannot prevail on his claims because he allegedly experienced no "misdiagnosis, delayed, or improper treatment." (Docket Entry 122 at 7; see also Docket Entry 120 at 15.) As an initial matter, Miles, in fact, specifically testified to delays attributable to the failure to provide accessible documents, including regarding the filling of a prescription and commencement of prescribed exercises. (See, e.g., Docket Entry 103-4, ¶¶ 24, 27; Docket Entry 108-12 at 60-62 (158:19-160:19), 63 (163:4-7).) In any event, a person need not experience "misdiagnosis, delayed, or improper treatment" (Docket Entry 122 at 7) for a violation of the Acts to occur. See Silva v. Baptist Health S. Fla., Inc., 856 F.3d 824, 833 (11th Cir. 2017). ("The focus is on the effectiveness of the communication, not on the medical success of the outcome.").

140

it did not <u>always</u> violate the Acts. (<u>See, e.g.,</u> Docket Entry 122 at 4 (purporting to rebut Plaintiffs' argument regarding "500 pages of [inaccessible] healthcare information" by referring to, inter alia, Miles's frequent receipt of unspecified large-print documents).) Importantly, the Court should not "evaluate the provision of accommodations as a whole," <u>Proctor v. Prince George's Hosp. Ctr.</u>, 32 F. Supp. 2d 820, 827–28 (D. Md. 1998), but instead must "focus[] on specific instances during the interaction between the disabled individual and the . . . public entity," <u>id.</u> As concerns the specific written communications that Plaintiffs have identified between January 6, 2015, and October 19, 2018 (<u>see</u> Docket Entry 105-4 at 21-225; Docket Entry 105-39 at 6-36), Miles's receipt of which UNCHCS has not disputed, the Court should deem those violations established as a matter of law because any reasonable jury would conclude that UNCHCS violated the Acts by providing standard-print documents to Miles, a legally blind patient who clearly (and repeatedly) communicated his inability to read standard print.

Documents that Miles received after October 19, 2018, however, rest on different ground, for two reasons. First, as described above, during September and October 2018, counsel for the parties corresponded about MyChart access issues. (<u>See</u> Docket Entry 113-16 at 1–6.) Second, around that time, UNCHCS began to provide Miles with some enlarged-print documents, including approximately 100

141

pages of such documents between October 2018 and May 2020. (See Docket Entry 105-39 at 229-323.)

The parties have offered divergent views on the significance those circumstances. According to UNCHCS, the availability of MyChart obviated the need for accessible print documents, and Miles's failure "to use the tools available to him [i.e., MyChart]" (Docket Entry 108 at 16) defeats his claim. (See id. at 13, 16-17; Docket Entry 120 at 16-17.) Additionally, UNCHCS has insisted that any formatting barriers Miles encountered (via MyChart or on enlarged-print documents) cannot violate the Acts, especially because Miles did not inform UNCHCS about any related limitations. (See Docket Entry 108 at 16; Docket Entry 120 at 15-16.) In Miles's view, he remains entitled to summary judgment notwithstanding the existence of MyChart because his visual impairments (including ocular albinism) limit his ability to access information on screens (see Docket Entry 123 at 6-7) and because documents on MyChart remain incompatible with his screen-reader program (see id. at 6). Moreover, Miles has contended that various other formatting barriers rendered inaccessible (i) documents available on MyChart (see id.) and (ii) the enlarged-print documents provided by UNCHCS after October 2018 (see Docket Entry 103-2 at 23).

Those assertions reveal a threshold dispute about how the Acts allocate the burden to identify communication needs and establish,

in light of those needs, an appropriate auxiliary aid. In other words, each party has staked its entitlement to summary judgment on the other party's failure to carry that burden. (Compare Docket Entry 108 at 17 ("Without establishing the accommodations he requested were actually necessary, Miles cannot show UNCHCS discriminated against him."), with Docket Entry 123 at 4 n.1 ("UNCHCS is responsible for consulting with [] Miles — an individual with a known disability — regarding his needs."), and id. at 6 ("UNCHCS cannot show that MyChart provides effective communication for [] Miles.").) As already mentioned, when a public entity deviates from a disabled individual's request in providing an auxiliary aid, some courts have tasked the individual with demonstrating the unreasonableness of that aid, see, e.g., Bartshe, 2020 WL 4754971, at *6 (citing 28 C.F.R. Pt. 35, App. A), whereas others have required that the public entity establish its reasonableness, see, e.g., Updike, 870 F.3d at 958 (same).[57]

_____

57 With respect to a public entity's obligation to "give primary consideration to the requests of individuals with disabilities . . . [i]n determining what types of auxiliary aids and services are necessary," 28 CFR § 35.160(b)(2), the preamble to the regulations provides as follows:

The public entity shall honor the choice [of the individual with a disability] unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164. Deference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different circumstances requiring effective communication.

(continued...)

143

Neither party has acknowledged those conflicting standards or explained the basis for applying either one in this action.  (See, e.g., Docket Entry 108 at 13-15; Docket Entry 123 at 4-7.)

In any event, the choice between the foregoing standards ultimately does not make a difference here, where the record reflects disputes about the accessibility of MyChart (and other auxiliary aids) and the sufficiency of Miles's communications with UNCHCS.  As relevant to the first of those disputes, UNCHCS has indicated that Miles could have accessed MyChart via his screen reader on a particular browser (see Docket Entry 113-16 at 6) or by "download[ing] the UNC MyChart Mobile App and us[ing] the built[-]in screen readers in the IOS and Android operating systems" (id.).  For his part, Miles has characterized MyChart as inaccessible in light of his visual impairments (see Docket Entry 123 at 6 (citing Docket Entry 103-4, ¶ 6 (averring as to sensitivity to light))) and the formatting of documents on MyChart (see id. (citing Docket Entry 105-26 at 10-11, 66-68); see also id. (citing Docket Entry 105-26 at 64-65)).  Additionally, Miles has relied on an opinion from Quon[58] and the Scott Declaration[59] to show that MyChart remains

_____

57(...continued)
Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35,711, 35,712 (July 26, 1991) (codified at 28 C.F.R. Pt. 35, App. A).

58  UNCHCS criticizes Plaintiffs' experts, but neither moves to strike the expert reports nor develops an argument for excluding such reports.  (See Docket Entry 120 at 11 n.4, 18-19; Docket Entry (continued...)

144

an unreasonable auxiliary aid.[60]  However, the record reflects no attempt by Miles or Scott to access MyChart via the app or the browser identified by George.  (See Docket Entry 108-12 at 58 (152:2-4) (Miles testifying that he has "[n]ot really" tried to access After Visit Summaries on MyChart); Docket Entry 120-2 at 24 (154:5-23) (Miles describing one occasion within "past couple years" when he could not view test results on MyChart); Docket Entry 121-2 at 3 (150:10-11) (Miles denying attempt to access MyChart from his cellphone); Docket Entry 103-14, ¶¶ 9-11 (Scott generally averring as to MyChart's incompatibility with screen reader, without mentioning choice of browser or use of app).)

---

58(...continued)
122 at 4.)  "A party should not expect a court to do the work that it elected not to do."  Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished).  Accordingly, this Court should disregard UNCHCS's undeveloped objections to Plaintiffs' experts' reports.  See, e.g., Bennett v. Colvin, No. 2:13CV12, 2013 WL 5595487, at *2 (W.D.N.C. Oct. 11, 2013) (unpublished) ("disregard[ing the p]laintiff's underdeveloped argument").

    59  UNCHCS objects to consideration of Dr. Scott's evidence in connection with NFB's and DRNC's claims.  (See Docket Entry 120 at 12-13, 18; Docket Entry 122 at 12-13.)  For the reasons set out in the discussion subsection addressing associational standing, those arguments lack merit.

    60  In particular, Quon opined that documents reviewed from Miles's MyChart account lack the metadata tags required for review on screen readers and that formatting barriers otherwise impede access by the low-vision community.  (See, e.g., Docket Entry 103-26 at 10-11, 39-41.)  Dr. Scott also averred that JAWS — the screen-reader program both he and Miles utilize (see, e.g., Docket Entry 120-2 at 11 (45:18-25)) — cannot read documents uploaded to MyChart.  (See Docket Entry 103-14, ¶¶ 9-11.)

