# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHN BONE, et al.,         )
                                )
           Plaintiffs,     )
                                )
           v.             )       1:18cv994
                                )
UNIVERSITY OF NORTH CAROLINA    )
HEALTH CARE SYSTEM,         )
                                )
           Defendant.      )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion to Enforce Settlement Agreement" (Docket Entry 139) (the "Motion"). For the reasons that follow, the Court should grant the Motion.

## BACKGROUND

In December 2018, John Bone, Timothy Miles, the National Federation of the Blind, Inc. (the "NFB"), and Disability Rights North Carolina (individually, the "DRNC," and collectively, the "Plaintiffs") initiated "this action against the University of North Carolina Health Care System (d/b/a UNC Health Care) ('[UNCHCS or Defendant]') . . . for denying blind individuals an equal opportunity to access their health care information, in violation of Titles II and III of the Americans with Disabilities Act of 1990 ([the] 'ADA'), . . . Section 504 of the Rehabilitation Act . . ., and Section 1557 of the Patient Protection and Affordable Care Act"

(Docket Entry 1, ¶ 1; accord Docket Entry 18 (the "Amended Complaint"), ¶ 1).  The Complaint and Amended Complaint seek compensatory and injunctive relief for these alleged violations, but do not request compensation for any medical expenses.  (See generally Docket Entries 1, 18.)

UNCHCS subsequently propounded interrogatories to Bone and Miles requiring that, for "each claim brought by [them]," they "detail the actual relief sought by [them], including the injunctive relief sought and the economic and compensatory damages suffered by [them] for which recovery is sought as a result of the allegations contained in the Amended Complaint."  (Docket Entry 139-7 at 3; Docket Entry 139-8 at 3.)[1]  In February 2021 (see Docket Entry 139-7 at 6; Docket Entry 139-8 at 6), Bone and Miles detailed the grounds for their compensatory damages demands, none of which involve compensation for (past or future) medical expenses.  (See Docket Entry 139-7 at 3-5; Docket Entry 139-8 at 4-5.)[2]  Nevertheless, shortly before 5 p.m. on Friday, October 15, 2021, UNCHCS's counsel wrote Plaintiffs' counsel an email stating, in relevant part:

> If a monetary settlement is reached in this matter, the defendants' [sic] insurance carrier will require the

---

1  Docket Entry page citations utilize the CM/ECF footer's pagination.

2  Their injunctive relief demands likewise did not involve medical expenses.  (See Docket Entry 139-7 at 5; Docket Entry 139-8 at 5.)

2

following information from each of the individual
plaintiffs in compliance with Section 111 of the
Medicare, Medicaid and SCHIP Extension Act of 2007
(Section 111) and related obligations under the Medicare
Secondary Payer (MSP) statute. This process can take
significant time and, accordingly, we are requesting this
information now.

>     1. Is either Plaintiff Medicare eligible and
>     enrolled in the Medicare Program?
>     2. Is either Plaintiff a Medicare beneficiary?
>     3. Has Medicare made any conditional payments
>     relating to this matter?
>     4. Please provide us with the DOB, address, and SSN
>     for each Plaintiff[.]

(Docket Entry 139-6 at 2-3.)

On Monday, October 18, 2021, Plaintiffs' counsel responded

with an email stating, in relevant part:

>     We were surprised to receive your email [above]
> because this case doesn't implicate these statutes. This
> is not a personal injury case where plaintiffs are
> seeking compensation for injuries for which medical costs
> are associated (and, thus, for which Medicare may have
> already paid or may be responsible for paying).
> Plaintiffs seek injunctive relief and damages for garden
> variety emotional distress — there are no medical bills
> implicated. If we are able to resolve this case through
> settlement, we can explore language making that clear.
> For now, however, we will not be providing the highly
> sensitive information requested.

(Id. at 2.) Plaintiffs represent, and UNCHCS does not dispute,

that "UNCHCS never responded to Plaintiffs' email and never raised

the issue during [the parties' subsequent] mediation" (Docket Entry

139-5 at 3). (See generally id. at 2-7; see also Docket Entry 140

at 3-4, 7; Docket Entry 141 at 5-7, 11-12.)

