IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHN BONE, TIMOTHY MILES, THE )
NATIONAL FEDERATION OF THE )
BLIND, INC., AND DISABILITY )
RIGHTS NORTH CAROLINA, )
                              )      1:18-cv-994
            Plaintiffs,       )
                              )
      v.                      )
                              )
UNIVERSITY OF NORTH CAROLINA  )
HEALTH CARE SYSTEM,           )
                              )
            Defendant.        )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

    With the damages claims of this case resolved, Plaintiffs
Timothy Miles, the National Federation of the Blind, Inc. ("NFB"),
and Disability Rights North Carolina ("DRNC") seek permanent
injunctive relief under various federal disability statutes to
remedy what they contend is the failure of Defendant University of
North Carolina Health Care System ("UNCHCS") to provide Miles and
non-party Dr. Ricky Scott (a constituent of Plaintiff DRNC), both
of whom are legally blind, with meaningfully accessible
communications. Plaintiffs' requested relief is sweeping and
seeks "significant reforms" across UNCHCS's entire network of
owned and managed health care entities. (Doc. 151-1 at 17; see
Doc. 163-1.) UNCHCS filed a response in opposition (Doc. 152),
and Plaintiffs filed a reply (Doc. 153).

On December 14, 2022, the court heard oral argument on the motion. But because, on the day before the hearing, UNCHCS updated the record on the status of its efforts to provide services to sight-impaired patients, the court instructed the parties to meet and confer and to file a joint status report outlining their respective positions as to whether Plaintiffs maintained that a permanent injunction was still warranted in light of the changes to certain policies and practices that UNCHCS reported making during the course of this litigation. On January 30, 2023, the parties filed their joint status report, largely maintaining their earlier positions concerning the propriety of injunctive relief. (Doc. 163.) At that time, the parties agreed there was no need for trial or further evidentiary hearing and that the court could decide the merits of the case on the summary judgment record.

After extensively reviewing the voluminous record, the court determined that there were three discrete factual issues that needed further clarification. (See Doc. 165.) Thus, on May 1, 2023, the court again heard oral argument, limited to the already closed factual record, on those three issues.

After careful consideration of the complete record and for the reasons set forth below, Plaintiffs' motion for permanent injunction will be granted in part and denied in part.

# I. BACKGROUND

## A. Factual Background

The court finds the following facts based on the cross-motions for summary judgment (Docs. 103, 105, 107, 108, 111, 112, 113, 114, 120, 121), the uncontested facts, and other evidentiary filings submitted by the parties (Docs. 151, 152, 153, 162, 163).[1]

### 1. Timothy Miles & Dr. Ricky Scott

Plaintiff Timothy Miles has been a patient at UNCHCS for over twenty years. (Doc. 103-4 ¶ 11.) He "routinely" visits UNCHCS clinics and plans to "continue" doing so in the future. (Id. ¶ 12.) At his deposition in February 2021, Miles testified that he visits five UNCHCS clinics with "some sort of regularity" (meaning at least once a year): UNCHCS's dermatology, endocrinology, nephrology, ophthalmology, and urology clinics. (Doc. 108-12 at 25-26.) Miles also frequents other UNCHCS clinics as well. Since March 2021 alone, Miles is or has been a patient of at least a dozen other UNCHCS providers: UNC Ophthalmology/Kittner Eye Center, UNC Urgent Care at Carolina Pointe II, UNC Otolaryngology ("ENT"), UNC Orthopedics, UNC Hospitals Emergency Department, UNC Hospitals Kidney Specialty and Transplant Clinic, UNC Hospitals Pulmonary Specialty Clinic, UNC Hospitals Endoscopy Center, UNC Hospitals Outpatient Center at

---

[1] All citations to the record are to the paragraph number or ECF docket page.

3

Eastowne (Laboratory Services), UNC Hospitals Imaging Center, and UNC Hospitals Central Outpatient Pharmacy. (Doc. 151-3 ¶ 7.) Miles also stated in his most recent declaration that, just within the last several months, he has also visited three additional UNCHCS facilities: UNC Hospitals Pre-Procedure Services at Chapel Hill, UNC Hospitals Ambulatory Surgery Center, and UNC Allergy Eastowne. (Doc. 163-4 ¶¶ 8-9.) All told, according to Miles's counsel, he has made upwards of 100 trips to UNCHCS clinics in the past four years alone.

Miles is legally blind, his vision loss being "so significant that it is not fully correctable with prescription lenses." (Doc. 103-4 ¶ 3.) He describes his visual acuity range as falling between "20/30 to 20/400, ideally 20/100 in one, 20/400 or 20/300 to 20/400 in either eye." (Doc. 108-12 at 3.) Although his vision is generally stable (albeit at reduced visual acuity levels), sometimes it gets worse when Miles is particularly stressed, or when his blood sugar levels fluctuate due to his diabetes. (Id. at 3-4, 7.) Miles also suffers from a condition known as oculocutaneous albinism, which makes him extremely sensitive to light. (Doc. 103-4 ¶ 6; Doc. 108-12 at 3.) According to Miles, this condition "renders no pigment in the eyes[,]" which means that for him "bright light is severely diminishing" and causes pain. (Doc. 108-12 at 3.) To deal with these visual disabilities, Miles uses two different prescription glasses, one for distance

4

and one for "up close." (Id. at 5.) He also frequently wears what he describes as "dark shades," which help mitigate his sensitivity to light. (Id. at 3, 5-6.) Miles says that the glasses bring him "a minimum amount of clarity." (Id. at 5.)

Even with prescription glasses, however, Miles cannot read standard print documents (Doc. 163-4 ¶ 4), though sometimes he uses a magnifying glass, which he carries with him everywhere for "where there's a need for a quick review of something."[2] (Doc. 108-12 at 42.) Miles can, however, read written material in large print. (Doc. 163-4 ¶ 5.) At one time, Miles could access size 16-point font, but in recent years he has experienced worsening eye strain and, as a result, "now require[s] a minimum size of 18-point font to access printed text," even with the aid of his prescription glasses. (Doc. 103-4 ¶ 8; see Doc. 108-12 at 5-6; Doc. 120-3 at 6 ("With the aid of prescription glasses, his visual acuity is measured around 20/150 for his right and left eyes.").) Sometimes, however, Miles requires size 24-point font or higher, but generally only when increased stress or high-blood sugar causes spots, or "floaters," that temporarily exacerbate his already blurred vision. (Doc. 108-12 at 36.) On occasions when Miles

_____

[2] According to Miles, although he carries a magnifying glass with him "pretty much" everywhere he goes (Doc. 108-12 at 9), he only "use[s] it on 18 [point font] and above . . . or a little bit lower than that" (id. at 43). Miles says the types of "quick thing[s]" he might try to read with his magnifying glass include "a receipt or something like that, [or] a button or a pen." (Id. at 5.) Mostly though, he uses the magnifying glass to view "objects" rather than "words." (Id. at 43.)

5

receives standard print documents at home – for example, credit-card bills he receives in the mail – he will not try to read them; instead, he will typically phone the relevant party to ask about the bill, though most of the time he "know[s]" the amount due, so "there's really not anything" for him to "look at" or "verify." (Id. at 11.) Other times, Miles will ask a friend or family member to come over to help him read something, even though he typically does not like other people having access to his "personal information." (Id. at 12.)

Miles also has a computer – which he sometimes uses to check emails, attend virtual meetings, and otherwise type or read documents – that is equipped with two accessible screen reading programs: JAWS Fusion and ZoomText. (Doc. 120-2 at 10-12.) JAWS Fusion (JAWS is an acronym for Job Access With Speech) is screen access software that reads aloud the text on a computer screen or iPhone and allows a user to edit documents much like the voice-dictation feature on a cell phone, such that JAWS Fusion "talks . . . types, [and] speaks out as you type." (Id. at 14.) ZoomText is a screen magnification program that allows the user "multiple levels of certain magnification," depending on the user's preference. (Id. at 12-14.)

According to Plaintiffs' counsel, Miles could (at least as of September 2018) "successfully navigate accessible websites using [this] screen-access software[.]" (Doc. 108-14 at 2.) More

6

recently, however, he has expressed an aversion to reading electronic documents because his condition, ocular albinism, makes him extremely sensitive to light. (Doc. 151-3 ¶ 5.) Miles also uses an iPhone, which is equipped with a screen reading device called "VoiceOver." (Doc. 108-12 at 17-18.) His iPhone also has an "accessibility feature," which he sometimes uses, that allows him to "enhance" the font size, labels, icons, or other applications. (Id. at 18.) Finally, Miles has a standard printer at home. (Id. at 56-57.)

Like Miles, Dr. Ricky Scott is legally blind, a long-time patient of UNCHCS, and a DRNC constituent.[3] (Doc. 151-4 ¶ 3-4; Doc. 151-1 at 6; Doc. 103-14 ¶ 4.) Dr. Scott routinely visits UNC Family Medicine West, "averaging two to three visits each year." (Doc. 151-4 ¶ 4.) He has also received services from Rex Laboratory Services at UNC Rex Hospital, where he "typically has lab work done . . . every couple of years." (Doc. 103-14 ¶ 5; see Doc. 151-4 ¶ 14.) Given the proximity to his home, Dr. Scott intends to return to both locations in the future. (Doc. 151-4 ¶ 14; see Doc. 103-14 ¶ 13.) He cannot "read printed materials," but he can "read documents in Braille or in accessible electronic formats that [he] can access on [his] computer using screen reader

---

[3] Although Dr. Scott is not a named Plaintiff, his experiences are relevant insofar as he is a DRNC constituent, and the DRNC has associational standing here to pursue relief on behalf of its injured constituents. See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec., 983 F.3d 671, 683 (4th Cir. 2020).

software, which converts written text to speech or to Braille on a refreshable Braille display." (Doc. 151-4 ¶ 3; <u>see also</u> Doc. 163-5 ¶ 3.)

Both Miles and Dr. Scott are constituents of Plaintiff DRNC "by virtue of their residency within North Carolina and their disabilities." (Doc. 103-13 ¶ 12; <u>see</u> Doc. 151-1 at 5-6, 17.) DRNC is a North Carolina non-profit corporation "authorized to pursue administrative, legal, and other appropriate remedies to protect and advocate for the legal rights of individuals with disabilities and to redress incidents of discrimination in the state." (Doc. 103-13 ¶ 5.) Miles is also a member of Plaintiff NFB, a non-profit corporation organized to "promote[] the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, health care, employment, family and community life, transportation, and recreation." (Doc. 103-12 ¶ 4.)

### 2. Defendant UNCHCS

Defendant UNCHCS is an integrated not-for-profit health care system owned by the state of North Carolina and established by state law. <u>See</u> N.C. Gen. Stat. § 116-37. Its principal place of business is Chapel Hill, North Carolina. (Doc. 18 ¶ 13.) Currently, it "consists of UNC Hospitals and its provider network"

8

along with "eleven affiliate hospitals and hospital systems across the state." (Id.) UNCHCS also "employs and contracts with numerous providers for the delivery of medical services in its facilities." (Id.) As the University of North Carolina website explains: "UNC Health provides care to patients in all of the state's 100 counties through its 11 hospitals, 13 hospital campuses, and hundreds of clinical practices" and "is one of the nation's leading academic health care systems, a $5.4 billion enterprise, with more than 33,000 employees from Hendersonville to Jacksonville." https://www.northcarolina.edu/institution/unc-health-care-system/ (last visited June 22, 2023).

UNCHCS, like many other hospital systems around the nation, uses Epic System ("Epic"), a third-party platform, to maintain its electronic medical records. (See Doc. 121-8 at 3; Doc. 103-28 at 8; Doc. 152 at 5.) Epic is a customizable "comprehensive electronic health record software program with applications for the outpatient and inpatient settings, as well as scheduling and patient portal, among others." (Doc. 103-28 at 8; see also Doc. 108-4 at 7 ("Epic is the integrated system that has the medical information, managed clinical information, and . . . billing components[.]").) Pertinent here, Epic helpfully captures all the patient "demographic[] and clinical information" needed to "service [that] patient[]." (Doc. 152 at 2.) Among other things, Epic also has what UNCHCS calls "FYI flag" functionality, a feature

9

that allows staff to input specific demographic (or other) information about a patient, including whether that patient has a disability requiring a specific accommodation. (See Doc. 103-11 at 4-6; see also Doc. 163-10 at 6.) Importantly, "Epic develops, installs and supports its applications in-house," meaning that UNCHCS does not have complete control over how the software works. https://www.unchealthcare.org/about-us/epic/providers/ (last visited June 5, 2023). Thus, as UNCHCS's counsel explained at the May 2023 hearing, UNCHCS and Epic work in collaboration when it comes to managing patient health records.

In conjunction with Epic, UNCHCS provides patients with "controlled access" to their medical records through an online application called "My UNC Chart," or more simply, "MyChart." https://www.unchealth.org/for-unch-health-professionals/epic-training/epic-product-overviews (last visited June 22, 2023). MyChart, which functions as an online "portal" available to patients via web browser or mobile app, allows patients to privately access documents pertinent to their medical care such as test results, appointment reminders, clinical information, after-visit summaries, and billing statements. (See Doc. 152 at 5; see Doc. 152-27 at 2-4.) Because MyChart is a "software product" that UNCHCS "license[s]" from Epic (Doc. 113-16 at 8), UNCHCS does not maintain complete control over the content, formatting, or metadata associated with each document uploaded to MyChart (see

10

Doc. 108-6 at 3-5, 10).  Although disputed here, UNCHCS maintains
that MyChart is "designed to be supported by screen readers on
mobile apps for iOS and Android, and on Desktop browsers" and that
the various features of MyChart "are supported by the JAWS screen
reader through the current state of the Google Chrome and Microsoft
Edge desktop browsers."  (Doc. 152-1 ¶ 12 (emphasis added).)[4]  If
MyChart is for any reason inaccessible, UNCHCS assists patients by
putting them in touch with technology personnel who can provide
trouble-shooting solutions.  (Doc. 152 at 5, 20; see Doc. 113-16
at 6; Doc. 152-25 at 1-3.)

Jeri Williams, UNCHCS's Chief Audit and Compliance Officer,
is primarily responsible for UNCHCS's compliance with federal and
state disability laws.  (Doc. 162 ¶¶ 1-3.)  Each entity affiliated
with UNCHCS also has its own Civil Rights Coordinator, who is
"tasked with entity-level ADA, and Section 504 and 1557 compliance,
including provision of effective communication to blind patients."
(Doc. 152 at 5-6; Doc. 152-28 at 2-3.)  As it relates specifically
to UNCHCS's efforts to provide disabled patients with meaningful
access to and participation in its health care services, UNCHCS's
"Effective Communication Policy" provides something of a mission
statement.  (Doc. 152 at 4; Doc. 162-1 ¶ 5.)  Since 2016, UNCHCS

---

[4] As detailed below, however, UNCHCS provides no record evidence – aside
from the testimony of Jeri Williams, UNCHCS's Chief Audit and Compliance
Officer, which appears to be based on hearsay – that MyChart is actually
compatible with screen readers such as JAWS.

has adopted at least six iterations of this policy. (See Docs. 108-7 to 108-10; Doc. 152-19; Doc. 162-1).

As initially conceived, the Effective Communication Policy focused mainly on communication with individuals of limited English proficiency. (Doc. 108-7 at 1-5.) However, it also specified that UNCHCS would "take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others" and would "provide appropriate auxiliary aids and services to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the UNCHCS service at issue." (Id. at 5.) The 2017 Effective Communication Policy again largely focused on individuals with limited English proficiency (Doc. 108-8 at 1-7) and provided the same general procedures for effectively communicating with patients with disabilities. (Compare Doc. 108-7 at 5, with Doc. 108-8 at 5.)

However, UNCHCS significantly revised the policy in April 2019 and again in May 2019. (Compare Doc. 108-8 at 1 with Doc. 108-9 at 1 and Doc. 108-10 at 1.) The two policies adopted in 2019 largely mirror each other, though the May 2019 version also includes a Notice of Nondiscrimination. (Compare Doc. 108-9 at 1-13 with Doc. 108-10 at 1-17.) The 2019 policies also contain a more-detailed procedure for communicating with patients with disabilities; for example, the more-thorough policy starts in the

12

policies "rationale" section, which provides that the goal of the policy is to provide "auxiliary aids and services . . . to patients with communication disabilities to ensure effective, meaningful communication with, and equal access to [UNCHCS]'s services by, these patients" and to "work with each patient to provide the patient's requested accommodation or a reasonable alternative accommodation." (Doc. 108-10 at 1; Doc. 108-9 at 1.) More recently, UNCHCS again significantly revised the Effective Communication Policy to include more detailed procedures as it relates to communicating with patients with disabilities.[5]

Additionally, UNCHCS has established an "ADA Workgroup," which "consists of a multidisciplinary team of UNCHCS staff who all experience providing accommodations to patients" (Doc. 162 ¶ 10) and "meets every three weeks" (Doc. 152-1 ¶ 8). The ADA Workgroup is currently engaged in a

> compliance audit targeted at enhancing existing policies, procedures, and processes for effective communication through updating policies, providing patient materials in accessible formats, flagging requested patient accessibility formats in Epic, ensuring timely provision of requested accessible formats and alternate accommodations, increased monitoring of accessible format provision, website and [MyChart] accessibility monitoring, training employees on nondiscrimination policies and requirements, and ensuring direct implementation of accessibility efforts by UNCHCS or provision of direct guidance to UNCHCS owned and managed entities.

---

[5] Those changes are highlighted in detail below. See infra, Part I-A-3(b).

(Doc. 152 at 8; see also Doc. 162 ¶ 10.) In addition, UNCHCS recently promoted Camille Brooks, a current member of the ADA Workgroup, to the position of Director of Accessibility in UNCHCHS's Office of Equity and Inclusion, effective November 28, 2022. (Doc. 162 ¶ 10.) In this role, Brooks "is responsible for the development, strategy, implementation, and evaluation of the language access program and ADA accommodations program across the UNC Health Care System to reduce disparities in access to quality care." (Doc. 163-3 at 57-58.) Brooks also works closely with Chief Audit and Compliance Officer Jeri Williams, "but in a manner that is designed to move more of the focus for the language access and ADA accommodations programs under the umbrella of a separate executive whose job duties center primarily on these programs." (Id.)

