UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHN BONE, TIMOTHY MILES, THE          )
NATIONAL FEDERATON OF THE              )
BLIND, INC., AND DISABILITY            )
RIGHTS NORTH CAROLINA,                 )
                                       )
          Plaintiffs,                  )
                                       )          1:18CV994
          v.                           )
                                       )
UNIVERSITY OF NORTH CAROLINA           )
HEALTH CARE SYSTEM,                    )
                                       )
          Defendant.                   )

<u>**MEMORANDUM OPINION AND ORDER**</u>

THOMAS D. SCHROEDER, District Judge.

Before the court are the parties' post-judgment motions requesting an award of attorneys' fees, expenses, and costs. Plaintiffs move for a statutory award of attorneys' fees, expenses, and costs as prevailing parties. (Doc. 172.) Defendant University of North Carolina Health Care System ("UNCHCS") moves for an award of costs based on a prior offer of judgment that was rejected. (Doc. 171.) For the reasons set forth below, Plaintiffs' motion will be granted to the extent of the award noted herein, and UNCHCS's motion for costs will be denied.

**I.   BACKGROUND**

This action involved challenges to UNCHCS's practices for providing medical care to sight-impaired patients of its health care system. The court has written extensively on the background

of this case.  (See Docs. 44, 98, 125, 143, 167.)  The principal facts as they relate to consideration of the pending motions are set out below.

Plaintiff Timothy Miles is a constituent of Plaintiff Disability Rights North Carolina ("DRNC"), which advocates for the disabled.  He is also a member of Plaintiff National Federation for the Blind, Inc. ("NFB"), a non-profit corporation organized to "promote[] the general welfare of the blind," which claims some 50,000 members, the majority of whom are blind.  (Doc. 18 ¶ 9; Doc. 103-12 ¶ 4.)  Miles has been a patient at UNCHCS for over twenty years.  (Doc. 103-4 ¶ 11.)  During that time and the pendency of this litigation, Miles visited multiple UNCHCS clinics at least annually, with somewhere near 100 such trips in the past four years alone.  (Doc. 167 at 4.)  He is legally blind and suffers from a condition known as oculocutaneous albinism, an extreme sensitivity to light.  (Doc. 103-4 ¶ 6; Doc. 108-12 at 3.)  As a result, he cannot read standard print documents on many occasions.  (Doc. 163-4 ¶ 4.)  He has a computer configured with JAWS[1] Fusion, a screen access software that reads aloud the text on a computer screen or iPhone and allows a user to edit documents much like the voice-dictation feature on a cell phone.  (Doc. 120-2 at 13-14.)  While he can use this software to access various

---

[1] JAWS is an acronym for "Job Access with Speech."

websites, he maintains he was unable to use it to access UNCHCS records.

Like Miles, Plaintiff John Bone is a constituent of DRNC and a member of NFB. (Doc. 18 ¶ 7.) He is also "blind and uses Braille to make and receive written communications." (Id.) Bone received services from Nash General Hospital, an alleged affiliate of UNCHCS, which failed to provide him Braille materials related to his medical services. (Doc. 18 ¶¶ 15-22.)

Similarly, Dr. Ricky Scott, a supplemental declarant in support of the organizational Plaintiffs in this case, is legally blind, a long-time patient of UNCHCS, and a DRNC constituent. (Doc. 151-4 ¶¶ 3-4; Doc. 151-1 at 6; Doc. 103-14 ¶ 4.) Dr. Scott routinely visits UNC Family Medicine West, "averaging two to three visits each year." (Doc. 151-4 ¶¶ 4-5.) He cannot "read printed materials," but he can "read documents in Braille or in accessible electronic formats that [he] can access on [his] computer using screen reader software, which converts written text to speech or to Braille on a refreshable Braille display." (Doc. 151-4 ¶ 3; see also Doc. 163-5 ¶ 3.)

Defendant UNCHCS is an integrated not-for-profit health care system owned by the state of North Carolina and established by state law. See N.C. Gen. Stat. § 116-37. Its principal place of business is Chapel Hill, North Carolina. (Doc. 18 ¶ 13.) Currently, it "consists of UNC Hospitals and its provider network"

along with "eleven affiliate hospitals and hospital systems across the state." (Id.) UNCHCS also "employs and contracts with numerous providers for the delivery of medical services in its facilities." (Id.) As the University of North Carolina website explains, "UNC Health provides care to patients in all of the state's 100 counties through its 11 hospitals, 13 hospital campuses, and hundreds of clinical practices" and "is one of the nation's leading academic health care systems, a $5.4 billion enterprise, with more than 33,000 employees from Hendersonville to Jacksonville." UNC Health, https://www.north carolina.edu/institution/unc-health-care-system/ (last visited March 7, 2024). UNCHCS, like many other hospital systems around the nation, uses Epic System ("Epic"), a third-party platform, to maintain its electronic medical records. (See Doc. 121-8 at 3; Doc. 103-28 at 8; Doc. 152 at 5.)

This lawsuit arises out of problems that Bone,[2] Miles, and Dr. Scott encountered when receiving care at UNCHCS providers. Because Miles is legally blind, he cannot read standard print documents (font size 12-point or less), even with the help of prescription glasses. (Doc. 163-4 ¶ 4.) Thus, years ago, Miles

---

[2] Bone had similar experiences as Miles and Dr. Scott. (See Doc. 18 ¶¶ 15-22.) However, Bone's claims relate to his interactions with Nash General Hospital, an alleged "affiliate" of UNCHCS that has been dismissed from this lawsuit and is excluded from Plaintiffs' motion for attorneys' fees. Bone's claim for attorneys' fees remains only to the extent of his damages claim against UNCHCS as an alleged affiliate.

asked UNCHCS to provide him with large print versions of documents commonly provided to patients during the course of a visit, including, for example, after-visit summaries, general consent to treatment forms, medical bills, and intake questionnaires. (Doc. 103-4 ¶ 13.) Yet for years - and despite Miles's repeated requests - UNCHCS providers regularly gave him standard print or otherwise inaccessible documents. (Id.) By Miles's calculation, from January 2015 to September 2018, he visited a UNCHCS facility more than 35 times, yet each time he was sent home with (or later mailed) "at least one inaccessible standard print document." (Id. ¶ 14; see Doc. 105-4 at 17-225 (copies of standard print documents that Miles retained from this time period).) As reflected in the record, the inaccessible standard print materials that Miles received and retained from January 2015 to September 2018 total approximately 200 pages. (See Doc. 105-4 at 21-225.) Such documents include bills, physician reports, receipts, after-visit summaries, discharge documents, medical records, appointment reminders, feedback-request forms, welcome packets, and instructions. (See id. at 18-20 (index of standard print documents dated between January 6, 2015, and September 18, 2018).) According to Miles, this number actually "under-represent[s]" how many inaccessible documents he received from UNCHCS during this period, as he was often required to review and sign standard print documents "during the check in process for these visits, copies of

5

which [he] did not always receive and therefore do[es] not possess." (Doc. 103-4 ¶ 14.)

Like Miles, Dr. Scott activated a UNC MyChart account several years ago with the understanding that it would allow him "to review [his] after-visit summaries and lab results in an accessible electronic format." (Doc. 103-14 ¶ 9.) Although he "regularly use[s]" a screen reader program (JAWS) "to access properly designed electronic documents and websites[,] . . . the documents available on [his] UNC MyChart account," at least as of March 2021, "were not readable by JAWS[,] and [he] could not access any of the information in these documents." (Id. ¶ 10.) Eventually, Dr. Scott "asked UNC Family Medicine West to stop sending [him] documents through UNC MyChart and [to] cancel [his] account because it [was] inaccessible and useless to [him]." (Id. ¶ 11.) In addition, Dr. Scott inconsistently received disability accessible forms during his visits to UNCHCS providers, sometimes receiving auxiliary services (Doc. 152-22 ¶¶ 5-6) and other times receiving standard print forms that he could not read (Doc. 163-5 ¶ 4).

Though Plaintiffs reached out to UNCHCS to attempt to resolve the repeated failures to provide Miles and Dr. Scott with accessible documentation from medical visits, consistent lapses led to the filing of this action in December 2018. (See Doc. 1.) The amended complaint (Doc. 18) alleged that UNCHCS denied "blind individuals an equal opportunity to access their health care

6

information" in violation of Titles II and III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, 12181-12189; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"); and Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557" of the "ACA") (collectively, the "Acts"). (Doc. 1 ¶ 1; accord Doc. 18 (amended complaint) ¶ 1). Even after the filing of this action, Miles and Scott continued to receive, from time to time, documents that failed to meet their disability needs.

UNCHCS (and former Defendant Nash Hospitals, Inc.) each moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docs. 20, 28.) The magistrate judge recommended that the motions be granted in part and denied in part. (Doc. 44 at 1.) As to the claims against UNCHCS, the magistrate judge recommended that the court deny the motion to dismiss entirely, concluding that Miles, Bone, NFB, and DRNC had plausibly stated a claim. (Id. at 14-24, 40-46, 51.)[3] On March 5, 2020, this court adopted the magistrate judge's recommendation, thereby allowing Plaintiffs' claims against UNCHCS to

---

[3] As to the claims against Nash, the magistrate judge recommended dismissal of all but Bone's claims for damages, concluding that neither Bone, NFB, nor DRNC had standing to pursue future-looking injunctive relief against Nash. (Doc. 44 at 32, 37-38, 50-51.)

7

proceed.  (Doc. 57 at 1-3.)[4]

UNCHCS later moved for judgment on the pleadings (Doc. 68), relying in large part on arguments made in its motion to dismiss.  (See, e.g., Doc. 98 at 20-21 (comparing arguments).)  The magistrate judge recommended that that motion also be denied (id. at 1), and this court adopted that recommendation (Doc. 106).[5]

Plaintiffs and UNCHCS subsequently filed cross-motions for summary judgment (see Docs. 103, 107, 109, 111, 112), and the magistrate judge issued a detailed 188-opinion recommending that the court find that UNCHCS violated Bone's and Miles's rights and that the parties' motions therefore be granted in part and denied in part "such that th[e] action shall proceed to trial on the issues of deliberate indifference and damages" (Doc. 125 at 187).

Shortly thereafter, but before this court had reviewed the magistrate judge's recommendation, the parties settled all remaining damages claims in the case against UNCHCS during a court-ordered mediation.  (Doc. 146; Minute Entry 02/08/2022.)  Pursuant to the settlement, Miles and Bone stipulated to a voluntary dismissal with prejudice of their claims for damages (Doc. 147 at 1), UNCHCS stipulated that "a violation of the ADA occurred during

---

[4] The court dismissed all ADA Title III claims against Nash.

[5] Bone, NFB, and DRNC thereafter settled all claims for damages against Nash, resulting in Nash's dismissal from this lawsuit.  (See Docs. 96, 97.)

the period between October 2016 and October 2018" (Doc. 146 ¶ 7), and UNCHCS agreed that "Plaintiffs to the Civil Action are entitled to reasonable attorneys' fees and costs, as determined under the ADA, for all claims resolved through settlement between UNCHCS and Plaintiffs" (Docs. 139-2 at 10, 139-3 at 10). Because Bone settled each of his remaining claims, he was voluntarily dismissed as a party to the case. (See Docs. 145, 146, 147.)

On August 3, 2022, UNCHCS served an offer of judgment on Plaintiffs pursuant to Federal Rule of Civil Procedure 68. (Doc. 171-1.) The offer proposed a nine-page consent decree, the principal relief of which included the following injunctive relief across multiple UNCHCS healthcare providers and affiliates:

- Include blind individuals in all UNCHCS and UNC Physician Network, LLC ("UNCPN") clinics communications, programs, and activities, unless doing so would cause an undue burden.

- Provide all blind individuals an equal opportunity to participate in or benefit from aid, benefits, or services, unless doing so would cause an undue burden or fundamental alteration to UNCHCS's Covered Affiliates' programs or services.