145

Regarding whether Miles adequately engaged with UNCHCS concerning his communication needs, UNCHCS has cited evidence suggesting that Miles (at least partially) thwarted the cooperative process of identifying an appropriate auxiliary aid. (See Docket Entry 108 at 16 (citing Docket Entry 108-12 at 58 (152:2-7), 59 (153:11-14)); see also Docket Entry 108-12 at 58 (152:17-20) (Miles denying ability to read After Visit Summaries on MyChart on grounds that such practice was "not [his] preference").) In response, Miles has relied on his repeated large-print requests and UNCHCS's obligation to inquire about the details of (and changes to) Miles's communication needs. (See Docket Entry 123 at 4-5 (citing Docket Entry 108-12 at 28 (74:3)); see also id. at 4 n.1 (citing 28 C.F.R. Pt. 35, App. A).) In other words, without disputing his failure to alert UNCHCS to the supposed inaccessibility of MyChart, Miles has insisted that UNCHCS bore responsibility for consulting with him, in the first instance, about the effectiveness of MyChart as an auxiliary aid. (See id. at 4-7.) As far as Miles's communications with UNCHCS about the enlarged-print documents that UNCHCS provided after October 2018, evidence regarding the accessibility of those documents (see, e.g., Docket Entry 103-4, ¶ 20 (Miles averring as to formatting barriers, including light-color fonts and changes in text size and case, as well as inability to read red ink without extreme discomfort)) does not establish that UNCHCS possessed

146

sufficient notice of those barriers when it provided the enlarged-print documents to Miles.

A neighboring court denied summary judgment under comparable circumstances. See Brown, 383 F. Supp. 3d at 556–59 (denying summary judgment on Title II claim when factual disputes persisted as to whether entity's choice of auxiliary aid qualified as effective). Here, the Court should decide, on the one hand, that a reasonable jury could (but need not) find that UNCHCS violated the Acts beginning on October 23, 2018 (i) by relying on MyChart as an auxiliary aid without ensuring its accessibility and (ii) by providing inaccessible documents both on MyChart and in paper form. The Court should determine, on the other hand, that a reasonable jury could (but need not) deem MyChart an appropriate auxiliary aid, especially given the information available to UNCHCS at the time of its October 2018 communications with Miles. Even if UNCHCS possesses the burden to demonstrate the reasonableness of MyChart as an auxiliary aid, evidence that Miles declined to participate in further discussion creates a jury question on that issue. See Updike, 870 F.3d at 958 (shifting burden to entity and identifying factual disputes as to whether entity violated ADA and Section 504 by denying deaf inmate access to American Sign Language interpreter, teletypewriter, and closed captioning). Furthermore, although deviation from formatting best practices does not necessarily establish a violation of the Acts, see Seremeth, 673

147

F.3d at 340, a reasonable factfinder may nonetheless decide that the enlarged-print documents provided by UNCHCS qualified as inaccessible. Accordingly, the Court should conclude that factual disputes preclude the entry of summary judgment as to communications occurring after October 23, 2018, except for documents unavailable on MyChart, such as standard-print letters and consent forms provided at the time of an appointment.[61]

### b. Bone

According to Bone, UNCHCS violated its effective-communication obligations in two distinct ways: directly, by sending him inaccessible documents related to healthcare services he received at Nash (see Docket Entry 103-2 at 19–20), and indirectly, by failing to ensure that Nash and its contractors provided accessible documents, despite possessing contractual and statutory responsibilities in that regard (see id. at 16–19 (contending that MSA between UNCHCS and Nash obligated UNCHCS to ensure Nash's compliance with federal laws, to include the Acts, and that the Acts inculpate UNCHCS for healthcare services it provides through

---

61  The Court should determine that UNCHCS's routine provision of standard-print consent forms violated the Acts despite the argument, in UNCHCS's reply, labeling such provision "immaterial" (Docket Entry 122 at 3) under the Acts. (See id. (stating that "UNCHCS read [consent forms aloud] to [Miles] at his request").) The cited testimony indicates that, on one occasion, in connection with a stress test, someone read the consent form aloud to Miles. (See Docket Entry 122-4 at 13 (140:7–22); see also id. at 9 (113:5–25) (Miles testifying that "[someone] just summarized [consent form]" at blood drawing lab).)

other entities like Nash)).   In response, UNCHCS has disputed Bone's "qualifi[cation] to receive the benefits of a public service, program, or activity," Lamone, 813 F.3d at 503, with respect to UNCHCS, because he received all pertinent healthcare services at Nash.  (See Docket Entry 110 at 13-14; Docket Entry 120 at 13.)  UNCHCS has insisted that it provides no such services at Nash, which retains control over its operations and qualifies as a "public entity" responsible for its own discriminatory conduct. (See Docket Entry 110 at 14-18; Docket Entry 120 at 19-22.)

Additionally, UNCHCS has asserted that Bone's settlement with Nash, together with his lack of distinct injury attributable to UNCHCS, precludes any recovery from UNCHCS.  (See Docket Entry 110 at 17-18; Docket Entry 120 at 18.)  UNCHCS alternately has framed that issue as relating to causation or standing (see Docket Entry 110 at 10-13, 14-15), asserting as to the latter that Bone can demonstrate neither traceability nor redressability (see id. at 10-13).  The Court should reject UNCHCS's arguments and conclude that Bone has shown, as a matter of law, that UNCHCS violated the Acts by its own conduct and via its affiliated entities.

Beginning with the first prong for establishing a violation under the Acts, no factual dispute exists as to Bone's disability, complete blindness.  (See Docket Entry 103-7, ¶ 3.)  Turning to the second prong, UNCHCS has defined the pertinent "service, program, or activity" as "contractual management services" (Docket Entry 110

149

at 14), like billing and record-keeping, which UNCHCS provided to Nash, not to Bone (see id. at 13). However, in distancing itself from the actual medical treatment Bone received at Nash, UNCHCS has glossed over its acknowledgment that "billing is . . . an important facet of the healthcare experience" (Docket Entry 108-6 at 29 (108:23-25)). UNCHCS has not challenged Bone's qualification to receive health care services at Nash or identified any qualification for such services imposed by either Nash or UNCHCS (see Docket Entry 110 at 13-14; Docket Entry 120 at 13), and thus Bone has satisfied the second prong, see Heather K. v. City of Mallard, 887 F. Supp. 1249, 1262 (N.D. Iowa 1995) (explaining that mere request for services from public entity may constitute only "essential eligibility requirement[]").

As concerns the third prong, the record conclusively establishes that (i) Nash failed to provide Bone with Braille documents during his admissions (see Docket Entry 103-7, ¶¶ 6-8; Docket Entry 110-10 at 20 (42:4-19)), (ii) Nash's contractors never sent Braille patient statements to Bone (see Docket Entry 103-7, ¶ 21), and (iii) UNCHCS sent Bone standard-print (rather than Braille) documents related to medical services he received at Nash (see id., ¶ 18). More specifically, on at least five occasions, UNCHCS sent Bone standard-print patient statements requesting payment for physician services at Nash. (See Docket Entry 105-7 at 5-36 (copies of statements); see also Docket Entry 103-10 at 26-32

150

(194:6–200:21) (Wade acknowledging that Patient Financial Services generated such statements); Docket Entry 103-7, ¶ 18 (Bone averring as to receipt of statements).) UNCHCS also sent Bone several standard-print reminders for orthopedic appointments at Nash. (See Docket Entry 105-7 at 39–51 (copies of reminders); see also Docket Entry 103-11 at 11–12 (80:2–81:9) (Tolbert testifying that UNCHCS sent such reminders via AccuDoc); Docket Entry 103-7, ¶ 18 (Bone averring as to receipt of reminders).)

UNCHCS has not disputed the foregoing facts, except to suggest that "Nash . . . orally explained" (Docket Entry 110 at 7) to Bone the contents of the non-Braille documents he needed to sign during his first emergency admission at Nash. (See id. at 7 (citing Docket Entry 110-10 at 10–11 (30:12–31:17)).) However, the cited excerpt from Bone's deposition actually indicates that Nash staff did "not really . . . explain[] . . . what it was that [Bone] w[as] asked to sign" (Docket Entry 110-10 at 10 (30:22–24)), except to (i) clarify that one document authorized more than one nurse to care for Bone (see id. at 10–11 (30:25–31:6)) and (ii) identify some documents as discharge papers (id. at 11 (31:14–17)). To the extent UNCHCS has asserted that Bone's other testimony undermines his claims against UNCHCS (see, e.g., Docket Entry 110 at 8), Bone's uncertainty as to the identity of the sender of inaccessible documents (see Docket Entry 110-10 at 40 (79:2–14), 47 (91:5–12), 51 (98:12–17), 53–54 (100:24–101:22)) does not excuse UNCHCS from

151

liability for sending such documents. Simply put, the pertinent question remains whether UNCHCS communicated effectively with Bone, not whether Bone believed he owed UNCHCS money or understood the legal relationship between UNCHCS and Nash.