Prior to this email exchange, the parties filed cross-motions

for summary judgment. (See Docket Entries 103, 107, 109, 111,

3

112.)  In January 2022, the undersigned issued a detailed opinion on those motions, recommending, as relevant here, that:

> The Court should conclude that, as a matter of law, UNCHCS repeatedly violated its effective communication obligations to Miles and Bone.  However, the Court should determine that factual disputes prevent the entry of summary judgment as to certain other alleged violations.  The Court also should not view the record as establishing deliberate indifference as a matter of law and instead should allow a factfinder to decide that issue (and the amount of compensatory damages, if any, owed to Miles and Bone).  Additionally, the Court should find against NFB as to organizational standing but should permit both NFB and DRNC to proceed via associational standing.  Furthermore, the Court should await trial to resolve the propriety and/or scope of injunctive relief, particularly in light of the above-mentioned factual disputes.

(Docket Entry 125 at 187.)

The following month, the parties participated in a lengthy settlement conference with the undersigned.  (See Minute Entry dated Feb. 8, 2022.)  At the conclusion of this settlement conference, the parties executed a "Settlement Checklist/Term Sheet" (Docket Entry 139-1 (the "February Settlement Agreement") at 2 (all-cap font and emphasis omitted)).  (See id. at 2, 5.)  As relevant here, the February Settlement Agreement provided that:

Bone and Miles would each receive a certain monetary payment, which payment would not include attorney's fees.  (Id. at 2.)[3] Notably, the February Settlement Agreement explicitly stated that "[n]o" "third party liens [would] be paid from [those] proceeds."

---

3    The February Settlement Agreement noted that the "Tax Treatment" for these payments would involve "1099[s]."  (Id. (emphasis omitted).)

4

(Id. (emphasis omitted).) The February Settlement Agreement specified a one-way release from Plaintiffs to UNCHCS, with Bone executing a general release and Miles, NFB, and DRNC executing a limited release; specifically, they would not release their claims for injunctive relief. (Id.) The parties stipulated that, inter alia, (1), as to Miles, NFB, and DRNC, a violation of the ADA occurred during the period between October 2016 and October 2018; (2) UNCHCS "agrees that Plaintiffs are entitled to reasonable attorneys' fees and costs, as determined under the ADA, for all claims resolved through settlement[;]" and (3) "[t]o the best of Defendant's knowledge, [Plaintiff] Bone owes no debt to Defendant." (Id. at 3-4.)[4]

As for the "effective date" of the parties' agreement, they entered into "[a] binding agreement today" (id. at 4 (all-cap font and emphasis omitted)), February 8, 2022 (see id. at 2), with UNCHCS to prepare a typed agreement incorporating the "[s]ettlement terms" (id. at 4 (emphasis omitted)). They further agreed that Bone would dismiss his claims and Miles, NFB, and DRNC would stipulate to dismissal of any damages claim, with "the Court [to] retain jurisdiction for the purpose of enforcing the terms of the settlement agreement through December 31, 2022." (Id. at 5

---

4 In his deposition, Bone testified that, due to his receipt of bills in standard font rather than in Braille, he experienced stress from not knowing how much, if anything, he owed UNCHCS. (See Docket Entry 141-1 at 6-7.)

(emphasis omitted).) The party representatives confirmed that they possessed "full authority to enter into [the February] Settlement Agreement," and Bone, Miles, and representatives from UNCHCS, NFB, and DRNC all signed the February Settlement Agreement. (Id. (emphasis omitted).)

However, on March 11, 2022, the parties sent the undersigned a joint letter, which stated, inter alia:

> At the conclusion of the February 8 conference with the Court, the Parties resolved the individual Plaintiffs' claims for damages and executed a term sheet memorializing the terms of their agreement. Defendant did not include in those terms the need to obtain confirmation from the Centers for Medicare & Medicaid Services ("CMS") that neither individual Plaintiff has outstanding Medicare liens related to this case. Subsequently, Defendant provided Plaintiffs proposed settlement agreements memorializing the terms reached on February 8 that include this new, material term regarding Medicare liens. As a result, the Parties have not yet reached agreement on the language of the settlement agreements. The parties explain their respective positions below.

> Plaintiffs' Position

> Following the February 8 conference, Plaintiffs made repeated requests for the draft settlement agreements, but [UNCHCS] did not send Plaintiffs the first drafts of the settlement agreements until March 2, 2022. Unfortunately, these draft agreements contained terms neither discussed nor agreed upon during the February 8 settlement conference, specifically in regard to UNCHCS's agreed-upon payments to Plaintiffs John Bone and Timothy Miles being contingent on receiving confirmation from CMS that each Plaintiff has no outstanding Medicare liens related to this case. UNCHCS raised this issue on one previous occasion — in an email from October 15, 2021, asking for the individual Plaintiffs' personal information (such as their Social Security numbers). Plaintiffs responded the next business day, noting that the Medicare Secondary Payer ("MSP") statute referred to