### 3. The Present Litigation

#### a. UNCHCS's Communications to Miles and Dr. Scott

This lawsuit arises out of problems that both Miles and Dr. Scott encountered when receiving care at UNCHCS providers. As noted, because Miles is legally blind, he cannot read standard print documents (font size 12-point or less), even with the help of prescription glasses. (Doc. 163-4 ¶ 4.) Thus, years ago, Miles asked UNCHCS to provide him with large print versions of documents commonly provided to patients during the course of a visit, including, for example, after-visit summaries, general consent to

14

treatment forms, medical bills, or intake questionnaires. (Doc.
103-4 ¶ 13.)

Yet for years, and despite Miles's repeated requests, UNCHCS
providers regularly gave him standard print or otherwise
inaccessible documents. (Id.) By Miles's calculation, from
January 2015 to September 2018, he visited a UNCHCS facility more
than 35 times, yet each time he was sent home with (or later
mailed) "at least one inaccessible standard print document[.]"
(Id. ¶ 14; see Doc. 105-4 at 17-225 (copies of standard print
documents that Miles retained from this time period).) As
reflected in the record, the inaccessible standard print materials
that Miles received and retained from January 2015 to September
2018 total approximately 200 pages. (See Doc. 105-4 at 21-225.)
Such documents include bills, physician reports, receipts, after-
visit summaries, discharge documents, medical records, appointment
reminders, feedback-request forms, welcome packets, and
instructions. (See id. at 18-20 (index of standard print documents
dated between January 6, 2015, and September 18, 2018).) According
to Miles, this number actually "under-represent[s]" how many
inaccessible documents he received from UNCHCS during this period,
as he was often required to review and sign standard print
documents "during the check in process for these visits, copies of
which [he] did not always receive and therefore do[es] not
possess." (Doc. 103-4 ¶ 14.)

15

In response to these failures, an attorney from Plaintiff DRNC contacted UNCHCS in September 2018, explaining in a detailed letter that although Miles had repeatedly requested that his providers send him large print documents, those providers had "routinely told" Miles "they [could not] honor his alternate format request." (Doc. 113-16 at 2.) The letter also highlighted UNCHCS's failure to provide Miles in accessible formats the "notices given in providers' offices, forms patients are required to complete, and many other communications of a personal nature," and it alerted UNCHCS that Miles's screen reading software, JAWS, seemed to be incompatible with documents uploaded to his MyChart account. (Id.)[6]

Less than a month later, the UNC Hospitals Patient Experience Director, Shane Rogers, responded by sending a large print letter directly to Miles explaining that UNCHCS "was investigating how it might be able to respond" to Miles's requests and asked Miles "to

_____

[6] Miles has a MyChart account, but he has "[n]ot really" tried to access or review electronic documents there, instead repeatedly indicating his "preference" for printed material. (Doc. 108-12 at 58.) Indeed, at least as of his February 2021 deposition, Miles could not recall ever attempting to open an after-visit summary (or any other document) from MyChart and printing it at his desired magnification, even though he believed at the time that document encryption would prevent his access in that manner. (Id. at 58-59.) At the same deposition, Miles also explained that he has not attempted to enlarge the after-visit summaries from MyChart because he "only use[s] paper when it comes to that." (Id. at 59.) In his two most recent declarations, however, Miles clarified that he "rel[ies] on hard-copy large print" given that his condition (ocular albinism) makes him particularly sensitive to reading electronic documents. (Doc. 151-3 ¶ 5; see also Doc. 163-4 ¶ 5.)

16

call [his] providers directly with any questions." (Doc. 103-4 ¶ 17; see Doc. 108-14 at 7-8 (providing a copy of the letter sent to Miles, dated October 16, 2018).) Not long after, UNCHCS also sent Miles "an enlarged[-]print document summarizing [his] patient financial account activity going back to January 25, 2017"; it did not send enlarged-print copies of "the [medical] bills themselves." (Doc. 103-4 ¶ 16.) Around the same time, UNCHCS's Senior Vice President and General Counsel B. Glenn George sent a letter directly to Miles's counsel and explained that UNCHCS was "currently working on fulfilling" Miles's requests for large print documents. (Doc. 113-16 at 4-5.) A week later, George sent Miles's counsel another letter, this one providing instructions for how Miles could access documents on MyChart with his JAWS screen reader software and his phone. (Id. at 6.) The letter also offered to arrange a call between Miles and someone from UNCHCS's technology department if he experienced any trouble doing so. (Id.) As far as the record indicates, neither Miles nor anyone acting on his behalf ever followed up.

Around the same time UNCHCS first reached out to Miles, however, one of its providers yet again gave him inaccessible documents. (Doc. 103-4 ¶ 18.) Following an appointment on October 19, 2018, at UNC/UPN Urgent Care at Carolina Pointe II, Miles was provided "a standard print intake form, privacy notice, payment receipt, and after-visit summary." (Id. ¶ 18; see also Doc. 105-

17

39 at 21–35.) And at another appointment on October 25, 2018, Miles was given a "standard print billing statement and charity care application from UNC Physicians." (Doc. 103-4, ¶ 19; <u>see</u> Doc. 105-39 at 37–42; <u>see also</u> <u>id.</u> at 2.)

Ostensibly at his wits' end, Miles then sued UNCHCS on December 3, 2018, alleging that it had repeatedly violated federal disability laws by failing to provide him with large print documents. (Doc. 1.) Soon thereafter, UNCHCS began to regularly provide Miles with large print documents, including approximately 100 pages of such documents between October 2018 and May 2020. (<u>See</u> Doc. 105-39 at 229–323.) In fact, when asked at his February 2021 deposition whether it was "accurate that more often than not" he "receive[d] the After Visit Summaries in large print," Miles responded: "As of this last year, I would say yes." (Doc. 108-12 at 55.) On Miles's account, however, many of these documents suffered from various formatting barriers that, despite the large print, rendered them inaccessible to him. (Doc. 103-4 ¶ 20; <u>see</u> <u>id.</u> ¶¶ 20–21 (stating that such documents contained blurry icons, varying text sizes and text cases, columns, and colored text); <u>see</u> <u>also</u> Doc. 105-39 at 229–53 (copies of such documents).) For instance, following a January 2019 appointment with UNC Ophthalmology/Kittner Eye Center, Miles received (about a month later) "a partially enlarged print copy of the after-visit summary" (Doc. 103-4 ¶ 23), which he still could not access given several

18

formatting barriers (see id. (stating that icons, text size and case, columns, and color barriers rendered document inaccessible)).

Similarly, after an appointment at UNC Dermatology Center on January 30, 2019, Miles received a large print version of the after-visit summary a few days later, but it "contained the same formatting barriers described previously, including icons, text size and case, column, and color barriers." (Id. ¶ 24; see also Doc. 105-39 at 272-286 (copy of the after-visit summary).) The billing statement that Miles received from UNCHCS Hospital Services, dated May 8, 2020, is also illustrative of the type of large print documents Miles regularly received: although much of the document contains large font, some critical sections – including the coupon portion, where the recipient can enter his or her credit card information to pay the bill – appears in standard print (or perhaps smaller) font that is clearly inaccessible to Miles. (See Doc. 103-4 ¶ 27(b); see also Doc. 105-39 at 318-323 (copy of the document).)

On other occasions, however, UNCHCS did not provide Miles with large print documents at all, instead sending him home with standard print, inaccessible documents. As Miles explained in March 2021, he visited a UNCHCS provider "at least 35 more times" since the present lawsuit was filed in December 2018, and during that time:

19

[his] access to large print documents has not improved
much. When [he] check[s] in for [his] visit, [he]
continue[s] to be presented inaccessible standard print
documents to review and sign, to be provided standard
print after-visit summaries, and to receive inaccessible
standard print documents in the mail from [UNCHCS].

(Doc. 103-4 ¶ 27; see also id. (cataloging examples of standard
print or otherwise inaccessible bills, consent forms, intake
questionnaires, and after-visit summaries).)

Further, in his most recent declarations (dated August 2022
and January 2023, respectively) Miles presents evidence –
essentially uncontested by UNCHCS - that UNCHCS providers have
failed to provide him with accessible documents throughout 2021
and 2022. (See Doc. 151-3; Doc. 163-4.) Indeed, from April 1,
2021, to August 1, 2022, UNCHCS providers "repeatedly sent [Miles]
home with, or mailed to [him], inaccessible standard print
documents after [his] clinical encounters." (Doc. 151-3 ¶ 9; see
id. at 9-71.) And on the other occasions in which UNCHCS did send
large print documents to Miles, it took months to do so (id. ¶ 14,
16-17), which "delayed [Miles's] access to medication . . . and
denied [him] timely access to information provided by [his]
providers" (id. ¶ 19).

Most recently, in November 2022, when Miles visited UNC
Hospitals Pre-Procedure Services "to receive medical instructions
related to an upcoming surgery[,]" the "receptionist gave [him] a
standard print consent form to sign[,]" and when he requested large

20

print, she instead checked him in without having him sign the consent form. (Doc. 163-4 ¶ 9.) At the same appointment, Miles was provided a medical questionnaire that he contends, although in large print, was "unreadable" because of "the formatting; the document used dark print on top of grayish blocks instead of using a white background." (Id.) A week later, when Miles went in for surgery, "[t]he receptionist required [him] to sign a standard print consent form and a billing treatment notice that [he] could not read[.]" (Id. ¶ 10.) Finally, in December 2022, Miles "continued to receive difficult-to-read enlarged after-visit summaries from UNC Health Care." (Id. ¶ 12.) For example, in documents he received in December 2022, Miles claims, "[t]here are . . . many changes in the text size and text case that stresses [his] eyes and forces [him] to miss important medical information." (Id. ¶ 12; see id. at 6-27 (providing examples of such large print but reportedly difficult to read documents).)

Although his trips to UNCHCS are far less frequent, Dr. Scott reports a largely similar experience. In Dr. Scott's case, UNCHCS providers have, at various times, failed to provide him with "accessible written materials in Braille or electronic formats." (Doc. 103-14 ¶ 6.) Specifically, Dr. Scott recalls making such a request during a visit to UNC Family Medicine West on February 27, 2019, but "clinic staff informed [him] that they only provide documents in print and that if [he] wanted to review these

21

documents, [he] should ask a sighted person for assistance." (Id.)
There is no record, however, as to whether Dr. Scott requested
that a provider staff member read the document to him in private.
Similarly, during other visits to both UNC Family Medicine West
and Rex Laboratory Services, he contends he was presented "with
only standard print consent forms to sign" and never with Braille
or accessible electronic formats of these documents. (Id. ¶ 7.)
In these instances, Dr. Scott specifically notes that staff never
offered to read or summarize the contents of these documents to
him. (Id.)

Like Miles, Dr. Scott activated a UNC MyChart account several
years ago with the understanding that it would allow him "to review
[his] after-visit summaries and lab results in an accessible
electronic format." (Id. ¶ 9.) Although he "regularly use[s]" a
screen reader program (JAWS) "to access properly designed
electronic documents and websites[,] . . . the documents available
on [his] UNC MyChart account," at least as of March 2021, "were
not readable by JAWS[,] and [he] could not access any of the
information in these documents." (Id. ¶ 10.) Eventually, Dr.
Scott "asked UNC Family Medicine West to stop sending [him]
documents through UNC MyChart and [to] cancel [his] account because
it is inaccessible and useless to [him]." (Id. ¶ 11.) Instead,
Dr. Scott has requested that "UNC Family Medicine West" call "if
it has lab test results" for him. (Doc. 151-4 ¶ 13.)

On August 26, 2022, Michelle Fallon, the Practice Manager at UNC Family Medicine West, called Dr. Scott "to understand [his] communication needs and need for auxiliary aids and services" in anticipation of an upcoming appointment set for September 20, 2022. (Doc. 152-22 ¶ 5; see Doc. 163-5 ¶¶ 4-5.) During the call, Fallon "discussed with Dr. Scott the assistance that UNCHCS can provide to facilitate the compatibility of the [JAWS screen reader that Dr. Scott uses], [and] the provision of Word and Braille versions" of certain medical documents that Dr. Scott had requested. (Doc. 152-22 ¶¶ 5-6.) Additionally, Fallon provided Dr. Scott with her personal contact information should there be "anything more [she] can do to help accommodate his needs for any of his future appointments or services" at UNC Family Medicine West. (Id. ¶ 5.) During Dr. Scott's next visit to UNC Family Medicine West on September 20, 2022, he received "Braille documents." (Doc. 163-5 ¶ 4.)

However, when he visited the "UNC Rex Lab Draw Station" later that day to "have blood drawn," he was "required to sign a print consent form that [he] could not read." (Id.) Similarly, "about a week after these September 20, 2022 visits," Dr. Scott "attended a scheduled visit at Wake Radiology UNC Rex Healthcare" and was again "required to sign a print consent form during the visit that

23

[he] could not read[.]" (Id. ¶ 5.)[7] He also "did not receive any Braille or electronically accessible documents from the radiology practice during or after the visit." (Id.) Although Dr. Scott has "not visited any UNC Health Care clinics since September 2022," he plans "to continue relying on UNC Health Care for [his] health care needs" and is "concerned" that he "will not consistently receive Braille going forward" at any UNCHCS facility. (Id. ¶ 6.)

### b. UNCHCS's Response

During the course of this lawsuit and ostensibly in response to Plaintiffs' requested injunction, UNCHCS has, notwithstanding its failures to provide Miles and Dr. Scott consistently with requested accessible communications, taken extensive organizational steps toward improving how it provides meaningful access to effective communication for the disabled, including the blind.

Most notably, UNCHCS has implemented a workflow process in Epic "that places a 'hard stop' in the registration process that will not allow patient registration to continue unless and until [certain] screening questions are answered," including screening questions "that specifically inquire as to whether patients are sight impaired or blind, and whether patients need a Large Print

---

[7] Again, the record is unclear as to whether, on either of these occasions, Dr. Scott requested that a clinic staff member read the consent form to him in private.

24

or Braille Print accommodation." (Doc. 162 ¶ 8.) Thus, when a new patient registers at a UNCHCS facility for the first time, "new Hard Stops will appear in the Workflow section that now need[s] to be completed" by UNCHCS personnel before the registration process can continue. (Doc. 162-5 at 1-6; see also Doc. 163-13 at 1-6.) This process is designed to ensure that UNCHCS intake staff immediately denote any accommodation a disabled patient needs, irrespective of the clinic or location. (See Doc. 163-12 at 5.) To facilitate this process, UNCHCS provides staff with a "tip sheet." (See Doc. 162-5; Doc. 163-12 at 5 (explaining that the "Tip Sheet" is available to UNCHCS personnel on the intranet and "outlines the process of collecting ADA Accommodations").) This tip sheet, like the one that describes more generally how to add a Patient FYI Flag (see Doc. 162-1 at 22),

> explains the process for completing ADA fields for patients without disabilities in Epic, as well as the process for completing ADA fields for patients with disabilities, with instruction regarding hard stops now present in UNCHCS's Epic system that are designed to help prevent personnel from skipping past the collection and input of certain patient demographic data along with patient needs for auxiliary aids and services."

(Doc. 163-3 at 15; see Doc. 162-5.) UNCHCS has also developed a "script" for staff for use during the intake process when asking new patients about any accommodations they need. (Doc. 163-12 at 5.) The script includes "examples of words that are

25

unintentionally not helpful or could be perceived negatively when discussing accommodation needs with patients with disabilities." (Id.)

As a result of this specific change to UNCHCS's registration process, Plaintiffs modified their proposed injunction by excising the demand that UNCHCS "automatically prompt, through the electronic health records system, registration and scheduling staff to affirmatively ask all individuals registering for or scheduling appointments if they or their companion require an accessible format due to disability." (Doc. 151-15 ¶ 6(a)(i)). Now, the requested injunction simply asks that UNCHCS "continue" to do this. (Doc. 163-1 ¶ 5; see Doc. 163-2 ¶ 5.)

Similarly, in response to Plaintiffs' request to "post conspicuous notice" that UNCHCS provides accessible formats (Doc. 163-1 ¶ 7(d)), UNCHCS added to its website homepage a prominent footer (entitled "Accessibility") that links to its "Language & Accessibility Services" page. https://www.unchealth.org/about-us/equity-inclusion/language-accessibility-services/website-accessibility-statement (last visited June 22, 2023). (See also Doc. 163-9 ¶ 12.) This link, which is also accessible under the "Equity & Inclusion" footer on UNCHCS's homepage, explains that "[i]f you have trouble reading, written information is also available in . . . accessible electronic formats, audio, large print, [and] other formats." https://www.unchealth.org/about-

26

us/equity-inclusion/language-accessibility-services (last visited June 22, 2023) (bullet points omitted). Additionally, the webpage provides links to several common UNC Health Forms – including, importantly, a Notice of Privacy Practices, a Nondiscrimination Notice, and a General Consent to Treatment Form – in large print format, specifically in compliance with American Council of the Blind guidelines. (Id.) Finally, the webpage provides instructions and website tips to increase the size of fonts, while also noting that "[a]ll PDFs are accessible and compatible with most screen readers." (Id.)

Additionally, UNCHCS revised its Effective Communication Policy twice in 2022 "to link staff directly to the Language and Accessibility Services page and the large print documents available there." (Doc. 152 at 7; see also Doc 152-19 at 9 (adding "Resources" subsection which provides a link directly to "selected patient forms" available "in large font").) The Effective Communication Policy in place today – much like the policies first adopted in 2019 – also sets forth detailed procedures for communicating with patients with disabilities. (Compare Doc. 162-1 at 6-8 and Doc. 152-19 at 7-9 with Doc. 108-10 at 5-6 and Doc. 108-9 at 5-6.) Further, Section V of the policy – entitled "Procedure for Effective Communication for Patients with Disabilities" - tasks "[t]he Civil Rights Coordinator at each Network Entity covered by th[e] policy [with] providing

27

appropriate notice, training and monitoring of the Network Entity's ongoing compliance with [the policy's] requirements." (Doc. 162-1 at 6.)