- Ensure the furnishing of "accessible formats" (defined to include Braille, large print, audio, or digitally navigable formats) where necessary to afford blind individuals an equal opportunity to participate in and enjoy the benefits of UNCHCS and UNCPN services, unless doing so would cause an undue burden.

- Not discriminate against blind individuals because they oppose any unlawful practice or coerce or interfere with their right to enjoyment of any protected practice.

- Provide policies and training to UNCHCS, UNCPN, and all entities managed or wholly-owned by UNCHCS.

- Designate an employee Accessibility Coordinator, who shall report directly to the Chief Audit and Compliance Officer of UNCHCS, to oversee and monitor compliance with the consent decree.

- Confirm that applicable practices and policies for providing print communications in "accessible formats" address the following provisions:

  o Upon oral or written request of a blind person, all clinics in the UNC Faculty Practice, UNC Hospitals, and UNCPN shall use a uniform process to "flag" in the electronic health record system and any other relevant databases/software systems the requested accessible format as that person's default format.

  o Provide the default accessible format to all blind individuals for all communications (including notices, forms, questionnaires, visit summaries, follow-up instructions, prescriptions instructions, invoices, billing, and other correspondence.

  o Confirm that MyChart is fully compatible with commonly used screen reader software (such as JAWS) and that the font size for text and documents within UNC MyChart can be enlarged by blind individuals using generally available computer functionalities.

  o Upon initial request of a blind person, mail any outstanding large print (otherwise offered in regular print) or Braille (where applicable) invoices or bills within one week after the invoices/bills were prepared, and those blind patients shall have the same time (from date of mailing) as non-blind patients before the account is sent to collections.

  o Provide large print general patient materials to blind patients within one week of the date they would have been provided in regular print.

  o Provide Braille materials to blind patients within two to five weeks of when such materials would have been provided in regular print.

10

o Provide the above policies and training to facilities
　　　　　　wholly-owned or managed by UNCHCS and encourage their
　　　　　　use of the same.

- Conduct manual accessibility audits of the UNCHCS websites,
  www.unchealthcare.org,　　www.uncmedicalcenter.org,　　and
  www.uncpn.com;　　　　　　www.findadoc.unchealthcare.org;
  www.rexhealth.com;　　　　www.uncchildrens.org;　　　　and
  www.chathamhospital.org.

- Implement training and monitoring for the consent decree.

- Provide guidance and assistance to facilities managed or
  wholly-owned by UNCHCS on how to comply with obligations
  to blind patients.

- Maintain information on websites notifying the public that
  accessible formats are provided free of charge in a timely
  manner.

- Provide a mechanism for requiring UNCHCS to address any
  alleged violation of the consent decree within 30 days,
  then court enforcement can be sought.

- Provide for the court's continuing jurisdiction over
  enforcement of the consent decree.

(See Doc. 171-1.)  Plaintiffs did not accept the offer of judgment
within the deadline of the rule.

　　　　Instead, on August 12, 2022, the remaining Plaintiffs, Miles,
NFB, and DRNC, filed a motion for a permanent injunction.  (Doc.
151.)  Plaintiffs argued that UNCHCS was unwilling to adopt
policies and procedures to provide effective communication to
blind patients and urged the court to do the following across the
UNCHCS network: (1) establish a process for collecting information
from patients at registration on their needs; (2) provide
accessible formats to patients in a timely manner; (3) ensure that

11

alternate document formats comply with certain guidelines, documents on MyChart contain proper metadata tagging and conform to Web Content Accessibility Guidelines ("WCAG"), and Braille transcribers are certified; and (4) engage in monitoring and training. (Doc. 151-1.) UNCHCS responded in opposition (Doc. 152), and Plaintiffs replied (Doc. 153). On November 18, 2023, UNCHCS moved to exclude Plaintiffs' proposed experts, whose reports were relied upon in Plaintiffs' motion for permanent injunction, even though the time for such challenges had passed. (Doc. 158.) Plaintiffs responded in opposition. (Doc. 160.)

On December 13, 2022, the day before the scheduled hearing on the motion for permanent injunction and to support its contention that no injunctive relief should be granted, UNCHCS disclosed additional steps it had recently taken and planned to implement to better provide equally effective access to sight-impaired patients. (Doc. 162.)

On December 14, 2022, the court heard oral argument on Plaintiffs' motion. (Minute Entry 12/14/2022.) In light of the changes to certain policies and practices that UNCHCS reported it made in its filing the day before the hearing, the court instructed the parties to meet and confer and file a joint status report outlining their respective positions as to whether they contended that a permanent injunction was still warranted, and if so, then on what grounds. (Id.)

12

On January 30, 2023, the parties reported they were unable to come to any agreement and set out their respective positions in light of the then-current record. (Doc. 163.) After reviewing the parties' submissions, the court scheduled another hearing for May 1, 2023, and raised several concerns it directed the parties to be prepared to address in order for the court to better understand the parties' respective positions on injunctive relief. (Doc. 165.) The court held a hearing on May 1, 2023, but because the parties could not agree on the propriety of the court hearing evidence or testimony from their proposed experts, the court only heard argument, and the parties submitted the case on the written record, which all parties agreed was sufficient for the court to enter a final judgment. (Minute Entry 05/01/2023.)

On June 22, 2023, the court issued its memorandum opinion and order, granting Plaintiffs' motion for permanent injunction in part, and denying it in part. (Doc. 167.) The court entered a final judgment imposing a three-year permanent injunction against UNCHCS as follows:

> Defendant UNCHCS, its officers, agents, servants, and employees, and other persons acting on behalf of or in concert with it who receive actual notice of this Permanent Injunction by personal service or otherwise, shall:
>
> Provide Plaintiff Timothy Miles, upon his request, with equally effective access to all material information UNCHCS provides its patients, which shall include, upon his request, large print documents in an accessible format; provided, however, that where such documents are

13

not available at the time of the clinical encounter and upon Miles's request, UNCHCS shall provide an alternative method of communication, such as by reading the communication to Miles in a private location that best maintains Miles's privacy and independence until UNCHCS can provide, as soon as practicable, large print copies.

Provide DRNC constituent Dr. Ricky Scott, upon his request, equally effective access to all material information that UNCHCS provides its patients, which shall include, upon his request, accessible electronic documents configured for use by screen reading devices such as JAWS to the extent UNCHCS has control over such documents for manipulation for use by screen readers, or, upon Dr. Scott's request, in Braille; provided, however, that where such documents are not available at the time of the clinical encounter and upon Dr. Scott's request, UNCHCS shall provide an alternative method of communication, such as by reading the communication to Dr. Scott in a private location that best maintains Dr. Scott's privacy and independence until UNCHCS can provide, as soon as practicable, electronic or Braille copies.

(Doc. 168 at 2.) The court otherwise denied Plaintiffs' requests for injunctive relief either because it was overbroad or had already been implemented by UNCHCS.

Plaintiffs now seek a total award of $2,144,284.11 as a prevailing party under the ADA, Section 504, and the ACA. (See Doc. 178-1 at 8.) This is composed of an award of $1,211,841.50 for 2,318.9 hours by attorneys and paralegals of the law firm of Brown, Goldstein & Levy, LLP, ("BGL"), $818,368 for 2,766.7 hours for DRNC attorneys and paralegals, and $114,074.61 in total expenses. (Id.) UNCHCS seeks an award of $2,396.22 in costs pursuant to Plaintiffs' rejection of its offer of judgment pursuant

14

to Rule 68 of the Federal Rules of Civil Procedure.  (Doc. 171.)
Each motion will be addressed in turn.

## II.  ANALYSIS

### A.  Plaintiffs' Motion for Attorneys' Fees and Costs

All three relevant federal laws in this action under which some
form of relief was awarded - the ADA, Section 504, and Section
1557 - allow a "prevailing party" to recover reasonable attorneys'
fees and expenses.  42 U.S.C. 12205 (ADA) (allowing reasonable
attorney's fee, including litigation expenses, and costs); 29
U.S.C. 794a(b) (Section 504) (allowing reasonable attorney's fee
as part of costs); 42 U.S.C. 18116(a) (Section 1557) (making relief
coextensive with 29 U.S.C. § 794).  "[A] plaintiff 'prevails' when
actual relief on the merits of his claim materially alters the
legal relationship between the parties by modifying the
defendant's behavior in a way that directly benefits the
plaintiff."  _Farrar v. Hobby,_ 506 U.S. 103, 111-12 (1992).  Put
another way, litigants are "a prevailing party for purposes of an
attorneys' fees award if they succeed on any significant issue in
litigation which achieves some of the benefit the parties sought
in bringing suit."  _Cone v. Randolph Cnty. Sch. Bd. of Educ.,_ 657
F. Supp. 2d 667, 682 (M.D.N.C. 2009) (internal citation and
quotations omitted).  That standard is satisfied by a "judgment
for damages in any amount, whether compensatory or
nominal."  _Farrar,_ 506 U.S. at 113.  It is also satisfied by an

15

injunction in favor of the party seeking fees. Cf. Mercer v. Duke Univ., 401 F.3d 199, 203 (4th Cir. 2005) (discussing the role of injunctive relief in the scope inquiry of a fees award and assuming its applicability in the prevailing party inquiry). The fee-shifting provisions of civil rights statutes encourage competent counsel to take on cases that will vindicate civil rights and discourage future violations. See Hensley v. Eckerhart, 461 U.S. 424, 429 (1983); City of Riverside v. Rivera, 477 U.S. 561, 574-75 (1986).

In considering an award to a prevailing party, the court engages in a three-step process. See Mercer, 401 F.3d at 203. First, it calculates the "lodestar" rate, which is simply the number of hours reasonably worked multiplied by a reasonable rate. Hensley, 461 U.S. at 433. The lodestar provides "an objective basis on which to make an initial estimate of the value of a lawyer's services." Id. To determine what is reasonable in terms of hours expended and rate charged, the court applies the twelve factors set forth in Johnson v. Georgia Highway Express Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). McAfee v. Boczar, 738 F.3d 81, 88 (4th Cir. 2013). The Fourth Circuit has articulated these factors as follows:

> (1) the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary

16

> fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the undesirability of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

In re Abrams & Abrams, P.A., 605 F.3d 238, 244 (4th Cir. 2010). Second, the court subtracts any fees incurred on unsuccessful claims that are unrelated to successful ones. Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 244 (4th Cir. 2009). Third, it considers adjusting the lodestar rate upward or downward based on the measure of success achieved by the Plaintiffs. Hensley, 461 U.S. at 434. While the court has discretion in calculating an award, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Id. at 429 (internal citation and quotations omitted). In that sense, therefore, the court's discretion is "narrow." N.Y. Gaslight Club v. Carey, 447 U.S. 54, 68 (1980). This narrowing serves the important public policy of "facilitating access to judicial process for the redress of civil rights grievances." Brandon v. Guilford Cnty. Bd. of Elections, 921 F.3d 194, 198 (4th Cir. 2019).

With this framework in mind, the court turns to each step in the analysis.

### 1. Prevailing Party

UNCHCS concedes that Plaintiffs are prevailing parties. (Doc. 177 at 2.) It argues, however, that Plaintiffs are only "technical[ly]" so, are only "'eligible for, rather than entitled to,' attorneys' fees, expenses and costs," and therefore should not be "entitl[ed] to an unreasonable award. (Id. at 2, 5.) UNCHCS also argues that the case involves "little or no damages," requiring the court to determine whether Plaintiffs' victory is sufficiently material to warrant an award and, if so, what is reasonable under the circumstances. (Id. at 5-6.)

Plaintiffs Miles, NFB, and DRNC are indeed prevailing parties. Each benefitted from the equitable relief obtained as a result of the court's entry of a permanent injunction against UNCHCS. Plaintiff Miles and Plaintiff DRNC, on behalf of Dr. Scott, its constituent, secured the entry of a three-year permanent injunction as to both individuals regarding UNCHCS's provision of compliant disability services. This plainly constitutes a judicially sanctioned judgment in Plaintiffs' favor. Mercer, 401 F.3d at 203.