Regarding UNCHCS's liability for conduct by Nash and Nash's contractors, the regulations interpreting the Acts endorse an expansive view of responsibility. See, e.g., 28 C.F.R. § 35.130(b)(1) (prohibiting various forms of discrimination "directly" as well as "through contractual, licensing, or other arrangements"); 45 C.F.R. § 84.4(b)(1) (same). Although UNCHCS has insisted that Nash "operates independently" (Docket Entry 110 at 2 (citing Docket Entry 28-9)) and maintained "control[ over] its patient billing processes for hospital services" (id. at 17 (citing Docket Entry 28-1 and Docket Entry 20-1, ¶¶ 7–8)) at the pertinent time, since 2014, UNCHCS has employed Nash's CEO (Docket Entry 120-22, § 3(a)) and has exercised contractual responsibility for Nash's "day-to-day operations" (id., § 2(a)). That close relationship distinguishes this action from Bacon v. City of Richmond, 475 F.3d 633 (4th Cir. 2007), in which the United States Court of Appeals for the Fourth Circuit determined that "the [public entity] played no part in depriving any plaintiff of the rights guaranteed by the ADA," id. at 639, and concluded that Title II disallowed strict liability under those circumstances, see id. at 639–40. Here, the Court should conclude, as a matter of law, that UNCHCS violated the

152

Acts (i) by its own conduct of sending Bone inaccessible documents central to his participation in a health program and (ii) by failing to ensure that Nash and its contractors communicated effectively with Bone in connection with such matters, both during and after his admissions to Nash.

Bone's settlement with Nash does not change the foregoing analysis or deprive Bone of standing. Despite UNCHCS's contrary suggestion (see Docket Entry 110 at 24–25 (citing, inter alia, Chisholm v. UHP Projects, Inc., 205 F.3d 731, 735 (4th Cir. 2000); Docket Entry 122 at 9 (same)), the authority on which UNCHCS relies does not preclude Bone's recovery from UNCHCS. See Chisholm, 205 F.3d at 735 ("[W]hen a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement." (quoting McDermott, Inc. v. AmClyde, 511 U.S. 202, 208 (1994))). In other words, to the extent any recovery from UNCHCS would compensate Bone for injuries jointly caused by UNCHCS and Nash, UNCHCS may claim an offset, not dismissal for lack of standing or judgment in its favor as a matter of law.

2. Deliberate Indifference

"A successful plaintiff in a suit under Title II of the ADA or [Section] 504 . . . is generally entitled to a full panoply of legal and equitable remedies." Paulone v. City of Frederick, 787 F. Supp. 2d 360, 373 (D. Md. 2011) (internal quotation marks omitted). "But proving the failure to provide a means of effective

153

communication, on its own, permits only injunctive relief." Silva v. Baptist Health S. Fla., Inc., 856 F.3d 824, 831 (11th Cir. 2017). "[C]ompensatory damages are available only upon proof of intentional discrimination or disparate treatment, rather than mere disparate impact." Paulone, 787 F. Supp. 2d at 373. "While the Fourth Circuit has not specifically addressed the standard required for proving intentional discrimination, the majority of circuits to have decided the issue have adopted a deliberate indifference standard, as have some district courts within the Fourth Circuit." Smith v. North Carolina Dep't of Safety, No. 1:18CV914, 2019 WL 3798457, at *3 (M.D.N.C. Aug. 13, 2019) (unpublished) (Schroeder, C.J.) (citing Green v. Central Midlands Reg'l Transit Auth., No. 3:17CV2667, 2019 WL 1765867, at *6 n.15, *9-10, *9 n.24 (D.S.C. Apr. 22, 2019) (unpublished), and Godbey v. Iredell Mem'l Hosp. Inc., No. 5:12CV4, 2013 WL 4494708, at *4-6 (W.D.N.C. Aug. 19, 2013) (unpublished)).

In order to prove deliberate indifference, "a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." Silva, 856 F.3d at 841 (internal quotation marks omitted); see also Adams v. Montgomery Coll. (Rockville), 834 F. Supp. 2d 386, 394 (D. Md. 2011) (explaining that "compensatory damages are available for failure to accommodate a plaintiff if defendants acted knowingly, voluntarily, and deliberately, even if

154

the violations resulted from mere thoughtlessness and indifference rather than because of any intent to deny [the p]laintiff's rights" (internal quotation marks omitted)). In the context of effective communication, a plaintiff makes the requisite showing by demonstrating "that [a covered entity's] staff knew there was a substantial likelihood that they would be unable to communicate effectively without [the specific accommodation requested by the plaintiff], but still made a deliberate choice not to provide [that specific accommodation]." Bax v. Doctors Med. Ctr. of Modesto, Inc., 393 F. Supp. 3d 1000, 1012 (E.D. Cal. 2019).

The first such element requires a plaintiff to "show that the public entity was on notice of the need for an accommodation." Csutoras v. Paradise High Sch., 12 F.4th 960, 969 (9th Cir. 2021) (explaining that requisite notice may result from request or obvious need for accommodation, or when accommodation qualifies as mandatory under statute or regulation). "[T]o meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." Duvall, 260 F.3d at 1140; see also J.V. v. Albuquerque Pub. Sch., 813 F.3d 1289, 1298 (10th Cir. 2016) ("[Courts] have recognized that intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely

result in a violation of federally protected rights." (internal quotations marks omitted)).

For example, in a Section 504 case involving student-on-student harassment, the Fourth Circuit hypothesized that a school may evince deliberate indifference by relying on remedial measures of known inefficacy. See S.B. v. Board of Educ., 819 F.3d 69, 77 (4th Cir. 2016) (describing such conduct as "clearly unreasonable . . . decision to remain idle"). In contrast, the mere failure to abide by best practices in the pertinent field does not amount to deliberate indifference. See Estate of Williams v. Douglas Cnty., No. 1:16CV2913, 2018 WL 9848045, at *22 (N.D. Ga. Sept. 6, 2018) (unpublished) ("Even if the actions taken by [the defendants] were not compliant with best practices [under the circumstances], there is no evidence they acted to intentionally discriminate against [the plaintiff] or were deliberately indifferent to his rights, as is required to prevail on an ADA or [Section 504] claim."); see also Butters v. James Madison Univ., 208 F. Supp. 3d 745, 755 (W.D. Va. 2016) (noting that neither negligence nor failure to comply with best practices establishes Title IX deliberate indifference); Hadix v. Caruso, No. 4:92CV110, 2009 WL 891709, at *12 (W.D. Mich. Mar. 31, 2009) (unpublished) (distinguishing noncompliance with best practices from eighth-amendment deliberate indifference), aff'd, 420 F. App'x 480 (6th Cir. 2011).

156

"Th[e deliberate-indifference] inquiry is nuanced and fact-intensive — precisely the province of the jury." Button v. Board of Regents of Univ., 289 F. App'x 964, 968 (9th Cir. 2008); accord Oviatt v. Pearce, 954 F.2d 1470, 1478 (9th Cir. 1992) ("Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." (affirming jury's finding of deliberate indifference for Section 1983 claim)). Other courts have described deliberate indifference as a "high bar," Csutoras, 12 F.4th at 969, "a difficult showing to make," Butters, 208 F. Supp. 3d at 755, and "[a] rigorous and hard[-]to[-]meet [standard]," Hill v. Cundiff, 797 F.3d 948, 975 (11th Cir. 2015) (analyzing Title IX deliberate indifference). Consistent with those principles, the Fourth Circuit has identified a jury question in a Title IX case even when a high-ranking, responsible official possessed "actual notice of the hostile environment created by [the pertinent actor]." Jennings v. University of N.C., 482 F.3d 686, 700-01 (4th Cir. 2007). In the context of the ADA and Section 504, courts have allowed a jury to consider the issue of deliberate indifference when the facts, taken in the light most favorable to the plaintiff, could support a conclusion that officials failed to adequately investigate the availability of requested accommodations, see Duvall, 260 F.3d at 1140-41, or that officials disregarded a disabled individual's

157

contemporaneous complaints about an alternate auxiliary aid, see Bax, 393 F. Supp. 3d at 1012–15.

a. Miles

UNCHCS has asserted that Miles cannot receive compensatory damages because, "critically, he receives documents from UNCHCS in large-print more often than not." (Docket Entry 108 at 20 (citing Docket Entry 108-12 at 55 (142:1-3)).) As discussed above, the record does not establish that proposition as a matter of law. UNCHCS also has baldly declared that "[t]here is no record evidence of intentional or deliberate discrimination by officials who have knowledge of discriminatory practices and authority to correct alleged discrimination, but failed to adequately respond." (Docket Entry 120 at 23 (citing Silva v. Baptist Health S. Florida, Inc., 303 F. Supp. 3d 1334, 1339 (S.D. Fla. 2018), and Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 349 (11th Cir. 2012)).) UNCHCS has not fleshed out that argument (see id.), for which reason alone it should fail, see, e.g, Bennett v. Colvin, No. 2:13CV12, 2013 WL 5595487, at *2 (W.D.N.C. Oct. 11, 2013) (unpublished) ("disregard[ing the p]laintiff's underdeveloped argument"); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) ("A party should not expect a court to do the work that it elected not to do.").