6

in UNCHCS's email was not applicable here given that
Plaintiffs do not seek compensation in this case for
injuries with associated medical costs — simply for
garden variety emotional distress stemming from
discriminatory treatment. Because UNCHCS never responded
to Plaintiffs' email and never raised the issue during
mediation, Plaintiffs believed their response had put the
issue to rest. Therefore, after agreeing on the
carefully-worded terms included in the term sheet all
parties signed on February 8, Plaintiffs were surprised
to receive draft settlement agreements containing
additional terms not negotiated for, such as:

- Payments to the individual Plaintiffs being
contingent on receiving confirmation from CMS
concerning Medicare liens

- Terms requiring the individual Plaintiffs to
consent to the release of private health care
information to UNCHCS

- Terms requiring both the individual Plaintiffs
*and* their counsel to indemnify UNCHCS for any
future claims related to Medicare and Medicaid
liens

In an effort to compromise, Plaintiffs offered the
following alternative language to address UNCHCS's
concern regarding potential Medicare liens:

The claims described and pled by [Bone/Miles] in
the Civil Action involve allegations of
discrimination and arise exclusively pursuant to
the ADA, Section 504, and Section 1557.
[Bone/Miles] has asserted no claims for bodily
injury or harm, wrongful death, or any other injury
requiring medical or mental health care. No
portion of the settlement payment is made to
compensate [Bone/Miles] for bodily injuries or
harm, or past or future medical, mental health, or
other health care expenses, as no such claims were
advanced in this case. [Bone/Miles] agrees that
there are no known or knowable claims, liens, or
super-liens against this settlement arising from
the events that are the subject of the Civil
Action. To the extent that any liens are asserted,
[Bone/Miles] agrees that he will ensure that any
and all claims, liens, and super-liens shall be

7

paid and satisfied or waived in full from the
proceeds of this settlement as reflected in this
Settlement Agreement and Release.

Counsel for UNCHCS, however, rejected this language,
stating that the terms initially included in the draft
agreements would have to be included in the final
agreements because of requirements imposed by its
insurance carrier. UNCHCS's insurance carrier
participated in the February 8 conference with the Court
but never brought this issue to Plaintiffs' attention or
insisted that a term related to Medicare liens be
included in the Parties' term sheet.

Plaintiffs would appreciate [the Court's] assistance
in resolving this issue. In particular, Plaintiffs
believe that UNCHCS should be held to the settlement
terms agreed upon on February 8, which did not include
the new terms involving Medicare liens included in
UNCHCS's draft settlement agreement. . . .

<u>Defendant's Position</u>

It is no mystery to parties to a settlement
agreement that payments to plaintiffs will be made
contingent upon receiving information from plaintiffs,
such as tax forms and other information necessary to
comply with the law. Here, Defendant will be making
settlement payments to Plaintiffs Miles and Bone through
Defendant's insurer. Defendant's insurer is obligated to
comply with the Medicare Secondary Payer Act ("MSP"), 42
U.S.C. § 1395y(b)(2), under which Medicare is entitled to
reimbursement and the parties' knowledge of Medicare's
reimbursement rights is statutorily presumed. 42 C.F.R.
§ 411.245. Further, Section 111 of the Medicare,
Medicaid, and SCHIP Extension Act of 2007 requires all
liability insurers, referred to as Responsible Reporting
Entities ("RREs"), to determine whether Plaintiffs are
Medicare eligible and report every case in which there is
a payment to a Medicare beneficiary in the form of a
settlement or judgment, with failure to follow the
reporting requirements subjecting the RRE to significant
penalties and fines. 42 U.S.C. § 1395y(b)(7) and (8).
Ironically, Plaintiffs want Defendant to comply with the
ADA, Section 504, and Section 1557, but seek to impede
Defendant's insurer's compliance with the MSP and Section
111.

On October 15, 2001, Defendant clearly notified Plaintiffs that Defendant's insurance carrier would require information from Plaintiffs Miles and Bone to ensure the insurance carrier's compliance with Section 111 and the MSP. Defendant notified Plaintiffs of the exact basic information needed and informed Plaintiffs that the process of complying with Section 111 and the MSP can be time consuming.