The policy then obligates UNCHCS to "take appropriate steps to ensure that both oral and written communications with individuals with disabilities are as effective as communications with others," a "duty [that] extends to 'companions' of the patient if it will impact the patient's care (e.g., a parent who is deaf when the patient is a child)." (Id. at 7.) Section V further contemplates that UNCHCS will (i) "promptly assess the individual needs of a patient at the time of registration" and (ii) record communication disabilities, as well as requested auxiliary aids and services, "in the electronic medical record as set forth in Section V.C.1 and 2 below." (Id.)

Most recently, UNCHCS updated the Effective Communication Policy in December 2022 to "expand the policy's applicability to each of the [twelve] entities displayed on the first page of the further revised policy." (Doc. 162 ¶ 5; see Doc. 162-1 at 1 (listing entities to which the Effective Communication Policy applies).) As UNCHCS explains, the Effective Communication Policy "previously applied only to the UNC Medical Center, which includes all UNC Hospitals' facilities and the clinical patient care programs of the School of Medicine of UNC-Chapel Hill[,]" but now, the policy is "applicable to UNC Health Care System/UNC Medical

28

Center, UNC Physicians Network, UNC Physicians Network Group Practices/UNC Physicians Group Practices II, Rex Healthcare/Rex Hospital, Chatham Hospital, Caldwell Memorial Hospital, UNC Rockingham Health Care/UNC Rockingham Hospital, Johnston Health, [Lenoir] Memorial Hospital, and Wayne Memorial Hospital." (Doc. 163-3 at 14.)

UNCHCS is also taking several other steps to comply with federal disability laws. For instance, it has recently "developed a revised Training Module regarding providing culturally competent care which includes targeted employee training on UNCHCS's new website for accessibility resources and tools to help patients, effective communication with patients and companions, access for patients and individuals with disabilities under Title II and Sections 504 and 1557, provision of auxiliary aids and services, and identification of individuals with communication disabilities in Epic." (Doc. 162 ¶ 6; see Doc. 162-2 at 1-88 ("2023 HCS Providing Culturally Competent Care").) As part of this effort, UNCHCS has also created several "tip sheets" for employees that provide "specific step-by-step instructions for performing tasks both within and using Epic . . . and that specifically relate to providing effective communication, including timely provision of auxiliary aids and services, to patients." (Doc. 162 ¶ 7.)

For example, UNCHCS now provides its personnel a tip sheet for printing after-visit summaries and patient statements in large

29

font through manual and automated processes. (Doc. 163-7 at 1; see Doc. 162-3 (tip sheet detailing, step-by-step, how to print the after-visit summary in large font and set up statements for the patient to receive in large font).) UNCHCS has also created a tip sheet for clinicians that "explains where clinicians can see the accommodations by hovering over the FYI flag in the storyboard, how to add an FYI flag for sight impaired patient needs, how to add additional information to further explain patient auxiliary aid or service needs, and how to edit or deactivate FYI flags." (Doc. 163-7 at 2; see Doc. 162-4.) This tip sheet is designed specifically so that, "[a]s clinical staff continue to care for the patient [after registration,] . . . documentation concerning accommodations may . . . be added or modified." (Doc. 162-4 at 1.)

## B. Procedural Background

On December 3, 2018, John Bone, Miles, NFB, and DRNC brought this action against UNCHCS and Nash Hospitals, Inc. ("Nash"), a non-profit hospital affiliate of UNCHCS. The complaint was amended thereafter (Doc. 18) and alleged that UNCHCS denied "blind individuals an equal opportunity to access their health care information" in violation of Titles II and III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, 12181-12189, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"), and Section 1557 of the Patient

30

Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557" of the "ACA") (collectively, the "Acts"). (Doc. 1 ¶ 1; accord Doc. 18 (amended complaint) ¶ 1). Plaintiffs alleged that UNCHCS, Nash, and their contractors violated federal law by "depriv[ing] blind individuals of full and equal access to their medical services, programs, and activities." (Doc. 18 ¶ 3.) Specifically, Plaintiffs alleged that UNCHCS and Nash regularly "provide critical communications, such as health care notices, visit summaries, follow-up instructions, forms, questionnaires, invoices, and other types of documents, only in standard print, a format inaccessible to blind individuals." (Doc. 18 ¶ 3.) Further, Plaintiffs alleged that "[w]hen blind patients . . . requested accessible alternative formats such as Braille or large print, [UNCHCS], Nash, and their providers . . . routinely failed to provide them." (Id.) Bone, for instance, alleged that Nash repeatedly sent him medical bills in print, despite his request that they be sent in Braille. (Id. ¶¶ 15-21.) Similarly, Miles alleged that, despite his repeated requests that UNCHCS provide him all documents in large print, it routinely provided him with standard print documents he could not read. (Id. ¶¶ 23-26.)

Soon thereafter, UNCHCS (and former Defendant Nash) each moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docs. 20, 28.) The motion was referred to the Magistrate Judge, who recommended that

31

it be granted in part and denied in part. (Doc. 44 at 1.) As to the claims against UNCHCS, the Magistrate Judge recommended that the court deny the motion to dismiss entirely, concluding that Miles, Bone, NFB, and DRNC had plausibly stated a claim. (Id. at 14-24, 40-46, 51.) As to the claims against Nash,[8] however, the Magistrate Judge recommended dismissal of all but Bone's claims for damages, concluding that neither Bone, NFB, nor DRNC had standing to pursue future-looking injunctive relief against Nash. (Id. at 32, 37-38, 50-51.) On March 5, 2020, this court adopted the Magistrate Judge's recommendation, thereby dismissing all Title III claims against Nash, but otherwise allowing Plaintiffs' other claims to proceed. (Doc. 57 at 1-3.)

UNCHCS later moved for judgment on the pleadings (Doc. 68), relying in large part on arguments made in its motion to dismiss. (See, e.g., Doc. 98 at 20-21 (comparing arguments).) The Magistrate Judge recommended that the motion be denied (id. at 1), and this court adopted that recommendation (Doc. 106). Meanwhile, Bone, NFB, and DRNC settled all claims for damages against Nash, resulting in Nash's dismissal from this lawsuit. (See Docs. 96, 97.)

Plaintiffs and UNCHCS subsequently filed cross-motions for summary judgment (see Doc. 103, 107, 109, 111, 112), and the

_____

[8] Plaintiff Miles did not bring any claims against Nash. (See Doc. 44 at 24; Doc. 96 at 1.)

32

Magistrate Judge issued a detailed opinion recommending that the parties' motions be granted in part and denied in part "such that th[e] action shall proceed to trial on the issues of deliberate indifference and damages." (Doc. 125.)

Shortly thereafter, but before this court had reviewed the Magistrate Judge's recommendation, the parties settled all remaining damages claims against UNCHCS, which resolved all damages claims in the case. (Doc. 146.) Pursuant to the settlement, Miles and Bone stipulated to a voluntary dismissal with prejudice of their claims for damages (Doc. 147 at 1), and UNCHCS stipulated that "a violation of the ADA occurred during the period between October 2016 and October 2018." (Doc. 146 ¶ 7.) Because Bone settled each of his remaining claims, he is no longer a party to this case.[9] (See Doc. 44 at 37; Doc. 57 at 2-3.)

On August 12, 2022, the remaining Plaintiffs, Miles, NFB, and DRNC, filed a motion for a permanent injunction. (Doc. 151.) UNCHCS responded in opposition (Doc. 152), and Plaintiffs replied (Doc. 153). On December 14, 2022, the court heard oral argument on Plaintiffs' motion and instructed the parties to file a joint status report outlining their respective positions as to whether they contended that a permanent injunction was still warranted,

---

[9] The court previously held that Bone lacked standing to pursue forward-looking injunctive relief because he failed to establish that he would return to any UNCHCS or Nash facility. (See Doc. 44 at 37; Doc. 57 at 2-3.) Plaintiffs do not contest that conclusion.

33

and if so then on what grounds, in light of the changes to certain policies and practices that UNCHCS reported it made shortly before the hearing.  As the parties were unable to come to any agreement, (Doc. 163), the motion for permanent injunction is ready for decision.

### C.  Nature of the Relief Sought

Plaintiffs contend they are entitled to injunctive relief "requir[ing] significant reforms across the entire UNCHCS network to ensure that no matter which 'UNC Health' provider Mr. Miles, Dr. Scott, and other NFB and DRNC members and constituents encounter, a functioning system is in place providing equally effective communication for blind individuals."  (Doc. 151-1 at 17.)  Specifically, Plaintiffs seek an order that UNCHCS do the following:

> (1)  Not exclude individuals with disabilities, including Plaintiffs, from participation in, or deny them the benefits of, its services, programs, or activities, or subject individuals with disabilities to discrimination, including with respect to UNCHCS's communications, including print, electronic, and website communications.

> (2)  Not deny individuals with disabilities, including Plaintiffs, an equal opportunity to participate in or benefit from aids, benefits, or services, or provide an aid, benefit, or service that is not as effective in affording equal opportunity to gain the same result or benefit as provided to others with respect to UNCHCS's programs, services, and activities.

> (3)  Take necessary and timely steps to ensure that it furnishes appropriate auxiliary aids and services

34

where necessary to afford individuals with
disabilities, including Plaintiffs, an equal
opportunity to participate in, and enjoy the
benefits of, the services, programs, and activities
of UNCHCS.

(4)  Not discriminate against individuals, including
Plaintiffs, because such individuals oppose any act
or practice made unlawful by the ADA, Section 504,
or Section 1557, and shall not coerce, intimidate,
threaten, or interfere with any individual in the
exercise or enjoyment of, or on account of his or
her having exercised or enjoyed, or on account of
his or her having aided or encouraged any other
individual in the exercise or enjoyment of, any
right granted or protected by the ADA, Section 504,
or Section 1557.

(5)  Continue to automatically prompt, through the
electronic health records system, registration and
scheduling staff to affirmatively ask all
individuals registering for medical care or
scheduling an appointment if they or their
companion require an accessible format due to
disability.

(6)  Within 28 days of this Order, confer with
Plaintiffs in an attempt to reach agreement on an
expert or experts whom UNCHCS shall engage to
assist it in implementing this Order and report to
the Court on which expert or experts the Parties
have selected. If the parties are unable to reach
agreement on an expert, Plaintiffs and Defendants
shall each propose experts to the Court and the
Court will make the selection.

(Doc. 163-1 ¶¶ 1-6.)

Plaintiffs also propose that UNCHCS take the following steps

within six months:

a. Ensure that it records and complies with all requests
by blind individuals for print communications, including
both paper and electronic communications, in accessible
alternative formats, including but not limited to

35

Braille, large print, audio, or digital navigable formats.

b. Ensure that the accessible formats it provides conform to established, recognized guidelines for accessible document design for each format type, for example:

> i. For digital formats: Web Content Accessibility Guidelines 2.1 ("WCAG 2.1"), https://www.w3.org/TR/WCAG21, Level A and Level AA Success Criteria;

> ii. For large print documents: Clear Print Accessibility Guidelines, https://www.cnib.ca/sites/default/files/2020-08/Clear%20Print%20Guidelines%202020.pdf, or the American Printing House for the Blind's Guidelines for Print Document Design, https://www.aph.org/aph-guidelines-for-print-documentdesign; and

> iii. For Braille documents: industry standards for Braille transcription by a certified Braille transcriber.

c. Issue or revise existing policies to the extent necessary to implement prompt production of standard print communications in the alternative format requested. Such policies shall include provisions:

> i. Extending deadlines to respond to documents for which an accessible format is requested by at least the same number of days it took UNCHCS to satisfy the accessible format request (if the request for accessible format was not immediately satisfied the same day it was made); and

> ii. Clarifying that, if a blind individual does not submit a required payment by the deadline for such payment, that blind individual shall not be responsible for fees related to the late payment or be sent to collections if they did not receive the same amount of billing notice in an accessible format as is granted to sighted individuals.

36

d. Post conspicuous notice, on the UNC Health website homepage, https://www.unchealthcare.org, for a period of one calendar year from the date the notice is first posted, that UNCHCS provides accessible formats, including Large Print, Braille, and accessible electronic documents, to individuals with visual impairments on request and identify an individual or department within UNCHCS, along with contact information, with whom individuals can communicate regarding a request for an accessible format.

e. Establish a process through which UNCHCS shall solicit, receive, and address complaints and feedback from the public and patients regarding the provision of accessible formats to individuals with disabilities.

(Doc. 163-1 ¶ 7.) Additionally, Plaintiffs have requested that the court mandate that UNCHCS and its affiliates do the following within twelve months:

a. Implement changes to its electronic health records system, and/or any subsequent health records system adopted during the period this Court retains jurisdiction over this case, and any other processes and procedures to:

i. Develop a simplified and uniform process to add a notification of the requested accessible format in the electronic health records system that will include the creation of a separate demographic field to identify communication disabilities and need for accessible format (such as the one currently in use for limited English proficiency patients), and a drop-down menu of available accessible formats. The electronic health records system shall prominently display the requested accessible format in the patient's electronic health record, such that all staff viewing the electronic health record are likely to see the notification;

ii. Ensure that once a blind individual has requested an accessible format, all future documents are automatically delivered to that individual in their requested accessible format,

37

without the need for subsequent requests or manual intervention by staff, through an automated accessible document generation process;

iii. Ensure that when a blind individual with a recorded need for an accessible format schedules an appointment at least four business days in advance (for those requesting Braille) or at least two business days in advance (for those requesting all other accessible formats), all "forms," i.e., documents provided during the appointment that do not vary in content based on the individual recipient (such as patient history and informed consent forms, as well as standard patient notices), are offered in the requested accessible format at the time of their appointment;

iv. Ensure that all print communications provided during a clinical encounter that have content that varies based on the individual recipient (such as after-visit summaries and patient statements) are provided in an accessible format:

> 1. At the time of the appointment, for individuals who have requested large print and accessible digital navigable formats; or

> 2. For all other accessible format requests, as soon as is practicable, which ordinarily will be within two business days after the appointment;

v. In cases where a print communication is not immediately available to an individual in their requested accessible format at the time of the clinical encounter, ensure they are offered an alternative method of accessing the communication at the time of the appointment (such as by reading the communication to the individual in a private location or offering a digital navigable format) that best maintains the blind individual's privacy and independence;

vi. Ensure that all print communications provided to patients before or after clinical encounters are provided or sent to blind individuals in their

38

requested accessible formats on the same day that such print communication would have been provided or sent, or was provided or sent, in standard print to a sighted individual, except that if Braille is the requested accessible format, the Braille communication shall be sent within four business days of when that communication would have been provided or sent, or was provided or sent, in standard print to a sighted individual; and

vii. Ensure that, for individuals who request large print or accessible digital formats, documents available through their UNC MyChart accounts are in their requested formats;

b. Train all persons having the ability to place notifications in the electronic health record system regarding the proper process to create a notification accurately denoting an individual's requested accessible format and provide any other training necessary to ensure proper implementation of effective communication policies and processes required by this Order. . . .

(Id. ¶ 8.)

Finally, Plaintiffs propose that (i) UNCHCS "[e]nsure that the above provisions are applied and implemented at all entities within the UNCHCS network, whether owned by UNCHCS or managed by UNCHCS"[10] (id. ¶ 9), (ii) UNCHCS submit status reports to the court every six months (see id. ¶ 10(a)-(e)) (listing contents of proposed reports)), and (iii) the court retain jurisdiction over this action for three years to monitor UNCHCS's compliance with the proposed injunction (id).

---

[10] Plaintiffs also request an order that, "[i]f an entity managed by UNCHCS refuses to comply with the requirements set forth [above], UNCHCS must cease its management contract or modify the terms of the management contract with said entity as necessary to remain in compliance." (Doc. 163-1 ¶ 9.)

39

## II.  ANALYSIS

### A.  Legal Standard

Because Plaintiffs seek a permanent injunction, they must first demonstrate "actual success" on the merits rather than a mere "likelihood of success" required to obtain a preliminary injunction. Mayor of Balt. v. Azar, 973 F.3d 258, 274 (4th Cir. 2020). Plaintiffs must then demonstrate that (1) they have suffered "an irreparable injury"; (2) the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); see Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (articulating similar test for preliminary injunctions). "[A]ll four requirements must be satisfied." Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010).

"A court should not impose an injunction lightly, as it is 'an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth., 771 F.3d 201, 207 (4th Cir. 2014) (quoting Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184,

40

188 (4th Cir. 2013) (en banc)). It is also well-established that any injunction must be narrowly tailored to the facts of the case. See PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 128 (4th Cir. 2011). An injunction is narrowly tailored when it is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Id. (citing Kentuckians for Commonwealth, Inc. v. Rivenburgh, 317 F.3d 425, 436 (4th Cir. 2006)).

If the court determines that permanent injunctive relief may be appropriate, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." Schmidt v. Lessard, 414 U.S. 473, 476 (1974). Accordingly, pursuant to Federal Rule of Civil Procedure 65, the injunction must describe with reasonable detail the acts prohibited or required. See Superior Performers, Inc. v. Thornton, No. 1:20-CV-00123, 2021 WL 2156960, at *9 (M.D.N.C. May 27, 2021.); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2955 (3d ed. 2013) ("Wright & Miller")("The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.").

As part of its settlement with Bone and Miles, UNCHCS stipulated that "for the limited purposes of resolution and Plaintiffs' request to the court to issue injunctive relief," "a

41

violation of the ADA occurred during the period between October 2016 to October 2018."  (Doc. 146 ¶ 7.)  This demonstrates actual success on the merits.  As such, the court must consider the four equitable factors identified by the Supreme Court to determine the appropriateness of injunctive relief.