The parties have also represented their agreement that the settlements Plaintiffs Bone and Miles obtained with UNCHCS entitle them to prevailing party status. They have not briefed this point, however, and because this relief resulted from a settlement, the court must examine the authority for this position on these facts

18

before awarding statutory attorneys' fees and expenses, as the parties cannot confer statutory authority for a fee award by mere agreement.

Bone and Miles reached their settlements during a court-ordered mediation conducted by the magistrate judge as part of the court's pretrial procedures. (Minute Entry 2/8/22.) UNCHCS agreed to pay both Bone and Miles damages to settle their individual claims, and the parties agreed that each would be "entitled to reasonable attorneys' fees and costs, as determined under the ADA." (Doc. 139-1 at 3.) The parties agreed at that time that the court retained jurisdiction for the purpose of enforcing the terms of the settlement agreement for Bone through December 31, 2022. (Id. at 5.) Thereafter, however, the parties disagreed on certain terms of the final documentation, and the magistrate judge entered an order setting a deadline for any motion to enforce settlement. (Minute Entry 3/15/22.) Plaintiffs Bone and Miles moved to enforce the court-mediated settlement and filed a supporting brief (Docs. 139, 140), UNCHCS filed a response in opposition (Doc. 141), and Plaintiffs filed a reply (Doc. 142). The magistrate judge entered a Recommendation that the court enforce the mediated agreement as urged by Plaintiffs. (Doc. 143.) This court adopted the Recommendation with an order that concluded that "UNCHCS shall perform its obligations under the February Settlement Agreement." (Doc. 145.)

The filed settlement agreements reveal that UNCHCS agreed to pay Miles $95,000.00 and Bone $30,000.00 to settle their damages claims. (Docs. 174-11 at 2, 174-12 at 2.) In the settlement agreements, UNCHCS acknowledged Plaintiffs' prevailing party status with the following provision: "UNCHCS agrees that Plaintiffs to the Civil Action are <u>entitled</u> to reasonable attorneys' fees and costs, as determined under the ADA, for all claims resolved through settlement between UNCHCS and Plaintiffs." (Docs. 174–11 at 5 (emphasis added), 174-12 at 5 (emphasis added).) The settlement agreements also provided that in the event of any action to enforce the agreements, the parties agreed to submit to the jurisdiction of the Orange County, North Carolina Superior Court for Miles and the Edgecombe County, North Carolina Superior Court for Bone, reserving the parties' right to remove an action to this federal district court. (Doc. 174-11 at 7-8; Doc. 174-12 at 6.) Thereafter, the parties filed a stipulation of dismissal of all claims for damages by Bone and Miles, specifically acknowledging the following:

> The Parties have agreed in their Settlement Agreement and Release that all Plaintiffs in the above-captioned action are entitled to reasonable attorneys' fees and costs, as determined under the ADA, for all claims resolved through settlement between the Parties, and that University of North Carolina Health Care System retains the right to make any challenges to Plaintiffs' recovery of reasonable attorneys' fees and costs aside from a challenge to Plaintiffs' entitlement as defined under the ADA.

20

(Doc. 147 at 1.)

Finally, in its briefing on these motions, UNCHCS presently acknowledges that Bone and Miles are prevailing parties based on their monetary payments. (Doc. 177 at 2 n.1.)

The Supreme Court's last pronouncement on the standard for determining prevailing party status where a settlement is mentioned was Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources, 532 U.S. 598 (2001). There, the Court rejected the "catalyst" theory whereby a plaintiff could recover fees so long as he had succeeded on a significant issue in the litigation that achieved some of the benefit sought in the action, even though it was not as a result of any formal court order.[6] The Court concluded that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." Id. at 605 (emphasis in original). To allow an award of fees in that circumstance would impermissibly "allow[] an award where there is no judicially sanctioned change in the legal relationship of the parties." Id. at 605. Rather, the Court stated, a plaintiff could be a "prevailing party" only if he was "awarded some relief" by the

---

[6] The Fourth Circuit had previously rejected the catalyst theory. See S-1 By and Through P-1 and P-2 v. State Bd of Educ. of N.C., 21 F.3d 49, 51 (4th Cir. 1994) (en banc).

court and achieved an "alteration in the legal relationship of the parties." Id. at 603-05. The Court observed that "some relief" included nominal damages and could be contained in a judgment on the merits or a signed settlement agreement "enforced through a consent decree." Id. at 603-04 (citing Maher v. Gagne, 448 U.S. 122 (1980)). Moreover, the Court in a footnote gave the following admonition:

> We have subsequently characterized the Maher opinion as also allowing for an award of attorney's fees for private settlements. See Farrar v. Hobby, supra, at 111, 113 S. Ct 566; Hewitt v. Helms, supra, at 760, 107 S. Ct. 2672. But this dictum ignores that Maher only "held that fees may be assessed . . . after a case has been settled by the entry of a consent decree." Evans v. Jeff D., 475 U.S. 717, 720, 106 S. Ct. 1531, 89 L.Ed.2d 747 (1986). Private settlements do not entail the judicial approval and oversight involved in consent decrees. And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal.

532 U.S. at 604 n.7.

Some courts have concluded that Buckhannon did not intend to restrict the analysis to a consent decree. In American Disability Association, Inc. v. Chmielarz, 289 F.3d 1315, 1319 (11th Cir. 2002), for example, the Eleventh Circuit focused on the Court's requirement that there be some "judicially sanctioned change in the legal relationship of the parties," Buckhannon, 532 U.S. at 605, and concluded that "even absent the entry of a formal consent decree, if the district court either incorporates the terms of a settlement into its final order of dismissal or expressly retains

22

jurisdiction to enforce a settlement, it may thereafter enforce the terms of the parties' agreement." Am. Disability Ass'n, Inc., 289 F.3d at 1320. Because the parties' settlement agreement provided substantive injunctive relief sought in the lawsuit and the court expressly retained jurisdiction to enforce the injunctive terms, the Eleventh Circuit held that the plaintiff was a prevailing party. Id. at 1321.

In National Coalition for Students with Disabilities v. Bush, 173 F. Supp. 2d 1272, 1278 (N.D. Fla. 2001), the parties entered into a settlement after the defendants filed motions for summary judgment and sought court approval. Eventually, the court entered a judgment that dismissed all claims, directed the parties to abide by their settlement agreement, reserved jurisdiction to enforce the order, and required the parties "to abide by their settlement agreement." Id. at 1275. The court held that "the judgment requiring the parties to abide by and retaining jurisdiction to enforce the Settlement Agreement" was, "as a practical matter," legally indistinguishable from a consent decree. Id. at 1276-78. The order, the court concluded, was sufficient to constitute a "change in the [parties'] legal relationship" within the meaning of Buckhannon. Id. at 1279.

A similar result was reached in Barrios v. California Interscholastic Federation, 277 F.3d 1128, 1134 & n.5 (9th Cir. 2002). In that ADA case, the court noted the Ninth Circuit's rule

23

that "a plaintiff 'prevails' when he or she enters into a legally enforceable settlement agreement against the defendant." Id. at 1134 (citing Fischer v. SJB-P.D. Inc., 214 F.3d 1115, 1118 (9th Cir. 2000), which in turn quoted Farrar, 506 U.S. at 111-12). Because the parties had settled their claims, the court concluded that the plaintiff was a prevailing party.

Other courts are more demanding, however. In New York State Federation of Taxi Drivers, Inc. v. Westchester County Taxi & Limousine Commission, 272 F.3d 154, 158-59 (2d Cir. 2002), for example, the court determined that the plaintiff was not prevailing because it resolved its claim with the defendant without any court involvement. The court noted that Buckhannon rejected the catalyst theory and interpreted the rule to require a "judicially sanctioned change in the legal relationship of the parties." Id. at 159. See also Hutchinson v. Patrick, 636 F.3d 1, 9-11 (1st Cir. 2011) (holding district court's order approving settlement agreement pursuant to Federal Rule of Civil Procedure 23(e) functionally equivalent to a consent decree because it altered the parties' legal relationship, reflected a "sufficient appraisal of the merits of the purposes of the imprimatur requirement," and indicated that the district court "expressly retained jurisdiction over the case"); id. at 11 n. 3 ("[T]he mere fact that a settlement is subject to court approval does not in itself supply the necessary ingredients for prevailing party status. It is the

24

presence of continuing judicial oversight that pushes the ball across the goal line and thus suffices to give a settlement the required judicial imprimatur."); Bell v. Bd. of Cnty. Comm'rs, 451 F.3d 1097, 1103 (10th Cir. 2006) ("[I]f a court does not incorporate a private settlement into an order, does not sign or otherwise provide written approval of the settlement's terms, and does not retain jurisdiction to enforce performance of the obligations assumed by the settling parties, the settlement 'does not bear any of the marks of a consent decree' and does not confer prevailing party status on the party whose claims have been compromised." (quoting T.D. v. LaGrange Sch. Dist. No. 102, 349 F.3d 469, 479 (7th Cir. 2003))); T.D., 349 F.3d at 478–79 (agreeing that "some settlement agreements, even though not explicitly labeled as a 'consent decree[,]' may confer 'prevailing party' status[ ] if they are sufficiently analogous to a consent decree," but holding that the settlement agreement at issue was not sufficiently analogous because it was not "embodied in a court order or judgment," it did not bear "the district court judge's signature," and the district court did not retain jurisdiction to enforce it); Truesdell v. Phila. Hous. Auth., 290 F.3d 159, 165 (3d Cir. 2002) (holding that court order that (1) "contains mandatory language," (2) "is entitled 'Order,' " (3) "bears the signature of the District Court judge," and (4) gives the plaintiff "the right to request judicial enforcement of the settlement

25

against" the defendant rendered the plaintiff a prevailing party); Smyth v. Rivero, 282 F.3d 268, 285 (4th Cir. 2002) ("[T]he judicial approval and oversight identified by the Supreme Court as involved in consent decrees are lacking where, as here, a settlement agreement . . . is neither incorporated explicitly in the terms of the district court's dismissal order nor the subject of a provision retaining jurisdiction."); Christina A. v. Bloomberg, 315 F.3d 990, 993-94 (8th Cir. 2003) (interpreting Buckhannon as requiring "either an enforceable judgment on the merits or a consent decree"; holding that the approval of a class action settlement agreement pursuant to Rule 23(e) "fails to impose the necessary 'imprimatur' on the agreement," that "the district court's approval of the settlement agreement [did] not, by itself, create a consent decree," and that the district court's express retention of jurisdiction to enforce the settlement agreement "alone is not enough to establish a judicial 'imprimatur' on the settlement contract").

Finally, some courts do not require a consent decree to confer prevailing party status if there has been some equivalent judicial action. In Sabo v. United States, 127 Fed. Cl. 606 (2016), the court defined a consent decree as an agreement of the parties that is contractual in nature but one that "the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other

26

judgments and decrees." Id. at 623. It noted that such an equivalent exists where the lawsuit "results in a court order in which the court expressly approves the parties' settlement agreement and retains jurisdiction to ensure the settlement's implementation." Id. at 625. See also Hutchinson, 636 F.3d at 9–11 (finding a judicial imprimatur exists where the court retains jurisdiction to enforce a settlement and exercised continuing judicial oversight); Davy v. CIA, 456 F.3d 162, 166 (D.C. Cir. 2006) (finding court order "functionally a settlement agreement enforced through a consent decree" because it contained mandatory language, was entitled "ORDER," and bore "the district judge's signature, not those of the parties' counsel").