158

In addition, the record contains evidence that individuals with authority to correct the failures to provide Miles with accessible large-print documents knew of his need for such documents but failed to ensure that he received them. For instance, multiple high-ranking UNCHCS officials, including George, Rogers, Williams, and Wade, all knew of Miles's need for accessible documents, and both Rogers and Wade run departments tasked with ensuring provision of accessible documents, but they failed to correct UNCHCS's continuing failure to provide Miles with accessible documents. Miles also routinely asked staff at his appointments for accessible documents and, per Rogers, anyone providing documents from EPIC to patients possesses the ability to provide enlarged copies, yet UNCHCS staff continue to fail to provide Miles with even those enlarged copies.

Moreover, even in courts that define deliberate indifference as requiring that "someone at the hospital 'had actual knowledge of discrimination against the [plaintiff], had authority to correct the discrimination, and failed to respond adequately,'" <u>Biondo v.</u> <u>Kaledia Health</u>, 935 F.3d 68, 74 (2d Cir. 2019) (quoting <u>Loeffler v.</u> <u>Staten Island Univ. Hosp.</u>, 582 F.3d 268, 276 (2d Cir. 2009)), <u>cert.</u> <u>denied sub nom. Kaleida Health v. Biondo</u>, __ U.S. __, 140 S. Ct. 956 (2020), that requirement

> do[es] not imply that a hospital could absolve itself of
> liability for damages by failing to empower staff members
> who have contact with patients to cure potential
> violations of [Section 504], such as by failing to

159

empower front-line staff to procure a necessary interpreter. Indeed, a hospital might be liable precisely because its policymakers fail to put in place a policy that would reasonably enable a patient to obtain the relief guaranteed by [Section 504] by complaining to the staff with whom she has contact. In that circumstance it might be argued that the "policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy." Loeffler, 582 F.3d at 275. That argument is especially strong in cases such as this where a regulation expressly addresses a particular need, see 45 C.F.R. § 84.52(d)(1) (stating that subject hospitals "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills"), effectively putting hospital policymakers on notice that they must ensure the hospital's policies are reasonably capable of meeting that need.

Id. at 76 n.4 (certain brackets in original).

Finally, UNCHS has contended that "[it] clearly engaged in extensive efforts to address Miles'[s] requests once brought to UNCHS's attention in September of 2018" (Docket Entry 108 at 20). As a preliminary matter, this argument concedes that UNCHS failed for years to respond to Miles's requests for accessible large-print documents, given his status as a patient at UNCHS since at least 1999, his requests for large-print documents for (at an absolute minimum) ten years, and his failure to receive large-print documents from UNCHS dating back to at least the 2000s, including approximately 200 pages of inaccessible documents from 2015 to September 2018. The record (as previously detailed) also contains evidence of UNCHS's failure to adequately respond to Miles's requests for accessible large-print documents after September 2018.

Under the circumstances, a reasonable jury could find that UNCHCS acted with deliberate indifference during that entire time frame. See, e.g., Updike, 870 F.3d at 954 (reversing grant of summary judgment to public entity "on the ground that [public entity's] failure to provide accommodations proceeded without conducting [] adequate investigation of [the plaintiff]'s disability and [] efficacy of other ways to communicate").

However, the Court should decline to treat the record as establishing deliberate indifference as a matter of law. Although the record reflects that UNCHCS sometimes failed to communicate effectively with Miles even after intervention by his counsel, a reasonable jury might conclude either that UNCHCS lacked sufficient knowledge of the "substantial[] likel[ihood of] . . . harm to [Miles's] federally protected right," Silva, 856 F.3d at 841 (internal quotation marks omitted), or that UNCHCS's attempts at effective communication (even if inadequate) did not constitute an utter "fail[ure] to act," id. (internal quotation marks omitted). For example, to the latter point, in October 2018, UNCHCS provided Miles with some enlarged-print documents (see Docket Entry 103-4, ¶¶ 16-17, 20-21) and responded (via counsel) to Plaintiffs' counsel about Miles's requests (see Docket Entry 113-16 at 4-5).

Furthermore, UNCHCS followed up with a possible "solution" to the problems that Miles experienced with MyChart and offered to provide additional support from "[its] technology department."

161

(Id. at 6.) Evidence from Miles and Quon about the inadequacy of those efforts (see Docket Entry 103-4, ¶¶ 20-21; Docket Entry 103-26 at 36-43) does not establish, as a matter of law, that UNCHCS possessed the requisite culpable mens rea at the pertinent time, especially given the apparent lack of contemporaneous complaints from Miles regarding formatting barriers and the continued inaccessibility of MyChart. Despite bearing the burden to prove UNCHCS's deliberate indifference, see Silva, 856 F.3d at 841, Plaintiffs have not cited any authority involving a judicial finding of the same (see Docket Entry 103-2 at 20-27; Docket Entry 121 at 23-34; Docket Entry 123 at 11-14).[62] Accordingly, the Court should deny summary judgment to both Miles and UNCHCS on the deliberate-indifference issue.

b. Bone

Per Plaintiffs, Bone's entitlement to compensatory damages derives from UNCHCS's failure to (i) ensure Nash's compliance with the Acts (to include by reviewing Nash's effective communication policies and procedures), (ii) provide Bone with accessible documents, and (iii) communicate with Nash's contractors regarding

_____

    62 To the extent Plaintiffs have relied on Paulone to support the conclusion that UNCHCS engaged in a "'pattern of failure to provide' requested accessible formats" (Docket Entry 103-2 at 27), Paulone does not identify what evidence suffices to establish deliberate indifference as a matter of law. See Paulone, 787 F. Supp. 2d at 399 (concluding that record reflected no fact question absent evidence of pattern that would evince deliberate indifference).

the same.  (See Docket Entry 103-2 at 26.)  Moreover, Plaintiffs have contended that UNCHCS evinced deliberate indifference by providing standard-print documents even after learning about Bone's need for Braille.  (See id. at 27.)  UNCHCS has resisted that conclusion, emphasizing that Bone (i) received medical treatment (and corresponding bills) from Nash (a separate public entity with which Bone has settled), and (ii) attributes no distinct injury to UNCHCS.  (See Docket Entry 120 at 26.)  UNCHCS also has noted "that [Bone] received a [B]raille bill approximately one month after his counsel notified UNCHCS of Bone's [B]raille needs" (id. at 27).

The Court should conclude that a reasonable factfinder could (but need not) discern deliberate indifference by UNCHCS, such that neither Bone nor UNCHCS possesses entitlement to summary judgment on that issue.  On the one hand, the record reflects that, during his first stay at Nash, Bone requested written communications in Braille from everyone he encountered at Nash (Docket Entry 103-7, ¶¶ 5-6), which requests Nash acknowledged (see Docket Entry 28-1, ¶¶ 7-8).  However, Nash failed to accommodate that request during Bone's admission.  (See Docket Entry 103-7, ¶ 7; see also Docket Entry 110-10 at 10 (30:10-11), 20 (42:12-19).)  During Bone's second admission to Nash, his request for Braille documents likewise yielded no results.  (See Docket Entry 110-10 at 20 (42:4-19).)  Thereafter, Bone received standard-print bills for services provided during his second admission, as well as

163

appointment reminders. (See Docket Entry 105-7 at 5-52; Docket Entry 103-7, ¶ 18.)