In response, Plaintiffs declined to provide the "highly sensitive information requested" despite the fact that this litigation, in general, implicates highly sensitive information such as Plaintiffs' medical records and medical services billing records, thereby necessitating the parties to enter into a Stipulated Protective Order. Plaintiffs' refusal to provide the information did not resolve the issue of Defendant's insurer's compliance with Section 111 and the MSP as Plaintiffs now suggest. Additionally, in their refusal, Plaintiffs clarified that they seek "damages for garden variety emotional distress." Such allegations trigger reporting obligations for Defendant's insurer under Section 111. 42 U.S.C. § 1395y(b)(8).

The settlement terms proposed to Plaintiffs are intended to allow Defendant's insurer to comply with the law. The terms are not intended to prejudice Plaintiffs and do not in fact prejudice Plaintiffs as Plaintiffs never identified any prejudice they would feasibly suffer as a result of enabling the insurer's legal compliance. If, as Plaintiffs state in their proposed compromise, Plaintiffs Bone and Miles "agree[] that there are no known or knowable claims, liens, or super-liens against this settlement arising from the events that are the subject of the Civil Action," then it should not be a problem for Plaintiffs to simply provide the information necessary for Defendant's insurer to satisfy its reporting obligations and be satisfied that it has complied with the law. Agreement to Defendant's settlement terms will allow its insurer to comply with the law and will allow payments to be made to Plaintiffs Bone and Miles. This is simple and should not be tortured for no clearly articulated reason, especially when there is no identified prejudice to Plaintiffs.

(Docket Entry 139-5 at 2-7 (emphasis, formatting, and certain brackets in original) (footnote omitted).)

9

Plaintiffs thereafter filed the Motion, "request[ing] that the Court enforce the Parties' February settlement and order Defendant to perform its obligations thereunder." (Docket Entry 139 at 3.) According to Plaintiffs, UNCHCS "now seeks to insert new material terms into the Parties' typed settlement agreements" (Docket Entry 140 at 1), namely:

> (1) they newly condition and delay UNCHCS's payments to Mr. Miles and Mr. Bone on and until CMS identifies any Medicare liens to be paid; (2) they require the individual Plaintiffs to pay liens out of the settlement monies; (3) they require the individual Plaintiffs to consent to the release of private health care information from CMS to UNCHCS; and (4) they mandate that Plaintiffs and their counsel indemnify and pay UNCHCS back any fines, penalties, and liens paid by UNCHCS to CMS.

(Id. at 5 (the "New Terms"); see generally Docket Entries 139-2 to 139-4.) Plaintiffs contend that "[t]he Court should reject Defendant's attempt to depart from the material terms agreed to on February 8 and enforce the February [Settlement Agreement] as drafted and agreed upon by all parties." (Docket Entry 140 at 1.) Plaintiffs further maintain that,

> because Plaintiffs have never sought compensation in this action or by settlement agreement for injuries with associated past or future medical costs, this case is not subject to the Medicare Secondary Payer provisions in the Medicare, Medicaid and SCHIP Extension Act of 2007, 112 Stat. 2492, 110 P.L. 173 ("MMSEA"), 42 U.S.C. § 1395y(b)(2). Even if it were, however, compliance with the MMSEA's reporting requirements does not require inclusion of the onerous, material new terms Defendant has now inserted into its draft typed settlement agreements.

(Docket Entry 140 at 2.)

UNCHCS opposes the Motion. (See Docket Entry 141.) Notably, UNCHCS does not dispute that it seeks to introduce new terms into the parties' agreement. (See generally id.) Instead, UNCHCS argues that such terms remain necessary for its insurer to comply with the MMSEA and MSP, that "the Parties' agreed upon settlement should provide for MSP[] and MMSEA compliance" (id. at 2), and that the proposed terms will not prejudice Plaintiffs. (See id. at 1-16.) In UNCHCS's view, the proposed "MMSEA and MSP[] reporting terms should be part of the Parties' Settlement Agreement as it should be assumed and embraced that the Parties entered into a Settlement Agreement compliant with all applicable laws. The Parties' agreed upon settlement must simply be fair and lawful." (Id. at 15.)

## DISCUSSION

### I. Relevant Standard

"Although resolution of a motion to enforce a settlement agreement draws on standard contract principles, it may be accomplished within the context of the underlying litigation without the need for a new complaint." Hensley v. Alcon Lab'ys, Inc., 277 F.3d 535, 540 (4th Cir. 2002). "To this extent, district courts have inherent authority, deriving from their equity power, to enforce settlement agreements. The exercise of this authority has the 'practical effect' of entering a judgment by consent." Id. (citation omitted).