### B.  Permanent Injunction Factors

#### 1.  Irreparable Harm

First, Plaintiffs must show irreparable harm.  While irreparable harm is only one of the four factors the court must consider in determining whether to grant injunctive relief, it is a necessary predicate irrespective of whether the other factors are shown.  SAS Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 386 (4th Cir. 2017) ("[R]egardless of the other factors, 'the equitable remedy of an injunction is unavailable absent a showing of irreparable injury'" (alterations omitted) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983))).  Given that UNCHCS stipulated to violating the ADA during the period from October 2016 to October 2018 (Doc. 146 ¶ 7), Plaintiffs clearly suffered irreparable harm in the past.

The question here, however, is whether Plaintiffs have established a concrete threat of future injury, and if so, to what extent; indeed, there would be little reason to enjoin conduct permanently that caused injury if it will not happen again.  As the Supreme Court has explained, "irreparable injury" is "a

42

requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." Lyons, 461 U.S. at 111; see also Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 162 (2010) ("A permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm." (emphasis added)).

Thus, regardless of any irreparable harm Plaintiffs have previously incurred, a permanent injunction will not issue unless there is reason to believe that future injury would constitute irreparable harm. See Keener v. Convergys Corp., 342 F.3d 1264, 1269 (11th Cir. 2003) ("Permanent injunctive relief requires . . . continuing irreparable injury" (emphasis added)); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997) ("To show irreparable harm [for purposes of permanent injunction], the party seeking injunctive relief must at least demonstrate 'that there exists some cognizable danger of recurrent violation' of its legal rights." (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953))); Millennium Funding, Inc. v. Doe, No. 121CV282RDATCB, 2021 WL 5217018, at *13 (E.D. Va. Oct. 15, 2021) (explaining that "permanent injunctive relief is appropriate" where "plaintiff . . . has demonstrated that it has suffered - and will continue to suffer - irreparable harm"); Palmetto Conservation Found. v. Smith, 642 F. Supp. 2d 518, 531 (D.S.C. 2009) ("The Foundation has suffered and will continue to suffer irreparable harm if the

[permanent] injunction is not issued"); <u>Reaching Hearts Int'l,</u> <u>Inc. v. Prince George's Cty.</u>, 584 F. Supp. 2d 766, 795 (D. Md. 2008) ("RHI has suffered and will continue to suffer irreparable harm in the absence of a permanent injunction."), <u>aff'd</u>, 368 F. App'x 370 (4th Cir. 2010).

At the same time, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," <u>O'Shea</u> <u>v. Littleton</u>, 414 U.S. 488, 496 (1974), and thus current compliance with the law does not necessarily preclude the entry of a permanent injunction. <u>See</u> <u>W.T. Grant Co.</u>, 345 U.S. at 633. But even so, the irreparable injury analysis focuses primarily on the likelihood of future misconduct, and past harm is "far from dispositive on the question of irreparable future harm." <u>SAS</u> <u>Inst.</u>, 874 F.3d at 386. After all, it is a basic principle of equity that entry of a permanent injunction is appropriate only if the movant establishes that it is currently under imminent threat of suffering <u>further harm</u> in the absence of the injunctive relief sought. <u>See</u> <u>Rondeau v. Mosinee Paper Corp.</u>, 422 U.S. 49, 59 (1975) ("[T]he usual basis for injunctive relief [is] that there exists some cognizable danger of recurrent violation." (internal quotation marks omitted)); <u>Belk v. Charlotte-Mecklenburg Bd. of</u> <u>Ed.</u>, 269 F.3d 305, 347 (4th Cir. 2001)("Before a court grants a permanent injunction, the court must first find necessity - a danger of future violations."); <u>SAS Inst.</u>, 874 F.3d at 385

44

("Injunctions by their nature attempt to anticipate the future[.]").[11]

Whether Plaintiffs have established the likelihood of future irreparable harm thus depends on whether they have met their burden of proving some "cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  W. T. Grant Co., 345 U.S. at 633; see CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 654 F.3d 276, 284-85 (2d Cir. 2011) ("The usual basis for prospective injunctive relief is not only irreparable harm, which is required for all injunctions, but also some cognizable danger of recurrent violation." (citations and internal quotation marks omitted)).  In this circumstance, the

---

[11] Accordingly, to the extent Plaintiffs argue that the court should simply presume future irreparable injury based solely on previous violations of the ADA (Doc. 151-1 at 7-8), they are incorrect.  See Metro Treatment of Maine, LP v. City of Bangor, No. 1:16-CV-00433-JAW, 2016 WL 6768929, at *12 (D. Me. Nov. 15, 2016) (expressing skepticism that courts should presume irreparable harm from the very fact that a civil rights statute was previously violated and concluding that the "court cannot dispense with the irreparable harm requirement, even in the context of civil rights statutes"); Davis v. Flexman, 109 F. Supp. 2d 776, 783 (S.D. Ohio 1999)("When a request for injunctive relief" under the ADA "is based upon a past wrong, a plaintiff must show a real or immediate threat that the plaintiff will be wronged again - a likelihood of substantial and immediate irreparable injury." (internal quotation marks omitted)); see also Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 216 (3d Cir. 2014) ("[A] presumption of irreparable harm deviates from the traditional principles of equity.").  In any event, this argument appears to matter little to Plaintiffs' theory of the case, as their primary contention is that UNCHCS's "federal law violations, and their resulting irreparable harm, continue to this day." (Doc. 151 at 10 (emphasis added); see Doc. 163 at 7 ("[A]bsent an injunction, [UNCHCS] will continue its haphazard and ineffective efforts to communicate with blind individuals and will continue violating federal law.").)

45

Supreme Court has made clear that plaintiffs have the burden of "satisfy[ing] the court that relief is needed." W.T. Grant Co., 345 U.S. at 633; see Porter v. Clarke, 923 F.3d 348, 364 (4th Cir. 2019). Where the record discloses "no significant threat of future violation," W.T. Grant Co., 345 U.S. at 635, the plaintiff fails to carry its burden of establishing that injunctive relief is warranted. "In a discrimination case, an injunction is most appropriate when [the defendant] has failed to adequately remedy the discrimination and prevent its recurrence." Reyazuddin v. Montgomery Cnty., Maryland, 754 F. App'x 186, 192 (4th Cir. 2018) (unpublished) (citing United States v. Gregory, 871 F.2d 1239, 1247 (4th Cir. 1989); United States v. Fairfax Cnty., Va., 629 F.2d 932, 941 (4th Cir. 1980)).[12]

In determining the threat of irreparable injury, and in turn the appropriateness of injunctive relief, the relevant inquiry here thus primarily concerns whether Plaintiffs have shown that UNCHCS threatens to violate their statutory rights under the Acts, a point the parties vigorously dispute.

UNCHCS argues that injunctive relief is not warranted for the simple reason that it "complies with Title II of the ADA and Sections 504 and 1557." (Doc. 163 at 26.) UNCHCS also contends

---

[12] Unpublished decisions of the Fourth Circuit are not precedential but are cited for the persuasive authority of their reasoning. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

46

that, to the extent it failed to comply in the past, its voluntary corrective measures have vitiated the need for the sweeping injunctive relief Plaintiffs seek. (Id. at 30 ("Plaintiffs fail to establish an ongoing harm necessitating injunctive relief.").) Plaintiffs, in turn, maintain that UNCHCS continues to violate the Acts, and therefore that injunctive relief is required to bring UNCHCS in compliance with federal law. (See, e.g., id. at 8 ("Because UNCHCS's processes and procedures still do not ensure effective communication with blind individuals, this Court should enter an injunction to ensure UNCHCS makes necessary changes and is accountable if it fails to do so.").)

Taken together, the Acts prohibit the exclusion of individuals with disabilities from the services, activities, and programs, including health programs, of entities receiving public funding. See Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012) (explaining that the ADA and Section 504 both "require a plaintiff to demonstrate the same elements to establish liability"); Basta v. Novant Health Inc., 56 F.4th 307, 314-15 (4th Cir. 2022) (adopting same standards for Section 504 claims as apply to Section 1557). To prevail, a disabled person must prove that he or she was excluded from participation in or denied the benefits of the hospital's services, programs, or activities, or otherwise was discriminated against on account of his or her disability. See Basta, 56 F.4th at 315; Nat'l Fed'n of

47

the Blind v. Lamone, 813 F.3d 494, 502-03 (4th Cir. 2016).[13]  Such

an unlawful denial occurs if a public entity refuses "to make

'reasonable modifications' . . . to enable disabled persons to

receive services or participate in programs or activities."

Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d

474, 488 (4th Cir. 2005) (discussing Title II and quoting 42 U.S.C.

§ 12131(2)); see Basta, 56 F.4th at 315 (explaining that one way

to prove discrimination on the basis of disability under Section

504 of the Rehabilitation Act is "by showing that a hospital failed

to adequately accommodate a [disabled] individual by providing

ineffective auxiliary aids").  Reasonable modifications, or what

are more commonly called "accommodations,"[14] include those

reasonably necessary to provide "meaningful access" to a public

service.  Koon v. North Carolina, 50 F.4th 398, 406 (4th Cir. 2022)

(quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)); see Basta,

---

[13] UNCHCS does not dispute that Miles and Scott are disabled and otherwise "qualified" to receive the benefits of a public service, program, or activity.  See Lamone, 813 F.3d at 503 ("To make out a violation of Title II, plaintiffs must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." (citation omitted)).

[14] The parallel regulation under the Rehabilitation Act uses the term "accommodation" rather than "modification," see 28 C.F.R. § 41.53, "but there is no material difference between the terms[,]" Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 145 n.6 (1st Cir. 2014).  The Fourth Circuit also appears to use the terms interchangeably.  See, e.g., Koon, 50 F.4th at 405; Lamone, 813 F.3d at 503 n.5; A Helping Hand, LLC v. Baltimore Cnty., MD, 515 F.3d 356, 362 (4th Cir. 2008).

48

56 F.4th at 315 (discussing Section 504); Pollack v. Reg'l Sch. Unit 75, 886 F.3d 75, 80-81 (1st Cir. 2018) (explaining that Title II of the ADA's "protection is characterized as a guarantee of meaningful access to government benefits and programs" (internal quotation marks omitted)).

The Executive Branch "has issued regulations which further define what meaningful access requires." Basta, 56 F.4th at 315 (citations omitted) (discussing regulations under the Rehabilitation Act). These regulations warrant the court's respect. Id. (citing A Helping Hand, LLC v. Baltimore Cnty., MD, 515 F.3d 356, 362 (4th Cir. 2008)).[15] With regard to communication-

---

[15] The Supreme Court has never decided whether these regulations are entitled to full deference under Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 844 (1984). See A Helping Hand, 515 F.3d at 362; accord Lange v. City of Oconto, 28 F.4th 825, 838 n.3 (7th Cir. 2022). At a minimum, though, the Supreme Court has said that the "well-reasoned views" of the Department of Justice, as the agency charged with implementing Title II of the ADA, "warrant respect" and "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 598 (1999) (internal quotation marks omitted). For that reason, the Fourth Circuit has consistently relied on the duly enacted regulations implementing both the ADA and the Rehabilitation Act when interpreting the meaning of certain statutory terms. See Basta, 56 F.4th at 315 (regulations implementing the Rehabilitation Act "warrant respect by this court" (internal quotation marks omitted)); Koon, 50 F.4th at 405 (ADA regulations "add further clarity" to statutory meaning); A Helping Hand, 515 F.3d at 362 ("These regulations provide further guidance interpreting many of the provisions of Title II."). Accordingly, deference to the Acts' implementing regulations is appropriate when considering whether UNCHCS is complying with the underlying statutory mandates. See Dee v. Maryland Nat. Capitol Park & Plan. Comm'n, No. CIV.A. CBD-09-491, 2010 WL 3245332, at *3 n.4 (D. Md. Aug. 16, 2010). Moreover, and for the same reasons, UNCHCS's suggestion that the regulations impose an obligation beyond that of the controlling statute is misplaced. (See Doc. 152 at 17-19.)

related disabilities, ADA regulations provide that public entities "take appropriate steps to ensure that communications with . . . members of the public ... with disabilities are as <u>effective</u> as communications with others[,]" 28 C.F.R. § 35.160(a)(1) (emphasis added), and to "furnish appropriate auxiliary aids and services <u>where necessary to afford</u> individuals with disabilities . . . <u>an equal opportunity</u> to participate in, and enjoy the benefits of, a service, program, or activity of a public entity[,]" <u>id.</u> § 35.160(b)(1)(emphases added). <u>See</u> <u>Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.</u>, 673 F.3d 333, 339 (4th Cir. 2012) (looking to regulations under the ADA to determine the meaning of a reasonable accommodation).[16]

As these regulations make clear, "[t]he hallmark of a reasonable accommodation is <u>effectiveness</u>." <u>Wright v. New York State Dep't of Corr.</u>, 831 F.3d 64, 73 (2d Cir. 2016) (quotation omitted and emphasis added). Accommodations may be reasonable even if they are not "best practices." <u>Seremeth,</u> 673 F.3d at 340. Accordingly, "a reasonable accommodation need not be perfect or

---

[16] Similarly, regulations implementing the Rehabilitation Act oblige recipients of federal funds to "[e]nsure that communications with their applicants, employees and beneficiaries are <u>effectively</u> conveyed to those having impaired vision and hearing." 28 C.F.R. § 42.503(e) (emphasis added). The ACA's regulations are much the same. <u>See</u> 45 C.F.R. § 92.102(a) (requiring covered entities to "take appropriate steps to ensure that communications with individuals with disabilities are <u>as effective as communications with others</u> in such programs or activities, in accordance with the standards found at 28 [C.F.R. §§] 35.160 through 35.164" (emphasis added)).

50

the one most strongly preferred by the plaintiff," Wright, 831 F.3d at 72 (internal quotation marks, brackets, and citations omitted), so long as it is effective enough to "afford handicapped persons equal opportunity to gain the same benefit[s]." Loye v. Cnty. of Dakota, 625 F.3d 494, 499 (8th Cir. 2010) (internal quotation marks, alterations, and citation omitted). Equal opportunity, however, does not guarantee equal results or preferential treatment. See Choate, 469 U.S. at 304 (noting that while Section 504 of the Rehabilitation Act "seeks to assure evenhanded treatment" and "opportunity for handicapped individuals" it "does not guarantee the handicapped equal results"). What constitutes a reasonable accommodation "is a question of fact and will vary according to the circumstances." Seremeth, 673 F.3d at 340 (citing Pandazides v. Va. Bd. of Educ., 13 F.3d 823, 833 (4th Cir. 1994)).

As stated above, Miles has been a UNCHCS patient for over twenty years and has visited dozens of different UNCHCS facilities to receive care. (Doc. 103-4 ¶¶ 11-12.) Because he is legally blind, Miles has routinely asked UNCHCS to provide him certain health-care documents – namely after-visit summaries, billing statements, and the like - in large print format. (Id. ¶ 13.) As Miles has explained, he presently requires large print documents with size 18-point font or greater because anything less (although previously sufficient) now "generally appears as a blur" and he

51

"cannot see the individual letters [or] ascertain if there are columns or tables[.]" (Doc. 151-4 ¶¶ 4-5.)

Yet the record clearly supports Miles's assertion that, nearly five years into this litigation, his access to large print documents "has not improved much." (Doc. 103-4 ¶ 27.) From September 2018, when Miles's counsel first contacted UNCHCS, through March 2021, when the parties filed cross motions for summary judgment, Miles visited a UNCHCS provider on at least 35 different occasions and was provided with 42 different standard print documents, totaling roughly 200 pages. (See Doc. 105-39 at 2-5 (providing index of such documents) and 6-228 (providing copies of such documents); see also Doc. 103-4 ¶ 27 (Miles's March 2021 declaration).) And from April 2021 to August 2022 (when Plaintiffs moved for a permanent injunction (Doc. 151)), Miles visited UNCHCS 13 more times yet was again "repeatedly" provided with inaccessible standard print documents. (Doc. 151-3 ¶ 9; see Doc. 151-3 at 10-71 (providing copies of such documents).) Finally, in the period between August 2022 and December 2022 (when the court heard oral argument for the first time), UNCHCS yet again provided Miles with standard print documents on three separate occasions. (Doc. 163-4 ¶¶ 9-11.)

To be sure, UNCHCS has on some occasions provided Miles with large print documents (see, e.g., Doc. 105-39 at 228-323), but these documents are often inaccessible to Miles for other obvious

52

reasons. (See Doc. 103-4 ¶ 20 (describing the various ways that the large print documents are still inadequate).) Illustrative is the billing statement Miles received following an appointment on May 18, 2020. (Doc. 105-26 at 182-187.) Clearly, much of the document is in large print. Yet crucially, the payment stub (i.e., the place where Miles is to enter credit-card information to pay the bill by mail) contains small print obviously inaccessible to him. (Id. at 182; see also Doc. 105-10 at 13-19.) Similarly, the address change and change of insurance sections, on the following page, clearly appear in small print. (Doc. 105-26 at 183.) Although Plaintiffs have a retained expert in document accessibility (see Doc. 105-26 at 3-14), it is readily apparent why these documents (among many others) are insufficient for someone with Miles's vision problems.[17] And there are other documents in the record that are similarly afflicted. (See, e.g., Doc. 105-26 at 95-126 (hospital billing statements containing mixture of 12-point, 14-point, and 16-point font), Doc. 105-39 at 201-208 (after-visit summary dated August 8, 2020, containing mixture of large and small print), Doc. 151-3 at 59-61 (medication instructions containing mix of large and small print).) Indeed,

---

[17] In addition to complaining about the font-size, Miles contends that certain large print documents UNCHCS provides are inaccessible because they contain column formatting and color schemes that make them difficult to read. (See Doc. 103-4 ¶ 20(c), (d).) However, UNCHCS is not necessarily required to provide Miles with each and every formatting request he desires, so long as it provides him with "meaningful access" to the benefit he seeks. Choate, 469 U.S. at 301.