In the Fourth Circuit, there appears to be no decision directly on point. In S-1 By and Through P-1 and P-2 v. State Board of Education of N.C., the full court, in rejecting the catalyst theory, held that a person may not become a prevailing party under 42 U.S.C. § 1988 "except by virtue of having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought." 21 F.3d at 51 (emphasis added). The court adopted Judge Wilkinson's dissent to the previous panel opinion in which he stated that a "plaintiff securing such a settlement can certainly be deemed to have prevailed in the absence of a formal judgment" because "Farrar merely clarified Hewitt by stressing that a voluntary change in conduct must be formalized in

27

a legally enforceable settlement agreement to transform a plaintiff into a prevailing party." <u>S-1 By and Through P-1 and P-2 v. State Bd. of Educ. of N.C.</u>, 6 F.3d 160, 171 (4th Cir. 1993) (Wilkinson, J., dissenting). The court has since extended prevailing party status to one who has obtained a preliminary injunction, even though the relief could be ephemeral, if the case is mooted by compliance as a result. <u>Stinnie v. Holcomb</u>, 77 F.4th 200, 215-16 (4th Cir. 2023) (en banc). In such a case, the plaintiff has been provided "concrete and irreversible relief on the merits" which was "as the result of a judicially ordered change in the parties' relationship." <u>Id.</u> at 214.

Here, the question is a close one. Under the unique circumstances of this case, the court accepts that Plaintiffs Bone and Miles are prevailing parties as to their damages settlements.[7] First, their settlement was reached during the parties' participation in a court-ordered mediation conducted by the magistrate judge. Second, their settlement agreement reflects an irreversible alteration in the parties' relationship, as both Plaintiffs obtained relief on the merits - the right, by contract, to damages that they sought in the lawsuit. Third, because the parties disagreed on whether they had reached a complete agreement,

---

[7] Parties seeking to preserve a plaintiff's prevailing party status are nevertheless best advised to seek the court's entry of a consent judgment that retains jurisdiction over enforcement.

they submitted their disagreement to the court which, exercising its inherent supervisory authority and implementing that portion of the parties' agreement that the court retain jurisdiction for the purpose of enforcing the terms of their settlement agreement as to Bone (Doc. 139-1 at 5), entered an order requiring that they abide by the terms of their agreement. (Doc. 143.) The Fourth Circuit has described this exercise of a district court's power to enforce a settlement agreement as one that "has the 'practical effect' of entering a judgment by consent." Hensley, 277 F.3d at 540 (quoting Millner v. Norfolk & W.R. Co., 643 F.2d 1005, 1009 (4th Cir. 1981)). The order thus bears a significant imprimatur of the court. Fourth, the parties' settlement agreement came on the heels of the magistrate judge's Recommendation on Plaintiffs' motion for summary judgment finding that UNCHCS had violated these two Plaintiffs' statutory rights. (Doc. 125.) And fifth, this is not a case where a defendant may be caught unaware it is subject to liability for attorneys' fees and expenses, as UNCHCS stipulated to these Plaintiffs' entitlement in the settlement agreements and represented the same to the court in the stipulation dismissing these Plaintiffs' damages claims.

Though all Plaintiffs therefore qualify as prevailing parties, the full nature of the relief, which matters for the scope of the fees and expenses to which Plaintiffs are entitled as prevailing parties, is more complicated. The court's final

injunction was limited in scope, applying only to Miles and Dr. Scott, a non-party. The court refrained from ordering certain requested equitable relief, but for separate reasons. Some of the relief, especially as to so-called "best practices" for sight-impaired individuals, exceeded the requirements of the applicable laws under which the claims were brought, and Plaintiffs' requests in that regard were clearly overbroad. Other relief, such as upgrades to UNCHCS's intake system for sight-impaired patients, was not included as part of the injunction only because UNCHCS had implemented it during the course of the litigation – though UNCHCS offered, and Plaintiffs rejected, it as part of the proposed Rule 68 offer of judgment, resulting in additional litigation costs. But while none of the relief was novel or ground-breaking, it ultimately inured to the benefit of all sight-impaired patients of the UNCHCS system, which serves an important public purpose. Mercer, 401 F.3d at 207. Thus, all Plaintiffs clearly obtained some important measure of equitable relief, not only for the individual Plaintiffs, but also for all sight-impaired patients of the UNCHCS system, the scope of which will be addressed further below.

### 2. Calculating the Lodestar Fee Award

Plaintiffs have submitted the time entries for the lawyers in Plaintiff DRNC, a non-profit advocacy group, and the BGL law firm located in Baltimore, Maryland. UNCHCS challenges the fees on

multiple grounds, including the claimed unreasonableness of the hourly rates and what it argues are excessive, redundant, and unnecessary hours resulting from overstaffing, block billing, and excessive/duplicative/unnecessary work. (Doc. 177 at 17-20.) Plaintiffs support their application with detailed time entries and affidavits of counsel. Plaintiffs contend they have excluded from their fee request all hours that are excessive, redundant, or otherwise unnecessary. (Doc. 174 at 7.) They also excluded all fees related to claims against Defendant Nash Hospitals, Inc., with whom Plaintiffs settled their claims, and as related to Plaintiffs' unsuccessful objection to the magistrate judge's ruling on Defendants' motion to dismiss. (Id.) Plaintiffs report they have further discounted their time by excluding fees for any timekeeper who worked 10 hours or less. (Id.) In total, this reportedly results in a reduction of 326 hours at a value of $170,189.00 at BGL's current rates. (Id.) DRNC also reports it reduced its fees by 716.7 hours, for a value of $218,935.00 at its current rates. (Id. at 7-8.) Thus, the total reduction is claimed to be $389,124.00.

### a. Time and labor required in the case

Plaintiffs are claiming a total of 5,085.6 hours in time and labor in this case, with 2,318.9 hours expended by attorneys and paralegals of the BGL law firm and 2,766.7 hours expended by DRNC attorneys and paralegals for both the merits case and the

31

preparation of the present motion for fees and expenses. As to the merits case, the following hours are claimed:[8]

| BGL Law Firm | |
|---|---|
| TIMEKEEPER | HOURS |
| Eve Hill | 29.3 |
| Jessica Weber | 620.9 |
| Chelsea Crawford | 58.2 |
| James Strawbridge | 1,173.7 |
| Angela Lima | 177.6 |
| Samantha Duckworth | 68.5 |
| Shana Fischer | 15.6 |

| DRNC | |
|---|---|
| TIMEKEEPER | HOURS |
| Holy Stiles | 953.5 |
| Christopher Hodgson | 1,474.1 |
| Lisa Grafstein | 28.4 |
| Nicholas Lett | 255.8 |

(Doc. 174-2 at 11; Doc. 174-8 at 11). As to the preparation of the present motion for fees and expenses, the following hours are claimed:

| BGL Law Firm | |
|---|---|
| TIMEKEEPER | HOURS |
| Jessica Weber | 54.7 |
| James Strawbridge | 112.8 |
| Angela Lima | 21.7 |

(Doc. 178-1 at 5.)

Plaintiffs argue that a substantial portion of their counsels' time related to responding to the multiple legal challenges UNCHCS mounted, which Plaintiffs argue were "overly

---

[8] All hours are rounded to the nearest tenth of the hour (every six minutes).

aggressive litigation tactics" that drove up the fees. (Doc. 178 at 8.) Plaintiffs also note that UNCHCS rejected their offer to enter into a tolling agreement to allow time to try to negotiate a resolution of their claims, which would have avoided litigation altogether. (Doc. 174-2 at 14.) UNCHCS, by contrast, characterizes Plaintiffs' lawsuit as an attempt to effect "top-down," system-wide relief well beyond what the law required or what could feasibly be accomplished, and contend that Plaintiffs rejected its repeated attempts to compromise and "find cooperative solutions." (Doc. 177 at 3-5.) There is some truth in each contention.

Plaintiffs are correct that they had to respond to UNCHCS's motion to dismiss, UNCHCS's motion for judgment on the pleadings (which the magistrate judge characterized as "largely repackage[d]" versions of UNCHCS's arguments he rejected on motion to dismiss (Doc. 98 at 20)), UNCHCS's unsuccessful motion to stay discovery (Doc. 70), and four summary judgment motions and accompanying briefs filed against each Plaintiff separately. (Docs. 107, 108, 109, 110, 111, 112, 113, 114.) Plaintiffs required an expanded word limit to respond. (Doc. 118.) Plaintiff also moved for partial summary judgment on liability. (Doc. 105.) After the magistrate judge concluded that UNCHCS had violated the ADA, Section 504, and Section 1556 with respect to Miles and Bone, UNCHCS filed objections to the Recommendation (Docs. 129, 130), to

33

which Plaintiffs had to respond (Doc. 136).

Thereafter, the parties prepared for a March 7, 2022 trial, filing the requisite pretrial disclosures, motions in limine, and proposed jury instructions and trial brief. (Docs. 134, 135.) Fourteen depositions were taken, and Plaintiffs retained two expert witnesses, Megan Morris and Dennis Quon. (Doc. 174 at 6, 22-23.)

At the February 8, 2022 settlement conference, UNCHCS stipulated that it had violated the ADA as to Miles and Dr. Scott, agreed to pay Plaintiffs damages, and agreed that Plaintiffs were prevailing parties. (Doc. 139-1.) Though the parties signed a term sheet, UNCHCS attempted to add other terms to the deal, and Plaintiffs were forced to move to enforce the settlement agreement at the direction of the magistrate judge. (Doc. 139, 140.) The court granted the motion, and the parties executed their settlement agreement. (Docs. 174-11, 174-12.) The settlement agreement left open the issue of equitable relief.

On August 3, 2022, UNCHCS served its offer of judgment (Doc. 177-3), which Plaintiffs rejected.

Following that, the parties briefed Plaintiffs' request for a permanent injunction (Docs. 151, 152, 153), and the court scheduled a hearing (Doc. 154). Plaintiffs prepared their witnesses for possible testimony at the hearing in response to this court's order that the parties be prepared to demonstrate

34

"how and why Plaintiffs contend [UNCHCS's new] remedies are inadequate." (Doc. 156 at 1.) One month before the hearing, however, UNCHCS moved to preclude Plaintiffs' experts (whose declarations were long part of the summary judgment record) under Federal Rule of Evidence 702. (Docs. 157-59.) The court denied the motion, finding that the time for such a motion "ha[d] long passed." (Doc. 161 at 2.)

On December 13, 2022, UNCHCS filed evidence of new measures it claimed to have implemented and others which it planned to implement in a further effort to meet and thus moot the challenges Plaintiffs brought in their motion for permanent injunction. (Doc. 162.) After the hearing the next day, the court directed the parties to meet and confer to determine whether in fact UNCHCS's recently disclosed efforts negated or mitigated Plaintiffs' concerns and to report to the court by January 30, 2023. (Minute Entry 12/14/22.) Plaintiffs contend they tried to meet but that UNCHCS rebuffed their attempt to include Plaintiffs' retained experts in any discussion, so any effort to resolve their differences fell apart. (Doc. 163.) Each side set out its version of where things stood at that point. (Id.)

In light of the parties' conflicting claims as to compliance with the relevant civil rights laws, the court scheduled another hearing for May 1, 2023, to attempt to resolve them. (Doc. 164.) The court posed specific questions to the parties so they could be

prepared to address them at the hearing. (Doc. 165.) The court also directed them to have their "technical people" available to answer any technical questions the court may have as to operation of the relevant Epic electronic medical records system. (Id. at 1.) Plaintiffs brought their experts to the hearing; UNCHCS had no retained expert but also did not bring its technical personnel.

On June 23, 2023, the court issued a 109-page memorandum opinion and order, granting Plaintiffs' motion for permanent injunction in part and denying it in part. (Doc. 167.) The court found that Miles and Dr. Scott would suffer irreparable harm absent an injunction. (Id. at 63.) The court also found that Plaintiffs sought "'top-down' system-wide relief meant to 'apply across the UNCHCS Network.'" (Id. at 66.) Consequently, the injunction Plaintiffs sought was "in myriad ways, plainly overbroad," and Plaintiffs sought to impose in some instances the types of "best practices" that the law does not require. (Id.) The court, therefore, decided to craft a more limited injunction properly suited to the circumstances of the case, explaining:

> Accordingly, the court will enter an injunction to order
> UNCHCS to do what it has failed consistently to do so
> far: provide Miles and Dr. Scott with equally effective
> access to all material information that UNCHCS provides
> its patients. For Miles, of course, that means providing
> him with accessible large-print documents. For Dr.
> Scott, that means providing electronic documents
> configured for use by screen reading devices (such as
> JAWS) to the extent UNCHCS has control over such
> documents in Epic or, upon Dr. Scott's request, Braille
> documents. However, as to both individuals, where such

36

documents are not immediately available at the time of the clinical encounter, UNCHCS shall provide an alternative method of communication that provides each with equally effective access to his healthcare information, such as by reading the documents. This injunction – fully set forth in the separate Judgment and Permanent Injunction - is narrowly tailored to remedy the harm established in this case. It also best comports with the proper scope of a federal district court's remedial power.