On the other hand, a reasonable jury might reject Plaintiffs' assertion that "UNCHCS has made no effort to ensure Nash's compliance [with the Acts]" (Docket Entry 103-2 at 26), particularly because the record reflects a division of authority between UNCHCS and Nash (see, e.g., Docket Entry 108-4 at 3 (28:14-22) (Ellington testifying that each managed affiliate employs "appropriate staff to follow state and federal guidelines"); Docket Entry 110-3 at 12-13 (50:5-51:20) (Ellington explaining that UNCHCS relies on "local leaders" and "programs" to ensure compliance with applicable laws)). Furthermore, a reasonable jury may deem Cash's efforts to provide Bone with accessible documents inconsistent with deliberate indifference. (See Docket Entry 28-1, ¶¶ 9-19.) A jury also could decide that awareness by Ellington and Williams of Bone's request for Braille does not amount to deliberate indifference. (See, e.g., Docket Entry 110-3 at 15-16 (56:10-57:6) (Ellington testifying that he spoke to Nash's CEO about Bone's complaint and learned that Nash "ended up getting the bill out in whatever form it needed to be done").) Accordingly, the Court should deny summary judgment on the deliberate-indifference issue as it relates to Bone.

164

### 3. NFB's & DRNC's Claims

On behalf of their members and constituents, including Miles, NFB and DRNC seek injunctive relief against UNCHCS for violations of the Acts. (See Docket Entry 103-2 at 27-28.) In response, UNCHCS has challenged both NFB's organizational standing (see Docket Entry 113 at 14-17) and NFB's and DRNC's associational standing (see id. at 17-19; Docket Entry 114 at 14-15).

#### a. Organizational Standing

UNCHCS has argued that NFB lacks organizational standing on the grounds that it suffered no injury in fact. (See Docket Entry 113 at 14-17 (contending that this action constitutes advocacy effort by NFB).) For its part, NFB has maintained that UNCHCS's conduct "frustrate[d its] mission to . . . complete[ly] integrat[e ]the blind into society on a basis of equality" (Docket Entry 121 at 37) and that NFB has diverted resources from its mission - both in attempting to collaborate with UNCHCS pre-suit and in challenging UNCHCS's conduct through this action (see id.). In support of its position, NFB has tendered a declaration from NFB's President, who averred as to NFB's activities and expenditures. (See Docket Entry 121-9 (the "Riccobono Affidavit").) For the following reasons, the Court should find against NFB as to organizational standing.

In deciding whether an organization possesses standing, the Court "conduct[s] the same inquiry as in the case of an

165

individual." Lane v. Holder, 703 F.3d 668, 674 (4th Cir. 2012) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982)). As relevant here, Article III standing requires injury in fact. See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc., 528 U.S. 167, 180 (2000) (defining such injury as "concrete and particularized and . . . actual or imminent, not conjectural or hypothetical"). "An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." Lane, 703 F.3d at 674. Importantly, organizational standing also requires a compelled diversion of resources, as opposed to a mere "setback to the organization's abstract social interests," Havens Realty, 455 U.S. at 379. In that regard, the Fourth Circuit has found organizational standing lacking when a diversion of resources "result[ed] not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices." Lane, 703 F.3d at 675 (second and third sets of brackets in original) (internal quotation marks omitted); see also Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276-77 (D.C. Cir. 1994) (noting that diversion of resources deemed sufficient to support standing in Havens "sprang from the organization's need to 'counteract' the defendants' assertedly illegal practices").

Here, the NFB's showing falls short. Although NFB has established (via the Riccobono Affidavit) that it would have made other beneficial use of the funds expended in this action (see

166

Docket Entry 121-9, ¶ 14), that circumstance alone does not confer organizational standing. See Lane, 703 F.3d at 675. Importantly, NFB cannot create organizational standing merely by electing to litigate; the diversion of resources must reflect a departure from its normal expenditures that "impair[s its] ability to provide its intended services," Democracy N.C. v. North Carolina State Bd. of Elections, 476 F. Supp. 3d 158, 182 (M.D.N.C. 2020) (applying standard from Havens). In other words, organizational standing requires a demonstrable causal relationship between the diversion of resources and the frustration of an organization's mission. See id. at 185–86. Because Plaintiffs have failed to establish such relationship here, the Court should conclude that NFB lacks organizational standing.

b. Associational Standing

UNCHCS has urged the Court to limit NFB's and DRNC's associational standing "to only the claims and remedies viably available to Miles or Bone." (Docket Entry 113 at 18; Docket Entry 114 at 15.) To the extent Plaintiffs have relied upon an additional constituent, Scott, whom UNCHCS supposedly denied effective communication (see Docket Entry 121 at 35), UNCHCS has characterized such reliance as an impermissible expansion of Plaintiff's claims dependent on "information regarding Scott not disclosed during the discovery period" (Docket Entry 120 at 18). In contrast, Plaintiffs have contended that associational standing

167

derived from Miles and Bone authorizes NFB and DRNC "to pursue relief on behalf of all of their members" (Docket Entry 121 at 35). The Court should reject UNCHCS's objection to the Scott Declaration and conclude that NFB and DRNC possess associational standing to pursue injunctive relief on behalf of their members.

Beginning with the evidentiary objection, UNCHCS has sought exclusion of the Scott Declaration, presumably pursuant to Federal Rule of Civil Procedure 37(c)(1), without developing an argument in support of exclusion. (See Docket Entry 120 at 18.) For that reason alone, the Court could reject UNCHCS's arguments regarding the Scott Declaration. See Bennett, 2013 WL 5595487, at *2; Hughes, 2014 WL 906220, at *1 n.1. In any event, UNCHCS has relied on inapposite authority suggesting only that the Court may (i) exclude witnesses omitted from initial or supplemental disclosures and (ii) limit testimony to subjects identified on such disclosures. (See Docket Entry 120 at 12 (citing Gunter v. Southern Health Partners, Inc., No. 1:16CV262, 2021 WL 4255370 (M.D.N.C. Sept. 17, 2021) (unpublished), appeal docketed, No. 21-2183 (4th Cir. Oct. 20, 2021), and Superior Consulting Servs., Inc. v. Shaklee Corp., No. 6:16CV2001, 2018 WL 1474184 (M.D. Fla. Mar. 7, 2018) (unpublished), recommendation adopted, 2018 WL 1470371 (M.D. Fla. Mar. 26, 2018) (unpublished)).)[63] As Plaintiffs have

---

63    Notably, both Gunter and Shaklee involved motions to strike.    See Gunter, 2021 WL 4255370, at *6, 8 (striking
(continued...)

168

pointed out (see Docket Entry 123 at 10-11), they repeatedly disclosed Scott as a witness during discovery and notified UNCHCS that "Scott requested and did not receive accessible formats of print documents in Braille or electronic format from UNC Family Medicine West in 2019" (Docket Entry 123-4 at 3; accord Docket Entry 123-5 at 3). UNCHCS has neither acknowledged that disclosure nor explained how the Scott Declaration nonetheless qualifies as improper. (See Docket Entry 120 at 12-13, 18-19.)

Additionally, with respect to UNCHCS's suggestion that "[it] specifically requested information from Plaintiffs regarding the subject-matter of [the] Scott[] Declaration" (id. at 12 (citing Interrogatories 2, 7, 9-12, 17)), the referenced interrogatories do not specifically seek information about Scott (see Docket Entry 120-11 at 2, 5, 7-9, 10-11). Moreover, in responding to those interrogatories, DRNC lodged objections that could cover Scott (see id. at 5) and, at various times, incorporated "declarations and affidavits filed with the [C]ourt in this action" (id. at 8; see also id. at 9, 11). At the time DRNC served those responses (see id. at 16 (dated February 22, 2021)), the record did not yet contain the Scott Declaration (see Docket Entry 103-14 (filed March 30, 2021)), but it did contain an earlier declaration from Scott

---

63(...continued)
undisclosed witness); Shaklee, 2018 WL 1474184, at *2-6 (addressing motion to strike witness testimony on subject matter beyond scope of disclosures).

(Docket Entry 26-2), which Plaintiffs filed in opposing UNCHCS's motion to dismiss and which generally mirrors the Scott Declaration. (Compare id., with Docket Entry 103-14.) Under the circumstances, the Court should consider the Scott Declaration in evaluating NFB's and DRNC's associational standing.