11

"[T]o exercise its inherent power to enforce a settlement agreement, a district court (1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions." Id. at 540-41.[5] "In deciding whether a settlement agreement has been reached, the Court looks to the objectively manifested intentions of the parties." Moore v. Beaufort Cnty., 936 F.2d 159, 162 (4th Cir. 1991)). Under North Carolina law, "where the language used in the contract is clear and unambiguous, the intention of the parties is to be gathered from the face of the contract." Augusta Homes, Inc. v. Feuerstein, No. COA08-1456, 199 N.C. App. 318, 682 S.E.2d 247, 2009 WL 2501399, at *4 (2009) (citing Goodyear v. Goodyear, 257 N.C. 374, 380, 126 S.E.2d 113, 118 (1962)); see also Crockett v. First Fed. Sav. &

---

[5]    In the absence of a factual dispute regarding the settlement agreement, a court may summarily enforce the settlement agreement; "[w]hen, however, there is a material dispute about the existence of a settlement agreement or the authority of an attorney to enter a settlement agreement on behalf of his client, the trial court must, of course, conduct a plenary evidentiary hearing in order to resolve that dispute." Millner v. Norfolk & W. Ry. Co., 643 F.2d 1005, 1009 (4th Cir. 1981) (citations omitted); see also Hensley, 277 F.3d at 541 ("If there is a factual dispute over the existence of an agreement, over the authority of attorneys to enter into the agreement, or over the agreement's terms, the district court may not enforce a settlement agreement *summarily*. Instead, when such factual disputes arise, the court must conduct a plenary evidentiary hearing in order to resolve that dispute and make findings on the issues in dispute." (citations, internal quotation marks, and footnote omitted) (emphasis in original)). "Because there are no disputed facts in this case, a hearing on this issue is unnecessary." Newson v. Prinston Pharm., Inc., No. 3:18-cv-269, 2021 WL 3811483, at *2 (W.D.N.C. Aug. 26, 2021), aff'd, No. 21-2064, 2022 WL 1261321 (4th Cir. Apr. 28, 2022).

12

Loan Ass'n of Charlotte, 289 N.C. 620, 631, 224 S.E.2d 580, 588 (1976) ("Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be."). "[H]aving second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement." Hensley, 277 F.3d at 540 (brackets in original) (internal quotation marks omitted).

## II. Analysis

"Here, there is a complete [s]ettlement [a]greement, signed by [all] parties, under which the Court is able to determine its terms and conditions." Medlin v. City of Mount Holly, No. 3:20-cv-722, 2022 WL 19768, at *1 (W.D.N.C. Jan. 3, 2022). Specifically, as relevant to terms and conditions here, the February Settlement Agreement provides that, in exchange for certain releases and dismissals, UNCHCS will make certain stipulations and payments to Bone and Miles, with "[n]o" "third party liens to be paid from [those] proceeds" (Docket Entry 139-1 at 2). (See id. at 2-5.) Further, the February Settlement Agreement manifests assent to those terms and conditions by explicitly confirming that the parties entered into "[a] binding agreement today" (id. at 4) and documenting the signature of all parties (see id. at 5). See Thomco Realty, Inc. v. Helms, 107 N.C. App. 224, 228, 418 S.E.2d 834, 837 (1992) ("[A]n essential contractual term, mutual

13

assent, is evidenced by the signatures of defendants."); see also Augusta Homes, 2009 WL 2501399, at *6 ("Moreover, mutual assent evidenced by the signing of the Agreement by all the parties is apparent from the face of the Agreement."). The February Settlement Agreement includes no contingencies regarding Medicare reporting or confirmation of the absence of any Medicare liens (see generally Docket Entry 139-1) and it does not make the parties' agreement contingent upon further negotiation over the contents of the "typed written agreement" memorializing the "[s]ettlement terms" (id. at 4 (emphasis omitted)). "It is evident that the [February Settlement] Agreement in this case contains the essential terms of the contract, definite within themselves or capable of being made definite[,] and, thus, that a valid and enforceable agreement was reached between the parties on [February 8, 2022]." Augusta Homes, 2009 WL 2501399, at *6 (internal quotation marks and citation omitted) (second set of brackets in original); see also Topiwala v. Wessell, 509 F. App'x 184, 186 (4th Cir. 2013) (concluding that "[t]he 'Settlement Terms' document unambiguously evinces an intent to be bound, and contains sufficiently definite terms," where "both the document's title and its contents would lead a reasonable person in the parties' position to believe that it was susceptible to only one meaning, as a binding agreement to settle the case along the terms contained therein," and "the document contained all essential terms of the settlement, including

14

specific properties and sums of money to be transferred, specific dates of transfers, a release, a warrantee, and a nondisparagement agreement," notwithstanding "the absence of various terms[,] such as a venue provision, a liquidated damages clause, and the precise timing of some transfers[,]" and observing "that those terms' absence did not prevent enforceability, because such terms were relevant, but nonessential").