UNCHCS itself put into the record – ostensibly as evidence of its updated large print template – a sample billing statement that contains the exact same problem described above. (See Doc. 163-9 ¶ 13 ("A sample large-print bill is attached[.]"); Doc. 163-15 (large print billing statement dated January 26, 2023).)[18]

When UNCHCS has provided Miles with large print documents – even assuming those documents are fully accessible – some have not arrived "for days, weeks, months, or even years after [his] healthcare visit[s]." (Doc. 103-4 ¶ 26). For example, in September 2020, Miles received after-visit summaries from UNC Hospitals Diabetes and Endocrinology relating to visits in September 2018 and April 2019, as well as a consent form relating to a sleep study from March 2019. (Id. ¶ 25.) On another occasion, following a visit to UNC Orthopedics, several weeks elapsed before Miles received a "large print copy of instructions for exercises" he was told to do at home, which "delayed [his] ability to do the exercises[.]" (Id. ¶ 27.) More recently, in March 2022, Miles "contacted UNC Health Care's Billing Department and requested large print copies" of his medical bills for 2021 (Doc. 151-3 ¶ 14), but UNCHCS apparently did not mail them until September 2022, nearly six months after Miles made the request (Doc. 152-1

---

[18] UNCHCS also put into the record what it proffered as a "sample" large-print after-visit summary. (Doc. 163-9 ¶ 14 (citing "Exhibit G" as a "sample large-print AVS").) Yet the document is in standard print. (See Doc. 163-16 at 1-21 (labeled as Exhibit G).)

¶ 17).

As Miles has explained, UNCHCS's failures to provide large print documents (at all or in a timely fashion) prevent him "from timely accessing the written follow-up instructions [he] receive[s], accurately updating [his] general practitioner and pharmacist about new medical instructions, or fully understanding [his] rights as a patient." (Doc. 103-4 ¶ 28.)

Like Miles, Dr. Scott has also repeatedly asked for, but not consistently received, accessible documents from UNCHCS, specifically UNC Family Medicine West and UNC Rex Hospital, where he usually visits.[19]  (See Doc. 163-5; Doc. 151-4; Doc. 105-14.) As Dr. Scott recounts, he first requested "accessible formats" from UNC Family Medicine West in February 2019, but "clinic staff informed" him that they "only provide documents in print" and that if he wanted to review these documents, he "should ask a sighted person for assistance." (Doc. 105-14 ¶ 6.)  Likewise, each time Dr. Scott has visited UNC Family Medicine West and Rex Laboratory Services in the past several years, staff have presented him "with only standard print consent forms to sign"; he has "never been provided Braille or accessible electronic formats of these documents, nor have staff offered to read or summarize them to

---

[19] As noted above, Dr. Scott is blind but can "read documents in Braille or in accessible electronic formats" on his computer "using screen reader software, which converts written text to speech or to Braille on a refreshable Braille display."  (Doc. 105-14 ¶ 2.)

[him]."  (Id. ¶ 7; see also Doc. 151-4 ¶ 8.)

Dr. Scott has been unable to access documents uploaded to his UNC MyChart, at least until he last attempted to do so sometime prior to March 2021.  As he explained in his March 2021 declaration, even though he regularly uses JAWS to access "properly designed electronic documents and websites[,]" the documents made available on his MyChart account "were not readable by JAWS" and thus he could "not access any of the information in [those] documents."  (Doc. 105-14 ¶ 10; see also Doc. 151-4 ¶ 12 ("As I described in my last declaration, I am unable to use MyChart for access to my UNC Health Care records.").)[20]

Dr. Scott acknowledges that, in August 2022, Michelle Fallon, the Practice Manager at UNC Family Medicine West, contacted him concerning his accessible format needs and offered to put him in touch with UNCHCS's information technology personnel about trouble-shooting these problems.  (Doc. 163-5 ¶ 4; see Doc. 152-25 at 1-3.)  He also acknowledges that during his next visit to

---

[20] Since then, UNCHCS has reached out to Scott on multiple occasions to help troubleshoot this problem.  (See, e.g., Doc. 152-22 ¶¶ 5-6; Doc. 152-25.)  There is no indication in the record, however, that Dr. Scott ever took UNCHCS up on the offer.  Rather, as Plaintiffs' counsel represented at the May 2023 hearing, Dr. Scott apparently insists that he not be involved in solving the MyChart problem at all.  The record also indicates that Dr. Scott has not attempted to access MyChart since he asked UNCHCS to stop "sending [him] documents" sometime prior to March 2021.  (Doc. 105-14 ¶ 11-12.)  For the reasons explained below, however, Dr. Scott's obstinance does not preclude his claim given the record evidence that MyChart is not fully compatible with his JAWS screen reader software.

56

UNC Family Medicine West on September 20, 2022, he received "Braille documents in connection" with that appointment. (Doc. 163-5 ¶ 4.) However, when he visited the "UNC Rex Lab Draw Station" later that day to "have blood drawn," he was "required to sign a print consent form that [he] could not read." (Id.) And about a week later, when he "attended a scheduled visit at Wake Radiology UNC Rex Healthcare," he was again "required to sign a print consent form during the visit that [he] could not read[.]" (Id. ¶ 5.)[21] He also "did not receive any Braille or electronically accessible documents from the radiology practice during or after the visit." (Id.)

UNCHCS does not deny (nor could it) that it has repeatedly provided Miles and Dr. Scott with inaccessible documents; rather, it maintains that, notwithstanding its past failures (which it characterizes as "alleged failures to always provide Miles and Dr. Scott with all documents or other communications[,]" Doc. 152 at 16), the availability of MyChart (and the presence of documents therein) obviates the need to provide Miles or Dr. Scott with accessible print documents. (Doc. 152 at 16 n.2; see also id. at 20 ("UNCHCS repeatedly endeavored to accommodate Miles and Scott, including repeated offers to provide instruction and trouble-shooting regarding [MyChart] accessibility."); Doc. 108 at 13, 16-

_____

[21] As noted above, it is not clear on this record whether Dr. Scott asked UNCHCS staff to read the print consent form to him before he signed it.

17 (making similar argument at summary judgment stage).)  As UNCHCS

puts it, "UNCHCS disputes that . . . any of UNCHCS's deviations

from  providing  requested  auxiliary  aids  were  unreasonable,

especially  where  reasonable  alternatives,  including  access  to

[MyChart], with assistance UNCHCS continually offered, was always

available."  (Doc. 152 at 16 n.2.)[22]

    This  argument  plainly  fails.   UNCHCS  put  <u>absolutely  no</u>

<u>evidence in the record</u> that documents uploaded to MyChart are in

fact compatible with common screen reader devices such as JAWS.[23]

Indeed,  the  only  evidence  before  the  court  on  that  score  –  in

addition to Dr. Scott's declaration that "the documents available

on [his] MyChart account were not readable by JAWS," a program he

regularly uses (Doc. 105-14 ¶ 10) - comes from Plaintiffs' retained

---

[22] UNCHCS also suggests that Miles and Dr. Scott have not been injured
at all, as they "continue to visit UNCHCS clinics without adverse health
care outcomes."  (Doc. 152 at 16; <u>see also</u> Doc. 120 at 15 (making a
similar  argument  on  motion  for  summary  judgment).)   No  doubt,  this
argument  fails  on  its  own  terms,  as  Miles  specifically  testified  to
delays  attributable  to  the  failure  to  provide  accessible  documents,
including regarding the filling of a prescription and commencement of
prescribed exercises. (<u>See, e.g.</u>, Doc. 103-4 ¶¶ 24, 27; Doc. 108-12 at
60-62.)  But even more fundamentally, a person need not experience "an
adverse health care outcome" (Doc. 152 at 16) for a violation of the law
to occur.  "The focus is on the effectiveness of the communication, not
on the medical success of the outcome." <u>Silva v. Baptist Health S. Fla.,</u>
<u>Inc.</u>, 856 F.3d 824, 833 (11th Cir. 2017).  <u>See</u> <u>Basta</u>, 56 F.4th at 315
("Both  the  statute  and  the  regulations  thus  make  clear  that  the
[Rehabilitation Act] focuses on the equal opportunity to participate in
obtaining  and  utilizing  services  in  hospital  settings."  (internal
quotation marks and emphasis omitted)).

[23] As it relates to Miles specifically, this argument also ignores that,
due to his light sensitivity and inability to read electronic documents
at length, MyChart is not an acceptable accommodation.  (<u>See</u> Doc. 151-3
¶ 5.)

58

expert, Mr. Dennis Quon. Quon opines, based on a review of several documents uploaded to Miles's MyChart account, that the MyChart documents are not "tagged" with the metadata necessary for use with screen reading software. (See Doc. 105-26 at 7, 10.) As Quon explains, "these documents are PDF files; they lack metadata tags that would facilitate their use in conjunction with a screen reader; and they are not set up as a large print document, including because the font is not 16-22 point in size." (Id. at 10; see also id. at 67 (analyzing billing statement uploaded to Miles's MyChart in April 2020 and concluding that "[i]t is not a digitally accessible document because it lacks metadata tags that would allow it to be read effectively by a screen-reader").) Put more simply, Quon opines that, at least with respect to the sample of documents he reviewed, UNCHCS seemingly fails to properly tag the documents uploaded to MyChart with the necessary metadata that "allows a blind patient to 'read' the document using screen reader software on his or her computer." (Id. at 7; see id. at 10 (Quon explaining that he reviewed "several . . . documents that Plaintiff Timothy Miles downloaded from his UNCHCS MyChart account" and concluding that "they lack metadata tags that would facilitate their use in conjunction with a screen reader").)

In response, UNCHCS offers only the declaration of Jeri Williams — which, in relevant part, appears to be based on hearsay — that "[i]t is [her] understanding that the features of [MyChart]

59

are supported by the JAWS screen reader through the current state of Google Chrome and Microsoft Edge desktop browsers." (Doc. 152-1 ¶ 12; see also id. ("I also understand that the features of [MyChart] are designed to be supported by screen readers on mobile apps for iOS and Android, and on Desktop browsers." (emphasis added)); id. ¶ 13 ("I understand that these documents are also compatible with most screen reader devices[.]" (emphasis added)); Doc. 163-9 ¶ 14 ("My understanding is that the AVS can be read using screen-reading software." (emphasis added)).) The equivocation in Williams's declaration appears again in UNCHCS's brief, which similarly uses carefully circumscribed language, stating: "[MyChart's] design targets conformance . . . and compatibility with screen readers, such as JAWS, on mobile apps for iOS and Android operating systems, and on desktop browsers like Google Chrome and Microsoft Edge." (Doc. 152 at 5 (emphasis added).)

At the May 2023 hearing, UNCHCS's counsel all but conceded the point yet maintained that it was difficult to provide a straight answer because Epic – from whom UNCHCS licenses "MyChart" (which again, is simply a software product) – had exclusive control of at least some documents uploaded therein. That may be true, but on this record Plaintiffs are correct that UNCHCS "has not . . . explained what process (if any) it has to make electronic documents accessible [on MyChart]." (Doc. 163 at 20-21.) UNCHCS

60

could have, for example, offered an expert or even a fact witness to testify about MyChart's compatibility with screen reading devices. But it chose not to provide such an evidentiary record, and it did not otherwise contest the evidence put forward in Quon's report.[24] As a result, UNCHCS has not forecast any evidence that it has configured MyChart to adequately provide for screen readers for Miles or Dr. Scott, and the court is left with the conclusion that, at least on this record, MyChart does not provide a reasonable accommodation for either of them.[25]

As a result, it is clear that Plaintiffs have met their burden of proving that Miles and Dr. Scott have a "cognizable danger of recurrent violation" in the absence of an injunction. W.T. Grant Co., 345 U.S. at 633; see also Roe v. Cheyenne Mountain Conf. Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1997) (when contemplating whether to enter an injunction to enforce the provisions of the ADA, "[t]he most important factor for the

---

[24] At the May 1, 2023, hearing, both sides made efforts to exceed the record but then objected to the other doing so. Counsel for UNCHCS represented that, at least as of that time, all after-visit summaries uploaded to MyChart contain the necessary metadata tagging to allow reading by screen readers. Plaintiffs' counsel, in turn, suggested that Quon had reviewed a new after-visit summary the day before the hearing which did not contain the necessary tagging.

[25] This is not to say that providing electronically accessible documents on MyChart is the only reasonable accommodation that UNCHCS might offer to either Miles or Dr. Scott. After all, there is no categorical rule to determine which auxiliary aids or services are required to achieve effective communication. See Basta, 56 F.4th at 319 (explaining that the task of determining whether an entity has "provided appropriate auxiliary aids where necessary is inherently-fact intensive" (quotation and alteration omitted)).

61

district court to consider is whether the facts indicate a danger of future violations of the Act"). Simply stated, the voluminous record in this case establishes that UNCHCS has – for years – deprived two of its legally-blind patients, Miles and Dr. Scott, of the ability to participate in and enjoy the benefits of UNCHCS's health care services on terms equally effective to those patients without sight-related disabilities. See Basta, 56 F.4th at 316 (quotation omitted).

And throughout this litigation – not to mention during the weeks and months in which the present motion for a permanent injunction was pending – these problems have persisted. See W. T. Grant Co., 345 U.S. at 633 (in determining the cognizable danger of recurrent violation, courts should consider, among other things, "the character of past violations"); Wilk v. Am. Med. Ass'n, 895 F.2d 352, 367 (7th Cir. 1990) (district court's decision to enter permanent injunction was "reasonable" particularly given the "systematic and long-term nature" of the illegal conduct); United States v. Hakim, 462 F. Supp. 3d 418, 434 (S.D.N.Y. 2020) ("Defendants' past record of noncompliance is an important indicator of the likelihood of recurrent violation."). As a result of these failures, Miles and Dr. Scott have been deprived, not only of the "the equal opportunity to participate in obtaining and utilizing services" at UNCHCS, Basta, 56 F.4th at 316 (quotation omitted), but also of critical information pertaining to their

62

health, see Silva, 856 F.3d at 834 ("[T]here can be no question that the exchange of information between doctor and patient is part-and-parcel of healthcare services.").

To be sure, during this time UNCHCS made important organizational strides in how it manages the effective communication needs of blind and sight-impaired patients throughout its vast network of providers. As explained below, this is particularly important when it comes to crafting the scope of the injunction. Yet despite these efforts, the needs of Miles and Dr. Scott have continued somehow to slip through the cracks. Accordingly, the court concludes that the failure to provide Miles and Dr. Scott with effective communications pertaining to their care at UNCHCS constitutes a continuing irreparable harm.

### 2. Remedies at Law Inadequate

Having established irreparable injury, Plaintiffs have necessarily shown that legal remedies, "such as monetary damages" alone, are inadequate. eBay, 547 U.S. at 391. The types of harm alleged – namely, the inability to independently access healthcare and billing information – are intangible and difficult to calculate mathematically, particularly in light of the future harm that Miles and Dr. Scott might suffer when returning to UNCHCS. See Berthiaume v. Doremus, 998 F. Supp. 2d 465, 476 (W.D. Va. 2014) (explaining that monetary damages were inadequate to remedy ADA violation when plaintiff planned to return to place of public

63

accommodation); Farnam v. Walker, 593 F. Supp. 2d 1000, 1013 (C.D. Ill. 2009) ("[T]he difficulty of putting a number on the harm to the plaintiff's health further supports the court's conclusion that money damages is an inadequate remedy." (citation omitted)); see also Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966) (Friendly, J.) ("A plaintiff asking an injunction because of the defendant's violation of a statute is not required to show that otherwise rigor mortis will set in forthwith; all that 'irreparable injury' means in this context is that unless an injunction is granted, the plaintiff will suffer harm which cannot be repaired.").

### 3. Balance of Hardships

Third, the balance of hardships supports the grant of the limited injunctive relief ordered here.[26] As explained in detail below, the permanent injunction entered here merely requires UNCHCS to provide Miles and Dr. Scott with the type of reasonable accommodation that UNCHCS is already required to provide by law. See Superior Performers, 2021 WL 2156960, at *9 (explaining that when an injunction "merely requires" a party to adhere to its pre-

---

[26] As discussed further below, see Part II-C infra, the proper weighing of the hardships also depends on the scope of the injunctive relief entered. See Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 640 (D.C. Cir. 1982) ("[T]he scope of an injunction should be determined by balancing harm to the plaintiff, other means of avoiding such harm, and the relative inconvenience to the defendant."). The injunction entered here, narrowly tailored to the extent of the violation established (and potentially impending), strikes the appropriate balance in this case.

existing obligations, the balance of the hardships generally weighs in favor of the plaintiff). It does not mandate that UNCHCS adopt "best practices" in excess of what the law requires. Thus, in balancing the likelihood of harm to Plaintiffs with the harm to UNCHCS should an injunction be granted, this factor weighs in favor of Plaintiffs.

### 4. Public Interest

Fourth, the public interest favors the grant of injunctive relief because "the public interest lies with upholding the law and having the mandates of the ADA and Rehabilitation Act enforced." Marlo M. ex rel. Parris v. Cansler, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010). As the Fourth Circuit has explained, "the ADA and Rehabilitation Act" reflect the "broad legislative consensus" that ensuring equality "for individuals with disabilities may require even well-intentioned public entities to make certain reasonable accommodations." Lamone, 813 F.3d at 510. Entry of injunctive relief here vindicates that legislative judgment.

### C. Scope of Injunctive Relief

Having determined that Plaintiffs have shown that Miles and Dr. Scott will suffer irreparable injury in the absence of an injunction, the court must determine the appropriate scope of that injunction, considered in light of the harm to be avoided. In doing so, the court is guided by the Supreme Court's admonition

65

that "the scope of injunctive relief is dictated by the extent of the violation established[.]" Califano v. Yamasaki, 442 U.S. 682, 702 (1979); see also Lowery v. Cir. City Stores, Inc., 158 F.3d 742, 766 (4th Cir. 1998) ("Being equitable relief, an injunction should be no broader than necessary to achieve its desired goals."), vacated on other grounds, 527 U.S. 1031 (1999)).