(Id. at 67-68.)  The court found the injuries alleged in the case and demonstrated by the discovery were - and thus the remedies to be imposed needed to be - individualized to Miles and Dr. Scott.

Indeed, although the association Plaintiffs sought relief for its members, apart from Miles and Dr. Scott, Plaintiffs were unable to provide any record support for the contention that any other members and the potentially scores of blind patients of UNCHCS suffered any similar harms – a fact established by the association Plaintiffs' Rule 30(b)(6) depositions as early as February 16-17, 2021.  (Doc. 108-16; Doc. 114-18; Doc. 171-2 at 3-4.)  Although Plaintiffs speculated that UNCHCS served more than 7,000 blind patients, throughout the litigation UNCHCS had identified only 175 patients as sight-impaired and recorded only three requests for large print documents and none for Braille documents.  (Doc. 151-1 at 19.)  Thus, the court declined major areas of Plaintiffs' requested relief, such as the following: a generalized mandate ordering UNCHCS to comply with federal disability laws; "necessary and timely steps to ensure that [UNCHCS] furnishes appropriate

37

auxiliary aids and services where necessary"; within six months, broad accessible format relief to "[e]nsure that [UNCHCS] records and complies with all requests by blind individual for print communications," "[e]nsure that the accessible formats [UNCHCS] provides conform to established, recognized guidelines for accessible document design," and "[i]ssue or revise existing policies to the extent necessary to implement prompt production of standard print communications in the alternative format requested"; within 12 months, substantial revisions to UNCHCS's electronic health record system (such as displaying the requested accessible format for each patient) and mandated training of all UNCHCS employees; and a requirement that all such changes be made network-wide for each provider within the UNCHCS system (whether or not owned or managed by UNCHCS), as well as all contractors providing documents on their behalf. (Id. at 86-88, 91-97.) The court rejected any "best practices" remedies as long as UNCHCS provided accessibility (id. at 84, 93) and declined to become entangled in any ongoing judicial oversight of a massive health care system as to which courts are ill-equipped to deal.

While the court declined this extensive relief, it did note that UNCHCS, as a result of the litigation, had already implemented substantial changes, including the following: agreeing to extend payment deadlines for sight-impaired individuals; agreeing to post conspicuous notices on the UNCHCS webpage for accessible formats;

establishing a process for the fielding of complaints; establishing an ADA Workgroup consisting of a multidisciplinary team to evaluate policies on an ongoing basis and ensure effective communication; and, importantly, establishing a uniform and automatic process within the UNCHCS computer system for the intake of patient information at reception to ensure that the patient's file would be flagged for the particular needs of the sight-impaired patient by all providers who had access to the health record. (Id. at 98-102.) This is addressed in more detail below in the section on evaluating the degree of success.

The number of hours expended in this case, then, is a function of three major, but related, factors. The first was Plaintiffs' use of outside counsel, which had the effect of duplicating effort by DRNC counsel. Plaintiffs argue that was reasonable because the case was "unusually complex – factually and legally" because they challenged practices of a statewide network. (Doc. 174 at 16.) Plaintiffs cite the lack of precedent regarding healthcare providers' obligations to ensure effective communications for the blind and point to their outside counsels' "long history of representing NFB and blind individuals in discrimination cases." (Id. at 17.) The second major factor is the alleged complexity of the case in general, which affects the legal staffing by Plaintiff DRNC and by their outside counsel. And the third factor was Plaintiffs' decision to pursue their full claims for relief even

39

though UNCHCS offered to implement extensive injunctive relief.[9]

Applicants bear the burden of documenting the appropriate hours expended. <u>Hensley</u>, 461 U.S. at 437. Courts are placed in a difficult position when asked to determine whether attorney hours were necessary to the relief obtained, and while a close and careful review of the reasonableness is appropriate, "ex post facto determination[s]" are improper. <u>Stuart v. Walker-McGill</u>, No. 1:11cv804, 2016 WL 320154, at *7 (M.D.N.C. Jan. 25, 2016).

As for Plaintiffs' decision to associate the BGL firm, the court finds it was reasonable under the circumstances. The association Plaintiffs lacked the resources, expertise, and bandwidth to effectively litigate this case to the extent it sought relief involving the whole UNCHCS healthcare network. (Doc. 174-8 at ¶ 10.) The BGL firm has the expertise, depth, and history with Plaintiff NFB to be an appropriate selection as co-counsel. UNCHCS's objections to this extent are therefore rejected although, as noted below, the court considers how the overreach of Plaintiffs' claims and duplicate staffing impacts the actual need for some of these services.

Although there was not a robust development of case law on the issue of a defendant's legal burden to provide effective

---

[9] For the reasons noted below, the court does not reduce any attorneys' fees or expenses based on Plaintiffs' failure to accept UNCHCS's August 2022 offer of judgment.

communications in this context of sight-impaired patients of a healthcare system, the general law applicable, as it turns out, was not that complex. (See Doc. 167 at 46-51.) What complicated the case was Plaintiffs' attempt to impose "best practices" onto the UNCHCS system (and all of its contractors), which interfaces with the Epic medical records system operated by a third party, as well as the MyChart records system. In as much as Epic is used nationally by many healthcare providers, this case had all the hallmarks of a test case to set a national standard to impose such "best practices" on that system. Indeed, Plaintiffs contended that this "was a case of regional, if not national, importance." (Doc. 174 at 15.) However, as the court found, this failed on two fronts. First, the law sets a minimum bar and does not require "best practices." Second, Plaintiffs were unable to establish the need for robust injunctive relief on behalf of members of the association Plaintiffs. This was known to Plaintiffs at least by the February 16 and 17, 2021 depositions of Virginia Knowlton Marcus, chief executive officer of Plaintiff DRNC, and Mark Riccobono, president of Plaintiff NFB, taken pursuant to Federal Rule of Civil Procedure 30(b)(6). (See Doc. 108-16; Doc. 114-18; Doc. 171-2 at 3-4.) At no point did Plaintiffs identify a single association member, other than Miles, Bone, and Dr. Scott, who suffered similar alleged deprivations to justify a more robust injunction. (Doc. 167 at 80-81.) From the court's perspective,

41

this overreach stymied any real prospect of compromise.

Plaintiffs argue that even though the injunction was narrower than what they requested, they would have had to expend the same number of hours to prove entitlement to permanent relief. (Doc. 172-3 at 17-18.) The court is not convinced. The narrow nature of the relief strongly suggests that it was Plaintiffs' insistence on "top-down" and extensive systemwide relief - especially the imposition of "best practices" standards for blind patients that included reconfiguring the medical records system (operated by a third party) - which the court found exceeded the requirements of the disability laws, that prevented the case from being resolved earlier. As a result, the court cannot escape the conclusion that a not insignificant portion of Plaintiffs' work on the injunctive relief phase of the case was motivated by a desire to obtain relief that was not legally available and thus could have been avoided had such overreach not been sought. The court will take this factor into account, however, in assessing the degree of success Plaintiffs achieved in Section 4 below.

UNCHCS does challenge specific portions of Plaintiffs' fee request as demonstrating overstaffing, block billing, and excessive, duplicative, and unnecessary work such that the court should make a reduction to the hours claimed. (Doc. 177 at 17-18.) First, UNCHCS contends that Plaintiffs had four lawyers involved in a deposition (Jeri Williams). (Doc. 174-3 at 44; Doc.

174-9 at 23.)  However, to address this duplication, Plaintiffs have already reduced all billing where more than two attorneys attended a deposition, resulting in a reduction of 34.6 hours, totaling $13,340.50 that Plaintiffs did not include in their fee request.[10]  The court thus finds no need to reduce the time entries further on this basis.  (Doc. 178-4 at 2.)

That being said, Plaintiffs effectively had two law firms pursuing the claims on their behalf: BGL and DRNC, who staffed a combined total of <u>eleven</u> legal personnel for whom they seek reimbursement.  Ordinarily, such a case would be handled by one law firm.  While DRNC decided to use its own inside counsel for portions of this matter and is entitled to be reimbursed for doing so, the court in determining reasonableness nevertheless must consider the extent to which having two teams of lawyers on the case resulted in duplicative billing.  Every time a new lawyer is added to any team, there is a corresponding marginal increase in duplicate time and effort.  The record contains evidence that BGL and DRNC engaged in some distribution of work (e.g., brief writing) and some discounting of billable hours in an attempt to avoid duplication.  Nevertheless, overlap is apparent.  Based on the timesheets provided, a reasonable (but conservative) estimate of the effect of having two law firms involved is a minimum 15 percent

---

[10] Of this, $6,838.50 was discounted from BGL's fees and $6,502.00 was discounted from DRNC's fees.  (Doc. 178-4 at 2.)

increase in the billings. (See, e.g., Doc. 174-3 (billing for, among other things, "Exchange emails with co-counsel," "Review email from [co-counsel]," "Save, label, log and e-mail documents to co-counsel," "Conference call with [co-counsel]," "Call with co-counsel," "Zoom conference with [co-counsel]," "Review draft discovery plan from co-counsel," "Edit discovery plan for 26(f) conference written by co-counsel," "Review motion to compel drafted by co-counsel," etc.); Doc. 174-9 (billing for, among other things, "review [co-counsel] email re: . . .," "respond to co-counsel email," "co-counsel meeting to discuss discovery next steps," "emails with co-counsel re: . . .," "review [co-counsel] edits and respond," "debrief deposition with [co-counsel]," etc.).) That Plaintiffs chose to staff the case with eleven timekeepers should not require UNCHCS to pay for such duplication. Thus, the court determines that a 15 percent reduction to the time spent on the merits case[11] is appropriate to better represent the time reasonably expended on this case. Hensley, 461 U.S. at 436-37 (holding the court is required only to make a reasonable estimate based on the record). The court will thus reduce the hours claimed on the merits case to the following:

---

[11] The court discerns no unreasonableness as to the time expended on the present motion for fees and expenses and therefore declines to reduce those totals.

44

| BGL Law Firm | |
|---|---|
| TIMEKEEPER | HOURS |
| Eve Hill | 24.9 |
| Jessica Weber | 527.8 |
| Chelsea Crawford | 49.5 |
| James Strawbridge | 997.6 |
| Angela Lima | 151.0 |
| Samantha Duckworth | 58.2 |
| Shana Fischer | 13.3 |

| DRNC | |
|---|---|
| TIMEKEEPER | HOURS |
| Holy Stiles | 810.5 |
| Christopher Hodgson | 1,253.0 |
| Lisa Grafstein | 24.1 |
| Nicholas Lett | 217.4 |

Second, as to so-called "block billing," the court does not discern any abuse that warrants a reduction. The entries describe largely legal research and brief writing, and counsel in its records provided more descriptive breakdowns within individual entries where appropriate.

Third, as to excessive or unnecessary work, UNCHCS cites multiple entries related to outlining and drafting briefing related to motion to dismiss arguments. Given the extensive briefing required by this case, the court cannot determine any abuse on this record and therefore declines to make any deductions on this basis. (Doc. 177 at 18.)