As far as the contours of associational standing in this action, UNCHCS has characterized NFB's and DRNC's standing as "limited" based on Plaintiffs' failure to "identify other blind constituents who possess more than purely speculative intent to seek healthcare services from UNCHCS." (Docket Entry 113 at 18; accord Docket Entry 114 at 15.) That argument misconstrues associational standing to require proof from individual members; however, associational standing exists only when the litigation requires no such proof. See Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."). The undersigned previously recommended that the Court deem the foregoing elements satisfied and conclude that NFB and DRNC possess standing to pursue injunctive relief against UNCHCS (see Docket Entry 44 at 23–24), which recommendation the Court

170

adopted (see Docket Entry 57 at 3). UNCHCS has developed no argument to alter that conclusion. (See Docket Entry 113 at 17–19 (relying on cases merely identifying above-referenced elements of associational standing); Docket Entry 114 at 14–15 (same).)[64] Accordingly, the Court should decline to "limit" NFB's and DRNC's associational standing in the manner that UNCHCS has proposed.[65]

### 4. Injunctive Relief

Plaintiffs have claimed entitlement to injunctive relief in the form of "systemic changes across [UNCHCS's] network to ensure that all UNCHCS affiliates provide equally effective communication to Plaintiffs or their members or constituents." (Docket Entry 103-2 at 27 (internal footnote omitted).) UNCHCS has disputed Plaintiffs' entitlement to any injunctive relief on the grounds that Miles "more often than not[] receives documents from UNCHCS in

---

64 In particular, UNCHCS has cited (i) Hunt, which the undersigned applied in recommending denial of UNCHCS's motion to dismiss (see Docket Entry 44 at 23); (ii) Payne v. Sears, Roebuck & Co., No. 5:11CV614, 2012 WL 1965389 (E.D.N.C. May 31, 2012) (unpublished), which rejected associational standing when (unlike here) the only member identified in the complaint lacked standing, id. at *9; and (iii) Equal Rights Ctr. v. Abercrombie & Fitch Co., 767 F. Supp. 2d 510 (D. Md. 2010), reconsideration granted on other grounds, id. at 529–30 (D. Md. Jan. 31, 2011), which deemed injunctive relief proper after analyzing the factors bearing on the "sufficient likelihood or threat of future injury," id. at 516.

65 As mentioned previously, Bone's lack of standing for injunctive relief against Nash precludes his request for the same against UNCHCS. For that reason, NFB and DRNC may not rely on Bone for purposes of obtaining injunctive relief against UNCHCS, but that circumstance makes no difference here, given Miles's participation in this action.

171

large print" (Docket Entry 113 at 19; <u>accord</u> Docket Entry 114 at

16) and "can access necessary documents using his computer and

MyChart" (Docket Entry 120 at 27). UNCHCS also has challenged

Plaintiffs' request for injunctive relief based on Bone's lack of

"concrete intent to receive future medical services from UNCHCS"

(Docket Entry 113 at 19; <u>accord</u> Docket Entry 114 at 16).

Alternatively, assuming that injunctive relief remains proper,

UNCHCS has argued that the Court should limit such relief to "the

five UNCHCS clinics where [Miles] is a current patient." (Docket

Entry 113 at 20; <u>accord</u> Docket Entry 114 at 17.)

As far as the particular relief sought, Plaintiffs have asked

the Court to require that UNCHCS take the following steps within

six months:

> a. Ensure that it records and complies with all requests
> by blind individuals for print communications in
> accessible alternative formats, including but not limited
> to Braille, large print, audio, or digital navigable
> formats;
>
> b. Ensure that the accessible formats it provides conform
> to best practices in the field of accessible document
> design for each format type (for example, the Web Content
> Accessibility Guidelines 2.1 ("WCAG 2.1"),
> https://www.w3.org/TR/WCAG21, for digital formats, and
> the Clear Print Accessibility Guidelines,
> https://www.cnib.ca/sites/default/files/2020-08/Clear%2
> 0Print%20Guidelines%202020.pdf, and the American Printing
> House for the Blind's Guidelines for Print Document
> Design,
> https://www.aph.org/aph-guidelines-for-print-document-d
> esign, for large[-]print documents; and best practices
> for Braille transcription by a certified Braille
> transcriber);

172

c. Issue or revise existing policies to the extent necessary to implement an accessible[-]formats policy that requires prompt production of standard[-]print communications in the alternative format requested, and includes provisions: (1) extending deadlines to respond to documents for which an accessible format is requested by at least the same number of days it took UNCHCS to satisfy the accessible[-]format request (if the request was not immediately satisfied the same day it was made); and (2) clarifying that, if a blind patient does not submit a required payment by the deadline for such payment, that patient shall not be responsible for fees related to the late payment or be sent to collections if the patient did not receive the same amount of billing notice in an accessible format as is granted to sighted patients; and

d. Establish a process through which UNCHCS shall solicit, receive, and address complaints and feedback from the public and patients regarding the provision of accessible formats to individuals with disabilities[.]

(Docket Entry 103-1 at 1-2.) Plaintiffs also have sought an order directing UNCHCS, within six months, to "ensure that all of its contractors that provide documents to UNCHCS patients, all affiliated entities within the UNCHCS network, both owned and managed by UNCHCS ('Affiliates'), and all Affiliates' contractors that provide documents to patients, comply with the [foregoing] requirements" (id. at 2-3).

Additionally, Plaintiffs have requested that the Court mandate that UNCHCS and its Affiliates, within twelve months, modify their

electronic health records system or other processes and procedures . . . to:

a. Automatically prompt registration and scheduling staff to affirmatively ask all patients if they require accessible formats due to a visual impairment;

173

b. Ensure that once a patient has requested an accessible format, all future documents are automatically delivered to that patient in their requested accessible format, without the need for subsequent requests or manual intervention by staff;

c. Ensure that when a patient with a recorded need for an accessible format schedules an appointment at least four business days in advance (for patients requesting Braille) or at least two business days in advance (for patients requesting all other accessible formats), all documents the patient receives during the appointment that do not vary in content based on the individual recipient ('forms') are offered in the patient's requested accessible format at the time of their appointment;

d. Ensure that all print communications provided during a clinical encounter that have content that varies based on the individual recipient are provided: (1) at the time of the appointment for individuals who have requested large print and accessible digital navigable formats; or (2) as soon as is practicable, which ordinarily will not be longer than two business days after the appointment, for all other accessible[-]format requests;

e. In cases where a print communication is not immediately available to an individual in their requested accessible format at the time of the clinical encounter, the patient shall be offered an alternative method of accessing the communication at the time of the appointment (such as by reading the communication to the individual in a private location or offering a digital navigable format);

f. Ensure that all print communications provided to patients before or after clinical encounters are provided or sent to blind patients in their requested accessible formats on the same day that such print communication would have been provided or sent, or was provided or sent, in standard print to a sighted individual, except that if Braille is the patient's requested accessible format, the Braille communication shall be sent within four business days of when that communication would have been provided or sent, or was provided or sent, in standard print to a sighted individual; and

174

> g. Ensure that, for patients who request large print or accessible digital formats, documents available through their My UNC Chart accounts are in their requested formats[.]

(<u>Id.</u> at 3–4.) Finally, Plaintiffs have proposed that (i) UNCHCS submit status reports to the Court every six months (<u>see</u> <u>id.</u> at 4–5 (listing contents of proposed reports)), and (ii) the Court retain jurisdiction over this action for two years to monitor UNCHCS's compliance with the proposed injunction (<u>id.</u> at 5).

Plaintiffs have demanded such relief because (A) Miles, Bone, and Scott, as well as other NFB members and DRNC constituents, likely will visit UNCHCS-affiliated providers in the future (<u>see</u> Docket Entry 121 at 41–43); (B) NFB and DRNC may "seek relief on behalf of their memberships" (<u>id.</u> at 43; <u>see also</u> <u>id.</u> at 43–44 (noting DRNC's status as P&A and identifying instances of broad injunctive relief)); (C) the nature of the violations (which "stem from UNCHCS's centralized health records system" (<u>id.</u> at 45)) warrants top-down relief (<u>see</u> <u>id.</u> at 45–48); and (D) the record demonstrates that a piecemeal approach (like some of UNCHCS's past efforts toward communicating effectively with Miles) would encourage additional litigation rather than afford complete relief (<u>see</u> <u>id.</u> at 48–49). In support of a narrower injunction, UNCHCS has characterized as speculative any potential harm to the thousands of unnamed visually impaired North Carolinians (<u>see</u> Docket Entry 122 at 14) and has asserted that the "judicial

175

re-engineering of a large healthcare system will create more problems than it will solve" (id. at 15).