Nevertheless, based on the theory that settlements "must contain terms that are fair and lawful," UNCHCS contends that "the Parties' agreed upon settlement should provide for MSP[] and MMSEA compliance." (Docket Entry 141 at 2.) In UNCHCS's view, the New Terms included in the draft "long-form Settlement Agreement and Release" (id. at 3) it proposed in March 2022 (see Docket Entries 139-2, 139-3 (collectively, the "March Drafts")) result in "no prejudice to Plaintiffs" (Docket Entry 141 at 4). According to UNCHCS, "Plaintiffs suffer no harm and undertake no additional detriment for which consideration is necessary if UNCHCS's insurer is able to confirm the absence of Plaintiffs' apparently non-existent reimbursement obligations." (Id.) "Thus," UNCHCS argues, "the Court should deny Plaintiffs' ambiguous Motion and instead have the Parties execute the [March Drafts] prepared by counsel for UNCHCS or have Plaintiffs provide the information necessary for MSP[] and MMSEA compliance." (Id. at 5.) UNCHCS's argument lacks merit.

15

To begin, the New Terms that UNCHCS seeks to insert into the parties' settlement agreement constitute material terms.  See Davis v. American Standard Ins. Co. of Wis., No. 2:15-cv-4136, 2015 WL 6742120, at *2-4 (W.D. Mo. Nov. 2, 2015) (explaining that terms regarding, inter alia, payment of Medicare liens, Medicare reporting forms and verifications, and indemnification qualify as material, "essential" terms, "not simply minor details," and observing that "terms involving the handling of Medicaid liens and the like cannot be perfunctory and non-essential ones in view of [a case upon which the plaintiff relied], particularly not where, as here, the insurance company sought to add the term that payment of unspecified liens in an unspecified amount would be made from the $10,580 the insurance company had agreed to pay [the plaintiff]").  Accordingly, if UNCHCS wanted the New Terms to form part of its settlement of Plaintiffs' damages claims, it needed to have secured Plaintiffs' agreement thereto and included such terms in the February Settlement Agreement.  Moreover, UNCHCS's proposal for payment of any Medicare or Medicaid liens out of "the total amount of the settlement of [Bone's or Miles's] claim against UNCHCS" (Docket Entry 139-2 at 3; Docket Entry 139-3 at 3; see Docket Entry 139-2 at 3-4, 7-10; Docket Entry 139-3 at 3-4, 7-10) directly contradicts the February Settlement Agreement.  (See Docket Entry 139-1 at 2 (specifying that "[n]o" "third party liens [are] to be paid from proceeds" of settlement payments).)  The Court therefore

16

cannot deem the New Terms part of the parties' settlement agreement. See, e.g., Hensley, 277 F.3d at 542 (observing that court cannot "supply a material term"); Chappell v. Roth, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001) ("[G]iven the consensual nature of any settlement, a court cannot compel compliance with terms not agreed upon or expressed by the parties in the settlement agreement."); see also Harris-Teeter Supermarkets, Inc. v. Hampton, 76 N.C. App. 649, 652, 334 S.E.2d 81, 83 (1985) ("When the terms of a contract are clear and unambiguous the express terms of the contract control in determining its meaning.").

Moreover, contrary to UNCHCS's position, the New Terms prejudice Plaintiffs. For instance, they require payment of any potential liens from the settlement proceeds, contrary to the terms of the February Settlement Agreement (see Docket Entry 139-1 at 2). (See Docket Entry 139-2 at 3-4, 7-10; Docket Entry 139-3 at 3-4, 7-10.) They also delay payment of the settlement proceeds until "the final determination of the total amount due Medicare in reimbursement" (Docket Entry 139-2 at 4; Docket Entry 139-3 at 4), a process that, per UNCHCS's lawyer, "can take significant time" (Docket Entry 139-6 at 3; see also Docket Entry 139-2 at 7 (indicating "that the length of time to obtain benefits and repayment information . . . can extend [for] many months"); Docket Entry 139-3 at 7 (same)). In addition, they require Plaintiffs and their counsel to broadly indemnify "UNCHCS and all of its agents,

17

assigns, servants, employees, officers, board members, owners, insurers, reinsurers, subsidiaries, affiliates, parents and attorneys" (Docket Entry 139-2 at 4; Docket Entry 139-3 at 4). (See Docket Entry 139-2 at 9-10; Docket Entry 139-3 at 9-10.) And as a final example, they require Miles and Bone to authorize CMS to release their medical information to UNCHCS "and its agents and insurers" (Docket Entry 139-4 at 3). (See id. at 2-5; see also Docket Entry 139-2 at 7; Docket Entry 139-3 at 7.) As such, the proposed New Terms would significantly alter the parties' agreement, in ways detrimental to Plaintiffs (and their counsel).