Throughout this litigation, Plaintiffs have been candid that they seek "top-down" systemwide relief meant to "apply across the UNCHCS Network." (Doc. 151-1 at 18, 24; see Doc. 163-1 ¶ 9.) On their account, "[o]nly system wide relief will be effective[,]" (Doc. 151-1 at 26), because UNCHCS's "failures are not unique to Mr. Miles and Dr. Scott – it is failing blind North Carolinians generally" (id. at 18). For the reasons discussed below, however, the injunction Plaintiffs seek is, in myriad ways, plainly overbroad. It also seeks to impose, in some instances, the types of "best practices" that the law does not require. Seremeth, 673 F.3d at 340. Accordingly, the court will, in the exercise of its equitable discretion, craft a more limited injunction that is properly suited to the circumstances of this case. See Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (when crafting an injunction, a court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case" (quotation omitted)).

The remainder of the court's opinion proceeds in two parts.

66

First, the terms of the injunction that will be entered are detailed, with an explanation of why it is an appropriately crafted remedy under the circumstances. Second, the court discusses the various reasons Plaintiffs' request for systemwide relief is unwarranted.

### 1. The Injunction is Narrowly Tailored

Based on the factual findings laid out above, the court concludes that Plaintiffs have demonstrated that an injunction addressed to remedy the particular harms incurred by Miles and Dr. Scott is appropriate. Accordingly, the court will enter an injunction to order UNCHCS to do what it has failed consistently to do so far: provide Miles and Dr. Scott with equally effective access to all material information that UNCHCS provides its patients. For Miles, of course, that means providing him with accessible large-print documents. For Dr. Scott, that means providing electronic documents configured for use by screen reading devices (such as JAWS) to the extent UNCHCS has control over such documents in Epic or, upon Dr. Scott's request, Braille documents. However, as to both individuals, where such documents are not immediately available at the time of the clinical encounter, UNCHCS shall provide an alternative method of communication that provides each with equally effective access to his healthcare information, such as by reading the documents. This injunction – fully set forth in the separate Judgment and Permanent

67

Injunction - is narrowly tailored to remedy the harm established in this case.  It also best comports with the proper scope of a federal district court's remedial power.

Under Article III of the Constitution, the "constitutionally prescribed role" of the courts "is to vindicate the individual rights of the people appearing before it." Gill v. Whitford, 138 S. Ct. 1916, 1933 (2018).  The court's power to grant equitable remedies is commensurate with this role: "Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."  Dep't of Homeland Sec. v. New York, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); see California v. Texas, 141 S. Ct. 2104, 2115 (2021) (explaining that a valid Article III remedy "operate[s] with respect to specific parties," not with respect to a law "in the abstract" (quotation omitted)); Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 472 (2017) ("Article III gives the judiciary authority to remedy the wrongs done to those litigants [before it], not the wrongs done to others.").

To that end, the Supreme Court has repeatedly cautioned that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Yamasaki, 442 U.S. at 702; see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 193 (2000); Madsen

68

v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222 (1974). Put differently, "the scope of injunctive relief is dictated by the extent of the violation established." Yamasaki, 442 U.S. at 702; Hayes v. N. State Law Enforcement Officers Ass'n, 10 F.3d 207, 217 (4th Cir. 1993) ("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation.").

This principle "applies with special force where, as here, there is no class certification." Kane v. De Blasio, 19 F.4th 152, 174 (2d Cir. 2021) (internal quotation marks omitted); see California v. Azar, 911 F.3d 558, 582–83 (9th Cir. 2018) ("Injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." (alterations and quotation omitted)); Meyer v. CUNA Mut. Ins. Soc., 648 F.3d 154, 170 (3d Cir. 2011) ("We are guided by the principle that in the absence of a certified class action, a plaintiff is only entitled to relief for itself" (internal quotation marks, citations, and alterations omitted)); Brown v. Trs. of Boston Univ., 891 F.2d 337, 361 (1st Cir. 1989) ("An injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled."). As the Supreme Court has explained again and again, it is error for a court to "impose[] a systemwide remedy going

69

beyond [the] scope" of the specific violations established.  <u>Lewis</u>
<u>v. Casey</u>, 518 U.S. 343, 359 (1996) (quoting <u>Dayton Bd. of Educ. v.</u>
<u>Brinkman</u>, 433 U.S. 406, 417 (1977)); <u>see</u> <u>PBM Prods.</u>, 639 F.3d at
128 ("[T]he court will vacate an injunction if it is broader in
scope than that necessary to provide complete relief to the
plaintiff or if an injunction does not carefully address only the
circumstances of the case." (internal quotation marks omitted)).
A systemwide remedy should be imposed "only if there has been a
systemwide impact[.]"  <u>Lewis</u>, 518 U.S. at 359 (quotation and
alteration omitted).

    As far as "the extent of the violation established" here,
<u>Yamasaki</u>, 442 U.S. at 702, Plaintiffs' showing of harm is far more
limited than they contend.  (<u>See</u> Doc. 151-1 at 18 (arguing that
UNCHCS "is failing blind North Carolinian's generally").)  It is
undisputed that UNCHCS comprises a vast network of approximately
3,200 physicians, 15 hospitals, and 500 clinics, all of whom
oversee roughly 3,500,000 clinical visits, 125,000 surgeries, and
550,000 emergency department visits annually.  (Doc. 152 at 2.)
All told, it provides care to patients in all of the state's 100
counties through its numerous hospital campuses and hundreds of
clinical practices.  (Doc. 151-1 at 26 n.13.)  Plaintiffs
themselves estimate that UNCHCS "serve[s] many thousands of blind
patients (including low-vision patients) each year," including as
many as 7,000 blind patients at UNCHCS Medical Center (itself only

70

a small part of the UNCHCS network) alone. (Doc. 151-1 at 18-19.) Yet on this record and after four and one-half years of litigation, Plaintiffs have identified at most three sight-impaired individuals who claim they were denied equally effective communications by any UNCHCS provider. (See Doc. 151-1 at 4-6 (identifying Miles, Dr. Scott, and Bone); see also Doc. 153 at 11.) And one of these individuals, Bone, is no longer a party.[27]

Plaintiffs, via a retained expert, Dr. Megan Morris, suggest that this number is understated because patients with disabilities are not likely to complain about their healthcare providers. (See Doc. 153-2 ¶ 19 ("In research I have conducted, persons with disabilities have expressed concerns about filing complaints against their health care providers regarding ADA noncompliance.").) That may be true. But it does nothing to supplement the factual record in this case, and the court is not inclined to engage in an "exercise in the conceivable" to expand the scope of the remedy beyond what has actually been established. United States v. Students Challenging Regul. Agency Procs. (SCRAP), 412 U.S. 669, 688 (1973); see Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009) ("In part because of the difficulty of verifying the facts upon which such probabilistic standing depends, the Court has required plaintiffs claiming an

---

[27] This court previously found that he lacked standing to pursue injunctive relief against UNCHCS. (See Doc. 44 at 37; Doc. 57 at 2-3.)

71

organizational standing to identify members who have suffered the requisite harm — surely not a difficult task here, when so many thousands are alleged to have been harmed.").

Thus, when the statutory violations established in this case are considered in the larger context of UNCHCS's entire network – one that serves, by Plaintiffs' own estimate, thousands of sight-impaired patients per year - they at best establish "isolated violations affecting a narrow range of plaintiffs" that cannot "justify systemwide relief." Armstrong v. Davis, 275 F.3d 849, 870 (9th Cir. 2001) (quotation omitted), abrogated on other grounds by Johnson v. California, 543 U.S. 499, 507 (2005); see McCullen v. Coakley, 573 U.S. 464, 492 (2014) (concluding that an injunction, being an equitable remedy, "focuses on the precise individuals and the precise conduct causing a particular problem"); CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 461 (4th Cir. 2000) (explaining that injunctive relief "must be tailored as precisely as possible to the exact needs of the case" (quoting Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 184 (1968))). Simply put, were this court to ask the question posed in Lewis - "[w]as th[e] [claimed violation] widespread enough to justify systemwide relief?" - the record compels the conclusion that Plaintiffs have not so demonstrated. Lewis, 518 U.S. at

72

359.[28]

Notably, moreover, the injury Plaintiffs have established here is necessarily individualized and thus does not warrant a broad mandatory injunction to "compl[y] with all requests by blind individuals for print communications, including both paper and electronic communications, in accessible alternative formats, including but not limited to Braille, large print, audio, or digital navigable formats." (Doc. 163-1 ¶ 7(a) (emphasis added).) A reasonable accommodation claim, by its very nature, is fact-specific. See Basta, 56 F.4th at 319 ("The task of determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently-fact intensive." (alterations and quotation omitted)); accord Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 189 (2d Cir. 2015) ("Given the fact-specific nature of the question of whether a measure to accommodate [an individual's] disability is a reasonable accommodation, this determination must be made on a case-by-case basis." (internal quotation marks omitted)); Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1267 (D.C. Cir. 2008) ("[T]he cases addressing meaningful access are necessarily

---

[28] In Lewis, the Supreme Court reversed as overly broad an injunction that effectively mandated an overhaul of law libraries in the Arizona prison system pursuant to Bounds v. Smith, 430 U.S. 817 (1977). See Lewis, 518 U.S. at 347-48. Because there were only two instances in which prisoners were hindered from pursuing their legal claims due to the inadequacy of the prison law libraries, the Supreme Court held that systemwide relief was inappropriate. Id. at 356, 359.

73

fact-specific[.]"); Wong v. Regents of Univ. of Cal., 192 F.3d 807, 818 (9th Cir. 1999)("Because the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations" sought.).

And while "primary consideration" must be given to a disabled individual's requested accommodation, 28 C.F.R. § 35.160(b)(2), such preference is not dispositive of whether an alternative accommodation is reasonable. See Wright, 831 F.3d at 72 (emphasizing that a reasonable accommodation under the ADA need not be the one "most strongly preferred"); McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1147 (11th Cir. 2014) (stating that "the regulations do not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded"). Instead, a public entity like UNCHCS "must furnish an auxiliary aid only when 'necessary' to achieve effective communication, meaning that the entity can defeat an ADA claim by 'demonstrat[ing] that [an] effective means of communication' other than the plaintiff's preferred accommodation was made available." Reyes v. Dart, No. 17 C 9223, 2019 WL 1897096, at *6 (N.D. Ill. Apr. 29, 2019) (alterations in original) (quoting 28 C.F.R. pt. 35, App. A, Subpart E); see also Pollack, 886 F.3d at 81; Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 343 (11th Cir. 2012)

74

(Rehabilitation Act); Paulone v. City of Frederick, 787 F. Supp. 2d 360, 397 (D. Md. 2011). Plaintiffs' requested injunction seems to acknowledge as much, including, in part, its request that UNCHCS be required to offer "alternative method[s] of accessing" communications where print communications are not immediately available "such as by reading the communication to the individual in a private location or offering a digital navigable format[.]" (Doc. 163-1 ¶ 8(a)(v).)

This is no surprise, of course, given that disabled patients – including, as here, those who are sight-impaired – have varying levels of needs, and hence a wide range of potential accommodations that would provide them with meaningful access to the services offered by those entities covered by Title II of the ADA. See PGA Tour, Inc. v. Martin, 532 U.S. 661, 688 (2001) ("[A]n individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration."). The differences between Miles and Dr. Scott alone bear this out.

The reason that Plaintiffs established irreparable harm here, however, is that UNCHCS did not provide either Miles or Dr. Scott – at least for a significant portion of the time at issue - with

75

any accommodation at all.[29]  Indeed, throughout this litigation, UNCHCS acknowledged its failures to provide Miles and Dr. Scott with certain documents (large print for Miles, and Braille for Dr. Scott) but maintained that MyChart – and the electronic documents uploaded therein – provided a reasonable alternative accommodation for both patients.  (See, e.g., Doc. 108 at 16-17; Doc. 152 at 5, 16 n.2.)  In Dr. Scott's case, that would be true,[30] except for the fact, as detailed above, that not all documents uploaded to MyChart are compatible with screen reading devices.[31]  Thus, Miles and Dr. Scott were left without an accommodation, at least not infrequently.

The upshot is that the harm incurred by Plaintiffs in this case – and hence the harm to be redressed via an appropriately tailored injunction – is necessarily limited to the precise violations established here: UNCHCS's failure to provide two of its blind patients with accessible document formats – or any other

---

[29] Nor, as Plaintiffs correctly point out, did UNCHCS ever put on any evidence that providing the requested accommodations would pose an undue burden or fundamental alteration.  (See Doc. 153 at 7 n.4.)

[30] Miles, however, has established that due to his ocular albinism he cannot read electronic documents for extended periods.  (See Doc. 151-3 ¶ 5.)

[31] At the May 1, 2023 hearing, UNCHCS counsel reported that some of the documents in MyChart were tagged.  But there is no record evidence of this.  Even if true, moreover, UNCHCS did not dispute that not all necessary documents are so tagged.  To the extent the lack of tagging involves documents over which UNCHCS may not have control (i.e., from non-UNCHCS providers), the record was not developed in this regard.

76

reasonable accommodation, such as a qualified reader during patient check-in - in a timely and consistent manner. Whether and what other accommodations might qualify as "reasonable" for those not before the court is, at this point, indeterminable. The focus of the injunctive relief is therefore limited to remedying the problem Plaintiffs have identified. See Gill, 138 S. Ct. at 1930 (a plaintiff's remedy must be "limited to the inadequacy that produced [his] injury in fact" (quoting Lewis, 518 U.S. at 357)); Va. Soc'y for Human Life, Inc. v. FEC, 263 F.3d 379, 393 (4th Cir. 2001) (district court should not have enjoined agency from applying challenged regulation to any party when "[a]n injunction covering [plaintiff] alone adequately protects it from the feared prosecution"), overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC, 681 F.3d 544, 550 n.2 (4th Cir. 2012); Kentuckians for Commonwealth Inc., 317 F.3d at 436 (holding that injunction was overbroad where it was "readily apparent that the injury anticipated from future permits [was] far broader than the scope of injury for which [the plaintiff] sought relief"); Hayes, 10 F.3d at 217 (vacating injunction that enjoined "all use of racially based criteria by the City of Charlotte in its employment decisions" when the "only policy challenged" by the plaintiffs was "the police department's promotion policy with regard to sergeants").

77

That NFB and DRNC have associational standing does not alter this conclusion. (See Doc. 153 at 12 (Plaintiffs arguing that "NFB and DRNC have standing to seek broad injunctive relief on behalf of their members/constituents"); Doc. 151-1 at 25 (Plaintiffs contending that "DRNC constituents and NFB members assuredly will use other UNCHCS providers given the breadth of the network").) As in all cases of associational standing, the associational plaintiff is suing to remedy injuries suffered by its members even when (as here) the association itself alleges no personal injury. See Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 342–43 (1977) (citations omitted).[32] Accordingly, the standing of the association itself is merely "coterminous" with that of its injured members. Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo., 458 F. Supp. 2d 160, 174–75 (S.D.N.Y. 2006); see A Helping Hand, 515 F.3d at 363 n.3 ("The doctrine of associational standing permits an organization to bring suit on behalf of its members for injury done to its members when (among other requirements) its members would have standing to sue in their own right." (emphasis omitted)); Maryland Highways Contractors Ass'n, Inc. v. State of Md., 933 F.2d 1246, 1250 (4th Cir. 1991)

---

[32] Neither DRNC nor NFB claims to have "organizational standing," that is, standing to seek redress "for an injury suffered by the organization itself." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005); see Warth v. Seldin, 422 U.S. 490, 511 (1975) (explaining that an organizational plaintiff may have standing to sue on its own behalf "to vindicate whatever rights and immunities the association itself may enjoy").

(explaining that an "association may have standing as the representative of its members who have been harmed"); Note, Circuit Approaches to Mootness in the Associational-Standing Context, 136 Harv. L. Rev. 1434, 1446 (2023) ("The 'complaining party' in an associational-standing case is not the organization but the members upon whom associational standing is based.").

It follows, therefore, that an associational plaintiff cannot "seek relief far beyond any injury" its members have actually established.  Conservation L. Found. of New England, Inc. v. Reilly, 950 F.2d 38, 43 (1st Cir. 1991).  As one court recently explained:

> Associational standing is in tension with . . . Article III redressability rules because it creates an inherent mismatch between the plaintiff and the remedy. . . . The association, by definition, has not suffered the injury. Its members have. To satisfy Article III's redressability requirement, then, the injunctive relief in an associational-standing case must benefit (and ameliorate an injury to) the association's members.

Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin., 13 F.4th 531, 540 (6th Cir. 2021) (citations and emphasis omitted); see also Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc., 566 F. Supp. 3d 383, 391 n.1 (D. Md. 2021)(explaining that associational plaintiff only had standing to seek relief on behalf of its members who had actually been injured); Small v. Gen. Nutrition Companies, Inc., 388 F. Supp. 2d 83, 98 (E.D.N.Y. 2005) (explaining that association's "standing

79

would only be coextensive with the standing that [injured] member would enjoy"); Michael T. Morley, Disaggregating Nationwide Injunctions, 71 Ala. L. Rev. 1, 26 (2019) ("A plaintiff group asserting associational standing should not be permitted to seek broader relief than its members could have received had they sued in their own right.").[33]

Here, DRNC and NFB have identified only two of its thousands of members who have encountered problems receiving accessible communications from a UNCHCS provider.[34] And importantly, as

---

[33] This is not to say that an entity with associational standing can never seek broad injunctive relief that would inure to the benefit of individuals (including that entity's members) that are not before the court. See Outdoor Amusement, 983 F.3d at 683 ("The Supreme Court has regularly found associational standing for trade associations when an injunction would benefit many of their members.") To the contrary, it is well established that "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in [a] lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they are entitled." Bresgal v. Brock, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (citations and emphasis omitted). Indeed, in some cases, the only way to vindicate an individual plaintiff's rights is by fashioning equitable relief that will necessarily be far-reaching. See Gill, 138 S. Ct. at 1930 (explaining that, in "malapportionment cases, the only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale restructuring of the geographical distribution of seats in a state legislature" (internal quotation marks omitted)); Milan D. Smith, Jr., Only Where Justified: Toward Limits and Explanatory Requirements for Nationwide Injunctions, 95 Notre Dame L. Rev. 2013, 2024 (2020) ("In the classic case where we are talking about an individual harmed by an executive policy, a successful case on the merits often entitles the plaintiff to no less."). But, as explained above, the remedy in this case is necessarily limited given the fact-bound nature of a reasonable accommodation inquiry.