As to travel charges, which all occurred during the merits phase of the case, Plaintiffs contend that BGL's practice is to charge for travel time but that attorneys attempt to work "to the

45

extent possible" while doing so.  Travel presents an opportunity cost in not being able to work at one's office.  It is also reasonable, however, to consider that such travel time is not the same as legal work and that, as a practical matter, lawyers cannot work at all times while en route.  Though a client may agree to pay full rates for travel, it is not reasonable to impose such a generous fee structure on an opponent, even for a prevailing party, where counsel is incurring travel cost because Plaintiffs sought an out-of-state firm to represent them.  Therefore, the court will reduce all time billed by BGL timekeepers <u>purely</u> for travel[12] by 50 percent.  A review of the submitted time entries indicates the following reductions: attorney Jessica Weber's hours billed for travel will be reduced from 20.9 hours to 10.6 hours, attorney James Strawbridge's hours billed for travel will be reduced from 24.3 hours to 12.2 hours, and paralegal Angel Lima's hours billed for travel will be reduced from 1 hour to 0.5 hours.  With those additional subtractions, the totals per timekeeper are:

| BGL Law Firm | |
|---|---|
| TIMEKEEPER | HOURS |
| Eve Hill | 24.9 |
| Jessica Weber | 517.5 |
| Chelsea Crawford | 49.5 |
| James Strawbridge | 985.6 |
| Angela Lima | 150.5 |
| Samantha Duckworth | 58.2 |
| Shana Fischer | 13.3 |

[12] The court did not reduce travel where the time entries reflect substantive work occurred.  (<u>See, e.g.</u>, Doc. 174-3 at 85; Doc. 174-9 at 70.)

46

DRNC's hours are unaffected:

| DRNC | |
|---|---|
| **TIMEKEEPER** | **HOURS** |
| Holy Stiles | 810.5 |
| Christopher Hodgson | 1,253.0 |
| Lisa Grafstein | 24.1 |
| Nicholas Lett | 217.4 |

Finally, UNCHCS argues, albeit in a footnote, that "[a]ll of the work Plaintiffs' legal team performed . . . after UNCHCS extended its August 3, 2022 Rule 68 Offer of Judgment" was unnecessary because the relief UNCHCS proposed in the offer of judgment exceeded the relief ordered by the court. (Doc. 177 at 18 n.7.) Plaintiffs concede that the offer of judgment would have applied to patients other than Miles and Dr. Scott (who were the only individuals to receive injunctive relief from the court), but they argue that the offer was "extremely narrow" because it applied only to "Covered Affiliates," which excludes UNCHCS-owned or UNCHCS-managed hospitals, whereas the court's injunction applied to all UNCHCS "officers, agents, servants, and employees, and other persons acting on behalf of or in concert with it." (Doc. 178 at 11-12.)

Federal Rule of Civil Procedure 68(d) provides that "[i]f the judgment the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." As recognized by the Supreme Court, Rule 68

47

acknowledges the longstanding historical designation of "costs" such that "the term 'costs' in [that Rule] was intended to refer to all costs properly awardable under the relevant substantive statute or other authority." Marek v. Chesny, 473 U.S. 1, 9 (1985). As such, "absent congressional expressions to the contrary, where the underlying statute defines 'costs' to include attorney's fees," courts have interpreted attorney's fees to be included as costs for purposes of Rule 68 and thus subject to that Rule's limitations, including the limitation pertaining to prior offers of judgment. Id.

However, not every statute incorporates an award of attorney's fees into the scope of costs. See id. at 8. Where a statute does not specifically invoke a right to attorney's fees "as part of costs," any entitlement to attorney's fees is not limited in the same way as Rule 68 costs may be. See id. at 8-9; Wyatt v. Ralphs Grocery Co., 65 F. App'x 589, 591 (9th Cir. 2003). Compare, e.g., 42 U.S.C. § 1988(b) (authorizing "a reasonable attorney's fee as part of the costs") with 42 U.S.C. § 12205 (authorizing "a reasonable attorney's fee, including litigation expenses, and costs").

While Section 504 and Section 1557 of the ACA both define costs to include an award of attorney's fees, see 29 U.S.C. §794a(b) (authorizing attorney's fees "as part of costs"); 42 U.S.C. § 18116 (making relief coextensive with 29 U.S.C. § 794),

48

the ADA does not. Instead, it provides that "a reasonable attorney's fee, including litigation expenses, and costs" be provided to a prevailing party. 42 U.S.C. § 12205. Neither party has addressed this linguistic distinction, but federal courts have been clear that the ADA right to attorney's fees for a prevailing party is not recoverable as a part of "costs" within the confines of Rule 68. See, e.g., Wyatt, 65 F. App'x at 591 (holding that "Rule 68's cost-shifting device does not apply to fees under the ADA," as the statute "does not define costs to include fees"); Webb v. James, 147 F.3d 617, 623 (7th Cir. 1998) (distinguishing the language of the ADA from other statutes where "costs were defined to include attorney's fees" as in Marek); Smith v. RW's Bierstube, Inc., No. 17-CV-1866 (PJS/HB), 2019 WL 6464142, at *3 (D. Minn. Dec. 2, 2019) (refusing to award fees under Rule 68 as they were not "part of costs"). Because Plaintiffs' application for fees is cognizable under the ADA, it is not limited by the prior Rule 68 offer of judgment. A deduction on this basis is therefore not warranted.

### b. Novelty and difficulty of the questions presented

The more complex case will generally support a greater number of hours. Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 175 (4th Cir. 1994). For the reasons noted above, the novelty, if any, of Plaintiffs' claims was a function of their breadth, which

49

was not supported by the law and would have likely imposed immense burdens on the UNCHCS healthcare system. It is true that the case involved some complexity in understanding the Epic and MyChart medical records and billing systems, but the extent of that complexity related in material measure to Plaintiffs' overbroad proposed remedies. To the extent Plaintiffs also claim complexity in understanding "the contractual relationships between UNCHCS affiliates," this again relates to Plaintiffs' effort to impose expansive system-wide remedies beyond the requirements of the law. This factor does not favor Plaintiffs.

### c. Skill required to perform the necessary legal services

Plaintiffs' claims involved several civil rights and health laws. Plaintiffs characterize the legal issues as "cutting-edge" with "little precedent" regarding a healthcare provider's obligation to ensure effective communication with the blind. (Doc. 174 at 16.) As noted, they portrayed the lawsuit as "a case of regional, if not national, importance." (Id. at 15.) UNCHCS responds that the case established no novel or important precedent and did not "break new ground in the body of law interpreting the ADA, the Rehab Act or the Affordable Care Act." (Doc. 177 at 8.)

As this court noted in its memorandum opinion and order imposing a narrow permanent injunction, the rights of the sight-impaired are indeed important, but Plaintiffs' attempt to impose

extensive "best practices" under the current statutory structure exceeded what the law reasonably required. As the court found, the claims could easily be resolved within the confines of the applicable law, which did not require such measures. This factor does not favor Plaintiffs.

### d. Preclusion of other employment by the lawyer due to acceptance of the case

Plaintiffs do not argue that this factor is relevant in the analysis, nor does the court so find.

### e. Customary fee for similar work

Plaintiffs contend that the hourly rates of their lawyers are reasonable. UNCHCS challenges the rates of the BGL firm as well as those of the lawyers at DRNC as excessive and beyond what the local market will bear. However, while Plaintiffs have filed several declarations to support their attorney fee award, UNCHCS has not filed any factual support in response.

The BGL firm handles disability rights cases nationally and has obtained successful results. (Docs. 174-13, 174-15, 174-17.) The firm is based in Baltimore, Maryland, and its rates for this case, as well as the hours sought, are as follows: $485 an hour for associate James Strawbridge, who Plaintiffs claim accounted for 1,286.5 hours;[13] $675 an hour for partner Jessica Weber, who

---

[13] The hours for James Strawbridge, Jessica Weber, and Angel Lima include additional time spent in preparation of Plaintiffs' motion for attorneys'

51

Plaintiffs claim accounted for 675.6 hours; $625 an hour for partner Chelsea Crawford, for whom Plaintiffs report 58.2 hours; and $725 an hour for partner Eve Hill, for whom they report for 29.3 hours. (Doc. 174-2 at 11.) The firm charges $295 an hour for paralegal Angela Lima, who billed 199.3 hours, and $265 an hour for paralegals Samantha Duckworth and Shana Fischer, who billed a total of 84.1 hours. (Id.) Plaintiffs offer support for the conclusion that these rates are reasonable within the Baltimore market and nationally. (Doc. 174 at 19-21.)

Plaintiff DRNC does not charge its clients for its services, but as a public interest association, it is entitled to seek an award for its attorneys and paralegals at the prevailing rates within the North Carolina community. Blum v. Stenson, 465 U.S. 886, 894-95 (1984). DRNC seeks the following hourly rates and accountable hours: $300 an hour for attorney Christopher Hodgson, who graduated law school and joined DRNC in 2015 and reports 1,474.1 hours; $325 an hour for attorney Holly Stiles, a 2007 law school graduate and former Equal Employment Opportunity Commission trial attorney, who reports 953.5 hours; and $375 an hour for attorney Lisa Grafstein, a 1995 law school graduate who reports 28.4 hours. (Doc. 174-19 at 8.) DRNC also charges $150 an hour for its paralegal, who graduated from paralegal training in 2015

fees and expenses. (See Doc. 174-2 at 10 (initial hours spent); Doc. 178-2 at 5 (additional hours spent on the fees motion).)

and reports 255.8 hours.  (Id.)

A reasonable rate is that which is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  Blum, 465 U.S. at 895 n.11.  The community in which the court sits is "the appropriate starting point for selecting the proper rate." Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 317 (4th Cir. 1988). However, where services of like quality are not available in the local community, and where a party acts reasonably in choosing counsel elsewhere, such external rates can be considered.  Id.  A reasonable rate can be demonstrated by evidence of what clients are normally willing to pay or by a showing of what comparable lawyers of skill can command under similar circumstances.  Rum Creek, 31 F.3d at 175.  Here, Plaintiffs have offered declarations of multiple lawyers to support the reasonableness of the hourly rates they seek.

The court, having reviewed the hourly rates proposed by DRNC, easily finds that they are well within the prevailing rates in this legal community.  As DRNC points out, its rates are "at or below the rates that comparable firms charge for attorneys of comparable experience and for paralegals." (Doc. 174-8 at 8.)

However, to the extent the rates charged by BGL are justified by reference to the rates charged by firms in the Baltimore (see Docs. 174-24, 174-26, 174-27) and other national markets

53

(including the Bay Area of California (see Docs. 174-13, 174-15) and Chicago, Illinois (see Doc. 174-17)), they are not as well supported, as is implicit in DRNC's statement of its rates.  UNCHCS points to the current guidelines for the District of Maryland Local Rules, which provide for the following hourly rates based on years of practice: $150-225 (< 5 years); $165-300 (5-8 years); $225-350 (9-14 years); $275-425 (15-19 years); and $300-475 (20+ years). Local Rules, https://www.mdd.uscourts.gov/local-rules (last accessed Jan. 31, 2023.)  These rates are not ceilings in the Maryland federal courts, however, and BGL can obtain an hourly rate in excess of that in the Baltimore market if it can justify it.  See Reyazuddin v. Montgomery Cnty., Md., 2022 WL 4608331, at *12 (D. Md. Sept. 30, 2022); Whitaker v. Navy Fed. Credit Union, 2010 WL 3928616, at *6 (D. Md. Oct. 4, 2010) (finding departure from the District of Maryland guidelines justified).  Moreover, the court considers the prevailing market to be the Middle District of North Carolina and will consider the Maryland local rule rates as only one of several factors in determining reasonableness.  BGL also relies on reference to fee awards it received in other cases, but those markets were California, and Chicago, Illinois, where fees are traditionally higher, and which are not comparable legal markets to the one here.  (See Doc. 174 at 20.)

Here, Plaintiffs seek reimbursement at current rates for all their lawyers' time for the past five years.  The law allows this;

54

but it also allows the court to account for the inflationary reduction in a delay in payment. <u>Daly v. Hill</u>, 790 F.2d 1071, 1081 (4th Cir. 1986). The court should also consider each lawyer's experience and training throughout the five-year pendency of this case. <u>Reyazuddin</u>, 2022 WL 4608331, at *12 (considering lawyers' experience when they actually worked on the case).