As a general matter, "federal injunctive relief is an extreme remedy." Simmons v. Poe, 47 F.3d 1370, 1382 (4th Cir. 1995). Furthermore, an equitable remedy should sweep no broader "than necessary to provide complete relief to the plaintiff." Pathways Psychosocial Support Ctr., Inc. v. Town of Leonardtown, 223 F. Supp. 2d 699, 717 (D. Md. 2002) (internal quotation marks omitted); see also Hayes v. North State Law Enf't Officers Ass'n, 10 F.3d 207, 217 (4th Cir. 1993) ("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation."). In other words, "[a]n injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.'" Hayes, 10 F.3d at 217 (quoting Consolidation Coal Co. v. Disabled Miners, 442 F.2d 1261, 1267 (4th Cir. 1971)).

As to the specific claims here,

> [i]n order to obtain injunctive relief under Title II of the ADA [or Section 504], "[o]nce a party has demonstrated actual success on the merits, the court must balance three factors to determine whether injunctive relief is appropriate: (1) the threat of irreparable harm to the movant; (2) the harm to be suffered by the nonmoving party if the injunction is granted; and (3) the public interest at stake."

Pathways Psychosocial, 223 F. Supp. 2d at 717 (quoting Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998)). Although courts may

176

presume that irreparable injury flows from the violation of a civil-rights statute, see id. at 717, that presumption does not necessarily justify broad injunctive relief, absent a showing that such relief "is necessary to prevent th[e challenged] harm," id. Courts have deferred until trial (or after trial) the issue of injunctive relief, particularly when questions remain about the scope of the pertinent violations. See Perez v. Sophia's Kalamazoo, LLC, Case No. 1:14CV772, 2015 WL 7272234, at *15 (W.D. Mich. Nov. 17, 2015) (unpublished) ("[E]ntry of prospective injunctive relief should await trial when the scope of the violations is more clearly established."); see also Cohen v. Minneapolis Jewish Fed'n, 286 F. Supp. 3d 949, 979 (W.D. Wis. 2017) (explaining that consideration of declaratory and injunctive relief would occur after trial); United States EEOC v. Bob Evans Farms, LLC, 275 F. Supp. 3d 635, 669–70 (W.D. Pa. 2017) (declining to consider injunctive relief at summary judgment and inviting parties to submit evidence at trial or at "post-trial remedial hearing").

Here, the Court should defer ruling on injunctive relief at this stage for the following reasons. First, almost a full year has elapsed since the parties filed the instant motions (see, e.g., Docket Entry 103 (filed March 30, 2021)), such that the trial (or post-trial evidentiary hearing) can provide a fresher record and may reveal whether any ongoing efforts by UNCHCS satisfy its obligations under the Acts. See Bazemore v. Friday, 751 F.2d 662,

695 n.10 (4th Cir. 1984) (Phillips, J., concurring in part and dissenting in part) ("[C]onditions existing as of trial time would have been highly relevant to the question of the propriety and scope of declaratory and injunctive relief."), aff'd in part and vacated in part, 478 U.S. 385 (1986). Second, although the Court should treat certain violations of the Acts established as a matter of law, questions about the accessibility of MyChart and other auxiliary aids (which bear on whether UNCHCS violated the Acts in certain respects and whether UNCHCS demonstrated deliberate indifference) should inform whether (and to what extent) the Court deems injunctive relief necessary.

Moreover, the scope of any injunctive relief may depend, at least in part, on how the Court defines the standard that UNCHCS must meet in communicating with Plaintiffs. Although Plaintiffs have suggested that UNCHCS must provide blind individuals "equal access to medical information" (Docket Entry 103-2 at 28 (emphasis added)), Plaintiffs appear to have relied on regulations interpreting the Acts, which speak in terms of "equal opportunity," 45 CFR § 84.52(d)(1) (emphasis added); accord 28 CFR § 35.160(b)(1), or "communications with individuals with disabilities [that] are as effective as communications with others," 45 CFR § 92.102(a) (emphasis added); accord 28 CFR § 35.160(a)(1). However, "[t]he plain language of [42 U.S.C. § 12132] prohibits public entities from discriminating against

178

qualified disabled individuals in its administration of services and programs," Lonberg v. City of Riverside, 571 F.3d 846, 851 (9th Cir. 2009), a prohibition "universally understood . . . [to] require[] . . . meaningful access," id. (emphasis added and internal quotation marks omitted) (collecting cases). Insofar as the regulations go beyond what the Acts require, Plaintiffs have not demonstrated that such regulations qualify as privately enforceable. See, e.g., Civic Ass'n of the Deaf of New York City, Inc. v. City of New York, No. 95 Civ. 8591, 2011 WL 5995182, at *9-10 (S.D.N.Y. Nov. 29, 2011) (unpublished) (deeming Title II regulations, including 28 C.F.R. § 35.160(a), unenforceable by private individual); Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist., No. 4:18CV2074, 2020 WL 5073958, at *6 (E.D. Mo. Aug. 27, 2020) (unpublished) (concluding that Title II regulations create no private right of action), appeal filed, No. 20-3046 (8th Cir. Oct. 1, 2020).[66]

Finally, to the extent Plaintiffs have requested an order requiring UNCHCS to comply with best practices in communicating with the low-vision community (see Docket Entry 103-2 at 28),

_____

[66] Although Plaintiffs at times have cited Seremeth in support of their position (see,e.g., Docket Entry 123 at 3 (citing Seremeth, 673 F.3d at 337)), that opinion did not consider the gap, if any, between the equal access envisioned by the regulations and the meaningful access mandated by the Acts, see Seremeth, 673 F.3d at 337-41 (citing regulations and characterizing ADA injury as "failure to make communication as effective as it would have been among [public employees] and persons without disabilities" but deeming accommodations reasonable under circumstances).

179

Plaintiffs have not shown that the Acts require such practices (see, e.g., Docket Entry 121 at 47 (citing submissions from Morris and Quon without reference to judicial authority)). See M.D. v. Abbott, 929 F.3d 272, 279 (5th Cir. 2019) (partially reversing grant of injunctive relief because "multimillion-dollar computer-system overhaul — while maybe a best practice — goes well beyond what is minimally required to remedy the [constitutional] violations"); see also id. ("The goal is a constitutionally effective foster-care program, not a specific kind of computer system used to help achieve that goal."). Although the Court ultimately may decide that UNCHCS should adopt certain recommendations from Plaintiffs' experts, the record at trial will better establish the necessity and/or proper scope of any injunctive relief.[67]

## II. The Sealing Motion

Plaintiffs have sought to seal several exhibits filed in connection with Plaintiff's Motion: documents containing Miles's medical and financial information that UNCHCS sent him (Docket

---

[67] Insofar as UNCHCS has disputed Bone's entitlement to injunctive relief, the Court need not address that issue further, as the Court already has determined Bone lacks standing to pursue such relief. (See Docket Entry 57 at 1-3.) Additionally, as previously discussed, UNCHCS's contention about Miles's receipt of large-print documents overstates the facts in the record. (See Docket Entry 108-12 at 55 (142:1-3) (Miles testifying during his deposition that he received only large-print After Visit Summaries "more often than not" during past year).) Therefore, the Court should not view either argument by UNCHCS as defeating Plaintiffs' entitlement to injunctive relief at this stage.

180

Entry 105-4 at 17–225; Docket Entry 105-39 at 1–323); patient statements (Docket Entry 105-7 at 5–36) and appointment reminders (id. at 38–52) that UNCHCS sent Bone; a UNC Hospital Services Bill that Miles received (Docket Entry 105-10 at 38–44); and certain of Miles's medical records accompanying Quon's expert reports (Docket Entry 105-26 at 25–31, 34–57, 72–126, 129–34, 158–78, 181–89) (collectively, the "Exhibits"). (See Docket Entry 104; see also Docket Entry 104-1.) In support of the Sealing Motion, Plaintiffs have contended that the Exhibits reveal "the confidential and highly sensitive personal health and financial information of [] Miles and [] Bone" (Docket Entry 104, ¶ 4). According to Plaintiffs, "[l]ess drastic alternatives to sealing . . . are not available" because "the Court's ability to perceive the entirety of these documents and their formatting is material to the Court's consideration of Plaintiffs' Motion" (id., ¶ 6).