UNCHCS's characterization of the New Terms as necessary for its insurer to comply with its obligations also lacks merit. As recently explained:

> Before 1980, "Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained." *Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011). In 1980, to curb the rising costs of Medicare, Congress enacted the MSP Act, which changed the prior system and made private insurers covering the same treatment the primary payers and Medicare the secondary payer. *Id.* "Medicare benefits became an entitlement of last resort, available only if no private insurer was liable." *Humana Med. Plan, Inc. v. Western Heritage Ins. Co.*, 832 F.3d 1229, 1234 (11th Cir. 2016).
>
> The MSP Act designates when Medicare will pay for medical items or services as the primary payer and when Medicare will pay as the secondary payer. 42 U.S.C. § 1395y(b). When an individual has private coverage, such as no-fault insurance or liability insurance, the MSP Act establishes Medicare's status as a secondary payer to a primary plan. § 1395y(b)(2). Medicare will send a confirmation explaining a liability insurance,

18

no-fault insurance, or workers' compensation claim was filed with Medicare and a Medicare Secondary Payer recovery case was established in the system. (*See* Doc. 61, Ex. B). Typically, Medicare does not pay for items or services for which a primary plan has paid or can reasonably be expected to pay. 42 U.S.C. § 1395y(b)(2)(A).

However, Medicare may make a conditional payment despite its status as secondary payer. § 1395y(b)(2)(B). When the primary plan does not fulfill its duties, the Secretary of Health & Human Services (Secretary) may make a payment conditioned on reimbursement. § 1395y(b)(2)(B)(i). If the Secretary makes a conditional payment, the primary plan must reimburse the Secretary. § 1395y(b)(2)(B)(ii). The MSP Act also establishes and defines a government cause of action to recover from a primary plan. § 1395y(b)(2)(B)(iii).

Stillwell v. State Farm Fire & Cas. Co., No. 8:17-cv-1894, 2020 WL 7389916, at *4-5 (M.D. Fla. Feb. 27, 2020) (emphasis added), report and recommendation adopted as modified in non-relevant part sub nom. United States ex rel. Stillwell v. State Farm Fire & Cas. Co., No. 8:17-cv-1894, 2020 WL 7389878 (M.D. Fla. May 29, 2020).

Thus, as the MMSEA Section 111, Medicare Secondary Payer Mandatory Reporting, Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation User Guide (the "User Guide") makes clear, Non-Group Health Plan[6] "claim information is to be submitted where the injured party is a Medicare beneficiary and payments for medical care ('medicals') are

---

6 "Liability insurance (including self-insurance), no-fault insurance, and workers' compensation are often collectively referred to as 'Non-Group Health Plan' or 'NGHP' insurance." User Guide, Chapter I, p. 2-2, available at https://www.cms.gov/files/document/mmsea-111-january-10-2022-nghp-user-guide-version-67-chapter-i-introduction-and-overview.pdf (emphasis omitted).

19

claimed and/or released, or the settlement, judgment, award, or other payment has the effect of releasing medicals." User Guide, Chapter I, p. 6-2, available at https://www.cms.gov/files/document/mmsea-111-january-10-2022-nghp-user-guide-version-67-chapter-i-introduction-and-overview.pdf (emphasis added); see also User Guide, Chapter III, p. 6-19 ("Information is to be reported for claims related to liability insurance (including self-insurance), no-fault insurance, and workers' compensation **where the injured party is (or was) a Medicare beneficiary and medicals are claimed and/or released or the settlement, judgment, award, or other payment has the effect of releasing medicals**." (emphasis in original)), available at https://www.cms.gov/files/document/mmsea-111-january-10-2022-nghp-user-guide-version-67-chapter-iii-policy-guidance.pdf. Accordingly, "'indemnity-only' settlements, which seek to compensate for non-medical damages, should not be reported. The critical variable to consider is whether or not a settlement releases or has the effect of releasing medicals." User Guide, Chapter III, p. 6-22 (emphasis added).