[34] NFB has approximately 200 members in North Carolina (Doc. 105-12 ¶¶ 4-6), and DRNC, as a "designated" Protection and Advocacy (P&A) organization for North Carolina, represents the interests of all North Carolinians with disabilities (Doc. 105-13 ¶¶ 4-6).

explained above, the question whether UNCHCS has violated the statutory rights of those two individuals – not to mention any other NFB or DRNC member not currently before the court - does not turn on a pure question of law, but rather on the application of the law to wholly distinct factual circumstances. See Lamone, 813 F.3d at 508 ("Determination of the reasonableness of a proposed modification is generally fact-specific.") Accordingly, although NFB and DRNC have standing to seek relief on behalf of their injured members, they do not have standing to seek systematic relief extending far beyond the injuries actually incurred by those members. See Equal Rights Center v. Abercrombie & Fitch Co., 767 F. Supp. 2d 510, 527–28 (D. Md. 2010) (confining scope of associational standing in ADA case to locations where members of plaintiff organization had actually "encounter[ed] barriers" and stores they had been "deterred from patronizing").

To hold otherwise would also seemingly allow Plaintiffs, by virtue of NFB's and DRNC's status as associational-plaintiffs, to end-run the requirements of Federal Rule of Civil Procedure 23, through which Congress has already set-forth the prerequisites for those seeking broad-based, class-wide relief. As the Seventh Circuit aptly put it, "A wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified. Why else bother with class actions?" McKenzie v. City of Chicago, 118 F.3d 552, 555 (7th Cir. 1997); see Sharpe v.

*Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) ("While district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an individual suit, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (citing *Yamasaki*, 442 U.S. at 702)); Michael T. Morley, *De Facto Class Actions? Plaintiff-and-Defendant-Oriented Injunctions in Voting Rights, Election Law, and Other Constitutional Cases*, 39 Harv. J.L. & Pub. Pol'y 487, 535 (2016) ("By issuing a Defendant-Oriented Injunction in a non-class case, a court effectively grants class-wide relief without determining whether Rule 23's requirements are satisfied, thereby circumventing and undermining Rule 23.").

Finally, the court is mindful that "federalism principles make tailoring particularly important where . . . plaintiffs seek injunctive relief against a state or local government." *Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1221 (9th Cir. 2018).[35] In this context, courts should carefully consider the nature of the relief sought and the scope of oversight requested, especially where the

---

[35] And UNCHCS is clearly an instrumentality of the State of North Carolina. _See_ N.C. Gen. Stat. § 116-37(a)(1) (establishing the University of North Carolina Health Care System "as an affiliated enterprise of The University of North Carolina"); _Singh v. Univ. of N. Carolina at Chapel Hill_, No. 1:22CV294, 2022 WL 1500545, at *5-7 (M.D.N.C. May 12, 2022)(concluding "that UNC-Health is an arm or alter ego of the State of North Carolina" after conducting an exhaustive review of both state law and UNCHCS's structure, operations, and mission).

state appears to be acting in good faith to address the issue at hand. See Burford v. Sun Oil Co., 319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)); Rizzo v. Goode, 423 U.S. 362, 378-79 (1976) (finding that the district court exceeded its authority because the injunction – which "significantly revis[ed] the internal procedures of the Philadelphia police department" – was an "unwarranted intrusion by the federal judiciary into the discretionary authority committed to [city officials] by state and local law" and "a sharp limitation" on the City's "dispatch of its own internal affairs" (internal quotation marks omitted)); Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon, 254 F.3d 846, 850 (9th Cir. 2001) ("[A] federal court must exercise restraint when a plaintiff seeks to enjoin any non-federal government agency, be it local or state."); see also Hawks v. Hamill, 288 U.S. 52, 53 (1933) (Cardozo, J.) ("Caution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties."); Reynolds v. Giuliani, 506 F.3d 183, 198 (2d Cir. 2007)("[G]reat[] caution is appropriate where a federal court is asked to interfere by means of injunctive relief

83

with a state's executive functions, a sphere in which states typically are afforded latitude."); cf. Horne v. Flores, 557 U.S. 433, 448 (2009) (explaining that "institutional reform injunctions" are disfavored, as they "often raise sensitive federalism concerns" and they "commonly involve[] areas of core state responsibility."); Missouri v. Jenkins, 515 U.S. 70, 131 (1995) (Thomas, J., concurring) (explaining how overbroad injunctions can override the "[s]tate's discretionary authority over its own program[s] and budgets and forc[e] state officials to reallocate state resources and funds . . . at the expense of other citizens, other government programs, and other institutions not represented in court").

As UNCHCS points out, Plaintiffs' requested injunctive order would not only "require UNCHCS to revise myriad aspects of its patient communication practices" (Doc. 152 at 23), but would also entangle this court in UNCHCS's operations by requiring UNCHCS to coordinate with Plaintiffs' expert witness for implementing new practices and reviewing status reports every six months in an effort to "assess[] the quality and effectiveness of UNCHCS's processes and compliance[.]" (Doc. 163-1 ¶ 10 (emphasis added).) This request is ostensibly to ensure that UNCHCS adopts best practices in complying with its obligations under the Acts. But best practices are not required, and the requested injunction plainly invites the court to second-guess the state's managerial

84

decisions and priorities, a task which "federal courts are ill suited to undertake[.]" City of Canton, Ohio v. Harris, 489 U.S. 378, 392 (1989); see Midgett, 254 F.3d at 850 ("[T]he fact that Tri-Met is a local government agency with procedures already in place for monitoring . . . ADA compliance militates against a federal court's mandating substitute procedures of its own design to address the same issues."); Brown v. Bd. of Trustees of LaGrange Indep. Sch. Dist., 187 F.2d 20, 24 (5th Cir. 1951) ("[A]n injunction requiring detailed and continuous supervision over the conduct of a [State entity] is not congenial to equitable principles and practices and will not usually be granted.").

These principles would be dishonored, moreover, if the court ignored UNCHCS's extensive efforts to better serve blind and sight-impaired patients. That UNCHCS has undertaken such efforts to better comply with federal law also weighs against issuing a permanent injunction requiring systemwide reform. See Reynolds, 506 F.3d at 198 (noting that evidence of state defendants' efforts to comply with federal law weighed against issuing permanent injunction); Casas v. City of El Paso, 502 F. Supp. 2d 542, 550 (W.D. Tex. 2007) ("[T]he City's apparent willingness to address Plaintiff's concerns" in combination with "proper respect for the integrity and function of local government institutions" cautioned against entering permanent injunction against locality (quotation omitted)); Levy v. Mote, 104 F. Supp. 2d 538, 545 (D. Md. 2000)

(noting that the "substantial remedial efforts undertaken" by the University of Maryland to comply with the ADA was reason for not granting a permanent injunction).

## 2. Plaintiffs' Proposed Injunction is Overbroad

As laid out in their proposed injunctive order (Doc. 163-1), Plaintiffs seek four major areas of mandatory relief, all allegedly "crafted" to "ensure future compliance with the law through <u>systemic reforms</u> designed to work." (Doc. 151 ¶ 8 (emphasis added).)

First, Plaintiffs propose a generalized mandate ordering UNCHCS to comply with federal disability laws. (<u>See</u> Doc. 163-1 ¶¶ 1-4.) Specifically, Plaintiffs ask that UNCHCS be ordered to (1) "[n]ot exclude individuals with disabilities" from participating in UNCHCS's services; (2) "[n]ot deny individuals with disabilities . . . an equal opportunity to participate in or benefit from" UNCHCS's services; (3) "[t]ake necessary and timely steps to ensure that it furnishes appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity" to participate in UNCHCS's services; and (4) "[n]ot discriminate against individuals . . . because such individuals oppose any act or practice made unlawful" by the ADA and other federal civil rights laws. (<u>Id.</u>)

Second, Plaintiffs seek broad "accessible format relief" – to be implemented within six months – that would require UNCHCS to:

86

(1) "[e]nsure that it records and complies with all requests by blind individuals for print communications" (id. ¶ 7(a)); (2) "[e]nsure that the accessible formats it provides conform to established, recognized guidelines for accessible document design" (id. ¶ 7(b)); (3) "[i]ssue or revise existing policies to the extent necessary to implement prompt production of standard print communications in the alternative format requested [including various specific policies]" (id. ¶ 7(c)); (4) [p]ost conspicuous notice, on the UNC Health website homepage . . . that UNCHCS provides accessible formats . . . to individuals with visual impairments" (id. ¶ 7(d)); and (5) "[e]stablish a process through which UNCHCS shall solicit, receive, and address complaints and feedback from the public and patients regarding the provision of accessible formats to individuals with disabilities" (id. ¶ 7(e)).

Third, Plaintiffs seek an order requiring UNCHCS, within twelve months, to make various changes to its electronic health record system. (Id. ¶ 8.) For example, Plaintiffs' proposed injunction would require UNCHCS to ensure that its electronic health records system "prominently display the requested accessible format in the patient's electronic health record, such that all staff viewing the electronic health record are likely to see the notification." (Id. ¶ 8(a)(i).) The proposed injunction would also require UNCHCS to modify its electronic health records system to ensure that "once a blind individual has requested an

87

accessible format, all future documents are automatically delivered to that individual in their requested accessible format . . . through an accessible document generation process." (Id. ¶ 8(a)(ii)). Additionally, the proposed injunction would require UNCHCS to train all employees to properly implement the new electronic health record system and provide "any other training necessary to ensure proper implementation of effective communication policies and processes required by" the injunction. (Id. at ¶ 8(b).)

Fourth, and finally, Plaintiffs seek the above-mentioned reforms network-wide, meaning that UNCHCS would be directed to implement all requirements at each provider within the UNCHCS network (whether owned or managed by UNCHCS) and "all contractors that provide documents to individuals on behalf of UNCHCS." (Id. ¶ 9.) Should "an entity managed by UNCHCS refuse[] to comply with the requirements set forth," moreover, Plaintiffs demand that UNCHCS be required to "cease its management contract or modify the terms of the management contract" with that entity as necessary to remain in compliance with the proposed injunction. (Id.)

Plaintiffs argue that such wide-ranging systemic relief is justified because (1) Miles, Dr. Scott, and other NFB members and DRNC constituents intend to and likely will visit UNCHCS-affiliated providers in the future (see Doc. 151-1 at 25–26; Doc. 121 at 41–43); (2) NFB and DRNC may "seek broad relief on behalf

88

of their memberships" (Doc. 151-1 at 25-27; see Doc. 121. at 43–44); (3) the nature of the violations (which "stem from . . . UNCHCS's centralized health records system" and therefore are "neither individualized nor limited to certain locations" (Doc. 151-1 at 25-26)) warrant "systemwide" relief (see id. at 24-27); and (4) the record demonstrates that UNCHCS's "piecemeal approach," like its past efforts toward communicating effectively with Miles and Dr. Scott, has failed, thereby justifying a broad injunction that would "end[] the need for protracted litigation," "advance[] the ADA's remedial goals," and finally "provide Plaintiffs complete relief." (Id. at 25-27).

In response, UNCHCS contends that the injunctive relief Plaintiffs seek is "far broader than reasonably necessary" in both substance and scope. (Doc. 152 at 23-24.) Substantively, UNCHCS contends that the injunction seeks to impose "best practices" that are not compelled by the Acts, all "without regard to reasonableness, cost, statutorily-allowed defenses . . . or the well-settled principle that accommodations need not be perfect or the one strongly preferred." (Id. at 24.) UNCHCS also argues that the proposed injunction is unreasonable in scope, given that it "seek[s] to impose its mandates systemwide to the point of altering contracts with managed entities and contractors, and far beyond the reach of any violations, whether stipulated or not yet established, pertaining to the services Miles and Scott received

89

through only several visits each year at approximately 6 total clinics." (Id. at 24.) Furthermore, UNCHCS says, "[a]llowing" Plaintiffs' "broad" request for injunctive relief "on a systemwide level" could "create confusion, chaos, and other unforeseen problems, including creating tension with other important health care laws and regulations that UNCHCS is obligated to follow, thereby presenting the untenable risk of interfering with UNCHCS's provision of health care services to its patients." (Doc. 163 at 31-32.)

UNCHCS is correct that Plaintiffs' requested relief is overbroad on several fronts. As noted above, while "injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation." Hayes, 10 F.3d at 217. Nevertheless, Plaintiffs seek sweeping injunctive relief that far exceeds the extent of any violation established. Consider, for instance, the first major category of relief sought by Plaintiffs – captured in the first four paragraphs of Plaintiffs' proposed injunction (Doc. 163-1 ¶¶ 1-4) - which does nothing more than duplicate UNCHCS's existing obligations under the law. Yet the problems with these "sort of go-thy-way-and-sin-no-more" provisions are well established. Lowery, 158 F.3d at 766. Such injunctions are, almost necessarily, overbroad in every case. If entered here, for example, Plaintiffs' proposed injunction would

90

effectively allow any DRNC or NFB member – regardless of how different their circumstances – to bring a Title II ADA claim arising at UNCHCS via a contempt motion. See Lowery, 158 F.3d at 767 (vacating portion of injunction that "essentially" enjoined defendant "from committing further violations of federal civil rights laws" because it prohibited more than the violation established in the litigation); Davis v. Richmond, Fredericksburg & Potomac R. Co., 803 F.2d 1322, 1328 (4th Cir. 1986) (concluding that injunction prohibiting the defendant from "committing further violations of Title VII" was overbroad because it impermissibly subjected the defendant "to contempt proceedings for conduct unlike and unrelated to the violation with which it was originally charged." (internal quotation marks and alterations omitted)).

As the Supreme Court put it, "the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged." N.L.R.B. v. Express Pub. Co., 312 U.S. 426, 435-46 (1941); see also Swift & Co. v. United States, 196 U.S. 375, 396 (1905) (Holmes, J.) ("We cannot issue a general injunction against all possible breaches of the law.").

More fundamentally, obey-the-law injunctions run afoul of the

91

traditional equitable principle – codified in Federal Rule of Civil Procedure 65(d) - that an injunction "state its terms specifically[] and . . . describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); see Schmidt, 414 U.S. at 476 ("Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."); E.E.O.C. v. AutoZone, Inc., 707 F.3d 824, 841 (7th Cir. 2013) ("An injunction that does no more than order a defeated litigant to obey the law" raises "vagueness" and "overbreadth" concerns under Rule 65); City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 144 (2d Cir. 2011) (observing that "an injunction must be more specific than a simple command that the defendant obey the law" (citation omitted)). Here, broad directives requiring UNCHCS to "comply" with federal disability laws and to otherwise "take necessary and timely steps" to furnish appropriate auxiliary aids to disabled individuals (Doc. 163-1 ¶ 3) plainly do not provide "explicit notice of precisely what conduct is outlawed[,]" Schmidt, 414 U.S. at 476, nor do they "describe in reasonable detail . . . the act or acts restrained or required[,]" Fed. R. Civ. P. 65(d)(1). Thus, the court has little trouble concluding that the vague "obey the law" provisions in Plaintiffs' proposed injunction are unwarranted here.

The second major category of relief Plaintiffs seek is also,

in various ways, overbroad. Plaintiffs demand in paragraph 7(b) of the proposed injunction that UNCHCS provide accessible formats in "established, recognized guidelines for accessible document design[,]" including, for example, Web Content Accessibility Guidelines 2.1 ("WCAG 2.1"), Clear Print Accessibility Guidelines or American Printing House for the Blind's Guidelines, and "industry standards for Braille transcription by a certified Braille transcriber." (Doc. 163-1 ¶ 7(b).) As discussed extensively above, however, an accommodation may qualify as "reasonable" even if it deviates from "best practices." Seremeth, 673 F.3d at 340. Accordingly, the court will not hold UNCHCS to any specific guideline or format, so long as the documents it provides to sight-impaired patients are accessible.[36]

Similarly, Plaintiffs' request that UNCHCS "issue or revise" its policies to "extend deadlines to respond to documents for which an accessible format is requested" by the "same number of days it took UNCHCS to satisfy the accessible format request" appears to exceed what the law requires. (Doc. 163-1 ¶ 7(c)(i).) In any event, an injunction is unwarranted, as UNCHCS has explained that in situations where an accessible format is not provided in a timely manner, "UNCHCS would extend the deadline for payment in

---

[36] And in any event, UNCHCS has represented to the court, without contradiction, that it nevertheless has adopted the American Council of the Blind guidelines for its large print documents even though not required to do so.

the same manner it would extend [it] to sighted patients." (Doc. 163-3 at 62.)