Here, Mr. Strawbridge, who was admitted to practice law in 2016, had 4 to 7 years of experience during the pendency of this case. Even under the high end of the Maryland fee guidelines, his rate would be $225 to $300 an hour within that community. His requested rate of $485 exceeds this by half or more. While he graduated law school in 2016, he clerked for a federal district judge and then clerked for a federal circuit judge. (Doc. 174-2 at 7.) So, he was a relatively new associate when he joined BGL in 2020. (<u>Id.</u>) Plaintiffs also offer declarations that his rate is reasonable for firms within the Middle District of North Carolina that practice "sophisticated and complex litigation." (Doc. 174-19 at 8-9; <u>see also</u> Doc. 174-21 at 4 (stating rates "appear reasonable and consistent with the rates charged by attorneys of like experience"); Doc. 174-22 at 4 (same); Doc. 174-23 at 5 (same).) However, the court finds that an hourly rate of $485 for a young associate exceeds the comparable rate here for this type of work, and his rate will be reduced to $375. This is in line with the hourly rate of one of Plaintiffs' North Carolina

55

declarant attorneys who has been licensed since 2015 and charged between $350 and $400 an hour.  (Doc. 174-23 ¶ 13.)

Ms. Weber, who was admitted to the bar in 2009, had 9 to 15 years of experience during the pendency of this case. (Doc. 174-2 at 4-6.)  The guidelines suggest a rate of $350 to $425 at the high end.  Her rate of $675 exceeds this amount.  Ms. Weber is a graduate of Yale Law School and Princeton University and also served as a law clerk to a federal district judge.  (Id.)  She has extensive experience in disability cases and is recognized by Lawdragon 500 as a leading plaintiff civil rights lawyer.  (Id. at 5-7.)  As with Mr. Strawbridge, Plaintiffs offer the opinion of North Carolina lawyers that this rate is comparable to a local market rate.  (Docs. 174-19 at 8-9, 174-21 at 4, 174-22 at 4, 174-23 at 5).  The court finds that her experience justifies a rate in excess of the Maryland guidelines, but in the present market should be reduced to $575.

Ms. Crawford graduated law school in 2013 and clerked for a federal district judge, then for a federal circuit judge.  (Doc. 174-2 at 8.)  She worked on the motion to dismiss phase of the case (from approximately 2019 to 2020) and in 2022 was listed in Lawdragon 500 as a leading civil rights lawyer.  (Id.)  She would have had 5 to 10 years of experience at the time of this case. Her hourly rate of $625 exceeds the Baltimore local rules rate, which, at the high end, is $300 to $350.  While Plaintiffs offer

56

North Carolina-based declarations as to the reasonableness of this rate as for the other timekeepers, the court finds that comparable attorneys in North Carolina would charge approximately $425 an hour for the nature of the work performed in this case. (See Doc. 174-23 ¶ 13 (noting 2015 graduate charging $350-$400 an hour); Doc. 174-21 ¶ 4 (noting 2008 graduate charging $400 an hour).) The court finds her rate should be reduced accordingly.

Ms. Hill, who was admitted to the bar in 1989, has over 30 years of experience as a disability rights attorney, having served as Deputy Assistant Attorney General of the United States Department of Justice, Civil Rights Division. (Doc. 174-2 at 7.) She served as supervising partner for six months while Ms. Weber was on parental leave. (Id.) Her rate of $725 an hour exceeds the $425 high end of the Baltimore rate. However, she is clearly a highly credentialed attorney, and her many years of experience justify a higher rate. The court cannot say that $725 an hour is unreasonable for her experience and skill level, given the nature of the work performed here, so it will leave that rate undisturbed.

Paralegals rates under the Maryland local rules range from $95 an hour to $150 an hour. The court finds no basis to compensate BGL paralegals higher than the $150 an hour charged by DRNC and at the high end of the Maryland local rules rate. Therefore, BGL's paralegals' time will be compensated at $150 an hour.

At these new rates, the following are the totals for the hours

57

spent on the merits case that the court has found to be compensable:

| BGL Law Firm | | | |
|---|---|---|---|
| **TIMEKEEPER** | **HOURS** | **RATE** | **TOTAL FEE** |
| Eve Hill | 24.9 | $725 | $18,052.50 |
| Jessica Weber | 517.5 | $575 | $297,562.50 |
| Chelsea Crawford | 49.5 | $425 | $21,037.50 |
| James Strawbridge | 985.6 | $375 | $369,600.00 |
| Angela Lima | 150.5 | $150 | $22,575.00 |
| Samantha Duckworth | 58.2 | $150 | $8,730.00 |
| Shana Fischer | 13.3 | $150 | $1,995.00 |
| | | **TOTAL FEE:** | **$739,552.50** |

| DRNC | | | |
|---|---|---|---|
| **TIMEKEEPER** | **HOURS** | **RATE** | **TOTAL FEE** |
| Holy Stiles | 810.5 | $325 | $263,412.50 |
| Christopher Hodgson | 1,253.0 | $300 | $375,900.00 |
| Lisa Grafstein | 24.1 | $375 | $9,037.50 |
| Nicholas Lett | 217.4 | $150 | $32,610.00 |
| | | **TOTAL FEE:** | **$680,960.00** |

Also at these new rates, the following are the totals for the hours spent on the present motion for fees and expenses, which includes briefing on legal issues:

| BGL Law Firm | | | |
|---|---|---|---|
| **TIMEKEEPER** | **HOURS** | **RATE** | **TOTAL FEE** |
| Jessica Weber | 54.7 | $575 | $31,452.50 |
| James Strawbridge | 112.8 | $375 | $42,300.00 |
| Angela Lima | 21.7 | $150 | $3,255.00 |
| | | **TOTAL FEE:** | **$77,007.50** |

### f. Contingency of a fee

There is no contingency fee in this case, so this factor is inapplicable to the lodestar calculation.

58

### g.    Time pressures imposed in the case

Plaintiffs do not argue the application of this factor, nor can the court discern any urgency to the proceedings which in fact carried on for almost five years.  This factor is neutral.

### h.    Award involved and the results obtained

As noted above, Plaintiffs achieved significant success for Plaintiffs Bone and Miles through their settlements and for the court-ordered injunction issued for the benefit of both Miles and Dr. Scott.  In addition, Plaintiffs managed to effect meaningful changes in the manner UNCHCS conducted its patient intake process to ensure that UNCHCS's medical records for sight-impaired patients are tagged to avoid the types of deficiencies in providing adequate medical information that plagued Miles's and Dr. Scott's experiences.  This litigation has also caused UNCHCS to create a working group to continue to monitor and improve its services to sight-impaired patients.  In significant ways, therefore, as the court noted in its permanent injunction opinion, "UNCHCS has already implemented much of what Plaintiffs ask[ed] for in their proposed injunction" (Doc. 167 at 99), which warrants some credit to the Plaintiffs.  See Project Vote/Voting for Am., Inc. v. Dickerson, 444 F. App'x 660, 662-664 (4th Cir. 2011) (considering voluntary actions taken during the course of litigation when considering the overall results obtained by the prevailing

59

party).[14]

Where Plaintiffs fell short was their attempt to impose on UNCHCS's healthcare system burdensome requirements based on "best practices" that were not required by the law and to do so across the UNCHCS network that included all contractors, and to persist in this request even after UNCHCS offered to implement substantial relief.  Plaintiffs' ultimate legal relief was undoubtedly far narrower than the award they sought from the court, which likewise requires consideration in the fee award.  To avoid duplication in its reductions, the court merely notes this factor here and addresses it further in Section 4 below.

### i. Experience, reputation, and ability of the lawyers

For the reasons noted above, Plaintiffs' counsel are highly credentialed and, as noted by their accomplishments and the opinions of other outside counsel, enjoy a reputation for excellence.

### j. Undesirability of the case

Plaintiffs do not argue this factor.  However, DRNC states in its declaration of Holly Stiles that "most North Carolina attorneys with relevant experience in the plaintiff's bar would have been reluctant or unable to take this case on a pro bono or contingency

---

[14] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority.  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

basis given the complexity and time-consuming nature of the litigation" and that "most larger firms that offer pro bono assistance within the state have conflicts due to current or past work on behalf of state government and/or UNC Health Care System." (Doc. 174-8 at 7.) UNCHCS does not address this factor, but these are logical, practical barriers to finding suitable counsel that the court considers which weigh in Plaintiffs' favor.

### k. Nature and length of the professional relationship between the lawyer and the client

Plaintiff NFB notes that it has had a decades-long association with the BGL firm. (Doc. 174 at 17; Doc. 174-20 ¶¶ 8-10.) While Plaintiff DRNC did not have such a relationship, it sought out the BGL firm because of that firm's decades-long history of successfully representing the disabled and the DRNC's inability to prosecute its claims alone. (Doc. 174-8 at 7-8.) This factor thus weighs in favor of Plaintiffs.

### l. Fee awards made in similar cases.

Plaintiffs do not offer any comparable fee awards from other similar cases. Rather, they rely on their arguments that their request is reasonable by pointing to the fact that a substantial fee award has been made where the plaintiff's recovery was nominal. (Doc. 178 at 3-4 & n.1 (citing Mercer, 401 F.3d at 202, 204, 208-09 (noting $350,000 in fees awarded despite "nominal" damages award).)

61

*   *   *

Based on all of the above, the court calculates the following lodestar award: $816,560.00 in fees allocated for work performed by the BGL firm,[15] and $680,960.00 in fees allocated for the work performed by DRNC, for a total lodestar amount of $1,497,520.00.

### 3. Adjustment for unsuccessful claims

Once the lodestar award is determined, the court is next to subtract any fees incurred on unsuccessful claims unrelated to successful ones. Robinson, 560 F.3d at 244. Here, Plaintiffs have already excluded any fees related to their unsuccessful challenge to the magistrate judge's recommendation on UNCHCS's motion to dismiss. (Docs. 172-3 ¶ 22, 172-9 ¶ 14.) The only claim under which no relief was had was the ADA Claim against Nash brought in Claim II, which sought injunctive relief against Nash and was dismissed at an earlier stage for lack of standing. (Doc. 44 at 24, 32-38; Doc. 57 (adopting the recommendation of the magistrate).)

UNCHCS contends that the extent of the injunctive relief obtained was largely limited to two individuals for three years. (Doc. 177 at 2.) This argument is more properly considered in the

---

[15] As the prior charts indicate, $739,552.50 of this amount is attributable to the merits portion of the case and $77,007.50 is attributable to the present motion for fees and expenses. The court separates them because any adjustment for success on the merits is not made to amounts related to the preparation of the present motion for fees and expenses.

section below on the ultimate measure of success achieved.

### 4. Adjustment for measure of success achieved

Finally, the court considers any adjustments in the lodestar upward or downward based on the measure of success achieved by the Plaintiffs. Hensley, 461 U.S. at 434. Plaintiffs characterize the results achieved as "excellent." (Doc. 174 at 24.) UNCHCS characterizes the victory as a "merely technical" one which "only vindicated the rights of two people." (Doc. 177 at 2.)

The court's measuring point is a comparison of the relief sought to the relief obtained. Mercer, 401 F.3d at 205. While in a case seeking injunctive relief this is ordinarily a comparison to the relief granted, id. at 205, a plaintiff can be deemed successful even where the relief was agreed to as a result of the litigation and thus not required to be ordered. See Project Vote, 444 F. App'x at 662-664 (limiting the scope of Buckhannon to the prevailing party inquiry and noting that voluntary action undertaken in connection with the litigation, even without a judicial order, may be considered as part of the prevailing party's overall success).