## A. Relevant Standards

"[T]wo independent sources" provide the public with a right of access to judicial records: "the common law and the First Amendment." Virginia Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004). "[T]he common law presumption in favor of access attaches to all 'judicial records and documents,'" Stone v. University of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978)), but "the First Amendment guarantee of access has been

181

extended only to particular judicial records and documents," id.
(citing Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253
(4th Cir. 1988) (documents filed in connection with summary
judgment motion in civil case)).

When a party proposes to seal judicial records to which a
public right of access applies, the Court begins by "determin[ing]
the source of the right of access with respect to each document,"
as "only then can it accurately weigh the competing interests at
stake." Virginia Dep't of State Police, 386 F.3d at 576 (internal
quotation marks omitted). "Th[e common-law] presumption of
access . . . can be rebutted if countervailing interests heavily
outweigh the public interests in access." Rushford, 846 F.2d at
253. The relevant factors include "whether the records are sought
for improper purposes, such as promoting public scandals or
unfairly gaining a business advantage; whether release would
enhance the public's understanding of an important historical
event; and whether the public has already had access to the
information contained in the records." In re Knight Publ'g Co.,
743 F.2d 231, 235 (4th Cir. 1984). Under the more stringent first-
amendment standard, the Court may seal material "only on the basis
of a compelling governmental interest, and only if the denial [of
access] is narrowly tailored to serve that interest." Stone, 855
F.2d at 180.

Under either standard, the Court evaluates the competing interests according to the following procedure. First, "it must give the public notice of the request to seal and a reasonable opportunity to challenge the request." Virginia Dep't of State Police, 386 F.3d at 576. Next, "it must consider less drastic alternatives to sealing." Id. Finally, "if it decides to seal[,] it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." Id. Those steps "ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." Id.

This legal framework applies to requests to file a redacted document, i.e., a document sealed in part. See United States v. Moussaoui, 65 F. App'x 881, 889 (4th Cir. 2003) ("As to those documents subject to a right of access, we must then conduct the appropriate balancing to determine whether the remainder of the document should remain sealed, in whole or in part."); see also Bethesda Softworks, LLC v. Interplay Ent. Corp., Civ. No. 09-2357, 2010 WL 3781660, at *9-10 (D. Md. Sept. 23, 2010) (unpublished) (treating motion to redact transcript as motion to seal).

**B. Analysis**

As a matter of procedure, all parties and the public have possessed access to the Sealing Motion since March 30, 2021. (See Docket Entry 104.) No party or member of the public has filed

183

anything in the intervening time period.  (See Docket Entries dated Mar. 30, 2021, to present.)  Accordingly, the Court finds all procedural prerequisites satisfied, as any interested persons have received "notice of the request to seal and a reasonable opportunity to challenge [it]," Virginia Dep't of State Police, 386 F.3d at 576.

Turning to the substance of the Sealing Motion, because Plaintiffs filed the Exhibits in connection with their request for dispositive relief, the public right of access to the Exhibits derives from the First Amendment.  See, e.g., Lord Corp. v. S&B Tech. Prods., Inc., No. 5:09CV205, 2012 WL 1015953, at *1 (E.D.N.C. Mar. 22, 2012) (unpublished) (applying first-amendment standard because "documents sought to be sealed have been filed in connection with or relate to a motion that seeks dispositive relief").  Thus, Plaintiffs must show that a "compelling governmental interest" supports its Sealing Motion, and that its request "is narrowly tailored to serve that interest," Stone, 855 F.2d at 180.  Under some circumstances, courts have deemed the protection of sensitive medical information a sufficiently compelling interest.  See Bell v. Shinseki, No. 1:12CV57, 2013 WL 3157569, at *9 (M.D.N.C. June 20, 2013) (unpublished) ("If the request is narrowly tailored, sensitive medical information may be sealed."), aff'd, 584 F. App'x 42 (4th Cir. 2014).

184

Applying those standards, the Court will deny the Sealing Motion without prejudice for the following reasons. First, the Exhibits contain some information disclosed elsewhere on the public record. For example, in connection with Defendant's Miles Motion, UNCHCS filed, on the public record, Miles's responses to an interrogatory in which he identified the locations and dates of his medical treatment. (<u>See</u> Docket Entry 108-18 at 3–4.) Similarly, an excerpt from Bone's deposition (a public exhibit to Defendant's Bone Motion) reveals the nature of some of Bone's medical treatment. (<u>See</u> Docket Entry 110-10 at 3–4 (17:24–18:6).) To the extent such information falls within the scope of the Sealing Motion, that previous public disclosure undermines Miles's and Bones's ability to demonstrate a compelling interest or satisfy the narrow-tailoring requirement. <u>See</u> <u>In re Knight Publ'g Co.</u>, 743 F.2d at 235 (explaining that "whether the public has already had access to the information contained in the records" constitutes one factor under common-law analysis); <u>Kinetic Concepts, Inc. v. Convatec Inc.</u>, No. 1:08CV918, 2010 WL 1418312, at *10–11 (M.D.N.C. Apr. 2, 2010) (unpublished) (applying Rule 26(c) and noting that, if information subject to sealing motion remains available elsewhere, "any restriction on public access to that same information . . . would serve no purpose").[68]

---

68 If public disclosure warrants denial of a sealing request under the less stringent common-law and good-cause analyses, such
(continued...)

Second, insofar as Plaintiffs have suggested that redactions, a less drastic alternative to sealing, would impair the Court's analysis, it bears emphasis that even the sealed versions of the Exhibits reflect some redactions. (See, e.g., Docket Entry 105-4 at 21-22 (redacting, inter alia, guarantor number and date of birth).) Given Plaintiffs' apparent belief that such redactions would not interfere with the Court's ability to evaluate the effectiveness of UNCHCS's communications, other redactions could likewise protect Miles's and Bones's privacy while still allowing public access to less sensitive material and formatting information. Because the form and volume of information conveyed to Miles and Bone by UNCHCS bear on whether UNCHCS complied with its effective-communication obligations, the Exhibits qualify as "necessary for determination of [Plaintiffs' Motion]," M.D.N.C. LR 5.4(a)(3), but that necessity alone cannot justify the breadth of the Sealing Motion, especially when the First Amendment creates a strong presumption in favor of public access. Accordingly, Plaintiffs must tailor their request more narrowly, "maintaining under seal only demonstrably confidential personal medical information entitled to protection." Ganzzermiller v. University of Md. Upper Chesapeake Med. Ctr., Civ. Action No. 16-3696, 2019 WL 4751457, at *10 (D. Md. Sept. 30, 2019) (unpublished).

_____

68(...continued)
request fares no better under the more demanding first-amendment standard.

186

## **CONCLUSION**

The Court should conclude that, as a matter of law, UNCHCS repeatedly violated its effective communication obligations to Miles and Bone. However, the Court should determine that factual disputes prevent the entry of summary judgment as to certain other alleged violations. The Court also should not view the record as establishing deliberate indifference as a matter of law and instead should allow a factfinder to decide that issue (and the amount of compensatory damages, if any, owed to Miles and Bone). Additionally, the Court should find against NFB as to organizational standing but should permit both NFB and DRNC to proceed via associational standing. Furthermore, the Court should await trial to resolve the propriety and/or scope of injunctive relief, particularly in light of the above-mentioned factual disputes. Finally, Plaintiffs have failed to justify the broad requests in the Sealing Motion but may seek more narrow relief.

**IT IS THEREFORE RECOMMENDED** that Plaintiffs' Motion (Docket Entry 103), Defendant's Bone Motion (Docket Entry 109), and Defendant's NFB Motion (Docket Entry 111) be **GRANTED IN PART AND DENIED IN PART**, such that this action shall proceed to trial on the issues of deliberate indifference and damages (as well as any violations of the Acts beyond those described above) and that the Court shall defer until trial the issue of injunctive relief.

187

**IT IS FURTHER RECOMMENDED** that Defendant's Miles Motion (Docket Entry 107) and Defendant's DRNC Motion (Docket Entry 112) be **DENIED**.

**IT IS THEREFORE ORDERED** that the Sealing Motion (Docket Entry 104) is **DENIED WITHOUT PREJUDICE** to a more narrowly tailored request. The Clerk shall maintain the subject materials under seal until January 28, 2022. If Plaintiffs have not moved to seal more limited excerpts by that date, the Clerk shall unseal Docket Entry 105 and attached exhibits.

This 14th day of January, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