UNCHCS contends that the MSP reporting requirements apply here because the parties' settlement agreement releases Bone's medical debt. (See, e.g., Docket Entry 141 at 12 (arguing that reporting "process must be followed because . . . UNCHCS agreed to release Bone from any obligation to pay outstanding debts for medical treatment"), 15 (arguing that "this is a case in which CMS's

20

instructions should be followed for MMSEA and MSP[] reporting purposes because . . . there is a release of any debt for medical services rendered").)  This argument misconstrues the February Settlement Agreement, which explicitly states that the "Release" remains "One Way From Plaintiff(s) to Defendant(s)" rather than "Mutual" (Docket Entry 139-1 at 2 (emphasis omitted)) and merely confirms that, "[t]o the best of Defendant's knowledge, [plaintiff] Bone owes no debts to Defendant" (id. at 4), resolving an outstanding stressor that UNCHCS's failure to provide information to Bone in Braille caused (see, e.g., Docket Entry 141-1 at 6-7). Moreover, in ascertaining whether a settlement implicates MSP reimbursement obligations, one looks to the scope of the Medicare beneficiary's "own claim against the third party that is later released in settlement." Taransky v. Secretary of U.S. Dep't of Health & Hum. Servs., 760 F.3d 307, 315 (3d Cir. 2014) (internal quotation marks and emphasis omitted).  Here, Plaintiffs did not seek compensation for medical expenses. (See, e.g., Docket Entry 139-7 at 3-5; Docket Entry 139-8 at 3-5.)  Accordingly, UNCHCS's theory that the February Settlement Agreement releases medical debt or other medical expenses misses the mark.

Further, as UNCHCS tacitly concedes (see, e.g., Docket Entry 141 at 2-3, 7, 11-12, 14), even if the parties' settlement agreement triggered such reporting obligations, compliance with MSP and MMSEA reporting requirements would not necessitate adherence to

the New Terms. "The mechanism for making Plaintiffs' Medicare benefits determination is set forth in the CMS User Guide," and states, in relevant part, that to ascertain "'the Medicare status of the injured party,'" an RRE may "'submit a query'" containing "'the injured party's Social Security Number (SSN) or Medicare ID (Health Insurance Claim Number [HICN] or Medicare Beneficiary Identified [MBI]), name, date of birth and gender.'" (Id. at 11 (emphasis omitted) (brackets in original) (quoting User Guide, Chapter I, p. 6-1);[7] see also 42 U.S.C. § 1395y(b)(8)(B). Rather than requesting such basic details,[8] the March Drafts oblige Plaintiffs to provide an expansive list of information to UNCHCS. (See Docket Entry 139-2 at 6-7; Docket Entry 139-3 at 6-7.) In addition, the MSP and MMSEA do not require insurers to report claims before payment of monetary settlements. See, e.g., 42 U.S.C. § 1395y(b)(8)(C) ("Information shall be submitted . . . within a time specified by the Secretary after the claim is resolved through a settlement, judgment, award, or other payment . . . ." (emphasis added)); User Guide, Chapter III, p. 6-20 ("RREs are to report after there has been a [Total Payment Obligation to the Claimant (the "TPOC")] settlement, judgment, award, or other payment and/or after [Ongoing Responsibility for Medicals] has been

---

 7   Further, "[w]hen submitting an SSN,[ ]RREs may enter a partial SSN." User Guide, Chapter I, at p. 6-1.

 8   Indeed, the March Drafts do not mention Social Security Numbers or Medicare IDs. (See Docket Entries 139-2, 139-3.)

22

assumed." (bold font in original) (underlining added)); see also User Guide, Chapter III, p. 6-20 (explaining that timeliness of reporting "will be based upon the latter of the," id., date on which "the payment obligation [i]s established," id. at p. 2-2, or the payment "will be funded or disbursed," id. at p. 6-20, and cautioning that "RREs should not report the TPOC until the RRE establishes when the TPOC will be funded or disbursed," id.). Accordingly, contrary to the New Terms (see Docket Entry 139-2 at 3-4; Docket Entry 139-3 at 3-4), the reporting process could occur after UNCHCS paid Plaintiffs the amounts due under the February Settlement Agreement.

## CONCLUSION

The February Settlement Agreement constitutes an enforceable settlement agreement between UNCHCS and Plaintiffs. UNCHCS's proposed New Terms qualify as material, contradict the February Settlement Agreement, prejudice Plaintiffs, and remain unnecessary for MSP and MMSEA compliance.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 139) be granted by ordering UNCHCS to perform its obligations under the February Settlement Agreement.

This 6th day of May, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

23