Plaintiffs' third major category of relief – which seeks to have UNCHCS overhaul its electronic health records system – is also unwarranted. Fundamentally, Plaintiffs' demand that UNCHCS "[i]mplement changes to its electronic health records system" (Doc. 163-1 ¶ 8(a)) is grounded upon the misconception that the district court must elucidate <u>how</u> UNCHCS should ensure it provides sight-impaired patients with accessible document formats. Plaintiffs may well be correct that UNCHCS would better serve sight-impaired patients by implementing the precise recommendations outlined in their proposed injunction. But that is not required of UNCHCS to comply with the law. The court is confident that UNCHCS is capable of devising the means to comply with the court's limited injunction and all legal requirements, particularly in light of the numerous workable suggestions articulated by Plaintiffs. See <u>Fortyune v. Am. Multi-Cinema, Inc.</u>, 364 F.3d 1075, 1087 (9th Cir. 2004) ("The injunction is not . . . in violation of Rule 65(d), even though it declines to provide AMC with explicit instructions on the appropriate means to accomplish this directive."); <u>Indep. Living Res. v. Oregon Arena Corp.</u>, 1 F. Supp. 2d 1159, 1173 n.16 (D. Or. 1998) (leaving "logistical matters" concerning the implementation of an injunction "in the capable hands of the [defendants]"); see also <u>Bennett-Nelson v.</u>

94

Louisiana Bd. of Regents, 431 F.3d 448, 455 (5th Cir. 2005)(noting that where a public entity has an affirmative obligation to make reasonable accommodations for a disabled individual but fails to meet that obligation, "the cause of that failure is irrelevant").

Furthermore, as UNCHCS has demonstrated, medical records provision is already a difficult and complex challenge for healthcare providers. Adopting Plaintiffs' effort to reconfigure the healthcare system's computer operations would, in addition to increasing the cost of its already substantial Acts-related compliance efforts, dictate its contractual terms with managed entities, disrupt its ongoing and evolving effective communication policies, practices, and compliance efforts, and necessitate a significant reallocation of financial resources and employee focus away from clinical support functions towards a focus on implementing a one-size-fits-all electronic health records process remodeling.

Such a provision would also require judicial oversight of the details of UNCHCS's electronic health records system, a task for which a federal district court is ill-equipped. See United States v. Paramount Pictures, Inc., 334 U.S. 131, 165 (1948) (vacating injunction that implicated the "judiciary heavily in the details of business management" in order for supervision "to be effective"); Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 277 (7th Cir. 1992)

(consideration of "scarce judicial resources" is important factor in determining the propriety of injunctive relief that would require continued court supervision); cf. Brown v. Plata, 563 U.S. 493, 558, (2011) (Scalia, J., dissenting) ("Three years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions.").

Finally, consider the fourth major category of relief that Plaintiffs seek here – articulated in paragraph 9 of the proposed injunction:

> "[e]nsure that the above-provisions are applied and implemented at all entities within the UNCHCS network, whether owned by UNCHCS or managed by UNCHCS, and all contractors that provide documents to individuals on behalf of UNCHCS. If an entity managed by UNCHCS refuses to comply with the requirements set forth in this Order, UNCHCS must cease its management contract or modify the terms of the management contract . . . "

(Doc. 163-1 ¶ 9.) This request is nothing more than an attempt to elide the requirements of Federal Rule of Civil Procedure 65(d)(2), not to mention basic principles of due process. Generally, the court lacks authority to – and here it will not - enjoin third parties not before it. "A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction." Wright & Miller, supra, § 2956; R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 957 (4th Cir. 1999) ("Injunctive relief, by its very nature, can only

96

be granted in an _in personam_ action commenced by one party against another in accordance with established process."). Indeed, "holding a nonparty in contempt for engaging in enjoined conduct might be considered as a possible denial of due process[.]" Wright & Miller, _supra_, § 2956. After all, "[t]he central reason that one who is not a party to the action in which the injunction was issued cannot be bound by it is that he has not had his day in court with respect to the validity of the injunction." G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 37 (1st Cir. 1980). Plaintiffs' request, while not directly enjoining other entities with whom UNCHCS manages and contracts, doubtlessly has the practical effect of doing so, and therefore the court will not order the requested relief.[37]

---

[37] Rule 65(d)(2) carves out the limited but well-established exceptions to the general rule that an injunction binds only the parties to the underlying action. First, Rule 65(d)(2) dictates that injunctions are binding not only on the parties to the underlying action, but also on their "officers, agents, servants, employees, and attorneys," even when those "officers, agents," etc., are not themselves parties to the lawsuit. Fed. R. Civ. P. 65(d)(2). Second, Rule 65(d)(2) makes an injunction binding on nonparties "who are in active concert or participation" with an enjoined party. Id.; see K.C. ex rel. Afr. H. v. Shipman, 716 F.3d 107, 115-16 (4th Cir. 2013). This latter rule is generally triggered if a nonparty aids or abets an enjoined party in violating an injunction, or when a nonparty is "in privity" with an enjoined party. See ADT LLC v. NorthStar Alarm Servs., LLC, 853 F.3d 1348, 1352 (11th Cir. 2017); Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc., 628 F.3d 837, 849 (7th Cir. 2010). Although the concept of privity is sometimes hard to pin down, it has generally been "restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding." Wright & Miller, _supra_, § 2956. Here,

Even more fundamentally, Plaintiffs do not have standing to seek this remedy. See Summers, 555 U.S. at 493 (plaintiff has the "burden of showing that he has standing for each type of relief sought"); TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2208 (2021) ("And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]"). On this record, there is no evidence that Miles or Dr. Scott, not to mention any other DRNC or NFB member, ever visited or plan to visit any non-UNCHCS facility. Nor do Plaintiffs otherwise explain how this relief would redress the harm caused by UNCHCS's failure to provide Miles, Scott, or any other DRNC/NFB members with equally effective communications. Accordingly, there is no reason to believe that this specific request would in any way "redress" Plaintiffs' "particular injury." Gill, 138 S. Ct. at 1934 (2018) (citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353 (2006)); see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 105–10 (1998) (analyzing each "of the specific items of relief sought," including specific types of injunctive relief, and finding none met "the redressability requirement").

It also bears emphasis that UNCHCS has already implemented

Plaintiffs have failed to demonstrate that either UNCHCS's managed care organizations, such as Nash General Hospital (a former defendant), or those entities with whom it contracts are "in privity" with UNCHCS.

much of what Plaintiffs ask for in their proposed injunction. Notably, as discussed extensively above, because UNCHCS affirmatively implemented a "hard stop" in the Epic registration process to ensure that it collects a patient's communication needs, if any (Doc. 162 ¶ 8), Plaintiffs have modified their proposed injunction to include a requirement that UNCHCS "continue to automatically prompt . . . registration and scheduling staff to affirmatively ask all individuals registering for medical care . . . if they or their companion require an accessible format due to disability." (Doc. 163-1 ¶ 5 (emphasis added).) In doing so, moreover, UNCHCS appears also to have, consistent with paragraph 8(a)(i) of Plaintiffs' proposed injunction, "[d]evelop[ed] a simplified and uniform process to add a notification of the requested accessible format in the electronic health records system that will include the creation of a separate demographic field to identify communication disabilities and need for accessible format . . . and a drop-down menu of available accessible formats." (Doc. 163-1 ¶ 8(a)(i).) Indeed, the step-by-step "tip sheet" provided to UNCHCS personnel explains precisely "the process for completing ADA fields for patients with disabilities[.]" (Doc. 163-3 at 15; see Doc. 162-5 at 2 ("Completing ADA field for Patients with Disabilities").)

In other ways, too, UNCHCS has implemented what Plaintiffs ask for in their proposed injunction. For example, Plaintiffs

request that UNCHCS "[p]ost conspicuous notice" on the UNC Health website homepage that it "provides accessible formats[.]" (Doc. 163-1 ¶ 7(d).) UNCHCS, by all accounts, is doing just that. https://www.unchealth.org/about-us/equity-inclusion/language-accessibility-services (last visited June 9, 2023). It is worth noting, moreover, that UNCHCS now provides, on this same webpage, several common healthcare forms in large print in accordance with American Council of the Blind guidelines. Id.

Consider, as well, Plaintiffs' request that UNCHCS "[e]stablish a process through which UNCHCS shall solicit, receive, and address complaints . . . regarding the provision of accessible formats to individuals with disabilities." (Doc. 163-1 ¶ 7(e).) UNCHCS's Notice of Non-Discrimination, which is provided for free in large print on its website, provides detailed information about how to file such a complaint. https://www.unchealthcare.org/app/files/public/30cb9a8a-84d7-427b-bebc-bcc1f17a3ea7/1557%20notice%20for%20website-current.pdf (last visited June 22, 2023). UNCHCS's Compliance Department "also provides multiple ways to report patient concerns, questions, and complaints[,]" (Doc. 163-12 at 7) including by providing information regarding how to contact "local" compliance officers across the UNCHCS network, https://www.unchealth.org/for-medical-professionals/compliance-office/compliance-concerns (last visited June 22, 2023).

Ordering such relief in these circumstances is problematic. As a foundational matter, Plaintiffs have not established how these specific remedies would redress the injuries that Miles and Dr. Scott have suffered. See Steel Co., 523 U.S. at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court[.]"). Moreover, the court is disinclined to order UNCHCS – on pain of contempt – to do the very things it is already doing absent some indication that it might revert to past practices after the litigation is concluded. To be sure, promises of reform alone are often insufficient to moot a case for purposes of Article III. See Porter, 923 F.3d at 364-65. But closely related to the concept of Article III mootness is the doctrine of prudential mootness, which derives from "doctrines of remedial discretion[,]" S. Utah Wilderness All. v. Smith, 110 F.3d 724, 727 (10th Cir. 1997), and addresses "not the power to grant relief but the court's discretion in the exercise of that power[,]" Chamber of Commerce v. United States Dep't of Energy, 627 F.2d 289, 291 (D.C. Cir. 1980); see S-1 v. Spangler, 832 F.2d 294, 297 (4th Cir. 1987) ("The discretionary power to withhold injunctive and declaratory relief for prudential reasons, even in a case not constitutionally moot, is well established."). This doctrine has special force when the relief sought is an injunction against the government: as one court put it, "once the plaintiff has a remedial promise from a coordinate branch in hand, we will generally decline

101

to add the promise of a judicial remedy to the heap." Winzler v. Toyota Motor Sales U.S.A., Inc., 681 F.3d 1208, 1210 (10th Cir. 2012) (Gorsuch J.); Spangler, 832 F.2d at 298 (explaining that prudential mootness is particularly applicable when the issue involves "the power of the federal courts" to "interfere by injunction with the internal process of a state administrative agency").

Applying these principles here, the court declines to "exercise its power" to order that UNCHCS continue carrying out practices it has already affirmatively adopted in apparent good faith. City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982); cf. A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331 (1961) ("[S]ound discretion withholds the remedy where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted.").

*   *   *

In the increasingly complex world of healthcare, the task of planning for and providing effective communications to every patient may be one of the most important and challenging tasks that any healthcare system faces. Disabled individuals are entitled to have their disability effectively accommodated, "but what such effective accommodation requires is based on the

102

abilities of the individual, the nature and complexity of the information exchanged, and the overall context of the situation." Basta, 56 F.4th at 319. And what constitutes a reasonable accommodation for one patient is not necessarily a reasonable accommodation for any other. Ensuring that any individual patient has meaningful access to a health provider's services therefore requires considerable planning, resources to execute the plans, and a willingness to adapt when those plans do not sufficiently accomplish their goals.

The voluminous record in this case confirms as much. It reveals that in many - perhaps most - respects, UNCHCS providers have strived to provide those who are sight-impaired with meaningful access to their services. Since this litigation began nearly four and a half years ago, UNCHCS has overhauled how it effectively communicates with disabled patients by making myriad changes to its practices and processes. Notably, it has worked extensively with Epic, from whom it licenses its electronic health care record software program, to ensure that intake personnel cannot complete the patient registration process without confirming whether the patient needs an auxiliary aid or service, including, for example, large print documents or a qualified reader. (See Doc. 162 ¶ 8, Doc. 163-13 at 1-6 (tip sheet for personnel describing new "hard-stop" registration process).) UNCHCS has also modified its software system to ensure that during

103

a patient's visit, the clinician can select and automatically print large print documents, such as after-visit summaries, at the time of the patient's appointment. (Doc. 163-3 at 54.) As it relates to the documents that do not vary by individual recipient – such as the general consent to treatment form and the notice of privacy practices – UNCHCS now provides them on its website in large font in accordance with American Council of the Blind Guidelines. https://www.unchealth.org/about-us/equity-inclusion/language-accessibility-services (last visited June 22, 2023). And in the event a patient does not print or view these documents in advance of his or her appointment, UNCHCS has also provided instructions to its personnel on how to print them in large print at the time of service. (Doc. 163-3 at 64.)

UNCHCS has also established an ADA Workgroup, which consists of a multidisciplinary team of UNCHCS staff who work together with a goal of continuously enhancing UNCHCS's policies, procedures, and processes for ensuring effective communication. (Doc. 162 ¶ 10; Doc. 152-1 ¶¶ 9-11.) Through the direction of the ADA Workgroup, UNCHCS has updated its Effective Communication Policy and expanded its scope (Doc. 163-7 at 1), developed a revised training module for staff on how best to provide culturally competent care for the disabled (Doc. 162 ¶ 6), and completed manual accessibility audits on UNCHCS's websites (Doc. 152-1 ¶ 10). It has also created several "Tip Sheets" that provide

UNCHCS personnel with step-by-step instructions for performing tasks both within the Epic electronic medical record system and that specifically relate to providing effective communication, including timely provision of auxiliary aids and services, to patients. (Doc. 162 ¶ 7.) As it relates to MyChart, UNCHCS and the ADA Workgroup are also working closely with UNCHCS's Information Services Department and Epic to implement certain MyChart enhancements for patient disabilities as they become available. (Doc. 163-9 ¶ 16.) UNCHCS has also shown a consistent willingness to put MyChart users in touch with its information technology support team to troubleshoot issues with MyChart accessibility. (See, e.g., Doc. 108-14 at 6; Doc. 152-22 ¶¶ 5-6; Doc. 152-25 at 1-2.)

Despite these efforts, however, the record also reveals that UNCHCS has nevertheless failed to accommodate, adequately and consistently, the needs of two patients of its healthcare providers, Miles and Dr. Scott. It is undisputed that, at times, UNCHCS has provided both Miles and Dr. Scott with a reasonable accommodation; indeed, on many occasions, it has provided each with the precise accommodation he wanted, even if in doing so it went above and beyond what the law requires. Yet it is also undisputed that on other occasions – including during the pendency of the present motion for a permanent injunction – UNCHCS failed to provide them with <u>any</u> appropriate auxiliary aid or service in

105

a timely fashion, thereby depriving them of the meaningful access to UNCHCS's services that the law requires.

Plaintiffs claim that UNCHCS's failures with respect to Miles and Dr. Scott are reflective of a widespread problem, and hence that systemwide relief is necessary to ensure that all blind individuals receive effective communication from UNCHCS providers.

But the power of a federal district court is more constrained. In what is perhaps the most famous pronouncement about the federal judicial power, Chief Justice John Marshall observed that "[t]he province of the court is, solely, to decide on the rights of individuals[.]" Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803). Any number of principles about Article III can be traced back to this observation, but the relevant one that follows here is that a plaintiff's remedy must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." Lewis, 518 U.S. at 357. The permanent injunction crafted in this case best comports with these principles, while also ensuring that Miles and Dr. Scott – the only individuals who have established injury on this record - are properly afforded the basic promise of equality in public services that animates the federal disability laws implicated here.

Finally, there is the issue of duration. The court finds that three years is a reasonable and appropriate duration for the narrow injunction in this case. This coincides with Plaintiffs'

request.  (See Doc. 163-1 at 11.)  This lawsuit began approximately four and a half years ago.  Yet since that time, and even with the specter of litigation, UNCHCS has failed to provide Miles and Dr. Scott consistently with effective communications.  Considering UNCHCS's good faith efforts to remedy its past failures and the narrow nature of the injunction (which includes providing communication formats to which UNCHCS has not objected, such as Braille and screen reader compatible documents), the court is confident that three years will not be overly burdensome or intrusive.  See Spencer v. Gen. Elec. Co., 894 F.2d 651, 660 (4th Cir. 1990) (in Title VII context, explaining that a "district court must, of course, exercise its discretion in light of the prophylactic purposes of the Act to ensure that discrimination does not recur"), abrogated on other grounds by Farrar v. Hobby, 506 U.S. 103 (1992); Developments in the Law - Types of Injunctions, 78 Harv. L. Rev. 1055, 1055 (1965) ("Although the duration of a so-called permanent injunction is theoretically unlimited, in many cases its temporal extent will be controlled by the nature of the situation it is designed to correct.").

## III. CONCLUSION

For the reasons stated, therefore,

IT IS ORDERED that Plaintiffs' motion for permanent injunction is GRANTED IN PART and DENIED IN PART, and a Judgment

and Permanent Injunction shall issue by separate order providing as follows:

> Defendant UNCHCS, its officers, agents, servants, and employees, and other persons acting on behalf of or in concert with it who receive actual notice of this Permanent Injunction by personal service or otherwise, shall:

> Provide Plaintiff Timothy Miles, upon his request, with equally effective access to all material information UNCHCS provides its patients, which shall include, upon his request, large print documents in an accessible format; provided, however, that where such documents are not available at the time of the clinical encounter and upon Miles's request, UNCHCS shall provide an alternative method of communication, such as by reading the communication to Miles in a private location that best maintains Miles's privacy and independence until UNCHCS can provide, as soon as practicable, large print copies.

> Provide DRNC constituent Dr. Ricky Scott, upon his request, equally effective access to all material information that UNCHCS provides its patients, which shall include, upon his request, accessible electronic documents configured for use by screen reading devices such as JAWS to the extent UNCHCS has control over such documents for manipulation for use by screen readers, or, upon Dr. Scott's request, in Braille; provided, however, that where such documents are not available at the time of the clinical encounter and upon Dr. Scott's request, UNCHCS shall provide an alternative method of communication, such as by reading the communication to Dr. Scott in a private location that best maintains Dr. Scott's privacy and independence until UNCHCS can provide, as soon as practicable, electronic or Braille copies.

IT IS FURTHER ORDERED that this injunction will remain in effect for three (3) years from the date of entry.

Any petition for costs and attorneys' fees may be filed no later than thirty days from the date of the entry of the Judgment

108

and Injunction.

                                        ___/s/___Thomas D. Schroeder
                                        United States District Judge

June 22, 2023