As the court notes above, in addition to the monetary relief granted Miles and Bone, the prosecution of this litigation prompted UNCHCS to implement changes which, because UNCHCS had already undertaken them, the court declined to include in a mandatory order. They were addressed in detail in this court's final

63

memorandum opinion and order but included the following principal results: agreeing to extend payment deadlines for sight-impaired individuals; agreeing to post conspicuous notices on the UNCHCS webpage for accessible formats; establishing a process for the fielding of complaints; improving written communications and external webpage for sight-impaired individuals with formats that comply with American Council of the Blind standards; establishing an ADA Workgroup consisting of a multidisciplinary team to evaluate policies on an ongoing basis and ensure effective communication; and perhaps most importantly, establishing a uniform and automatic process within the UNCHCS computer system for the intake of patient information at reception to ensure that the patient's file would be flagged for the particular needs of the sight-impaired patient by all providers who had access to the health record. (Doc. 167 at 24-30, 98-102.)

However, Plaintiffs failed to persuade the court to adopt the extensive changes to the Epic and MyChart medical records systems – and to adopt them across the large UNCHCS healthcare system – that were the feature of their lawsuit. In many ways, it is hard to parse some of this larger effort from Plaintiffs' claims, as UNCHCS's failures to provide Plaintiff Miles with effective communications was related in part to the problems he had accessing UNCHCS's medical records online using his JAWS Fusion and ZoomText screen reader programs. (Doc. 167 at 6-7.) Those

64

problems, in turn, related (at least in part) to the way Epic and MyChart documents were uploaded and stored. Thus, Plaintiffs' efforts to improve those systems identified potential problems. But Miles and Dr. Scott were the only patients presented to the court to have experienced such problems, and Miles declined UNCHCS's efforts to work with him to try to figure out why his computer was unable to interface with the UNCHCS system.

What is clear to the court is that Plaintiffs' efforts to seek overbroad injunctive relief served as an impediment to resolution of these claims. Complicating the case was the fact that much of the important relief UNCHCS eventually implemented was reported to the court very late in the day, even the day before the court's scheduled hearing on the motion on December 14, 2022.[16]

Because Plaintiffs' efforts to impose overbroad changes to the medical records system, the court concludes that a reduction is appropriate as it relates to that relief. The court is directed to make a reasoned calculation of the measure of success based on the complete record. "There is no precise rule or formula for making these determinations. [A] district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Hensley,

---

[16] To the extent there was the need for further legal work and a hearing after that date, UNCHCS is partly to blame as it chose to wait so late to update the record with new information about its continuing efforts to respond to Plaintiffs' challenges.

65

461 U.S. at 436–37.  Here, the court finds that a 25 percent reduction in the fee award for the original merits portion of the case is appropriate based on the relative success of Plaintiffs' claims.  An overall award valued at 75 percent of the adjusted totals sought for the original merits portion fairly captures the meaningful change that Plaintiffs were able to achieve through their pursuit of this litigation, tempered by the overbroad scope of the relief sought and the ultimately narrow scope of the relief actually awarded.  Based on that reduction, Plaintiffs are entitled to a fee award for the original merits portion of $554,664.38 for the fees sought by BGL and $510,720.00 for the fees sought by DRNC.

However, the court finds it would be unfair to similarly reduce the fee award for the portion of fees accumulated during the present motion for fees and expenses period.  Thus, it declines to make any reductions to those fees and preserves them at their adjusted lodestar amount of $77,007.50 attributable to the BGL firm.  Thus, the final award for fees totals $1,142,391.88, with $631,671.88 in fees for the BGL firm and $510,720.00 for DRNC.

### 5. Compensable Expenses and Costs

Plaintiffs seek $114,074.61 in litigation expenses and costs.[17]  UNCHCS contends that this amount should be reduced "because of Plaintiffs' limited success and because parties are

---

[17] Of these expenses and costs, BGL is seeking $97,563.58, including $59,843.25 in expert witness fees, and DRNC is seeking $16,511.03.

66

not entitled to reimbursement for 'questionable litigation expenses.'" (Doc. 177 at 21.)  UNCHCS points to what it contends are vague expert time entries, charges in full or half-hour increments, and full charges for travel time.  (Id.)  Plaintiffs respond that UNCHCS "nitpicks" the expenses, never contests that experts were essential to Plaintiffs' success, and "ignores the modest hours both experts billed."  (Doc. 178 at 12.)

"[A] prevailing plaintiff is entitled to compensation for reasonable litigation expenses" along with the attorney's fees under the relevant statutes in this action.  Daly, 790 F.2d at 1084.  "Reasonable litigation expenses include such expenses as 'secretarial costs, copying, telephone costs and necessary travel.'"  Certain v. Potter, 330 F. Supp. 2d 576, 591 (M.D.N.C. 2004) (quoting Trimper v. City of Norfolk, Va., 58 F.3d 68, 75 (4th Cir. 1995)).  Most relevant here, reasonable litigation expenses may include recovery for expert witness fees where appropriate.  See, e.g., Lovell v. Chandler, 303 F.3d 1039, 1058 (9th Cir. 2002); Hall v. Claussen, 6 F. App'x 655, 681–82 (10th Cir. 2001).

While Plaintiffs point out that Dr. Morris, one of their experts, tracked her time in 30-minute increments, that is slight justification for the generic entries and suggests some overvalued timekeeping.  The court will therefore reduce reimbursement of Dr. Morris's time, which is valued at $17,134, by 20 percent, leading

67

to a reduced gross value of $13,707.20. Dr. Quon's billing in quarter-hour increments, while not ideal, will not be disturbed. His work is valued at $42,709.25. However, for the same reasons noted as to the award of attorneys' fees, the court will reduce the overall expert expense award for both experts by 25 percent to reflect the level of success on the merits Plaintiffs achieved in this litigation. Thus, the total expert award is $42,312.34. Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections, 2017 WL 4400754, at *8-*10 (E.D.N.C. Sept. 29, 2017) (reducing expert reimbursement based on partial success on the merits); Favors v. Cuomo, 39 F. Supp. 3d 276, 309 (E.D.N.Y 2014) (same).

Plaintiffs seek reimbursement for all other expenses incurred for, among other things, electronic research, travel costs, deposition transcripts, delivery and postage, electronic discovery platform fees, a share of the mediation fee, the medical records fee, and teleconference fees in a total amount of $54,231.36, with BGL claiming an entitlement to $37,720.33 and DRNC claiming an entitlement to $16,511.03. BGL's expenses can be further broken down, as $36,325.95 was spent on the merits portion of the case and $1,394.38 was spent on the present motion for fees and expenses. UNCHCS does not address these in specific. The court will therefore award them, subject to a 25 percent reduction in the expenses for the merits portion to account for the ultimate degree of success obtained. Therefore, those expenses total

68

$28,638.84 for BGL and $12,383.27 for DRNC for a total award of non-expert expenses of $41,022.11.

Costs are awardable pursuant to 28 U.S.C. § 1920, and they are potentially subject to the offset provided by Plaintiffs' failure to have accepted UNCHCS's offer of judgment. However, Plaintiffs have not identified any awardable costs in their application. The court need not consider this factor further.

Thus, the overall compensable expenses are $83,334.45, with BGL recovering $70,951.18 and DRNC recovering $12,383.27.

B. **UNCHCS's Motion for Costs**

UNCHCS moves for an award of costs following its August 1, 2022 offer of judgment pursuant to Federal Rule of Civil Procedure 68, which Plaintiffs did not accept. (Doc. 171-1.) UNCHCS argues that it offered to accept a consent decree awarding Plaintiffs more expansive relief than they obtained on their motion for injunctive relief. (Doc. 171 at 2.) UNCHCS seeks an award of $2,396.22 for costs of transcripts "necessarily obtained for use in the case after communicating its August 3 [sic], 2022 Rule 68 Offer." (Id.) Plaintiffs oppose the request, arguing that the deposition transcript costs are not recoverable because the depositions took place before the offer of judgment was made and, in any event, the offer of judgment was not more favorable than the court's final judgment. (Doc. 175 at 1.) In reply, UNCHCS contends that it necessarily incurred the costs of these

69

transcripts because it had to purchase them in order to respond to Plaintiffs' continued argument that system-wide relief was necessary, and its proposed consent decree was clearly more favorable. (Doc. 176.)

Rule 68 provides: "At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." Fed. R. Civ. P. 68(a). If the opposing party does not accept the offer within 14 days and "the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68(d). For deposition costs to be recoverable, they must have been "incurred after the offer was made." Id.

Here, Plaintiffs contend that because the depositions of Virginia Knowlton Marcus, Chief Executive Officer of Plaintiff DRNC, and Mark Riccobono, President of Plaintiff NFB, were originally taken pursuant to Federal Rule of Civil Procedure 30(b)(6) on February 16 and 17, 2021, some 18 months before the offer of judgment, they are ineligible as having been incurred before the offer. (Doc. 175 at 1-3; Doc. 171-2 at 3-4.) Plaintiffs note that UNCHCS received transcripts from the depositions within the month of their taking and even attached transcript excerpts to its brief in support of its motion for summary judgment. (Docs.

70

108-16, 110-11, 113-17, 114-18; Doc. 122-14.) UNCHCS notes, however, that while the depositions were taken before the offer of judgment, the invoices were not received by its counsel until November 5, 2022, and paid after that time. (Doc. 171-2.)

Plaintiffs are correct that these invoices were not "incurred after the offer [of judgment] was made," as required by Rule 68(d). Rather, the depositions were taken by UNCHCS, and thus the liability incurred, on February 16 and 17, 2021, nearly a year and a half before the offer of judgment. While the cause for delay in getting the invoices to UNCHCS is not entirely clear and is irrelevant in this instance, it appears that the invoices were initially sent to UNCHCS's insurer and then refused as falling within a self-insured retention. (See Doc. 171-2 at 3-4 ("Chubb has advised Veritext [the court reporter] that there is an open SIR on this claim. As the Insured has not paid the invoice your office will need to resolve it.").) For this reason, these costs are not recoverable, and the court need not resolve whether the offer of judgment was more favorable than the court's judgment.

## III. CONCLUSION

This case was brought to vindicate the rights of UNCHCS patients who suffer from a sight-related disability. An obvious purpose of the fee-shifting statutes is to encourage meritorious cases. City of Riverside, 477 U.S. at 574 (noting that "[r]egardless of the form of relief he actually obtains, a

71

successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards," which justifies fee-shifting). However, there is something seriously amiss where after more than four and one-half years of litigation, the prevailing parties' request for attorneys' fees and expenses exceeds $2.1 million, which is nearly seventeen times the amount of the compensation paid to two Plaintiffs, and the three-year injunctive relief benefitted only two individuals, one of whom is not even a Plaintiff. As set out extensively above, this is largely because of three reasons. Here, Plaintiffs sought to pursue a test case to remake the electronic medical records system for a massive state healthcare provider by imposing a national standard containing "best practices" for sight-impaired patients that the law did not require. The healthcare provider, UNCHCS, while logically resisting that effort, nevertheless demonstrated repeatedly that it could not ensure that a mere three individuals, Plaintiffs Bone and Miles, as well as Dr. Scott, were provided access to their medical records that was equally effective as that of other patients. Along the way, however, UNCHCS did manage, voluntarily, to significantly improve its practices for sight-impaired patients – changes that will benefit Plaintiffs as well as other sight-impaired patients. It did so, however, after Plaintiffs rejected UNCHCS's offer to consent to an extensive proposed judgment granting Plaintiffs much

of the relief they sought. Yet, the court cannot, and did not, consider Plaintiffs' rejection of that offer because one of the three laws they sued under did not allow it.

For the reasons noted, therefore,

IT IS ORDERED that Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs (Doc. 172), is GRANTED IN PART AND DENIED IN PART as follows:

1.  As to work performed by the BGL law firm, UNCHCS shall pay Plaintiffs $631,671.88 for attorneys' fees and $70,951.18 for litigation expenses, for a combined amount of $702,623.06; and

2.  As to work performed by DRNC, UNCHCS shall pay Plaintiffs $510,720.00 for attorneys' fees and $12,383.27 in litigation expenses, for a combined amount of $523,103.27.

IT IS FURTHER ORDERED that UNCHCS's motion for costs (Doc. 171) is DENIED.


                                  /s/   Thomas D. Schroeder
                                  United States District Judge
March 8, 2024.